1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
2               MARSHALL DIVISION

3    MASS ENGINEERED DESIGN, INC.  *   Civil Docket No.
                                   *   2:06-CV-272
4    VS.                           *   Marshall, Texas
                                   *
5                                  *   November 13, 2008
     ERGOTRON INC., ET AL          *   1:00 P.M.

6
                          TRANSCRIPT OF TRIAL
7             BEFORE THE HONORABLE LEONARD DAVIS
                UNITED STATES DISTRICT JUDGE
8                      AND A JURY

9    APPEARANCES:

10   FOR THE PLAINTIFF:       MR. MAX TRIBBLE
                              Susman Godfrey
11                            1000 Louisiana St., Suite 5100
                              Houston, TX   77002
12                            MR. JUSTIN NELSON
                              MR. JAY NEUKOM
13                            Susman Godfrey
                              1201 Third Avenue, Suite 3800
14                            Seattle, WA   98101
                              MR. OTIS CARROLL
15                            Ireland Carroll & Kelley
                              6101 South Broadway, Suite 500
16                            Tyler, TX   75703
                              MR. FRANKLIN JONES
17                            Jones & Jones
                              201 East Houston Street
18                            Marshall, TX   75670
                              MR. GREG MAAG
19                            MR. JONATHAN PIERCE
                              Conley Rose
20                            600 Travis Street, Suite 7100
                              Houston, TX   77002
21
     APPEARANCES CONTINUED ON NEXT PAGE:
22   COURT REPORTERS:         MS. SUSAN SIMMONS, CSR
                              MS. JUDY WERELINGER, CSR
23                            Official Court Reporters
                              100 East Houston, Suite 125
24                            Marshall, TX   75670
                              903/935-3868
25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)

1

2  APPEARANCES CONTINUED:

3  FOR THE DEFENDANTS:      MR. KURT NIEDERLUECKE
   (Ergotron, Inc.)         MS. LORA FRIEDEMANN
4                           MR. GRANT FAIRBAIRN
                            MS. LAURA MYERS
5                           Fredrikson & Byron
                            200 South Sixth St., Suite 4000
6                           Minneapolis, MN   55042
                            MR. ERIC FINDLAY
7                           Ramey & Flock
                            100 East Ferguson, Suite 500
8                           Tyler, TX   75702

9
   (Dell, Inc.)             MR. CRAIG TYLER
10                          Wilson Sonsini Goodrich & Rosati
                            8911 Capital of Texas Highway
11                          Westech 360, Suite 3350
                            Austin, TX   78759-7247
12                          MR. BLAKE ERSKINE
                            Erskine & McMahon
13                          P.O. Box 3485
                            Longview, TX   75606
14                          MR. MATT REED
                            MS. NATALIE MORGAN
15                          Wilson Sonsini Goodrich & Rosati
                            12235 El Camino Real, Suite 200
16                          San Diego, CA   92130

17
                    *      *      *      *      *
18

19                      P R O C E E D I N G S

20              COURT SECURITY OFFICER:  All rise.

21              (Jury in.)

22              THE COURT:  Please be seated.

23              All right.  Did the parties have the

24  times on the morning videos?

25              MR. TRIBBLE:  We do, Your Honor.

1  The first one played, Henry Garrana, was 44 seconds.

2  That was all Plaintiff.  The second Garrana was

3  Plaintiffs, 6 minutes, 13 seconds; Defendants, 3

4  minutes, 27 seconds.

5                    And I think we're ready now to play

6  Mr. Santandrea, the product marketing manager at Dell.

7                    THE COURT:  Santandrea, what's the time

8  on that?

9                    MR. TRIBBLE:  It's 22 minutes, 56 seconds

10  for Plaintiff; 3 minutes, 11 seconds for Defendants.

11                    THE COURT:  All right.  Very well.

12                    You may proceed.

13                    (Video playing.)

14                    QUESTION:  Do you understand you are here

15  testifying as Dell's 30(b)(6) witness?

16                    ANSWER:  Yes.

17                    QUESTION:  Do you know what that means?

18  That your testimony binds the corporation?

19                    ANSWER:  That -- yes.

20                    QUESTION:  Mr. Santandrea, what is your

21  job?

22                    ANSWER:  I am a product marketing manager

23  at Dell.

24                    QUESTION:  Does your job also include

25  sales of non-Dell-branded monitors?

1            ANSWER:  No.

2            QUESTION:  What is the difference between

3  a Dell-branded monitor and a non-Dell-branded monitor?

4            ANSWER:  A Dell-branded monitor is a

5  monitor that has been engineered and manufactured by

6  Dell.

7            QUESTION:  You work to have a higher

8  margin for Dell-branded products than non-Dell-branded

9  products, correct?

10            ANSWER:  Yes.

11            QUESTION:  Does Dell believe that the

12  Mass Engineered Design monitors are critical to the

13  financial and healthcare markets?

14            ANSWER:  Through our investigation and

15  speaking with the product manager who was most closely

16  associated with Mass Engineered and the product, it did

17  not seem as a critical part of the offering.

18            QUESTION:  You are aware that at one

19  point Dell did think that Mass was a critical part of

20  the offering for those markets, correct?

21            ANSWER:  It's difficult to say what was

22  thought at the time.  But it was included in what we

23  call the configurator where we sell computers.

24            QUESTION:  Can you please -- you see

25  where it says Mass Engineered Design on Line 35 right

1  here?

2              ANSWER:  I do see it.

3              QUESTION:  Can you please read Column 1

4  of that spreadsheet, please?

5              ANSWER:  Niche, special applications

6  provide dual, triple, and quad flat panel solutions

7  critical to financial and healthcare markets not

8  available through distribution.

9              QUESTION:  Mr. Santandrea, does that

10 refresh your recollection about whether, as of the time

11 of this spreadsheet, Mass -- excuse me -- Dell thought

12 that Mass Engineered Design monitors were, quote,

13 critical to financial and healthcare markets, end quote?

14             ANSWER:  I'm not sure what information

15 this spreadsheet is representing.

16             QUESTION:  Okay.  So just so I'm clear

17 and the jury is clear --

18             ANSWER:  Uh-huh.

19             QUESTION:  -- you don't know whether --

20 when Dell wrote critical to financial and healthcare

21 markets whether Dell actually meant that it was critical

22 to financial and healthcare markets?

23             ANSWER:  Well, it says critical to

24 financial and healthcare markets, but I'm not sure what

25 they meant.

1                    QUESTION:   What do you think they meant?

2                    ANSWER:   It could be a variety of things.

3                    QUESTION:   Do you think that it meant

4    that Mass monitors were critical to those markets, to

5    selling products in those markets?

6                    ANSWER:   Can I see what the title of this

7    column is?

8                    QUESTION:   Absolutely.   It's entitled

9    reason for existence.

10                    Does that refresh your recollection or

11   your testimony for me and the jury about whether in a

12   column titled reason for existence, when Dell wrote

13   critical to financial and healthcare markets, whether

14   Dell actually meant that it was critical to healthcare

15   and financial markets?

16                    ANSWER:   It's -- it's hard to say.   I --

17   I don't know what -- where this is coming from.   So I

18   don't know if this is marketing speak or if this is an

19   internal reference.

20                    QUESTION:   Can you tell us any other

21   reason besides what it says, that Mass Engineered Design

22   is, quote, critical to financial and healthcare markets,

23   end quote, why you would have said that, besides the

24   obvious, that it was critical to financial and

25   healthcare markets?

1            ANSWER:  I don't know what this document

2 is, but we do training for salespeople, and I could see

3 how we would give a summary of products to the

4 salespeople to help them understand where things go.

5            And usually training the salespeople

6 tends to be pretty extreme so that they get the point.

7            QUESTION:  Do you call Ergotron critical

8 to financial and healthcare markets?

9            ANSWER:  It does not say critical in that

10 cell.

11            QUESTION:  Can you please read the second

12 to last sentence starting with I understand allowed,

13 please?

14            ANSWER:  I understand your solution is

15 better, and that's where we are moving.

16            QUESTION:  You don't dispute, do you,

17 that this is Dell telling Mass that, quote, I understand

18 your solution is better, end quote, correct?

19            ANSWER:  It says that in the e-mail, and

20 yes, it appears to be from Dell.

21            QUESTION:  And will you please tell me

22 and the jury what the subject of the e-mail is?

23            ANSWER:  The subject is re: Mass

24 Multiples monitors.

25            QUESTION:  In your role as product

1 manager of displays in North America, does Dell have a

2 preference for selling Dell-branded monitors as opposed

3 to non-Dell-branded monitors?

4          ANSWER:  We focus more of our energies on

5 selling Dell-branded monitors.  However, we listen to

6 the customer.  And if the customer requests another

7 brand, we will sell it to them to the best of our

8 abilities.

9          QUESTION:  Unless the customer requests

10 it, you're not going to give it to them; is that right?

11          ANSWER:  We offer other -- we offer

12 third-party monitors on our web for sale.

13          QUESTION:  But if the customer doesn't

14 request a third-party monitor, you are going to provide

15 them, as a default, the Dell-branded monitor, right?

16          ANSWER:  I can't control, in general,

17 what the salespeople are doing.  Our goal ultimately,

18 when we sell product, is to listen to the customer and

19 sell them really what they want.

20          So if we are offering a Dell-branded

21 product that meets their needs, then that is the one we

22 want to sell to them.  If they request features or

23 functions that are available in a third-party monitor

24 that are not available in a Dell monitor, the right

25 thing for the salesperson to do is to sell that

1   third-party monitor or what the customer wants.

2          QUESTION:  All else equal, you would sell

3   a Dell-branded monitor before a non-Dell-branded

4   monitor, right?

5          ANSWER:  I believe that the Dell-branded

6   products would be sold primarily.

7          QUESTION:  And could you please read the

8   first bullet point under margin on Page 3?

9          ANSWER:  Dell-branded mix.  Currently

10   sell all Dell-branded peripherals for desktops --

11   desktop notebooks.  Always quote Dell-branded unless

12   specifically asked to quote third-party equipment.

13          QUESTION:  That's Dell's policy, right?

14          ANSWER:  I am not aware of what this

15   presentation comes from, and I'm not aware of a

16   specifically written policy to that end elsewhere.

17          QUESTION:  What is written here is no

18   different really from what you just testified, which is

19   all else equal, you will sell a Dell-branded product

20   before you sell a non-branded -- Dell-branded product,

21   correct?

22          ANSWER:  It's -- the part I don't like

23   about this is that it doesn't capture the customer needs

24   aspect of what I said.

25          QUESTION:  Well, it's right there.  It

1  says if -- they're specifically asked to quote

2  third-party equipment.  So if the customer asks for

3  third-party equipment, you will give them a quote,

4  right?

5                    ANSWER:  Oh, if they specifically ask for

6  third-party equipment.  But what's not captured here is

7  the idea that if they are asking for a product of a

8  certain feature and we -- the Dell-branded is only

9  similar, that I would say that the salesperson should go

10  to the third-party products.

11                    QUESTION:  Assuming the features were the

12  same -- I think you just said this; that if the features

13  were the same, you would want the customer to buy a

14  third-party stand with Dell-branded monitors as opposed

15  to a multiscreen stand with other monitors attached to

16  it, right?

17                    ANSWER:  I think if the -- if it was more

18  profitable to do so, then that would be the choice.

19                    QUESTION:  For displays, how many of the

20  Dell-branded products are basically made entirely by

21  somebody else and then -- as you call it, OEM, and then

22  the Dell brand goes on, and how many of them are those

23  that Dell is more actively involved in, as you just

24  described?

25                    ANSWER:  At this time, our current

1  products, from what I understand, none of them are

2  strictly OEM, Dell-branded someone else's products.  We

3  are involved with the engineering of them.

4             QUESTION:  Where are they manufactured?

5             ANSWER:  They're manufactured mostly in

6  Taiwan and China.

7             QUESTION:  The panel and technology

8  provider is a third party, or is it Dell-owned?

9             ANSWER:  It is a third-party.

10             QUESTION:  After that there is, then, a

11  factory that puts all the components together, and

12  that's a third party that you were just describing; is

13  that right?

14             ANSWER:  Yes.  That we call a system --

15  it's a sort of a systems integrator that puts the parts

16  together.

17             QUESTION:  Those systems integrators are

18  in Asia?

19             ANSWER:  They are.

20             QUESTION:  They are in Singapore?  Is

21  that what you said?

22             ANSWER:  One of them, I know, is in

23  China, and I believe the other one is in Taiwan or

24  China.

25             QUESTION:  If a monitor was purchased at

1  around the same time as the stand, one would think that

2  the stand is being used for the monitor; is that right?

3            ANSWER:  It's -- it's difficult to guess

4  what the customer is doing with the products that they

5  buy from us.

6            QUESTION:  You're sitting here today as

7  Dell's corporate representative unable to tell me and

8  the jury whether, when a customer buys a stand at the

9  monitor -- and a monitor at the same time, you don't

10  know how they're using those two products?

11            ANSWER:  It is -- it's difficult to

12  guess, because our monitors generally come with stands.

13  So that other mount could be used for an already

14  existing monitor that they have.

15            QUESTION:  Sitting here today, can you

16  think of any other use for a multiscreen stand besides

17  putting monitors on that stand?

18            ANSWER:  No.  I believe the multi-monitor

19  stand is for putting monitors on it.

20            QUESTION:  When Dell sells an LCD, it

21  tries to sell a stand to go with it?

22            ANSWER:  We sell a number of peripherals,

23  and a more fully featured monitor stand is one of many

24  peripherals that we offer to sell when someone buys a

25  monitor that already has a stand.

1          QUESTION:  When Dell buys a third-party

2   product, does it give the third-party notice of the

3   amount of units Dell intends to sell over a certain time

4   period in the future?

5          ANSWER:  It depends.  We do have a

6   forecasting mechanism or process at Dell for third-party

7   products.

8          QUESTION:  Your best testimony, as we sit

9   here today as Dell's corporate representative, is that

10  you believe that Ergotron is on the forecast list,

11  correct?

12         ANSWER:  I believe at -- either at this

13  time or in the past, that Ergotron products have been on

14  the forecasted list.

15         QUESTION:  Can you please tell us and the

16  jury how long Dell will provide Ergotron forecasts for

17  the future purchases of the all-in-one monitor and

18  chassis stand?

19         ANSWER:  The document says Dell will

20  provide Ergotron with a 12-month rolling forecast on a

21  monthly basis.

22         QUESTION:  Have Dell or any of its

23  customers ever complained about Ergotron's products?

24         ANSWER:  In my role, I do not get some of

25  that or get that particular feedback.

1          QUESTION:  As a corporate representative

2     for Dell sitting here today, are you aware of any

3     complaints that either Dell or its customers have had

4     regarding Ergotron products?

5          ANSWER:  No, I'm not aware of any.

6          QUESTION:  Could you please tell me and

7     the jury how many computers Dell sold to Merrill Lynch

8     in this one purchase order?

9          ANSWER:  Upon looking at the document

10    more, I believe this is more of a receipt for a purchase

11    order, but -- just to be clearer, according to this

12    receipt, in Line 1, it says a quantity of 23,500 of what

13    appears to be Dell GX260D desktop computers.

14         QUESTION:  Can you please tell me and the

15    jury how much Merrill Lynch paid Dell for those 23,500

16    computers alone?

17         ANSWER:  They paid in the -- under the

18    cost center amount, $16,920,000.

19         QUESTION:  Merrill Lynch also bought

20    23,500 DS 100 devices?

21         ANSWER:  Line 2 indicates a quantity of

22    23,500 desk stand 100 products were purchased.

23         QUESTION:  Can you please tell me and the

24    jury what Merrill Lynch paid for those 23,500 units?

25         ANSWER:  According to a field indicated

here, cost center amount, it says $2,820,000.

QUESTION:  Can you please tell me and the jury how many monitors Merrill Lynch bought from Dell?

ANSWER:  In Line 3, there's a quantity of 47,000 products, which appears to be the Dell UltraSharp 1702 flat panel.

QUESTION:  That is a -- that is a Dell-branded monitor?

ANSWER:  It says Dell UltraSharp 1702 flat panel.

QUESTION:  Yes or no, is it a Dell-branded monitor?

ANSWER:  Yes.

QUESTION:  Why do you think Merrill Lynch purchased 23,500 stands at the same time it purchased exactly double that amount of monitors?

ANSWER:  It's difficult to say what they're going to do with the products.

QUESTION:  You are really telling me and the jury under oath that you have absolutely no idea why Merrill Lynch would buy 23,500 stands at the exact same time it bought 47,000 monitors?

ANSWER:  All of our Dell monitors include their own stands.  So the Desk Stand 100 could be used for already existing monitors.  I don't know.

1          QUESTION:  What is your best system as

2   your personal -- in your personal capacity or in Dell's

3   30(b)(6) capacity corporate representative, about why

4   Merrill Lynch bought 23,500 stands at the same time it

5   bought 47,000 units?

6          Please tell us under oath what your best

7   testimony is.

8          ANSWER:  It's impossible to know from

9   this information what they did with the products.

10          QUESTION:  I just want to confirm for me

11   and the jury that your testimony is that you have no

12   idea -- that Dell has no idea why Merrill Lynch bought

13   23,500 stands with the opportunity to put two monitors

14   on each stand at the exact same time it bought 47,000

15   monitors?

16          ANSWER:  They could do many things with

17   those products.

18          QUESTION:  You're telling the jury that

19   Dell has no idea about whether Merrill Lynch put those

20   47,000 monitors on each of the two monitor heads on the

21   DS 100?

22          ANSWER:  According to this information,

23   it's impossible to tell.

24          QUESTION:  The jury will have to tell,

25   correct?

1          ANSWER:  If -- if they're asked the

2    question, I guess they will decide.

3          QUESTION:  Do you believe that a

4    reasonable jury could conclude that Merrill Lynch was

5    going to put the 47,000 monitors it bought on the 23,500

6    stands that it bought at the exact same time in the

7    exact same purchase order?

8          ANSWER:  That is one possible use of

9    these products.

10          QUESTION:  I think you testified earlier

11    that you can think of no other use for the monitor

12    stand, besides putting monitors on them; is that right?

13          ANSWER:  At this time, I think that using

14    them for what they are intended for is the best possible

15    use.

16          QUESTION:  Using them for what they are

17    intended for is to put monitors on them, correct?

18          ANSWER:  Yes.

19          QUESTION:  Mr. Santandrea, you would

20    characterize Merrill Lynch as one of the biggest

21    purchasers, if not the biggest purchaser, of Ergotron's

22    stands?

23          ANSWER:  While I'm familiar with the

24    spreadsheet, I didn't add up every -- every customer.

25          QUESTION:  Do you think that selling

1  38,169 units to one customer represents a large customer

2  of both Dell and Ergotron?

3             ANSWER:  It's difficult to categorize

4  that as large.

5             QUESTION:  What does the e-mail say?

6             ANSWER:  In the body it says, Ann and

7  Kip, per the e-mail below, we have a problem at Merrill

8  Lynch.  They have been a huge purchaser of the Ergotron

9  product, and it does not appear that they are being

10 taken care of.

11            QUESTION:  Do you agree with that

12 assessment from a Dell employee, sitting here as Dell's

13 corporate representative?

14            ANSWER:  It's difficult to say what this

15 person means by huge.

16            QUESTION:  Can you please read for the

17 jury the subject of the e-mail?

18            ANSWER:  The subject line is FW:  Order

19 for the 1,970 Dell GX620, and then in parentheses,

20 defective Ergotron dual display stands.

21            QUESTION:  You don't doubt, do you, that

22 Merrill Lynch was complaining about Ergotron's defective

23 dual display stands?

24            ANSWER:  According to this document, I

25 can't see that they were complaining.

1          QUESTION:  Could you please read the

2     third sentence?

3          ANSWER:  There is an apparent defect with

4     the stands where the mounting arm cannot tighten down

5     enough to hold the monitors without sliding down.

6          QUESTION:  You don't doubt, do you, that

7     Merrill Lynch was complaining to Dell about Ergotron's,

8     quote, defective stands?

9          ANSWER:  The e-mail says that there is an

10    apparent defect with the stands.

11         QUESTION:  Do you see the e-mail from

12    Emily Malek, dated Thursday, November 30th, 2006?  Could

13    you please read that e-mail aloud?

14         ANSWER:  The e-mail says, I put overnight

15    shipping on seven orders.  If Merrill Lynch can have at

16    least 300 to 600 by 12/11, we should be okay.  If -- it

17    says, MO can ship, great, but we need at least 300

18    stands, 600 monitors.  Let me know.  I'm scared about

19    Ergotron.  They usually don't have much supply.

20         QUESTION:  That's how Dell felt as of

21    November 30th, 2006, correct?

22         ANSWER:  I see that Emily Malek wrote the

23    e-mail, and she has a Dell address.

24         QUESTION:  Sitting here today as Dell's

25    30(b)(6) corporate representative, is that how Dell felt

1   as of this time?

2               ANSWER:  It looks like this is an e-mail

3   that Emily wrote.

4               QUESTION:  Besides this e-mail where

5   Emily Malek states she is, quote, scared about Ergotron,

6   they usually don't have much supply, correct?

7               ANSWER:  The e-mail says, I'm scared

8   about Ergotron.

9               QUESTION:  You recall our discussion that

10  Merrill Lynch paid Dell $16,920,000 for the 23,500

11  computers?

12              ANSWER:  Yes, I recall.

13              QUESTION:  Do you recall our discussion

14  that Merrill Lynch paid Dell 2,820,000 for the 23,500

15  DS 100 stands?

16              ANSWER:  Yes I, recall.

17              QUESTION:  What was the total amount in

18  this one purchase order?

19              ANSWER:  On the third page of Exhibit 17,

20  at the top, I see a field that indicates PO amount, and

21  it says $33,493,520.

22              QUESTION:  Didn't Dell advertise selling

23  multiscreen stands and displays at the same time?

24              ANSWER:  Yes.  I recall seeing

25  advertisements.

1              QUESTION:  You said a reasonable jury

2  could conclude that the customer was going to use the

3  standards to put the monitors bought in the same

4  purchase order on at the same time, right?

5              ANSWER:  That's a possible conclusion.

6              (End of video clip.)

7              MR. TRIBBLE:  Now, Your Honor, if it

8  please the Court, we have the deposition of Shala

9  Stevenson.  She's a software peripheral representative

10  of Dell.  The running time on this is 4 minutes, 54

11  seconds for Plaintiff and 55 seconds for Defendants.

12              THE COURT:  Okay.  You may proceed.

13              (Video playing.)

14              QUESTION:  Please state your name for the

15  record.

16              ANSWER:  Shala Stephenson.

17              QUESTION:  Did you used to go by Shala

18  Schwarze?

19              ANSWER:  Yes.

20              QUESTION:  What was your position in 2000

21  and 2001 within Dell?

22              ANSWER:  Software and peripherals

23  representative.

24              QUESTION:  So in 2000 and 2001, you were

25  in software and peripheral sales; is that right?

1            ANSWER:  That's correct.

2            QUESTION:  During that time, you had

3   interactions with Mass Multiples, correct?

4            ANSWER:  Correct.

5            QUESTION:  You received this e-mail

6   chain, marked as Exhibit 1?

7            ANSWER:  By my name being on there, it

8   looks like I did.

9            QUESTION:  Can you please read the e-mail

10  that he sent you that's at the bottom of this first

11  page?

12           ANSWER:  That's good news.  However, I

13  see that you guys are selling Ergotron mounts for the

14  other panels.  That is an infringement to our patent.

15           QUESTION:  Thank you.

16           Do you recall what you did when you

17  received this e-mail?

18           ANSWER:  I do not recall.

19           QUESTION:  During this timeframe, though,

20  I'm talking about 2000 and 2001 when you received this

21  e-mail, did you speak to anybody about the fact that

22  Dell had just gotten an e-mail that it infringed Mass'

23  patent?

24           ANSWER:  I don't recall.

25           QUESTION:  Mr. Stageman identified one

1  patent; is that right?

2              ANSWER:  I don't remember.

3              QUESTION:  You don't recall whether you

4  followed up on anything about this e-mail, correct?

5              ANSWER:  I don't remember thinking

6  anything about it.

7              QUESTION:  You recall just getting it and

8  then not thinking about it; is that right?

9              ANSWER:  Correct.

10             QUESTION:  Did you tell anybody within

11 Dell that Mass had a patent that covered selling

12 Ergotron mounts for other panels?

13             ANSWER:  I don't recall.

14             QUESTION:  You do know that it was

15 available to sell Ergotron mounts with Dell displays,

16 correct?

17             You were aware at least as of August

18 22nd, 2001 that that offering was accused by Mass of

19 infringing its patent, right?

20             ANSWER:  I was 21 years old.  I don't

21 think I thought a lot of it.  I -- I don't think I

22 thought anything of it.  I was just trying to sell some

23 product.

24             QUESTION:  Ergotron and Dell product and

25 Mass product, right?

1              ANSWER:  Any product.

2              QUESTION:  I want to make sure you answer

3  my question.

4              Regardless of your age, at least as of

5  this date, you did know that Mass told you that selling

6  Ergotron mounts with Dell displays infringed Mass'

7  patent, correct?

8              ANSWER:  According to this e-mail, it

9  looks like I was notified.  I do not recall anything of

10 that.

11             QUESTION:  And so going back to the first

12 page of Exhibit 1, the e-mail from Eric Stageman to --

13 to you --

14             ANSWER:  Uh-huh.

15             QUESTION:  -- does that e-mail specify

16 any patent numbers?

17             ANSWER:  Not that I see, no.

18             QUESTION:  Does it identify any specific

19 products, for example, by part number or model number?

20             ANSWER:  No.

21             QUESTION:  Do you remember having had any

22 conversations with Mr. Stageman about patent

23 infringement, other than what's reflected in this

24 e-mail?

25             ANSWER:  Not at all.

1          QUESTION:  With respect to the exact

2  words that you read, this is giving another solution

3  besides selling Mass products, correct?

4          ANSWER:  That would be correct.

5          QUESTION:  Are you aware that you need

6  permission from the patent holder to sell the product?

7          ANSWER:  I would not have been aware of

8  that.

9          QUESTION:  You just went ahead and sold

10  it anyway, right?

11          ANSWER:  I don't think I thought anything

12  of it.

13          QUESTION:  You ignored the patent,

14  correct?

15          ANSWER:  I wouldn't say that I ignored

16  the patent.  I would say I didn't think anything of it.

17          QUESTION:  You got the e-mail; you

18  continued to sell the Ergotron stands plus the displays,

19  correct?

20          ANSWER:  I didn't think anything of it.

21          QUESTION:  How is that not ignoring it?

22          ANSWER:  I guess it can be looked at as

23  ignoring it, but I didn't think anything of it.

24          QUESTION:  Is it your job to make legal

25  evaluations about patent infringement?

1              ANSWER:  No.

2              QUESTION:  Did Dell have a policy of --

3  of when you got a notice of patent infringement to relay

4  that on to legal counsel?

5              ANSWER:  If there was, I wasn't aware of

6  one.

7              QUESTION:  So you weren't aware of any

8  internal procedures where if you got a notice of patent

9  infringement, you would relay that on, correct?

10             ANSWER:  Correct.

11             (End of video clip.)

12             MR. TRIBBLE:  Your Honor, we now have

13 about an eight-minute video from Kevin Paulson.  He was

14 a product manager for flat panels at Ergotron.

15             Plaintiffs' running time is 8 minutes;

16 Defendants' running time is 6 seconds.

17             Oh, and I believe after this first clip,

18 the Defendants have their own clip that they want to

19 play, which is 2 minutes, 57 seconds.

20             THE COURT:  All right.  Proceed.

21             (Video playing.)

22             QUESTION:  Could you please state your

23 full name for the record.

24             ANSWER:  My name is Kevin J. Paulson.

25             QUESTION:  You work for Ergotron?

1                   ANSWER:  Yes, I do.

2                   QUESTION:  When you were the product

3    manager for flat panel products, were you involved in

4    developing what became the DS 100 line?

5                   ANSWER:  Yes, I was.

6                   QUESTION:  Can you recall when you

7    developed the DS 100?

8                   ANSWER:  Yes.

9                   QUESTION:  When was that?

10                  ANSWER:  We began development of that

11   shortly after I arrived.  That may have already begun

12   development before I arrived, so in 1999.

13                  QUESTION:  Were you aware of the

14   competition in the flat panel market for the DS 100 when

15   you started developing the product?

16                  ANSWER:  Yes.

17                  QUESTION:  What competition were you

18   aware of in 1999?

19                  ANSWER:  Specifically by name?

20                  QUESTION:  Yeah.

21                  ANSWER:  I guess I don't understand what

22   you're asking.

23                  QUESTION:  Specifically, by name what

24   competition were you aware of?

25                  ANSWER:  Well, there were multiple

1  competitors.  I could list several, but --

2              QUESTION:  Were you aware of Mass

3  Multiples?

4              ANSWER:  Yes.

5              QUESTION:  Was the DS 100 the first flat

6  panel dual display product that Ergotron offered?

7              ANSWER:  Yes.  Yes, it was.

8              QUESTION:  How did you attempt to sell

9  the DS 100?  How did you attempt to break into the

10 market?

11             ANSWER:  The DS 100 was developed through

12 customer feedback, so breaking into the market involved

13 essentially developing prototypes, showing those

14 prototypes to customers, collecting feedback,

15 redesigning where necessary, tweaking the prototypes.

16             QUESTION:  You developed the product

17 based upon the customer feedback in part?

18             ANSWER:  Yes.

19             QUESTION:  For the DS 100, you wouldn't

20 just show them the stand; you would also put monitors on

21 the stand, or what would you do?

22             ANSWER:  We would do both, show it with

23 or without.  It depended on the circumstance.

24             QUESTION:  The customers understood that

25 the purpose of the stand was to put monitors on it; is

1  that right?

2              ANSWER:  I assume so.  It's difficult for

3  me to know exactly what they understood.

4              QUESTION:  That was your assumption at

5  least, right?

6              ANSWER:  Yes.

7              QUESTION:  Do you recognize this

8  document?

9              ANSWER:  Yes, I do.

10             QUESTION:  This was the price list for

11 the DS 100 line as of September 1, 2000; is that right?

12             ANSWER:  Yes.

13             QUESTION:  You had sent these products by

14 essentially taking your cost and marking it up by

15 between three and a half and four times; is that right?

16             ANSWER:  Essentially.

17             QUESTION:  You knew that Merrill Lynch

18 was buying a lot of DS 100 product, correct?

19             ANSWER:  Well, I knew that Merrill Lynch

20 and other customers purchased Ergotron product, yes.

21             QUESTION:  You were aware that in

22 2003/2004, there was a major ramp-up of the number of

23 units sold per year by Ergotron for the DS 100 line?

24             ANSWER:  That may be.

25             QUESTION:  You were able to successfully

1  ramp-up from a couple thousand units per year to tens of

2  thousands of units per year?

3                    ANSWER:  Eventually.

4                    QUESTION:  The costs came down as you

5  ramped up?

6                    ANSWER:  Yes.

7                    QUESTION:  Was the DS 100 the only dual

8  display stand that you sold, starting from 1999 through

9  2006?

10                    ANSWER:  The only dual display stand that

11 Ergotron sold?

12                    QUESTION:  Yes.

13                    ANSWER:  We had -- yes, as I recall, that

14 was the only stand.

15                    QUESTION:  Did you attend any trade shows

16 where there would be multidisplay units on sale?

17                    ANSWER:  Yes.

18                    QUESTION:  What trade shows did you

19 attend?

20                    ANSWER:  I attended a number of trade

21 shows.  SIA was one that was held in New York.  I don't

22 recall the names of all the shows.  That was one of the

23 most prominent shows.

24                    QUESTION:  You would often see Mass

25 Multiples' products at these trade shows?

1               ANSWER:  I wouldn't say often.

2               QUESTION:  On occasion at least you

3    would?

4               ANSWER:  Yes, on occasion you would see

5    them at trade shows.

6               QUESTION:  You saw them at the SIA show

7    you referenced, right?

8               ANSWER:  Again, I don't recall.  I don't

9    recall which trade shows and which products were --

10   which competitors were present.

11              QUESTION:  Exhibit 5.  Let me know when

12   you are ready.

13              ANSWER:  Okay.

14              QUESTION:  You attended this show, right?

15              ANSWER:  Yes, I did.

16              QUESTION:  We already talked about Mary

17   Beth Martin.  Did she attend many shows with you?

18              ANSWER:  She attended -- she attended

19   several shows with me, yes.

20              QUESTION:  Saeb Asamarai, am I saying

21   that right?

22              ANSWER:  Saeb Asamarai (pronouncing).

23              QUESTION:  Saeb Asamarai?

24              ANSWER:  Yes.

25              QUESTION:  Who is he?

1              ANSWER:  He is one of our design

2   engineers.

3              QUESTION:  Is he still employed with the

4   company?

5              ANSWER:  Yes, he is.

6              QUESTION:  He would go with you to trade

7   shows as well?

8              ANSWER:  We would try to bring

9   development engineers to trade shows if we could.

10              QUESTION:  For what purpose?

11              ANSWER:  To help them understand customer

12   feedback.

13              QUESTION:  Did you ever attend the IT for

14   Wall Street show?

15              ANSWER:  I think so, yes.

16              QUESTION:  Did you think that Mass

17   Multiples had a nice look about the product?

18              ANSWER:  Did I think they had a nice

19   look?

20              QUESTION:  Yeah.

21              ANSWER:  I guess I didn't consider that,

22   really.  I don't know that I -- I don't recall

23   discussing aesthetics.

24              QUESTION:  Could you turn to 60158?

25              ANSWER:  Okay.

1          QUESTION:  You see it says Mass Multiples

2   strengths, weaknesses?

3          ANSWER:  Oh, yes, I see that.

4          QUESTION:  Listed under the strengths is

5   aesthetics, right?

6          ANSWER:  Yes, it is.

7          QUESTION:  Also listed under the

8   strengths is various options.  Do you see that?

9          ANSWER:  I do see that.

10          QUESTION:  Mr. Paulson, as part of your

11   job responsibilities as product manager for flat panel

12   products, you would also send out product bulletins

13   whenever there was a product defect or a change in lead

14   time in the product, correct?

15          ANSWER:  Yes.

16          QUESTION:  That would happen on occasion,

17   correct?

18          ANSWER:  Yes, on occasion.

19          QUESTION:  You don't think it's abnormal

20   for the product to occasionally have problems with

21   defects or lead time issues, correct?

22          ANSWER:  No.  I think all products have

23   issues of one sort or another that need to be

24   communicated to the sales force.

25          QUESTION:  There were times where the

1    lead time to the customer was delayed, correct?

2                    ANSWER:  On Ergotron products?

3                    QUESTION:  Yeah.

4                    ANSWER:  Yes.

5                    QUESTION:  On the DS 100?

6                    ANSWER:  Probably.

7                    (End of video clip.)

8                    MR. TRIBBLE:  I think, Your Honor, we can

9    raise the lights.

10                   MS. FRIEDEMANN:  No, we have a brief

11   video that we would like to present now, Your Honor.

12                   It's 2 minutes and 57 seconds.

13                   THE COURT:  All right.

14                   (Video playing.)

15                   QUESTION:  Why did you decide to enter --

16   strike that.

17                   Why did Ergotron decide to enter the flat

18   panel dual display market?

19                   ANSWER:  Well, that decision was made

20   before my arrival.  When I arrived, we were already in

21   the market, so...

22                   QUESTION:  Do you know why Ergotron

23   decided to enter the flat panel dual display market?

24                   ANSWER:  No.  I mean, as I said, that

25   decision was made prior to my arriving at the company,

1  so exactly what went into it, I -- I'm not sure.

2              QUESTION:  Were you involved in the

3  purchase by Merrill Lynch through Dell of the DS 100

4  line of products?

5              ANSWER:  No, I was not.

6              QUESTION:  I think -- I think we talked

7  about this earlier.  You saw Mass Multiples as one of

8  Ergotron's competitors, right?

9              ANSWER:  Yes.  We -- yes, they were

10  considered a competitor, a minor competitor.

11              QUESTION:  You studied their device and

12  analyzed it?

13              ANSWER:  I did not.

14              QUESTION:  Can you turn to 60140?

15              ANSWER:  Okay.

16              QUESTION:  Who is Dan Hallberg?

17              ANSWER:  Dan Hallberg is an employee of

18  Ergotron.

19              QUESTION:  This presentation and others

20  in this -- Tabs 9, 10, and 11 -- were geared towards

21  convincing customers to attach a flat panel monitor to

22  these arms, right?

23              ANSWER:  No, that's not right.  They

24  were -- they were geared towards helping our sales

25  force.

1            QUESTION:  Sell the devices?

2            ANSWER:  Yes.

3            QUESTION:  A key component of selling the

4   devices is eventually having a monitor to attach the

5   devices to, right?

6            ANSWER:  Well, I don't know if I would

7   say eventually.  I mean, very often, the monitors were

8   in place, and we were brought in after the fact.

9            QUESTION:  That's not consistent with

10  what this presentation says, is it?

11           ANSWER:  This specific presentation by

12  Dan Hallberg?

13           QUESTION:  Yeah.

14           ANSWER:  Yes, I think it is.  There's a

15  bullet point which states, Can sell arms where flat

16  panel monitors are found, indicating those flat panel

17  monitors would already be in place.

18           (End of video clip.)

19           MR. TRIBBLE:  Is that it?

20           I think now we can turn the lights on.

21           THE COURT:  All right.

22           MR. TRIBBLE:  Your Honor, Plaintiffs

23  would call Dr. Ed Akin to the stand.

24           THE COURT:  Dr. Akin.

25           MR. TRIBBLE:  Mr. Nelson will conduct

1  this examination.

2              THE COURT:  All right.  Were you sworn,

3  Dr. Akin?

4              THE WITNESS:  No, sir.

5              THE COURT:  All right.  If you will raise

6  your right hand.

7              (Witness sworn.)

8              THE COURT:  All right.  Have a seat right

9  up here, please.

10             MR. NELSON:  If it please the Court, Your

11  Honor, we have notebooks -- for counsel -- of exhibits

12  and for the Court.

13             MR. TRIBBLE:  Your Honor, may I approach?

14             THE COURT:  Yes, you may.

15             MR. TRIBBLE:  I only have one copy.

16             Your Honor, we do have one more color

17  version of the presentation.

18             THE COURT:  All right.  You may proceed.

19             MR. NELSON:  Thank you, Your Honor.

20        JOHN EDWARD AKIN, PLAINTIFF'S WITNESS, SWORN

21                  DIRECT EXAMINATION

22  BY MR. NELSON:

23      Q.    Could you please state your name for the

24  record.

25      A.    John Edward Akin, and I go by Ed.

1       Q.     Dr. Akin, what is your occupation?

2       A.     I'm a professor at Rice University in

3   Houston, Texas.

4              MR. NELSON:  Could we please put up his

5   resume, please?  And let's just zoom in.

6       Q.     (By Mr. Nelson) Is this your resume,

7   Dr. Akin?

8       A.     Yes, sir.

9       Q.     And let's just zoom on your academic title.

10  Could you please read for the jury your positions that

11  you have?

12      A.     I'm a professor of mechanical engineering,

13  and I also have a joint appointment as a professor of

14  computational and applied mathematics.

15      Q.     Thank you.

16             And let's drop down to your educational

17  experience.

18      A.     All right, sir.

19      Q.     Could you please tell the jury your

20  educational experience.

21      A.     Yes.  I got a bachelor's degree in civil

22  engineering and a master's degree in engineering

23  mechanics from Tennessee Tech, and I received a Ph.D. in

24  engineering mechanics from Virginia Tech.

25      Q.     And, Dr. Akin, do you have any honors?

1       A.      Yes, sir, I have a few.

2       Q.      Please tell the jury what those are.

3       A.      I have been elected to be a fellow of the

4  American Society of Mechanical Engineers.

5       Q.      Well, let me stop you there.  What does it

6  mean to be elected as a fellow?

7       A.      One starts off as a member in the society,

8  and then as you serve that society in various ways in

9  committees and so forth, you are nominated to be

10  elevated to a position of a fellow, and eventually, one

11  gets elected to that position.

12      Q.      And what are some of your other honors?

13      A.      I'm on the Editorial Board of the Journal for

14  Engineering Computations, and I've been listed in some

15  of the Who's Who type publications.

16      Q.      And let's please go to see what members of

17  professional and technical societies you're a part of.

18      A.      Yes, sir.  I belong as a fellow to the

19  American Society of Mechanical Engineers and am a member

20  of the other societies, the American Society of Civil

21  Engineers, the American Society for Engineering

22  Education, the Society for Petroleum Engineers, and the

23  U.S. Association for Computational Mechanics.

24      Q.      Dr. Akin, are you a member of any

25  professional review boards that review the work of other

1    scholars in the field to determine whether they're

2    appropriate for publication?

3          A.    Yes, sir.

4          Q.    And what are those?

5          A.    Well, the most recent ones are listed here.

6    I mentioned I was on the Editorial Board of the Journal

7    of Engineering Computations.  I reviewed for the Journal

8    of Advances in Engineering Software.

9                I have reviewed for the American Society of

10   Mechanical Engineering Journal of Applied Mechanics;

11   also for the International Journal of Numerical Methods

12   for Engineering; the American Society of Civil

13   Engineering Journal for Engineering Mechanics;

14   Communications and Applied Numerical Methods; the

15   Computational Physics.

16               And then I also reviewed proposals for the

17   National Science Foundation as to whether they should

18   reward proposals or fund proposals.

19         Q.    Thank you.

20               Let's go to the second page, please, and

21   let's go to where you are an engineer at and where

22   you're registered.

23         A.    Yes.

24         Q.    Are you a registered engineer, professional

25   engineer?

1    A.    Yes.  I'm registered in the states of Texas,

2   Arkansas, and Tennessee.

3    Q.    Thank you.

4          And, Dr. Akin, have you published any

5   books -- let's actually go to the third page first.  And

6   are these listed in reverse chronological order here?

7    A.    Yes, they are.

8    Q.    And what is the first book that you published

9   that -- under No. 1?

10    A.    Well, that's one that I actually edited

11   instead of authoring it.  It was done for the American

12   Society of Mechanical Engineers, and it dealt with

13   computational methods for fusion energy research.

14    Q.    Okay.  And can you just briefly describe what

15   fusion energy research -- what that was about.

16    A.    In that timeframe, we -- in 1978, fusion

17   energy was thought to be the way of the future for

18   energy, that by the year 2000, we would basically have

19   unlimited free energy through this approach.

20          And at this date, they're still saying, in

21   about 30 years from now, we'll have wide free energy

22   from this approach.

23    Q.    Okay.

24    A.    So it was quite exciting at the time.

25    Q.    Let's go to No. 4 on that.  What is that

1  book?

2      A.    That book is a text on computer-assisted

3  mechanical design.

4      Q.    Is that this book right here (indicating)?

5      A.    It is, sir.

6      Q.    Okay.  And let's just go to the last one that

7  you've written, No. 8 -- No. 7 and 8.  Are you still

8  publishing and writing books?

9      A.    Yes, sir.  The last one that I wrote was on

10  carrying out finite element analysis with error

11  estimators so they can automatically correct themselves.

12          And then I have one in progress for theory

13  and applications of finite element analysis software.

14      Q.    Thank you, Dr. Akin.

15          MR. NELSON:  Let's go to the next -- or

16  actually, go back to the following page, Page 3.

17      Q.    (By Mr. Nelson) Dr. Akin, are you the holder

18  of any patents?

19      A.    Yes, sir.

20      Q.    And approximately how many patents do you

21  have?

22      A.    I have five U.S. patents and two foreign

23  patents.

24      Q.    Thank you.

25          And what do those patents concern, generally?

1      A.      They're generally a patent that I have for

2  allowing the drilling of oil wells in a faster manner.

3      Q.      Thank you.

4              And it looks like Pages 3 through 11 really

5  go through the 126 articles that you've written.  Let's

6  just start at the last one in time, so let's go back to

7  Page 3 and see -- just tell the jury maybe what that

8  last one that you've published was, that No. 126.

9      A.      Well, the last one was sort of a survey

10 article.  It was prepared in honor of Professor Tinsley

11 Oden at The University of Texas on the event of his 70th

12 year, recognizing and outlining his significant

13 contributions in the field of mechanics.

14             And we've been friends for 40 years, and I

15 wanted to take part in recognizing his outstanding work

16 there at the University of Texas.

17     Q.      And, Dr. Akin, let's go to your university

18 service.  Have you served -- that's the last page of the

19 document.

20     A.      Yes, sir.

21     Q.      Have you served in any capacity or been

22 elected by the faculty in any capacity at Rice

23 University?

24     A.      Well, yes.  In 2004, I was elected as speaker

25 of the faculty, which is the official representative of

1  the entire Rice University faculty --

2      Q.    Well, could you just get into a little more

3  detail about what you do and your responsibilities as

4  speaker of the faculty?

5      A.    As speaker of the faculty, I am the official

6  representative to the press, to the administration, to

7  the president, to the Board of Directors, and of course,

8  I have to represent the interest of the faculty.

9          Another elected position was -- we notice on

10  the second line there, for 13 years, I was elected to

11  the committee that recommended to the president which

12  individuals at the university are to be awarded tenure.

13      Q.    Thank you.

14          And did you ever serve as chairman of the

15  Mechanical Engineering Department at Rice University?

16      A.    Yes.  Over a period of about six years, I

17  served as chairman, and I also served as associate

18  chairman for, looks like, another six years.

19      Q.    Okay.  And that's 1986 to 1991, was your

20  first tenure as chairman; is that right?

21      A.    Yes, sir.

22          MR. NELSON:  Yeah.  There we go.

23  Thank you.

24      Q.    (By Mr. Nelson) And, Dr. Akin, let's -- you

25  also have -- do consulting and engineering work on the

1   side?

2        A.    Yes.  As a registered engineer, I try to

3   bring practical experience to the university.

4        Q.    And let's just go down to the first one,

5   1966.  What was your first either consulting engineering

6   experience or job?  What were you doing there?

7        A.    Well, that was -- I was employed as an

8   aerospace engineer at the National Aeronautics and Space

9   Administration in Huntsville, Alabama, for the Saturn

10  Moon Rocket Project.

11       Q.    Thank you.

12             And let's go to the next one up, 1968 to

13  1976.  And then actually, 1976 to 1981, it says you were

14  working at Oakridge National Laboratory.  Can you just

15  explain to the jury what you were doing there.

16       A.    Well, the first one, the Development

17  Division, is essentially of the Weapons Division.  I was

18  doing mechanical design of components for nuclear

19  weapons, which is, of course, secret.

20             The other period was when I was working with

21  the Fusion Energy Group where we hoped to find,

22  basically, unlimited energy for the nation.

23       Q.    And, Dr. Akin --

24             MR. NELSON:  Let's just go up a little

25  bit.

1    Q.    (By mr. Nelson) It says from, it looks like,

2  1986 to 1991, and then again, 1991 through 1997, you

3  were working at The University of Texas Health Science

4  Center in Houston.

5         Could you just explain your work there.

6    A.    Yes.  I had a joint appointment with the

7  Orthopedic Department at The University of Texas.  We

8  were working with the orthopedic surgeons doing the

9  mechanical design of artificial hip joints.

10   Q.    Thank you.

11        And this also says that over the course of

12 your career, you've served as an expert witness for

13 various law firms.  Have you been hired here as an

14 independent expert by the Plaintiffs in this case?

15   A.    I have.

16   Q.    And, Dr. Akin, have you served on either side

17 in patent infringement cases before?

18   A.    Yes, I have.

19   Q.    Dr. Akin, have you ever served as an expert

20 witness for Dell in a patent infringement case?

21   A.    Yes, I have.

22   Q.    What was that case about?

23   A.    That case was about support systems for

24 single monitors.

25   Q.    Thank you.

1        And did Dell rely on your opinion in that

2   case?

3        A.    I believe they did.

4        Q.    Thank you.

5              Did you give a deposition or give testimony

6   on behalf of Dell in that case?

7        A.    I did.

8        Q.    Thank you.

9              Okay.  Dr. Akin, have you been able to

10  examine the devices accused of infringement in this

11  case?

12       A.    I have.

13       Q.    And what were you asked to do?

14       A.    I was asked to examine the accused devices,

15  the DS 100 dual, the DS 100 quad horizontal, and the LX

16  dual, to determine whether or not they infringed the

17  Claims 16 and 17 of the '978 patent.

18       Q.    And, Dr. Akin, we're going to get into great

19  detail on this shortly, but in general, can you please

20  tell the jury your conclusions you reached with respect

21  to whether the DS 100 infringes both Claim 16 and

22  Claim 17 of the '978 patent?

23       A.    When combined with the pair of displays, it

24  is my opinion that it does infringe Claim 16.

25       Q.    And what about the DS 100 quad?  What is your

1  opinion with respect to whether the DS 100 quad

2  infringes Claims 16 and 17 of the '978 patent?

3      A.    I think I didn't finish answering your first

4  question.

5      Q.    Oh, I'm sorry.  I didn't mean to interrupt.

6      A.    It also infringes -- the DS 100 dual

7  infringes Claim 17 as well.

8      Q.    Okay.

9      A.    Yes.  Likewise, in my opinion, the DS 100

10 quad horizontal infringes Claims 16 and 17 of the '978

11 patent.

12     Q.    And with respect to the LX device accused of

13 infringement here, what were your conclusions with

14 respect to whether the Ergotron LX device infringes

15 Claim 16 and Claim 17 of the '978 patent?

16     A.    In my opinion, it also infringed both

17 Claims 16 and 17 of the '978 patent.

18     Q.    And, Dr. Akin, with respect to all three of

19 those devices, did you reach an opinion whether the

20 stands alone were contributorially and directly

21 infringing the '978 patent for those two claims?

22     A.    Yes.  But I should have also mentioned that

23 I -- my finding was when the displays are present.

24 But in answer to your last question, yes, they also

25 infringe indirectly.

1      Q.     And, Dr. Akin, did you reach a conclusion

2  with respect to whether these stands are an inducement

3  to infringe with respect to the '978 patent, Claims 16

4  and 17?

5      A.     Yes.  I found that they induced others to

6  infringe.

7      Q.     And, Dr. Akin, other than the infringement

8  issues, were you asked to do any other type of review in

9  this case?

10     A.     Yes.  I was asked to look at evidence

11 presented by the Defendants that claim to show that the

12 '978 patent was invalid.

13     Q.     And I think you're going to be back on the

14 stand in a few days after the Defendants put on their

15 case, but just briefly, can you tell the jury, did you

16 form any opinions about whether the Defendants'

17 claims -- whether the '978 patent would be invalid under

18 their theory?

19     A.     Yes.  I examined the Defendants' claims, and

20 I found that the '978 patent was not invalid.

21     Q.     Thank you.

22            Before we get into the specifics of the

23 actual units, I'm hoping you can just give all of us a

24 little brief overview about the scientific principles

25 and technology that you're going to be discussing for

1  about the next hour or so.

2          What scientific principles did you consider

3  in reaching your opinions?

4      A.   I had to consider forces and torques and

5  pressures and friction.

6               MR. NELSON:  And let's go to the first

7  slide.

8      Q.   (By Mr. Nelson) What are we looking at here?

9      A.   Well, a force is a load acting at a

10  particular direction, in this case, indicated by the

11  arrow F that represents a load, in this example, being

12  applied to the end of a wrench that's tightening the

13  nut.

14     Q.   Okay.  And can you please describe just

15  generally what the force is here?

16     A.   The force in this case would be the load

17  coming from the individual's hand.

18     Q.   And what do we have here under T?  What is

19  that?

20     A.   Well, the force has a labor arm, as I've

21  illustrated in black here as length L, and the force

22  acting with that lever arm creates a torque or a turning

23  effect, and that's generally represented by a curved

24  arrow about the center where the torque is applied or

25  where the rotation is tending to occur.

1      Q.     And just what's -- it might be obvious, but

2  what's going on here in this picture?

3      A.     In this case, we've seen that the load has

4  been applied with a lever arm, and it has accomplished a

5  rotation of the nut in some fashion to tighten it.

6      Q.     What does the force F do?

7      A.     The force F?

8      Q.     Right here (indicating).

9      A.     Yes.  It applies a load, in this case,

10  perpendicular to the wrench.

11      Q.     Okay.  And you also mentioned -- I think

12  there's a session of pressure as a principle.  Can you

13  explain what pressure means and how it relates to this

14  case?

15      A.     Yes.  When two objects are in contact, they

16  develop a pressure between them that is distributed --

17  distributed over the contact area and acts perpendicular

18  to the surface where they're contacting.

19            In this example, we see a box sitting on the

20  floor, so the weight of the box has been distributed

21  over its bottom contact area to form a pressure, P as

22  it's shown here, and then the floor responds with an

23  equal and opposite pressure at that contact surface.

24      Q.     And there's also, I think, friction.  And

25  what do you mean by friction here?

1    A.    Well, when -- when you have two objects

2  pressed together and contact to develop a pressure, it

3  is also possible for a tangential or a parallel force to

4  resist that -- the resisting motion parallel to the

5  surface.

6         In this example, you have a box sitting on

7  the floor, and you can push on it, but that horizontal

8  friction force develops over the contact area and

9  resists up to a point.  And that's important.

10    Q.    Okay.  And then what happens -- what's next?

11  I mean, how do you overcome that?

12    A.    As you increase the force in this case, you

13  would eventually be able to overcome the friction, and

14  then you would see the block start to move.

15    Q.    Okay.

16    A.    So in this illustration, we're seeing that

17  the pressure is perpendicular to the contact surface and

18  that the friction is parallel to it.

19    Q.    And how do these principles apply to this

20  case?

21    A.    Well, in this case, I had to look at

22  connections and joints involving the various accused

23  devices and the patented devices, and I had to use these

24  concepts in reaching my opinions.

25    Q.    And before we get into the specific analysis

1  of the devices, are you familiar with the term a person

2  of ordinary skill in the field of invention?

3        A.    Yes, sir.

4        Q.    What is that?

5        A.    A person of ordinary skill in the field is a

6  hypothetical person created by the courts.  It's a

7  person that thinks in a conventional way in this

8  particular field at the time of the invention.

9        Q.    And who is the inventor of the '978 patent at

10 issue in this case?

11       A.    The inventor is Mr. Jerry Moscovitch.

12       Q.    Did you consider Mr. Moscovitch's level of

13 skill in reaching your opinion about an ordinary level

14 of skill?

15       A.    No, sir.

16       Q.    And why not?

17       A.    Because the Court deems an inventor to be

18 higher -- have a higher skill than a person of ordinary

19 skill.

20       Q.    Okay.  Did you speak with Mr. Moscovitch

21 about what the level of ordinary skill would be for a

22 person in this area?

23       A.    I did speak to him to try and assess the

24 types of employees that he likes to hire in his company.

25       Q.    And what did he tell you?

1       A.      He told me he liked to hire persons with a

2  bachelor's degree in industrial design or mechanical

3  engineering with zero to three years of experience.

4       Q.      Did you review any other documents or

5  testimony to reach your conclusion about what a person

6  of ordinary skill is in this area?

7       A.      Yes.  I also reviewed the deposition

8  testimony of their chief product development person for

9  another company that makes competing support stands.

10       Q.      Okay.  And what did you conclude from that?

11       A.      From that testimony, Mr. Durkee, I determined

12  that he liked to hire mechanical engineers with a

13  bachelor's degree.

14       Q.      And, Dr. Akin, did you consider anything else

15  in reaching your opinion about a person of ordinary

16  skill in this area?

17       A.      Well, I had to consider the level of

18  technology that's associated with this patent, and then,

19  of course, I had to look at the patent itself.

20       Q.      Okay.  I want to show you what's been marked

21  as Plaintiff's Exhibit 928, which is -- should be the

22  patent.  Do you know what this is?

23       A.      This is a certified copy of the '978 patent.

24       Q.      And in general, do you know what this patent

25  relates to?

1    A.    Yes.  It relates to a display system for

2 use -- multiple display system for use by a single user.

3              MR. NELSON:  And let's turn to the last

4 page of the document.

5    A.    Yes, sir.

6              MR. NELSON:  And let's blow up --

7    Q.    (By Mr. Nelson) What are we looking at here,

8 Dr. Akin?

9    A.    Here we're seeing the last two claims out of

10 this patent, Claims 16 and 17.

11   Q.    Okay.  And what is your knowledge about

12 whether Claims 16 and 17 are the asserted claims in this

13 case?

14   A.    My understanding is that they are the only

15 two of the 17 that are asserted in this case.

16   Q.    Okay.  And we have on the board behind

17 Mr. Carroll over there Claim 16, and Claim 17 is behind

18 it.  We'll get to that in a second.

19   A.    All right, sir.

20   Q.    And, Dr. Akin, are you aware of this Court's

21 claim construction in this case?

22   A.    I am.

23   Q.    Did you use this Court's claim construction

24 that the jury has in reaching your analysis about

25 whether the DS 100 infringes these two claims?

1      A.      Yes, I did.

2      Q.      Okay.

3              MR. NELSON:  So let's go now, then, to

4  maybe the DS 100 dual, and let's put the DS 100 dual on

5  there.

6              May it please the Court.  May I ask

7  permission for Dr. Akin to come down and use the devices

8  to --

9              THE COURT:  Yes, that will be fine.

10             MR. NELSON:  Okay.

11     Q.      (By Mr. Nelson) And, Dr. Akin, in your

12 opinion, does the DS 100 dual, is this DS 100 dual a

13 display system?

14     A.      It is.

15     Q.      Okay.  And you can go over there to the

16 display system right here.  That's the first part of it;

17 is that right?

18     A.      Yes, sir.

19     Q.      Okay.  In your opinion, Dr. Akin, is the DS

20 100 designed for use with monitors?

21     A.      Yes, it is, in my opinion, designed for use

22 with monitors.

23     Q.      Okay.  Can you please explain why?

24     A.      Well, yes.

25             Well, as you can see, the mounting plates

1  that are supplied as a part of the arm are mounting

2  plates through a part of an industry standard for being

3  attached to the displays.  And we see that there are two

4  of those present.

5       Q.    Okay.  And did you consider anything else in

6  forming your conclusion that the purpose of the stand is

7  to mount monitors?

8       A.    Well, yes.  I also considered the

9  documentation, in particular, the instruction manual,

10  the advertisements, and the sworn deposition

11  testimony of the Defendants' employees.

12       Q.    Okay.

13            MR. NELSON:  Let's go to Plaintiff's

14  Exhibit 351.

15       Q.    (By Mr. Nelson) Do you recognize this,

16  Dr. Akin?

17       A.    Yes, I do.  This is the instruction manual

18  for the DS 100 series horizontal dual-monitor stand.

19       Q.    And did you review this document in analyzing

20  whether the DS 100 is a display system?

21       A.    I did.  We see in this top figure, for

22  example, that it shows quite clearly that the intention

23  is to mount two displays to the mounting plates that I

24  identified earlier on the -- that are associated with

25  the stand.

1              MR. NELSON:  And let's just zoom in maybe

2    on the picture right there of the front of the

3    installation manual.

4         Q.   (By Mr. Nelson) What does this show?

5         A.   Well, this shows a silhouette or a

6    see-through version of what we have here, two displays

7    attached to the mounting plates on the arm of the DS 100

8    stand.

9         Q.   And by the way, Dr. Akin, are you aware of

10   which party in this case produced this installation

11   manual?

12        A.   Yes.  I can tell from the number in the lower

13   right corner that begins with the letters DEL, that this

14   was produced by the Dell Corporation.

15        Q.   Okay.

16              MR. NELSON:  And let's go to Plaintiff's

17   Exhibit 582.

18        Q.   (By Mr. Nelson) What is this, Dr. Akin?  What

19   are we looking at here?

20        A.   This is an advertisement by Ergotron showing

21   the stand being used with two displays and offering to

22   sell it in that fashion.

23        Q.   And is it being used with any of the other

24   Defendants, as an advertisement for any of the other

25   Defendants?

 1              MR. NELSON:  Let's zoom out of the

 2   document.

 3       Q.   (By Mr. Nelson) It looks like it's just --

 4   right now, that's just Ergotron alone, correct?

 5       A.   I think that's just Ergotron alone.

 6       Q.   Okay.

 7              MR. NELSON:  Let's go to Plaintiff's

 8   Exhibit 812.

 9       Q.   (By Mr. Nelson) What have we got here?

10       A.   Well, this is an Ergotron advertisement in

11   combination with Dell where we see, again, they're

12   presenting the stand with the two monitors attached and

13   offering to sell it in that configuration.

14       Q.   Okay.

15              MR. NELSON:  Let's zoom out to the

16   document.

17       Q.   (By Mr. Nelson) Are you aware, Dr. Akin --

18              MR. NELSON:  Let's zoom in on the margin

19   for pocket the different right there.  Well, no.  Pocket

20   the difference right below it.  Yeah.  Thank you.

21              And -- and -- I'm sorry.  That entire --

22   yeah.  There we go.

23       Q.   (By Mr. Nelson) And, Dr. Akin, are you aware

24   of what that says here?

25       A.   Well, I'll have to read it, sir.

1       Q.     Yeah.

2       A.     It's apparently saying that you may save $734

3  by purchasing this combined infringing unit.

4       Q.     Yeah.  Okay.

5              And it says you make, correct?  That's the

6  extra --

7       A.     You make.

8       Q.     Yeah.  Okay.

9              MR. NELSON:  And let's please go to

10 Plaintiff's Exhibit 593.

11      A.     Yes, sir.

12      Q.     (By Mr. Nelson) And, Dr. Akin, is this --

13 what is this advertisement?

14      A.     Well, once again, we see this is a joint

15 advertisement by Ergotron and CDW showing the displays

16 being mounted with the stand and offering to sell it in

17 that configuration.

18      Q.     All right.  And what about Plaintiff's

19 Exhibit 606 that we're looking at here?

20      A.     606, we see Ergotron's name at the top, Tech

21 Data in the middle.  So once again, we have the displays

22 bundled with the stand being offered for sale as an

23 infringing unit.

24      Q.     Do these documents support your opinion that

25 the DS 100's purpose is to be used with two displays?

 1     A.    Yes.  In my opinion, its sole and only

 2 purpose is to use with two displays.

 3     Q.    Did you consider any other information?  I

 4 think you said deposition testimony; is that right?

 5     A.    Well, of course.  In addition to the ads and

 6 the manuals, I had to examine the legal sworn testimony

 7 of the Ergotron employees.

 8     Q.    Okay.

 9              MR. NELSON:  Let's go -- is there

10 anyone --

11              THE COURT:  Counsel, are you going to

12 have him use those exhibits?

13              MR. NELSON:  I'm sorry.

14              THE COURT:  If not, he can take the

15 witness stand again.

16              MR. NELSON:  Yes.  It's coming up.  I'm

17 sorry.

18              THE COURT:  All right.

19              MR. NELSON:  It's coming up very briefly.

20              THE COURT:  Okay.

21              MR. NELSON:  He's going to go through the

22 deposition testimony and he's going to write right

23 there.  I'm sorry, Your Honor.

24              And let's please go --

25     Q.    (By Mr. Nelson) You said the Ergotron --

1    A.    Mr. Segar's deposition testimony, for

2  example -- he was the corporate representative from

3  Ergotron -- was --

4    Q.    Okay.

5              MR. NELSON:  Let's see that.

6    Q.    (By Mr. Nelson) And could you just please

7  read that for the jury, please.

8    A.    The first question there?

9    Q.    Yes.  Yes, please.

10   A.    QUESTION:  Is the only purpose of this

11 product we're looking at to hold two electronic

12 displays?

13           ANSWER:  This particular part number's

14 designate -- designated -- or is designated to hold two

15 displays.

16   Q.    And what's the next question?  Let's go ahead

17 and read that through.

18   A.    The next question:  And that's the only

19 purpose of the product, right?

20   Q.    And what's the answer?

21   A.    I guess I'm confused what other purpose

22 you're thinking.

23   Q.    Okay.  And then go to the only purpose.

24   A.    The only purpose I can think of is for this

25 part number to hold two displays.

1    Q.    Okay.

2    A.    I just want to make sure that there's nothing

3 else.

4    Q.    Okay.  What's his answer there?

5    A.    I mean, yeah.  We didn't promote -- we didn't

6 design it to do other -- to hold other things, for

7 instance.  So, yeah, I think it's to hold two displays.

8    Q.    Okay.  Thank you.

9           MR. NELSON:  And I think we just saw Dr.

10 Santandrea -- or Mr. Santandrea's testimony, but let's

11 see that.

12    Q.    (By Mr. Nelson) And is this Mr. Santandrea's

13 testimony on the same point?

14    A.    I believe it is, yes, sir.

15    Q.    Okay.  And could you please read this last

16 question where it says my name, and then the question

17 and answer following that?

18    A.    Starting at Line 5?

19    Q.    Yes.  Yes, sir.

20    A.    We discussed this previously, but when

21 Ergotron discusses these multiscreen stands with you, it

22 tells CDW that the purpose of the stand is to attach

23 monitors to that stand, right?

24    Q.    Answer?

25    A.    The answer:  Yes.  In their product

1  literature, I would say that -- I would say that, yes.

2       Q.    Okay.  And actually, I think that's

3  Mr. DeTota, just to be clear for the record, and that's

4  the CDW --

5       A.    CDW corporate representative.

6       Q.    Yes.  Okay.

7             And did you reach an opinion that --

8  regarding whether the DS 100 is a display system as used

9  in Claim 16?

10      A.    In my opinion, it is a display system as

11 cited in Claim 16.

12      Q.    Okay.  And so let's now go back to the

13 device.

14      A.    Yes, sir.

15      Q.    Okay.  Let's go to base member, please.

16      A.    Yes.

17      Q.    Does the DS 100 seen here have a base member?

18      A.    Yes, sir.

19      Q.    And has a base member been defined by the

20 Court?

21      A.    Yes.  Base member has been defined by the

22 Court.

23      Q.    And what is that, Dr. Akin?

24      A.    It's defined as the lowermost portion of the

25 system that supports the arm above a surface.  You see

1 we have an arm being supported above a surface and that

2 there is a lowermost -- lowermost portion that I would

3 refer to as the base.

4           THE COURT:  Dr. Akin, I'm not sure the

5 jury can see.  You're pointing toward the audience.  If

6 you could turn that to where -- there, that's better.

7           THE WITNESS:  Thank you, Your Honor.

8      A.    And as we can see, there is an arm being

9 supported above a surface.  This is the lowermost

10 portion of that, so under the Court's construction, I

11 would consider this to be a base under that definition.

12      Q.    (By Mr. Nelson) Okay.

13           MR. NELSON:  Let's go on then to the pair

14 of electronic displays, which is the next element of the

15 claim.

16      Q.    (By Mr. Nelson) Dr. Akin, in your expert

17 opinion, does the DS 100 have this element, or does

18 it -- is its purpose for this element?

19      A.    My understanding and from the sworn testimony

20 and the information I reviewed that its sole purpose is

21 to have two displays or to be mounted to two displays.

22      Q.    Okay.  And let's just see the Court's

23 construction of that.  Is it your expert opinion that

24 with two displays, that the claim would be met here?

25      A.    Yes.  These displays meet the Court's

1   definition of electronic device for displaying

2   information in a visual form, and there are a pair of

3   them connected to the arms.

4       Q.    Okay.  Is your opinion based simply on the

5   fact that the DS 100 is used in connection with two

6   displays?

7       A.    No, sir.  As I said, my conclusion is based

8   on the advertisements, the manuals, and the sworn

9   testimony of employees of Ergotron.

10      Q.    Okay.  Good.  Thank you.

11              MR. NELSON:  Let's put up positioning

12  means.

13      A.    Yes, sir.

14      Q.    (By Mr. Nelson) And let's talk about

15  positioning means.

16              Is it your opinion that the DS 100 meets

17  positioning means?

18      A.    Yes, sir.  That constitutes three individual

19  parts.

20      Q.    Okay.  And let's just go through those.

21  Let's go to the Court's claim construction of that,

22  please.

23      A.    Yes.  That's defined by the Court as being an

24  apparatus used to support -- or pardon me -- to position

25  the displays.

1      Q.    Okay.

2            MR. NELSON:  So let's go then to Item A,

3  which is -- back to the claim.

4      Q.    (By Mr. Nelson) What is -- in your expert

5  opinion, does the DS 100 have an arm assembly for

6  supporting the displays?

7      A.    Yes.  In my opinion, it does.

8      Q.    And would you show the jury, please?

9      A.    Yes.  But it would probably be clearer here

10  if we'll remind them of the definition.

11      Q.    Oh, yeah, please.

12            MR. NELSON:  Let's go to the definition.

13      A.    In this case, it's one or more

14  constitutive --

15            MR. NELSON:  Next slide.

16      A.    Pardon me, sir.

17      Q.    (By Mr. Nelson) Okay.  Go on.

18      A.    It's one or more constitutive parts

19  connecting to and projecting from support above -- or

20  from the base.

21            And we see that there is an arm assembly here

22  in the DS 100 being supported from the base.

23      Q.    Okay.  And, Dr. Akin, let's go to B, which is

24  support means for supporting the arm assembly from the

25  base member, and let's see the Court's construction for

1    that.

2              Before we get to that, Dr. Akin, what does

3    this support means?  Are you aware of what type of

4    element this claim is -- or this part of the claim is?

5         A.    Yes, sir.  This is a -- a special legal

6    wording.  It's a means-plus-function term or claim

7    element.

8         Q.    And can you just please tell for the jury

9    what is a means-plus-function claim, and what is the

10   test for determining infringement under

11   means-plus-function?

12        A.    To -- the test is to use a

13   function-way-result test.  You determine if an

14   infringing -- alleged infringing device satisfies this

15   claim, if it has structures to perform the identical

16   function, and it performs that function in identically

17   the same way or in an equivalent way or has an

18   equivalent structure for performing that.

19        Q.    Okay.

20              MR. NELSON:  And let's just go to the

21   next slide.

22        Q.    (By Mr. Nelson) And is this what you're

23   talking about, Dr. Akin?

24        A.    Yes, sir.

25        Q.    Okay.  And let's actually go back to the

1  previous slide.

2          MR. NELSON:  And could you -- let's just

3  highlight on plus equivalents?

4     Q.   (By Mr. Nelson) Could you just explain for

5  the jury the significance of plus equivalents right here

6  on this and on this (indicating)?

7     A.   Well, as we've seen, the Court has identified

8  certain specific numbered items in the patent, and the

9  phrase plus equivalents means that one might be able to

10  find an equivalent structure that satisfies the

11  necessary legal test.

12     Q.   Okay.  And, Dr. Akin --

13          MR. NELSON:  Let's go to the next slide,

14  please.  Next slide.

15     Q.   (By Mr. Nelson) In your expert opinion, can

16  you please -- is this the Court's claim construction for

17  the function of -- required by the support means

18  element?

19     A.   Yes, it is.

20     Q.   Okay.  Could you please explain for the jury

21  how the DS 100 has the function of supporting the arm

22  assembly from the base member?

23     A.   Well, we can see that it's accomplishing that

24  here, that there's a cylindrical upright post.  There is

25  a clamp that fits around that and a bolt for tightening

1   that clamp and that that is the structure that

2   accomplishes this function.

3        Q.    Okay.

4              MR. NELSON:  Let's go to the next slide,

5   please.

6        Q.    (By Mr. Nelson) And is this -- did you make

7   the slide?

8        A.    Yes.  That's my photograph of the device.

9        Q.    Okay.  And let's look at the two different

10  structures.

11             MR. NELSON:  Let's go to the next slide,

12  please.

13       A.    Yes, sir.

14       Q.    (By Mr. Nelson) What are we looking at here,

15  Dr. Akin?

16       A.    The numbers highlighted in yellow are the

17  specific structure or components identified by the Court

18  that carry out this function in Figure 7 of the patent.

19       Q.    And again --

20       A.    And plus the Court's equivalents if they're

21  found by the function-way-result test.

22             MR. NELSON:  And the next slide?

23       Q.    (By Mr. Nelson) And what are we looking at

24  here?

25       A.    This is an exploded view of the joint

structure defined by the Court.  I think we're going to

see an animation where these components are shown being

assembled together to form a closed joint.

Q.    Okay.

MR. NELSON:  Let's see that.

A.    The plug is inserted, we'll see a washer is

applied, and then a bolt comes in and tightens, squeezes

that joint together to form contact surfaces.

Q.    (By Mr. Nelson) Okay.

MR. NELSON:  And let's go to the next

slide, please?

A.    Yes.

Q.    (By Mr. Nelson) What are we looking at here,

Dr. Akin?

A.    In this case, in Figure 19, we're looking at

a second set of structures that are identified in the

patent.  Once again, the highlighted numbers are the

specific structure that the Court has identified, so we

look for those structures or equivalents.

Q.    All right.  And can it be either the

equivalent of Figure 17 or Figure 19 for this?

A.    That is correct, sir.

Q.    Okay.  And just to be clear, does the DS 100

need to have the structure that is identical to the

identified structure by the Court?

1    A.    No.   It can find equivalent structure defined

2   by some legal test.

3    Q.    Okay.   What structure in the patent performs

4   the function of supporting the arm assembly from the

5   base member?

6    A.    The structure in the patent or the figures

7   that we've just seen, the -- for example, in this case,

8   we're seeing the plug 208 product is inserted into the

9   socket 206.   They're squeezed together by a bolt that

10  develops variable pressure and friction through the

11  contact surfaces when they're squeezed together.

12   Q.    Okay.

13       MR. NELSON:   And let's go to Figure 19.

14   Q.    (By Mr. Nelson) Let's just describe how --

15  what the way was for Figure 19.

16   A.    Well, I just described Figure 19.

17   Q.    Okay.

18       MR. NELSON:   Then let's go back to Figure

19  7.  I'm sorry.   The previous slide, please.

20   Q.    (By Mr. Nelson) Okay.   And what is the way

21  that's done in Figure 7?

22       MR. NELSON:   Previous slide.   Yep, there

23  we go.   Perfect.

24   A.    Yes.   In this case, once again, we see that

25  the components are going to be fit together.   There is a

1   large washer that's going to be in contact with the

2   upright.  The bolts are going to be inserted.

3         It's going to squeeze those joints together

4   to develop bearing surfaces that will transmit pressure

5   and friction necessary to support the weight and the

6   overturning effect of the arm.

7      Q.   (By Mr. Nelson) And can you please explain in

8   greater detail -- I think you were talking about bearing

9   pressure.  What do you mean by bearing pressure, Dr.

10  Akin?

11     A.   Well, as I described earlier, when you have

12  two surfaces in contact, they develop a pressure acting

13  perpendicular to the surface, and they can also develop

14  a friction that's tangent to the surface or parallel to

15  the surface.

16     Q.   Okay.

17            MR. NELSON:  And let's go back to DS 100.

18     Q.   (By Mr. Nelson) What structure in the DS 100

19  performs the function of supporting the arm assembly

20  from the base member?

21     A.   Well, the structure is a clamp joint.

22            MR. NELSON:  Next slide.  Okay.

23     A.   Here are photographs I took at the top and

24  back view.  Here have the physical back view.  A

25  cylindrical joint with a bolt to tighten and squeeze it

1  around the cylindrical post so that the -- again, that

2  the surfaces are clamped together.

3         They develop pressures that vary around the

4  posts and develop friction, and the combination of those

5  allow the weight of the arm and the display to be

6  supported by this joint in an equivalent fashion.

7      Q.    (By Mr. Nelson) And can -- again, just can

8  you explain to us, just to be clear for the jury, the

9  way that the DS 100 structure performs the function of

10  supporting the arm assembly from the base member in

11  substantially the same way as Figures 7 and 19 of the

12  patent?

13     A.    Well, the -- the Ergotron DS 100 product and

14  the structure in the patent accomplish that function in

15  the same way of using variable pressure and compression

16  to accomplish the same result.

17     Q.    And could you just -- and friction, let's

18  talk a little bit focusing on friction.

19     A.    For this joint?

20     Q.    Yes.

21     A.    Yes.  For example, in this joint, the -- it's

22  being squeezed around the cylinder, so we've got

23  pressure perpendicular to the cylinder.

24         There will be a friction that's developed

25  parallel to the cylinder around the edge and that, in

1    part, will be supporting the weight and the overturning

2    torque from the weights of the arm and displays.

3         Q.    Okay, Dr. Akin.

4              MR. NELSON:  Let's go to the next slide.

5         Q.    (By Mr. Nelson) What are we looking at here?

6         A.    That is a drawing of the assembled hinge for

7    the DS 100.

8         Q.    Okay.  And what --

9              MR. NELSON:  Go to the next part of it.

10        Q.    (By Mr. Nelson) What is that, Dr. Akin?

11        A.    This is an exploded view of all of these

12   parts, and you see how, once again, they're squeezed

13   together by the bolt clamp.

14             MR. NELSON:  And for the record, this is

15   Plaintiff's Exhibit 1321.

16        Q.    (By Mr. Nelson) And how -- Dr. Akin, again,

17   can you explain how this support means performs the

18   function in substantially the same way as Figure 17 and

19   19 of the patent?

20        A.    Well, because, once again, it squeezes the

21   surfaces together, like I explained earlier, creates a

22   normal pressure or bearing pressure and perpendicular to

23   those surfaces and friction parallel to those surfaces,

24   then in combination, allow the stands to support the

25   weight and the overturning effect of the weight.

1    Q.    Okay.  And, Dr. Akin, the last part of this

2  function-way-result test is result.

3         Did you analyze and compare the results

4  accomplished by the Figure 17 and 19 structure with the

5  results accomplished by the DS 100 structure?

6    A.    Yes.  The test requires that the results be

7  substantially the same.  In this case, the results are

8  identically the same.  That structure, the way they're

9  accomplishing, they're supporting the arm assembly from

10  the base.

11    Q.    Okay.

12              MR. NELSON:  Let's move on to the next

13  part of the claim, please.

14    Q.    (By Mr. Nelson) And, Dr. Akin, what is this

15  next part of the claim here?

16    A.    This mounting means is actually two separate

17  means-plus-function clauses.

18    Q.    Okay.  And what are those, Dr. Akin?

19    A.    The first is a means for mounting the

20  displays to the arm assembly.

21    Q.    Okay.  And let's just focus on that, and

22  could you show the jury what you're talking about for

23  the means for mounting?

24    A.    The means for mounting in this case is, in

25  each case, is a hinge connected to the rear of the

1 display through a rotational joint, that is, the hinge,

2 connecting to the arm with an arm connector.

3          And so this is essentially a vertical hinge

4 in this form.  And there are a pair of those, one for

5 each display, joining it to the arm.

6     Q.   Okay.  And, Dr. Akin, is this also a

7 means-plus-function element?

8     A.   Yes.  This is another means-plus-function

9 element where I would have to apply a function-way-

10 result test.

11    Q.   Okay.

12          MR. NELSON:  So let's go to that next

13 slide, please.  Next slide.

14    Q.   (By Mr. Nelson) And what is the claim term

15 for -- what is the function, as defined by the Court,

16 for this claim term?

17    A.   This claim term is supposed to function to

18 mount displays to the arm assembly.

19    Q.   Okay.  Does the DS 100 have structure that

20 performs this function?  Please show the jury if it does

21 and how it does.

22    A.   Yes.  It has structure performing this.  We

23 see we have this vertical hinge attached to the rear of

24 the display.  There are several horizontal surfaces

25 connected together with a bolt through the center.

1    Those surfaces are squeezed together.

2              They develop, again, a variable pressure

3    around those surfaces and a friction.  Then in

4    combination will support the weight and its overturning

5    torque from being out in front of the arm to accomplish

6    that mounting of the displays to the arm.

7         Q.    Okay.

8              MR. NELSON:  And let's go to Plaintiff's

9    Exhibit 351.

10        Q.    (By Mr. Nelson) What are we looking at here,

11   Dr. Akin?

12        A.    This is the instruction manual for the DS

13   100.

14        Q.    Okay.

15              MR. NELSON:  And let's blow up the part

16   where it talks about mounting.

17        Q.    (By Mr. Nelson) What are we seeing here,

18   Dr. Akin?

19        A.    We're seeing here in the top image that a

20   display with its mounting bracket is supposed to be

21   inserted in the slot of the arm with the bolt -- the arm

22   connector or the hinge connector tightened, and that is

23   the way that the manual recommends the mounting of the

24   displays to the arm.

25              And from the way this drawing is shown, I can

1    see that that means that it's supposed to be with the

2    hinge in the vertical position.

3        Q.    And by just explaining to the jury, when the

4    hinge is in the vertical position, what does that mean?

5        A.    In that case, it means we have this

6    side-by-side motion of the displays relative to the arm

7    and relative to each other.

8        Q.    Okay.  And, Dr. Akin, has the Court

9    identified structure in a patent that performs the

10   mounting function?

11       A.    It has.

12       Q.    Okay.

13             MR. NELSON:  Next slide, please.  Next

14   slide.  Okay.  Sorry.  Next slide.  Yeah, there we go.

15       Q.    (By Mr. Nelson) What is that, Dr. Akin?

16       A.    The Court has identified, again, the numbered

17   items that are highlighted in yellow in Figure 8 and

18   Figure 9.  Those structures, plus equivalents, would --

19   are the structure that the Court cites here, one of the

20   two sets.

21       Q.    Okay.  And to be clear, Dr. Akin, does the DS

22   100 need to have the structure that is identical in

23   Figures 8 and 9 in order to infringe the patent?

24       A.    No.  It can have equivalent structure.

25       Q.    Okay.  And let's go then to the way part of

1  the function-way-result.

2          How does the Figure 8, 9 structure perform

3  the function of mounting the displays to the arm

4  assembly?

5      A.    Well, if we start looking at the right

6  figure, we'll see that in the back there is an Item

7  No. 16, which represents the rear of the display in the

8  patent where a socket is mounted.

9          And in this case, we see that the -- there is

10  a ball joint, 56 is inserted into that socket and

11  develops a contact surface area over part of that ball

12  where again pressures develop and frictions develop so

13  that in combination, those pressures and frictions can

14  support the weight of the display through this

15  rotational joint and resist the overturning effect of

16  the display through this rotation.

17      Q.    Do the tabs identified by the Court play a

18  roll in mounting the displays to the arm assembly?

19      A.    Yes.

20      Q.    Okay.  And what is that?

21      A.    The tabs that you're referring to are Tab No.

22  80 in this Figure 9.

23      Q.    Okay.

24          MR. NELSON:  Let's go to the next slide,

25  please.  Let's see.  Yep.

1      Q.    (By Mr. Nelson) Okay.

2      A.    In this case, we're seeing an animation of

3 how the ball joint is inserted into the socket at the

4 rear of the display, and then the tabs are going to be

5 brought forward and placed into a matching set of sort

6 of Y-shaped tabs in the arm and rotated and locked into

7 position.

8      Q.    Okay.

9           MR. NELSON:  And let's go, please, to the

10 next slide.

11     Q.    (By Mr. Nelson) What are we looking at here,

12 Dr. Akin?

13     A.    This is the second structure identified by

14 the Court, the Figure 19 and 20 structure.  Once again,

15 the numbered parts highlighted in yellow are the ones

16 that have been identified by the Court as the structure

17 to be used to compare against the infringed device or

18 the equivalent structure.

19     Q.    Okay.  And, Dr. Akin, you said the

20 highlighted structures have been identified by the

21 patent; is that right?

22     A.    Yes.

23     Q.    Okay.  And, again, to be clear, does the DS

24 100 need to have a ball joint or a structure that is

25 identical to this Figure 1920 structure in order to meet

1    this part of the claim?

2        A.    No, it does not have to have an identical

3    structure.  It has to have an equivalent structure that

4    is determined by a legal test.

5        Q.    Okay.  How does the Figure 19, 20 structure

6    perform the function of mounting the displays to the arm

7    assembly?

8                MR. NELSON:  Next slide, please.

9        A.    Well, once again, we see that we're

10   starting with, in this case, 152, the rear of a display

11   to which a socket is mounted, the ball jocket (sic) --

12   ball joint -- the ball, rather, is inserted into that

13   socket.

14               They develop a contacting surface area over

15   part of the surface of the ball, and it's squeezed

16   together here to form pressures and friction, and that

17   combination of pressure and friction are sufficient to

18   support the weight of the display and its overturning

19   torque as it's transmitted through that joint.

20       Q.    (By Mr. Nelson) Okay.  And, Dr. Akin, did you

21   perform an analysis of the way on the DS 100 structure

22   right in front of you?

23       A.    Yes.

24       Q.    Okay.  What structure in the DS 100 performs

25   the claimed mounting function?

1          MR. NELSON:  And next slide, please.

2      Q.    (By Mr. Nelson) What are we looking at here,

3  Dr. Akin?

4      A.    Here you see a photograph that I took -- it's

5  probably going to be easier for you to recognize, but in

6  this case, we see that there is a rotational joint

7  attached to the rear of the display, in this case, it's

8  a vertical hinge, and bolted through a connector to the

9  arm; that it consists of parallel surfaces in this case

10  that are in contact with each other and through -- and

11  there's a bolt through the center squeezing those

12  together, so it develops a variable amount of pressure

13  and friction distributed through this joint so that

14  combination will support the weight of the display and

15  resist its overturning effect by being out in front of

16  the display.

17      Q.    And, Dr. Akin, where is the mounting actually

18  located with respect to where it is on the back of the

19  display?

20      A.    Well, in this case, again, we can see that

21  the hinge is directly connected to the mounting plate

22  that is intended to have the standard industry

23  connection to a display --

24      Q.    And then --

25      A.    -- at the back of the display.

1    Q.    Okay.  And again, let's just go into a little

2  bit more detail about the friction accomplished there,

3  Dr. Akin.

4    A.    Yes, sir.

5    Q.    Can you give a little more detail, please,

6  about the friction?

7    A.    Sure.

8    Q.    Yeah.

9    A.    We probably see it a little bit more clearly

10  here, but you can recognize that, for example, the top

11  and bottom surfaces of the joint where it's being

12  squeezed together -- I'll just put my mic down.

13        You'll see that there are horizontal surfaces

14  there so that on the top, for example, there would be a

15  frictional force that develops on that bearing pressure

16  that pulls towards the arm, and then on the bottom,

17  there would be one of equal magnitude to the opposite

18  direction.

19        So those two pulling in opposite directions

20  create a torque and that torque, in part, resists again

21  the overturning effect from the weight of the display

22  being placed in front of the arm.

23    Q.    Okay.  And, Dr. Akin, did you compare the way

24  the DS 100 performs the claim mounting function with the

25  ways that the Figure 8, 9 structure and the 19, 20

1  structure identified in the patent perform that

2  function?

3      A.    Yes.  The structure in the patent, the two

4  sets of structures in the patent, and the Ergotron

5  structure here for the DS 100 accomplish that function

6  in substantially the same way but using variable

7  pressures and friction in order to develop the necessary

8  force and torque to mount the displays to the arm.

9      Q.    Okay.  And, Dr. Akin, did you compare the

10 results in Figures 8, 9 of the patent and Figures 19, 20

11 of the patent with the results achieved by the mounting

12 structure in the DS 100?

13     A.    Yes.  Those results have to be substantially

14 the same.  Again, in this case, they're identically the

15 same, that the monitor is securely and safely mounted to

16 the arm assembly.

17     Q.    Okay.  And just to be clear, so that in your

18 opinion, Dr. Akin, does the DS 100 meet the mounting

19 means portion of this Claim 16?

20     A.    Yes, sir.  In my opinion, it does.

21     Q.    Okay.

22          MR. NELSON:  And let's go, please, to the

23 next slide.

24     Q.    (By Mr. Nelson) What is the next part of

25 this -- of this claim, Dr. Akin?

1      A.      There has to be a means for adjust --

2   adjusting the angular orientation of the displays

3   relative to the arm assembly.

4      Q.      And, again, Dr. Akin, is this a

5   means-plus-function claim?

6      A.      It is a means-plus-function display that,

7   again, requires a function-way-result test.

8      Q.      And, Dr. Akin --

9              MR. NELSON:  Next slide, please.

10     Q.      (By Mr. Nelson) What are we looking at here?

11     A.      We're looking at the definition of the

12  function as adjusting the angular orientation, and we're

13  also looking at a top view, which is Figure 4 in the

14  patent, but I think it's going to be animated to show

15  how the ball joint in the patented structure

16  accomplishes this adjustment feature.

17     Q.      Okay.  And how -- how does the patent --

18  actually, let's go to the animation.  What are we

19  looking at here, Dr. Akin?

20     A.      So, again, we're looking, in this case, at a

21  top view looking down at the patented structure where we

22  see that the ball joint allows the rotation so that we

23  get the side-to-side motion of the displays relative to

24  the arm assembling.

25     Q.      Okay.  And, Dr. Akin, let's -- in your expert

1  opinion, does the DS 100 perform the function of the

2  Court's claim construction of adjusting the angular

3  orientation of each of the displays relative to the arm

4  assembly?

5      A.    Yes, sir.  It's quite easy to see here that

6  both structures -- both of the displays can easily be

7  rotated relative to the arm assembly.

8      Q.    Okay.

9          MR. NELSON:  And next slide, please.

10     Q.    (By Mr. Nelson) And what are we looking at

11 here again, Dr. Akin?

12     A.    We're back to the Ergotron installation

13 manual for the DS 100.

14     Q.    Okay.

15         MR. NELSON:  And let's blow that up,

16 please.

17     Q.    (By Mr. Nelson) What are we looking at here?

18     A.    Here we're looking at a similar top view of

19 this particular device where we see that there -- the

20 rotation is taking place about this -- in this case, the

21 vertical hinge, and it has exactly the same motion

22 relative to the arm assembly so that the displays can be

23 rotated relative to the arm assembly and towards one

24 another.

25     Q.    Okay.

1                MR. NELSON:  And next slide, please.

2        Q.    (By Mr. Nelson) What are we looking at here,

3   Dr. Akin?

4                I'm sorry.  Go on.  Did you want to go back

5   to the previous slide?

6        A.    Well, there was another part of that.

7        Q.    Go ahead.  Yeah.  Yeah.

8        A.    And also I noted that at the top of this

9   line, it states that that is the factory setting that

10  the -- for the hinges that the displays are intended to

11  be used in this side-to-side motion.

12       Q.    Okay.  And, Dr. Akin, there's these little

13  arrows right here.  What do those arrows represent right

14  there on the instruction manual?

15       A.    Well, they represent the motion -- as I said,

16  the side-to-side motion of the displays.

17       Q.    Okay.

18                MR. NELSON:  Next slide, please.

19       Q.    (By Mr. Nelson) What are we looking at here,

20  Dr. Akin?

21       A.    This, again, is the Court's construction, and

22  it's the same physical pieces that we saw numbered

23  before in the previous Figure 8 and Figure 9 drawing

24  from the patent.

25       Q.    Okay.  And so what structure did the Court

1  identify from the '978 patent as performing the function

2  of adjusting the angular orientation of the displays

3  relative to the arm assembly?

4      A.   Well, we see -- for example, on the right, it

5  starts with the back of the display, the rear of the

6  display.  We have a socket 60.  We have the ball 56 that

7  fits in that socket.  And then, of course, there is a

8  shaft continuing on from that.

9            Again, we come to the tabs that are going to

10  be supported -- going to be inserted into the arm and

11  locked into position in the arm similar to the way the

12  bolt is locked here.

13      Q.   Okay.  And, Dr. Akin, in what way does the

14  Figure 8, 9 structure perform this function of adjusting

15  the angular orientation of each of the displays relative

16  to the arm assembly?

17      A.   Well, when we insert the ball in the socket,

18  you can recognize that there's -- it limits the motion.

19  In engineering jargon, we call that kinematic

20  constraint.

21            So the ball is placed inside the socket,

22  which means that it cannot move around, it cannot

23  translate, but it still has its ability to rotate.

24  And in this case, we only need one type of rotation in

25  the claim, and that's the side-to-side rotation.

1   So --

2       Q.      And -- I'm sorry, Doctor.  I didn't mean to

3   interrupt.  Go on.

4       A.      So it's through this kinematic constraint of

5   these surfaces being in contact with one another that

6   allows this rotation to take place about the center of

7   the ball.

8       Q.      And where in the patent, Dr. Akin, is it --

9   is the means for adjusting happening with respect to

10  where the display is?

11      A.      Again, it's happening relative to the rear of

12  the display at which point, of course, it is attached in

13  the patent -- I should not be pointing to this -- in the

14  patent, that is where it is attached, as we saw from the

15  numbered device -- or from the numbered items.

16      Q.      Okay.

17              MR. NELSON:  And next slide, please.

18      Q.      (By Mr. Nelson) What are we looking at here?

19      A.      Here we are looking at the same structure we

20  talked about before with the mounting means, in this

21  case, on the right.  We're starting from the rear of the

22  display, 152.  We're going to have a socket that's

23  attached to that rear of the display.

24              Again, the ball is going to be put in the

25  socket, which presents three -- three -- present this

1  limiting or constraining to one point, one location, but

2  still allows the rotation, the one degree of rotation,

3  needed for this claim.

4      Q.    Okay.  And, again, what is this, Dr. Akin?

5      A.    This is an animation of the socket on the

6  rear of the display with the ball being inserted, and

7  then, of course, the shaft continues on.

8          In this case, there's a plug, a square-type

9  plug, that would fit into a corresponding portion of the

10 arm.

11         So it's those structures, plus the equivalent

12 structure that might be found by the function-way-result

13 test.

14     Q.    Okay.  Now let's go back, Dr. Akin, to the

15 device in front of you.

16     A.    Yes, sir.

17             MR. NELSON:  Next slide, please.

18     Q.    (By Mr. Nelson) What are we looking at here,

19 both in front of you and on the screen right there?

20     A.    Well, here are the photographs that I took

21 that made it a little bit more clearer.  So looking

22 down, you can see that the vertical hinge is set up to

23 allow this to be rotated -- the display to be rotated

24 here relative to the arm display.

25         And so that's what we're seeing here, just

1    sort of a top view of this joint accomplishing that.

2        Q.    And again, Dr. Akin, on the DS 100, where --

3    where is the rotation at?  Where is it mounted there?

4        A.    The means for adjusting is the mounting -- is

5    mounted here to the rear of the display and then, of

6    course, mounted to the arm.

7        Q.    Okay.  Now, Dr. Akin, does the DS 100 have

8    the exact structure identified by the Court?

9        A.    It does not.

10       Q.    Why does that not matter?

11       A.    Well, as we said previously, it does not have

12   to have the exact structure.  It only has to have an

13   equivalent structure as determined by some legal test.

14       Q.    Okay.  And why, in your opinion, is the way

15   that the DS 100 performs the claimed adjusting function

16   substantially similar as Figures 8, 9 and Figures 19, 20

17   of the '978 patent?

18       A.    Well, I don't recall discussing the way for

19   the hinge.  The way for the hinge is that, once again,

20   we have these horizontal mounting surfaces -- we can't

21   see in that view, but the jury can see it on here --

22   that are squeezed together.

23            And so those surfaces mount or touch each

24   other in such a way that it constrains the joint in two

25   ways.  The joint cannot move around.  The center point

1    of the joint is fixed, but those horizontal surfaces

2    that contact also constrain the kinematics.

3            So in this case, the joint has only one

4    degree of motion, and that's the one degree of motion

5    claimed in the patent, the side-to-side motion.

6    I --

7        Q.    Okay.  And, Dr. Akin -- I'm sorry.  Go on.

8        A.    I didn't finish the answer.

9        Q.    Oh, sorry.

10       A.    And so both the patented structure and the

11   Ergotron DS 100 structure accomplish the same result in

12   substantially the same way by using kinematic

13   constraints for a rotation about a single point that

14   allows the rotation of the side-to-side motion and

15   accomplishes similar results to those in the patent.

16           So they, in my opinion, are equivalent

17   structures.

18       Q.    Dr. Akin, in your opinion, is the hinge a

19   subset of movement for the ball and socket and

20   encompasses the range of motion that's required by

21   the -- by the patent?

22       A.    Yes.  The rotational effect, the visual

23   effect of a hinge having one degree of freedom in this

24   case, essentially vertical, and the visual effect of

25   rotation of the ball, the hinge is a subset, because the

1   ball can rotate in this -- about this axis, this

2   side-to-side motion, but it can also rotate in about two

3   other axes.  It can rotate about a horizontal axis here

4   or a horizontal axis there (indicating).

5              So the ball has other capabilities, but

6   they're not required in this claim.  Just the rotation

7   of the displays relative to the arm assembly and towards

8   each other is what's claimed.

9              MR. NELSON:  And the next slide, please.

10      Q.    (By Mr. Nelson) What are we looking at here,

11  Dr. Akin?

12      A.    Here we're looking at an animation of how, on

13  the left, a hinge can rotate only about a vertical axis

14  in this case to accomplish the side-by-side rotation.

15      Q.    Okay.

16      A.    And we see that a ball joint can do exactly

17  that as well.  It can also accomplish this side-to-side

18  rotation.

19      Q.    Okay.

20              MR. NELSON:  And next slide, please.

21      Q.    (By Mr. Nelson) What are we looking at here,

22  Doctor?

23      A.    But beyond that, here we're seeing another

24  animation that shows that a ball joint has other

25  abilities to rotate that are not a part of this claim.

1    It can rotate about the axis coming out front of the

2    member.  It can rotate so that it can go between the two

3    slots in the two pink pieces here that are the socket

4    representation.

5              So a ball joint has other degrees of

6    rotational freedom, what we can see going on at the ball

7    joint, that are not needed in this claim.

8              MR. NELSON:  Next slide, please.

9         Q.   (By Mr. Nelson) What are we looking at here,

10   Dr. Akin?

11        A.   This is a table taken from a textbook of

12   the -- some of the most common types of mechanical

13   joints, a textbook that I've used in one of the classes

14   that I teach.

15        Q.   Okay.

16              MR. NELSON:  Next slide.

17        Q.   (By Mr. Nelson) What is that, Dr. Akin?

18        A.   The top element in this table has a figure of

19   a -- what's called a revolute joint or what every day we

20   call a hinge joint.

21              And the third column, it has the No. 1, and

22   that indicates that it has only one degree of rotation,

23   and then also there's some comments that I added that

24   should have been in red, I guess, that points out that a

25   hinge allows only one directional motion.

1       Q.     Okay.  And just to be clear for the jury,

2  this is your comment, not on the text, right?

3       A.     That is my comment, not the text.

4       Q.     Okay.  And although you see right here --

5  what is that, Dr. Akin?

6       A.     The curved arrow again is indicating the

7  direction of rotation in this case, not a port --

8       Q.     Okay.

9       A.     -- but it has a single axis of rotation on

10 this hinge.

11      Q.     And what is this right here, Dr. Akin?

12      A.     That's my sort of sketch to --

13      Q.     No.  The No. 1.  I'm sorry.

14      A.     No. 1 shows that in the engineering jargon,

15 this has one degree of rotational freedom.

16      Q.     Okay.  And, Dr. Akin, what else have you

17 highlighted here?

18      A.     In the lower portion of that table, it's what

19 the engineers call a sphere or ball joint, which is --

20 as I've indicated, it's a rotational structure that the

21 visible feature is that it's restrained so that it has

22 to rotate about the center of the ball, but it can

23 rotate about three axes.

24             So you see the No. 3 in the third column.

25             And so I've also added some connotations that

1  were not in the text that points out that it can rotate

2  about any axis.  Whatever the hinge axis is, the ball

3  joint can have that subset of rotational or visual

4  effects.

5       Q.    And, Dr. Akin, did you also consider the

6  testimony of Ergotron's corporate representative on this

7  point?

8       A.    Yes, I did.  I listened -- or read the

9  deposition testimony of the Ergotron employees, I

10 believe Mr. Segar.

11      Q.    Go ahead and sit down for this part.

12      A.    Thank you, sir.

13             THE COURT:  Are you getting close to a

14 breaking point or --

15             MR. NELSON:  Yes, Your Honor.  If we go

16 about three more minutes, we'll be subject -- we'll be

17 done with the DS 100.

18             THE COURT:  All right.  Very good.

19             MR. NELSON:  Okay.  Maybe actually five

20 more minutes.

21             THE COURT:  All right.

22             MR. NELSON:  Don't hold me to three,

23 please.

24      Q.    (By Mr. Nelson) Okay.  You were talking about

25 the deposition testimony of Dr. Segar -- or Mr. Segar --

1       A.      Yes, I was.

2       Q.      -- Dr. Akin?

3               And did you consider that testimony?

4       A.      I did.

5       Q.      And is this the testimony you considered?

6       A.      Yes.

7               (Video playing.)

8               ANSWER:  The ball and socket would allow

9    you to move it side to side, up and down, or in a

10   rotational manner.  So it really has three degrees of

11   freedom.

12              QUESTION:  Looking solely at the

13   side-to-side aspect of it --

14              ANSWER:  Uh-huh.

15              QUESTION:  -- it allows the same degree

16   of movement as the joint that Ergotron uses?

17              ANSWER:  Clarify.  Can you clarify the

18   question?

19              QUESTION:  Sure.  The ball-and-socket

20   joint moves on a side-to-side rotation the same

21   degree -- has the same degree of movement as the

22   Ergotron pivot, right?

23              ANSWER:  I'm not sure you get the same

24   full 90 degrees of rotation, but you can -- you can move

25   it side to side and up and down and swivel it.

1          So you -- I guess you get the same -- you

2    get more than the motion that we have.

3               QUESTION:  But it includes the motion

4    that you have?

5               ANSWER:  It includes -- it includes the

6    motion that we have, plus more.

7               (End of video clip.)

8        Q.    (By Mr. Nelson) And does that affect your

9    opinion one way or the other, Dr. Akin, about whether

10   the DS 100 performs the function in substantially the

11   same way as Figures 8, 9 and 19 and 20 of the patent

12   with respect to this element?

13       A.    Yes.  It confirmed my analysis that it does

14   satisfy those elements in Claims 16 and 17 in the '978

15   patent.

16       Q.    And, Dr. Akin, finally, with respect to this

17   part of the element, did you compare the results

18   achieved by the adjusting structure identified by the

19   Court in Figures 8 and 9 and 19 and 20 of the patent

20   with the results achieved by the adjusting structure for

21   the DS 100?

22       A.    Yes, I did.

23       Q.    And what was your conclusion there?

24       A.    Well, again, the results were identical in

25   that it allowed each of the displays to be rotated

1   relative to the arm assembly and toward one another.

2        Q.    Okay.  And in your opinion, Dr. Akin, just to

3   sum up for at least this part of the element, does the

4   DS 100 have the claim means for adjusting that's in the

5   patent?

6        A.    Yes, it does.  Yes.  I -- I was thinking of

7   adjusting when I answered that question --

8        Q.    Okay.

9        A.    -- but it also has the mounting means.

10  But for adjusting means, it also satisfies those

11  elements of Claims 16 and 17.

12       Q.    Okay.

13             MR. NELSON:  And I think this probably

14  is -- I'm not quite done with the DS 100, but this is an

15  appropriate stopping point, if it's okay with the Court.

16             THE COURT:  All right.  Very well.

17             All right.  Ladies and Gentlemen of the

18  Jury, we'll take our afternoon break, and we'll come

19  back at 3:15.

20             So enjoy your break.  Remember my

21  instructions.  Be in recess.

22             COURT SECURITY OFFICER:  All rise.

23             (Jury out.)

24             (Recess.)

25             COURT SECURITY OFFICER:  All rise.

1                    THE COURT:  Please be seated.

2                    All right.  Mr. Nelson, you may proceed.

3                    MR. NELSON:  Thank you, Your Honor.

4                    Let's go, please, to the final element of

5    the claim, and if we can put that slide -- yeah.

6         Q.    (By Mr. Nelson) Dr. Akin, finally, what is

7    the final part of Item C that the jury can read down

8    there and then up here on the screen?

9         A.    The final part is, to thereby permit said

10   displays to be angled toward each other to a desired

11   degree.

12        Q.    And what did you conclude with respect to

13   whether the DS 100 can be angled towards each other to a

14   desired degree?

15        A.    Since the Court did not define the term, that

16   means I have to interpret it in terms of this

17   hypothetical person of ordinary skill in this field.  So

18   I -- I interpreted that to mean that the displays can be

19   booked in some way for the desire of the user.

20              Like you might have it in one position and

21   perhaps the sun has changed, and you now have glare and

22   you want to adjust it to a desired degree to obtain a

23   comfortable or desirable result of not having such a

24   glare.

25        Q.    And, Dr. Akin, to be clear, I want you to

1  assume for me that the DS 100 can only move in an

2  up-and-down manner.

3       A.    All right, sir.  In a permanent?

4       Q.    Permanent configuration.

5       A.    Yes, sir.

6       Q.    In that permanent configuration, would the DS

7  100 infringe?

8       A.    No, sir.

9       Q.    Okay.  Why in your -- does -- let me back up.

10            Does the DS 100 have an up/down rotation as

11 well as the side-to-side rotation?

12      A.    It does.  You could rotate the hinge very

13 easily into a horizontal position and would accomplish,

14 in that temporary fixture, the motion that you've

15 described.

16      Q.    Why, in your opinion, does it not matter for

17 infringement purposes whether it goes up, down, or side

18 to side?

19            MR. NIEDERLUECKE:  Your Honor, I have an

20 objection.  Please approach?

21            THE COURT:  All right.

22            (Bench conference.)

23            MR. NIEDERLUECKE:  Your Honor, they're

24 about to testify -- the expert is about to testify that

25 this is capable of infringement in a different

1   configuration, because you can reconfigure it.

2                   None of that is in his report.  He wasn't

3   even aware at the time he was deposed that the

4   thing could be -- that the DS 100 could be set up

5   differently.  So it's nowhere in his report that -- he's

6   just about to testify to that.

7                   The witness is set up in a fashion -- he

8   doesn't have in his report anything about that and about

9   whether or not that would be an infringing setup.

10                  THE COURT:  I think he just testified

11  that it would not be.

12                  MR. NIEDERLUECKE:  He did, but now he's

13  about to tell why it can be, even though it doesn't have

14  a permanent fix.  They're going to argue that because

15  it's not a permanent fix and that you can take it apart

16  and reconfigure it, it infringes.

17                  THE COURT:  Side to side?

18                  MR. NIEDERLUECKE:  Do it side to side.

19  And that's not in his report anywhere.

20                  THE COURT:  He's got in his report that

21  it infringes, if it goes from side to side.

22                  MR. NIEDERLUECKE:  Side to side but not

23  up and down, Your Honor.  He didn't analyze that.

24                  MR. NELSON:  He does talk about the

25  side-to-side movement, Your Honor, and it's to make

1  clear some of his deposition testimony where

2  Mr. Niederluecke was questioning him, and we want to

3  make clear that as there's the capability there, it

4  would still infringe, despite this up/down movement.

5                 MR. NIEDERLUECKE:  He did not rely on

6  that, and he did not even say that in his deposition

7  responses, Your Honor.  And if Mr. Nelson can prove me

8  wrong --

9                 MR. NELSON:  No, I'm not -- I'm not

10  disputing that.

11                 THE COURT:  Okay.  Sustain the objection.

12                 MR. NELSON:  Can I get some

13  clarification?

14                 I would like to go back to what he's

15  already testified to about this standard factory

16  setting.  He's already testified to that, and I can go

17  there?

18                 THE COURT:  Sure.

19                 MR. NELSON:  Okay.

20                 (Bench conference concluded.)

21                 MR. NELSON:  Let's go, please, to

22  Plaintiffs' 351, which is the installation manual.

23      Q.    (By Mr. Nelson) And, Dr. Akin, can -- what is

24  the standard factory setting for the DS 100 as -- as

25  instructed by Ergotron here?

1    A.    Well, as we can see from the top of this

2 page, and I think I pointed it out early, that the

3 standard factory setting is so that the displays are set

4 to move in this side-to-side motion.

5    Q.    Thank you.

6          And just to wrap up Claim 16 in the DS 100,

7 do you have an opinion as to whether the DS 100

8 infringes Claim 16 of the '978 patent?

9    A.    I do.

10    Q.    What is that opinion?

11    A.    In my opinion, it infringes Claim 16 and 17

12 of the '978 patent.

13    Q.    Okay.  Well, we'll get to Claim 17 in a

14 little bit, but let's focus on Claim 16 for right now.

15    A.    Yes, sir.

16    Q.    Okay.  And just please restate your opinion

17 with respect to Claim 16.

18    A.    Yes.  Thank you, sir.

19          In my opinion, the DS 100 dual infringes

20 Claim 16 of the '978 patent.

21    Q.    Okay.  And let's now go to Claim 17.

22          MR. NELSON:  The next slide, please.

23    A.    Yes, sir.

24    Q.    (By Mr. Nelson) And, Dr. Akin, what is your

25 opinion as to whether the DS 100 infringes Claim 17 of

1  the '978 patent?

2      A.    Well, Claim 17 includes a substantial portion

3  of the same items that were in Claim 16, and for the

4  reasons that I described earlier, plus examination of

5  the additional terms in these claims, it is my opinion

6  that the DS 100 dual also infringes on Claim 17 of the

7  '978 patent.

8      Q.    Let's talk about a few -- or those three

9  differences.

10              MR. NELSON:  Next slide, please.

11      Q.    (By Mr. Nelson) Could you, please, Dr. Akin,

12  explain these differences to the jury and why you

13  believe that with respect to these elements that the DS

14  100 has the claimed elements?

15      A.    Well, for example, in the supporting means,

16  there's been an additional term that it has to support

17  the arm assembly above a surface.  And I think I've

18  demonstrated earlier that it does support the arm above

19  the surface.

20              And likewise, down in the means for

21  adjusting, there is an additional phrase -- two

22  additional phrases.  One is that it has to be about a

23  generally vertical axis, and we just saw in the previous

24  slide that the factory setting for this device is about

25  a generally vertical axis, and that thereby that

1  generally vertical axis motion, or the side-to-side

2  motion, has to allow the displays to move relative to

3  each other to a desired degree.

4      Q.    Dr. Akin, for the portions of Claim 17 that

5  are the same as Claim 16, do you have an opinion

6  regarding whether those portions of Claim 17 are met in

7  the DS 100?

8      A.    Yes.  For the reasons that I explained above,

9  those identical portions are equally found in the device

10 for Claim 17.

11     Q.    Okay.  And, Dr. Akin, just to restate and

12 wrap up here with respect to Claim 17, what is your

13 opinion with respect to DS 100 with two displays,

14 whether that would infringe Claim 17 of the '978 patent?

15     A.    Yes.  I should have pointed out previously

16 that it does require the two displays to be present.

17          So for the reasons that I explained for Claim

18 16 and for these additional features that I have

19 verified are also present -- these claim elements are

20 also present, I do find that the DS 100 dual infringes

21 Claim 17.

22     Q.    Okay.  Now, Dr. Akin, was there another

23 product that you analyzed in the DS 100 family besides

24 the DS 100 dual?

25     A.    Yes, sir.

```
 1          Q.     And what is that?

 2          A.     Another product that I analyzed was the DS

 3   100 horizontal quad and the --

 4                 MR. NELSON:  Your Honor, may I approach?

 5          A.     -- and the LX.

 6                 THE COURT:  Yes you may.

 7          Q.     (By Mr. Nelson) Dr. Akin, are you able to see

 8   that?

 9          A.     Yes, sir.

10          Q.     Okay.  What is your opinion with respect to

11   the DS 100 quad and whether it infringes the patent?

12          A.     The DS 100 quad, with two displays attached,

13   would infringe Claims 16 of the '978 patent, in my

14   opinion, and also Claim 17 of the '978 patent.

15          Q.     What are the reasons why you believe that the

16   DS 100 quad infringes Claims 16 and 17 of the patent?

17          A.     Well, basically, it is almost just two DS

18   100s connected together.  It does have a slightly

19   different supporting means, and I would have to apply

20   the function-way-result test, too, but -- I guess I

21   forgot your question, sir.

22          Q.     That's okay.

23                 What reasons, I think, was my question.  What

24   reasons do you think why the DS 100 quad infringes

25   Claims 16 and Claim 17 of the '978 patent?
```

1    A.    For the reasons that I've described above,

2  plus the additional study that I had to do of the

3  slightly different mounting support means.

4    Q.    All right.  And we talked about the support

5  means.

6    A.    Yes, sir.

7          MR. NELSON:  Let's please go to the next

8  slide.  And the next slide.

9    Q.    (By Mr. Nelson) Dr. Akin, what are we looking

10 at here?

11   A.    This is a photograph that I took showing the

12 different clamping means for supporting the arm on the

13 upright.  In the DS 100 quad, we see that, once again,

14 we have an upright cylindrical clamp that is clamped

15 around the upright post and accomplishes that same -- as

16 I described before, the same contact surfaces, bearing

17 pressures, and friction to receive and transmit the

18 weight and the torque.

19          But in addition, it has a slight projection

20 in the front.  Instead of being built into the arm, this

21 actually has a bolted connection or a fastener that

22 attaches to a hole or a slot in the arm assembly instead

23 of being built in.

24   Q.    And, Dr. Akin, does the DS 100 quad structure

25 support the arm assembly from the base member in

1  substantially the same way as the patent structure you

2  previously discussed?

3       A.    Yes, for the reasons I previously discussed.

4       Q.    And, Dr. Akin, just to be clear, it's the DS

5  100 with monitors; is that right?

6       A.    Yes, sir.

7             Thank you for pointing out my omission.

8       Q.    Okay.  And, Dr. Akin, did you also --

9             MR. NELSON:  Actually, next slide.  Next

10 slide, please.

11      Q.    (By Mr. Nelson) Did you also analyze the

12 inducement to infringe and contributory infringement?

13      A.    I did, sir.

14      Q.    And have you seen any evidence that the

15 Defendants instruct the end users to install displays on

16 the DS 100 stand?

17      A.    Yes, sir.

18      Q.    What is that evidence, briefly?

19      A.    Well, once again, we have on the screen the

20 image taken from the installation manual.  We'll see in

21 the lower left, for example, that -- pardon me -- that

22 it is showing the displays to be mounted to the arm

23 using tools so that the hinge is connected in that

24 vertical position that allows the side-to-side motion.

25      Q.    And, Dr. Akin, in your opinion, is the DS 100

1  a staple article of commerce?

2      A.    No, sir.  Without attached displays, I think

3  it has no other function.

4      Q.    Okay.  And are you aware of any substantial

5  non-infringing uses of the stands?

6      A.    I am not, sir.

7      Q.    Okay.  And -- and before we go on to

8  inducement to infringe, can we just clarify that the DS

9  100 quad, for the same reasons it infringed Claim 16,

10  what is your opinion with respect to whether the

11  Claim 17 of the '978 patent is infringed with respect to

12  the DS 100 quad with two or more monitors?

13      A.    With two or more monitors, for the reasons I

14  described previously, I found that the DS 100 quad would

15  also infringe Claim 16 and 17.

16      Q.    Thank you.  17?

17      A.    Yes, you interrupted me.  I said and 17, sir.

18              MR. NELSON:  Let's see next slide,

19  please.

20      Q.    (By Mr. Nelson) And, Dr. Akin, did you

21  perform an analysis of the LX system as well to

22  determine infringement with respect to Claim 16 and

23  Claim 17 of the '978 patent?

24      A.    Yes, sir.

25      Q.    And what was your conclusion there?

1      A.      That the LX Ergotron dual display with two

2 displays attached would also infringe Claim 16 of the

3 '978 patent.

4      Q.      Okay.

5                MR. NELSON:  Let's show this.  Next

6 slide, please.

7      Q.      (By Mr. Nelson) Dr. Akin, what are we looking

8 at here in Plaintiffs' Exhibit 640?

9      A.      This is an advertisement from Ergotron

10 offering to sell its stand with two displays attached

11 for use by a single viewer.

12      Q.      Okay.  And, Dr. Akin --

13                MR. NELSON:  Next slide please.

14      Q.      (By Mr. Nelson) -- what is your opinion with

15 respect to whether the DS 100 has the highlighted

16 elements of Claim 16?

17      A.      In my opinion, it has the highlighted

18 elements of Claim 16.

19      Q.      Okay.  And can you just explain that, please,

20 to the jury?

21                Maybe we can go back a slide and you can

22 point out either at the table or in the photo about

23 where those elements are.  Whatever is easier for you.

24                THE WITNESS:  I don't see a photo, so I

25 will approach the exhibit, if I may, Your Honor.

```
 1              THE COURT:  Yes, you may.

 2              MR. NELSON:  Let's go back a slide.

 3      A.    Yes, sir.

 4              As I said, with a pair of displays, this

 5  would be a display system.  You see that we have a

 6  lowermost portion, according to the arm above a surface,

 7  so we have a base member.

 8              It's intended to be used with a pair of

 9  electronic displays for visually displaying information.

10  We have an arm assembly here, this silver part.

11      Q.    Okay.

12      A.    That's connected to and projects from a

13  supporting upright.

14      Q.    Thank you, sir.  I think that's probably --

15  okay.

16              Why don't you go back to the witness stand.

17      A.    Yes, sir.

18      Q.    And, Dr. Akin, before we move on from this

19  slide, did you reach an opinion with respect to the

20  positioning means for positioning the displays with

21  respect to that element?

22      A.    Yes.  I found all three of the A, B, and C

23  paragraphs that are found in the Ergotron LX dual.

24      Q.    Okay.  And --

25              MR. NELSON:  Let's go to the next slide,
```

1  please.

2      A.     All right, sir.

3      Q.     (By Mr. Nelson) And what are we looking at

4  here, the support means?

5      A.     Here, we're looking at the support means,

6  yes, sir.

7      Q.     Okay.

8              MR. NELSON:  Next slide.

9      Q.     (By Mr. Nelson) And, again, Dr. Akin, please

10 tell the jury what we're looking at here.

11     A.     Well, here, we see the Court's function

12 definition in the table; the function of supporting the

13 arm assembly from the base member.

14     Q.     Okay.  And, Dr. Akin, what is your

15 conclusions with respect to whether the LX has the

16 function of supporting the arm assembly from the base

17 member?

18     A.     It has that function.

19     Q.     And, Dr. Akin, what is your conclusion with

20 respect to whether the LX performs the function of

21 supporting the arm assembly from the base member in

22 substantially the same way as the patent structure?

23     A.     Well, it has that function of using variable

24 pressure and friction to support the arm assembly from

25 the base member, sir.

1      Q.     Okay.  And why is that, Dr. Akin?

2      A.     Why is that?  I don't follow your question.

3      Q.     Well, I'm sorry.  How -- that's a bad

4  question.

5             How does the LX perform the function of

6  supporting the arm assembly from the base member in

7  substantially the same way as the patent structure?

8      A.     Well, this is a more complicated joining

9  structure than the other two devices that we looked at.

10  Hidden inside the upright where you cannot see it in

11  this figure, there are some other mechanisms.

12             There is a pair of springs that are inside

13  designed to support part of the weight of the display

14  and the arm, and there's also the friction brake inside

15  here and some ball bearings and rails.  And so that --

16  that structure inside the LX device combines in a

17  similar way to use variable pressure and frictions

18  through those more complicated joints to support the

19  member.

20             This particular member has other features

21  that are not addressed in the claim, such as the ability

22  to raise and lower the display.

23      Q.     Thank you, Dr. Akin.

24             Did you analyze the results achieved by the

25  LX structure you just discussed as compared to the

1  claims in the patent -- in the structure in the patent?

2      A.    Yes, sir.

3      Q.    What was your conclusion with respect to

4  that?

5      A.    Well, the arm is connected, again, to the

6  front of the upright slider, which is somewhat in front

7  of the support stand.  It transmits its weight and the

8  overturning effect of the weight and the arm and the

9  display through the stationary joint in a substantially

10 similar way by using variable pressures and frictions to

11 transmit that weight and torque to -- through the

12 upright onto the base.

13     Q.    Okay.  And so, Dr. Akin, I think we've

14 discussed the function and the way and the result for

15 this claim or this element of the claim.

16           In your opinion, does the LX have the claimed

17 support means?

18     A.    In my opinion, it does have the support means

19 of the Claim 16.

20     Q.    Okay.

21           MR. NELSON:  Let's please go to the next

22 slide.

23     Q.    (By Mr. Nelson) Dr. Akin, what is your

24 opinion with respect to whether the LX has the mounting

25 means as discussed in the patent?

1      A.     The LX has equivalent structure to the

2  mounting means displayed in the patent.

3      Q.     And, Dr. Akin, is this also a

4  means-plus-function claim?

5      A.     Yes.  Again, this is the same

6  means-plus-function display -- claim that we discussed

7  earlier.

8           MR. NELSON:  Okay.  Let's go to the next

9  slide.

10      Q.     (By Mr. Nelson) What are we looking at here,

11  Dr. Akin?

12      A.     We see in the top right the Court's table

13  definition of the function of mounting the displays to

14  the arm assembly.

15           You can see here that again there are two

16  mounting plates or display support plates, and they

17  attach to the rear of the display.  Then they are joined

18  again to a vertical hinge but a different type of

19  vertical hinge, which is then clamped onto the arm.

20  So the structure in this case is that structure I just

21  identified, vertical hinge 7, the display plates 2,

22  connected to the arm assembly 3, and I generally call

23  that a connector, No. 12.

24      Q.     Thank you Dr. Akin.

25           MR. NELSON:  Let's go to the next slide.

1             Actually, before we go to the next slide,

2    let's go back one slide.

3        Q.    (By Mr. Nelson) Dr. Akin, what is your

4    opinion with respect to whether the structure in the LX

5    performs the function of mounting the displays to the

6    arm assembly in substantially the same way as Figures 8,

7    9 of the patent and Figures 19, 20 of the patent?

8        A.    It is my opinion that it does support them in

9    substantially the same way to accomplish substantially

10   the same result.

11       Q.    And let's spend a little bit of detail on

12   substantially the same way part.

13            Could you please tell the jury why the LX has

14   substantially the same way as the structure within the

15   '978 patent for both Figures 8, 9 and also for Figures

16   19, 20?

17       A.    Yes.  So once again in this case, we have

18   another vertical hinge.  It's a slightly different

19   shape.  It's being squeezed together.  It develops

20   bearing pressures and frictions, the combination of

21   which will transmit the weight from in front of the arm

22   of the display and that overturning torque from that

23   little offset distance by variable pressure and friction

24   through that rotational joint to the arm, basically in a

25   substantially similar way to the way that the ball joint

1  accomplishes it in the patented structure for those

2  figures.

3      Q.    And, Dr. Akin, how does the load transfer

4  affect your analysis with respect to this mounting

5  means?

6      A.    The load is transferred through this joint

7  with its overturning torque by means of variable

8  pressure and friction, sir.

9      Q.    Okay.  Thank you.

10          And again just to be clear, Dr. Akin, where

11  is the display mounted from?

12      A.    Well, once again, in this image, we can only

13  see the display support plates, but they are intended to

14  connect to the rear of the display using a standard --

15  industry standard connection points.

16      Q.    Thank you.

17          What is the result achieved by the mounting

18  structure of the LX device?

19      A.    It supports the arm assembly from the base,

20  which is identically the same result as the patented

21  structure.

22      Q.    How does this compare to the result -- I

23  think you just said this actually.  It's the identical

24  result, is that right, as the patented structure?

25      A.    Yes, sir.

1      Q.    Okay.  In your opinion, does the LX have the

2  mounting means of Claim 16?

3      A.    In my opinion, it does, sir.

4              MR. NELSON:  And let's go to the next

5  slide, please.

6      Q.    (By Mr. Nelson) Dr. Akin, did you also

7  analyze where the LX has a means for adjusting with

8  respect to Claim 16, Subpart C of the patent?

9      A.    Yes, I did.

10      Q.    And what was your conclusion with respect to

11  that?

12      A.    Well, it has the same structure that we just

13  talked about.  Again, a vertical hinge accomplishes this

14  side-to-side motion.

15              MR. NELSON:  The next slide, please.

16      Q.    (By Mr. Nelson) Is that what you're

17  discussing, Dr. Akin?

18      A.    Yes.

19      Q.    Just to remind the jury, what is the function

20  as described in the Court's construction for means for

21  adjusting for this element?

22      A.    Well, it has to be able to adjust each of the

23  displays relative to the arm assembly.

24      Q.    Okay.  And, again, Dr. Akin, what did you

25  conclude with respect to whether the LX has the claimed

1  function in the Court's opinion?

2      A.    Well, I concluded it does have this element.

3      Q.    Dr. Akin, could you please compare the LX

4  hinge portion and whether it performs the result in

5  substantially the same way for adjusting the angular

6  orientation as the figures disclosed in Figures 8 and 9

7  of the patent and Figures 19 and 20 of the patent?

8      A.    Well, as I discussed previously, hinge joints

9  have a limitation or kinematic constraint so that the

10 surfaces hold the center of the joint in a fixed

11 position behind the display or relative to the arm.  It

12 helps keep the joint in a fixed position and allows only

13 one axis of rotation.

14          In this case, that one axis of rotation is

15 the side-to-side motion relative to the arm so that each

16 display can be rotated towards another.

17     Q.    Dr. Akin, did you analyze the result achieved

18 by the LX hinge structure and the patent structure?

19     A.    Yes, I did.

20     Q.    And what -- what conclusion did you reach

21 with respect to results?

22     A.    Well, again, the results have to be

23 substantially the same.  They were identically the same

24 in this case.  But it does allow that each display to be

25 moved relative to one another, relative to the arm, and

1  relative to one another.

2      Q.    Thank you.

3            So just to conclude this -- this element for

4  the jury, in your opinion, does the LX have the

5  adjusting means of Claim 16?

6      A.    In my opinion, it does.

7      Q.    Thank you.

8            And, finally, let's turn to the last portion

9  of the claim --

10            MR. NELSON:  Actually, let's go to this

11  slide.  Next slide please.

12     Q.    (By Mr. Nelson) And what are we looking at

13  here, Dr. Akin?

14     A.    This is an image taken from one of the

15  Ergotron advertisements that shows a top view, once

16  again, of the monitors, showing that the vertical hinge

17  keeps the hinge joint center at one location and then

18  rotates about that single axis to accomplish the

19  side-to-side motion.

20     Q.    And if we go down to the big blowup over

21  there, what is your opinion with whether the LX allows

22  the user to angle towards one another -- the displays

23  towards one another to a desired degree?

24     A.    I also find that element present in the LX,

25  sir.

1      Q.      And why is that, Dr. Akin?

2      A.      Well, for the same reason that the user has

3  some desire to adjustment for glare or comfort, that

4  they can move either one or both of the displays to

5  accomplish some desired degree of rotation.

6      Q.      And, Dr. Akin --

7              MR. NELSON:  Let's go to the next slide

8  please.  Next slide.

9      Q.      (By Mr. Nelson) Did you -- what did you

10  conclude with respect to whether the LX infringes

11  Claim 17 of the '978 patent?

12      A.      Well, again, it has to have the pair of

13  electronic displays mounted and satisfy these additional

14  elements beyond those of Claim 16, which is to have the

15  arm above a support surface, that it has to have the

16  rotation about a generally vertical axis, and the

17  displays have to be able to move relative to one

18  another.

19              And for the reasons that I described before,

20  for all the elements that are identical, plus I find

21  these additional elements -- in the LX dual, I find that

22  it also infringes Claim 17.

23      Q.      Thank you.

24              And so with respect to all of the claims and

25  all the two -- actually, the three Ergotron products

1  we've discussed -- the DS 100 horizontal, the DS 100

2  quad and then the LX -- were they based upon

3  consideration of the accused devices with two or more

4  monitors?

5      A.    I -- my understanding is that their sole use

6  is to be used with two or more monitors, but I didn't

7  quite follow your question.

8      Q.    I'm sorry.  Just to be clear for the jury, I

9  want to make -- for example, let's go back to the quad.

10 The quad has the ability to have two or more.  Can it

11 have up to four monitors on that?

12     A.    Yes.

13     Q.    Does that change your opinion about whether

14 it infringes Claim 16 and Claim 17 of the '978 patent?

15     A.    No.  It would just have to have at least a

16 pair of monitors.

17     Q.    Thank you.

18           In all your opinions given today, have you

19 applied the Court's claim construction definitions?

20     A.    I have.

21     Q.    Thank you.

22           And finally, Dr. Akin, I want -- did you

23 analyze also the Claim -- Claim 16 and 17 about whether

24 that Claim 16 and 17 are embodied in Mass Multiples'

25 product?

1    A.    I did.

2              MR. NELSON:  May I approach, Your Honor?

3              THE COURT:  Yes, you may.

4    Q.    (By Mr. Nelson) And, Dr. Akin, could you just

5    tell the jury really briefly why you are analyzing

6    whether Mass' product falls within Claim 16 of the '978

7    patent?

8    A.    I had to analyze this, because in order to

9    recover damages for lost sales of their own product, I

10   have to verify that their own product meets each and

11   every element of the claims in the patent, the '978

12   patent.

13   Q.    In general, Dr. Akin, what was your

14   conclusion regarding the Mass products?

15   A.    My conclusion was that the Mass product does

16   satisfy Claim 16 '978 patent.

17   Q.    Let's just run through them really quickly.

18         Is the Mass product a display system?

19   A.    Yes, sir.  My understanding is up to this

20   date that they've only been sold with the displays

21   attached and manufactured by Mass.

22   Q.    And does the Mass product have a base member?

23   A.    It does have a base member in the lowermost

24   portions, according to arm assembly.

25   Q.    Does it have a pair of electronic displays?

1      A.     It does have a pair of electronic displays.

2      Q.     Does it have positioning means for

3 positioning displays?

4      A.     Yes.  I find each of the three subparagraphs

5 present in that device.

6      Q.     Does the Mass product have an arm assembly

7 for supporting the displays?

8      A.     Yes.  It has an arm assembly.

9             If you turn the device around, I'm sure the

10 jury could see that it's connected to, projecting from

11 one or more constituent parts to be supported above the

12 base -- from the base.

13     Q.     And, Dr. Akin, did you review this product

14 assembled?

15     A.     Yes.  I reviewed it assembled and

16 disassembled.

17     Q.     Okay.  And with respect to support means,

18 what was your conclusion with respect to whether the

19 Mass product had the function that the Court identified

20 for support means in Claim 16 of the patent?

21     A.     It had that function.

22     Q.     And, Dr. Akin, what did you conclude with

23 whether the Mass product operated in substantially the

24 same way as the structure identified in the patent?

25     A.     Well, it wasn't really necessary for me to do

1  a function-way-result test.

2       Q.    Why was that?

3       A.    It's because I found the exact structure for

4  the support means as outlined and claimed in the patent.

5       Q.    And thank you, Dr. Akin.

6             Let's now go to mounting means.  What did you

7  conclude with respect to mounting means and whether the

8  Mass device has the mounting means as discussed in claim

9  '978 -- or Claim 16, Item (c) of the '978 patent?

10      A.    I found that it does have the mounting means

11 of Claim 16, Part (c).

12      Q.    Okay.  And does the Mass product have

13 structure that mounts the displays to the arm assembly

14 and that adjusts the angular orientation of each of the

15 displays relative to the arm assembly?

16      A.    Yes, it does.

17            Once again, there is a rotational joint

18 attached to the rear of the display; in this case, it's

19 ball joint.  It's then connected to the arm, and it does

20 have the means for adjusting as outlined here in

21 Paragraph (c).

22      Q.    Is the structure in the Mass patent identical

23 to the structure identified by the Court for performing

24 those functions?

25      A.    Yes, sir.

1       Q.     And finally, I want to turn to this last

2   element, which is angled toward each other to a desired

3   degree.

4       A.     Yes, sir.

5       Q.     And, Dr. Akin, what is your conclusion as to

6   whether the displays can be angled towards each other to

7   a desired degree?

8       A.     My examination of the device showed that it

9   had that ability, sir.

10      Q.     And, Dr. Akin, in your opinion, therefore,

11  does the Mass product contain each and every element of

12  Claim 16 of the '978 patent?

13      A.     In my opinion it does, sir.

14      Q.     Thank you.  Thank you, Dr. Akin.

15              MR. NELSON:  We will pass the witness.

16              THE WITNESS:  Thank you, sir.

17              THE COURT:  All right.

18              Cross-examination.

19              MR. NIEDERLUECKE:  Your Honor, we just

20  need a minute to set up.

21                      CROSS-EXAMINATION

22  BY MR. NIEDERLUECKE:

23      Q.     Good afternoon, Dr. Akin.

24      A.     Good afternoon.

25      Q.     Good to see you.

1       A.      Good to see you, sir.

2       Q.      Dr. Akin, do you have copies of your reports

3  up there with you?

4       A.      No, sir.

5       Q.      It might help you, if I refer to them.

6              MR. NIEDERLUECKE:  May I approach, Your

7  Honor?

8              THE COURT:  Yes, you may.

9              MR. NIEDERLUECKE:  Thank you.

10             THE WITNESS:  Thank you, sir.

11      Q.      (By Mr. Niederluecke) Dr. Akin, I would like

12 to try to start at a point where I think we can reach

13 some agreements, okay?

14      A.      All right, sir.  Yes, sir.

15      Q.      That's always a good place to start.

16 I understand from your testimony in this case --

17             MR. NIEDERLUECKE:  And, Your Honor, is it

18 okay if I move back and forth to the table?

19             THE COURT:  Yes, uh-huh.

20             MR. NIEDERLUECKE:  Thank you.

21      Q.      (By Mr. Niederluecke) I understand from your

22 testimony in this case that the DS 100 product -- can

23 you see it okay from there?

24      A.      Yes, sir, I can.  Thank you.

25      Q.      As it sets on that table does not infringe

1  the '978 patent, correct?

2       A.    No, sir, that's not correct.

3       Q.    That product right there, as it sets on that

4  table, you believe, in your expert opinion, infringes

5  the '978 patent?

6       A.    It indirectly infringes, yes, and contributes

7  to others to infringe.

8       Q.    Okay.  But indirect infringement and

9  contributory infringement require more than just the

10  object, right?

11      A.    Yes.  It requires that you offer to sell the

12  monitors or mount the monitors with it or other

13  features.

14      Q.    And it requires knowledge of the patent,

15  doesn't it?

16      A.    Yes, sir.

17      Q.    And it requires an actual intent to cause an

18  infringement, doesn't it?

19      A.    I would agree with that, because it requires

20  knowledge of the patent; and, therefore, if you knew of

21  the patent -- yes, I would agree with that.

22      Q.    Okay.  So knowledge and intent is what we

23  need in addition to this device, okay?  Correct?

24      A.    I think that's correct, sir.  I would

25  probably have to review the law section of my report

1  here, if you would like me to do that.

2      Q.    Well, if you want to, that's why I put it

3  there, because I know you've got some law laid out in

4  there that you analyzed your system by.

5            Did you want to take the time to do that?

6      A.    You're asking me about the contributory or

7  inducement infringement?

8      Q.    Yes.

9      A.    Which one are we talking about at this point,

10 sir?

11     Q.    Let's -- let's -- well, we can -- I think --

12 well, let's look at inducing infringement, if you turn

13 to Page 10 of your report.

14     A.    Yes, sir, I'm there.

15     Q.    Would you agree to induce infringement, it

16 takes an active and knowing, aiding, and abating of

17 another's direct infringement, right?

18     A.    I'll have to read this, sir.  Do you see that

19 here?

20     Q.    Under inducing infringement.

21     A.    Yes, I'm there.

22     Q.    And right in your --

23     A.    Yes, that's correct.

24            The legal definition is that it must -- the

25 Defendant must actively and knowingly aid and abet

1 another's direct infringement.

2       Also, the inducer must have actual or

3 constructive knowledge of the patent and must intend to

4 induce infringement.  However, either direct evidence or

5 circumstantial evidence may be sufficient to prove

6 intent.

7       Inducing infringement may include selling

8 components that are used in an infringing apparatus with

9 the knowledge and the intent that its customers would

10 directly infringe by using components to make, use, or

11 sell the patented invention as well as instructing or

12 directing -- I think it should say others -- to perform

13 the infringing acts through labels, through

14 advertisement, or through sales activities.

15     Q.   And that's the law under which you conducted

16 your analysis, correct?

17     A.   Yes, sir.

18     Q.   And you understand, ultimately, the Court

19 here will provide the actual law, right?

20     A.   Of course, sir.

21     Q.   So we have something called literal

22 infringement.  Do you understand that, Doctor?

23     A.   Yes, sir.

24     Q.   Okay.  So for literal infringement, we have

25 direct infringement, correct?  That's one element -- one

1  type of literal infringement?

2      A.    Yes, sir.

3      Q.    And then there's another type called

4  indirect, correct?

5      A.    Yes, sir.

6      Q.    Okay.  And we were just discussing indirect,

7  right?

8      A.    Yes, sir.  We were discussing one of the two

9  types, and then direct.

10     Q.    And now that you've reviewed that, would you

11 agree that indirect requires not only that you show

12 ultimately all the elements are put together, but that

13 you also show knowledge of the patent and intent of the

14 indirect infringer, correct?

15     A.    Correct.

16     Q.    So let's deal with direct infringement --

17     A.    All right, sir.

18     Q.    -- okay?

19     A.    Yes.

20     Q.    Would you agree that this device, as it sets

21 here right now, the DS 100 does not directly infringe

22 the '978 patent?

23     A.    It would not directly infringe until you

24 attach two displays.

25     Q.    Okay.  Until you attach two displays.  And I

1 think that's what you said in your direct testimony as

2 well, correct?

3       A.    I think so, sir.

4       Q.    So if I have those two stands and that -- I

5 have this stand and have these two individual Dell

6 monitors, we still haven't reached a part where we've

7 reached direct infringement, have we?

8       A.    Well, that depends, sir.  Did you sell the

9 monitors with the stand or offer to sell the monitors

10 with the stand, or do they just belong to somebody else

11 that has no association with the stand?

12      Q.    I'm saying, as they set there right now, do

13 they directly infringe?  Do they meet all of the

14 elements of the '978 patent right here?

15      A.    Without the displays attached to the device,

16 then the DS 100 only indirectly infringes.

17      Q.    So we are in agreement that as long as

18 they're not attached, we don't have direct infringement?

19      A.    No, we don't have an agreement, sir.

20      Q.    I thought that's what you just said.

21      A.    No.  I said if you -- if you also offered to

22 sell those monitors or did sell those monitors with the

23 display, even though they're not physically attached,

24 then it's a direct infringement.

25      Q.    Okay.  So now it doesn't take the attachment

1 anymore; is that right?

2          You just told me a minute ago that to be

3 infringing, as you kept clarifying with Mr. Nelson, the

4 Plaintiffs' attorney, that it has to be attached to be

5 infringed, because that's what the claim says, right?

6     A.    I don't think that's the interpretation, sir.

7 My understanding of direct infringement is, if you offer

8 to sell an infringing combination or infringing system

9 or sell, then that's a direct infringement.

10     Q.    Isn't that called contributory infringement?

11     A.    There is a second indirect infringement that

12 is known as contributory infringement where you

13 contribute to others forming or selling an infringing

14 configuration.

15     Q.    Both contributory and inducement of

16 infringement require knowledge and intent, correct?

17     A.    They both require knowledge -- I'm reading,

18 sir.  If you will let me pause for a moment, I'm reading

19 the terms.

20          I would agree with that, because it says it

21 has to take place with knowledge, that the components

22 were especially made or adopted for use in an infringing

23 product, to be a portion of contributory infringement.

24     Q.    Does the '978 patent require that the

25 monitors be attached to the stand?

1    A.    The '978 patent requires that the stand be

2  used with a pair of monitors for a single user.

3    Q.    Do they have to be attached, or can they just

4  be setting there, like those two single stands are right

5  now?

6    A.    I think the logical conclusion is, sir, they

7  have to be physically attached.

8    Q.    Okay.  Thank you.

9          And so the stands don't infringe until those

10 monitors are mounted to them, correct?

11   A.    No, sir.  They indirectly infringe without

12 the presence of the monitors, and they directly infringe

13 if the monitors are mounted or if the monitors are sold

14 with the stand or offered to be sold with the stand.

15   Q.    Do you recall having your deposition taken,

16 Mr. -- Dr. Akin?

17   A.    Yes, sir, I do.

18   Q.    And you were under oath at that deposition,

19 correct?

20   A.    That is correct, sir.

21   Q.    And I assume you did your best to give an

22 accurate and truthful answer, correct?

23   A.    I always try to, sir.

24              MR. NIEDERLUECKE:  Page 124, Counsel.

25              MR. NELSON:  124?

1      MR. NIEDERLUECKE:  Yes, Page 124 of the

2  first day on the 19th, Lines 9 through 14.

3      There we go.

4      Q.    (By Mr. Niederluecke) Dr. Akin, at that

5  deposition, is it correct that I asked you, Do you

6  understand the difference between contributory

7  infringement and direct infringement?

8      A.    Yes, sir, I see the question.

9      Q.    And you said, yes, I do, didn't you?

10     A.    Yes, sir.

11     Q.    Then I asked you to directly infringe, there

12  has to be two monitors mounted on the DS 100 stand,

13  correct?

14     Do you see that?

15     A.    Yes, that's what I said.

16     Q.    And what was your answer?

17     MR. NELSON:  Your Honor, may we approach,

18  please?

19     THE COURT:  Yes, you may.

20     (Bench conference.)

21     MR. NELSON:  I think he is about to

22  violate the limine about any witness giving a conclusion

23  on the ultimate conclusion of law.  It's certainly up to

24  this Court about this.

25     I think it's going to be pretty clear in

1   the jury instructions that direct infringement includes

2   offers to sell, make, use, or offer for sale.  So if

3   he's trying to get our expert to say that it's not an

4   offer for sale, as a matter of law, to be direct

5   infringement, that's completely improper and outside of

6   the limine.

7                   MR. NIEDERLUECKE:  Your Honor, he's

8   already testified that there is contributory

9   infringement inducement.  He's -- he's given his

10  testimony to the ultimate conclusion to these three.

11                  I'm just cross-examining him on his

12  position, because he already said in his deposition they

13  don't directly infringe.

14                  MR. NELSON:  I think he was pretty clear

15  on the stand, but, regardless, it's a conclusion.  We

16  agreed, I think, on this limine.  That conclusion goes

17  to ultimate issues of law which go to jury instructions,

18  and I think it's an agreed jury instruction on this,

19  that an offer of sale, make, use, or sell, offer for

20  sale, it doesn't matter.  And I think he's going for

21  jury nullification here to go around the jury

22  instructions here.

23                  It doesn't matter what he says the answer

24  to this question, because the Judge is going to instruct

25  the jury in the jury instructions.

```
 1                    THE COURT:  I will sustain the objection.

 2                    MR. NIEDERLUECKE:  Your Honor, can I

 3   ask -- my point being, he's already -- he's already

 4   admitted -- I won't ask him anything about offer for

 5   sale.  I'll stay away from that.

 6                    He's bringing it up.  I don't have any

 7   desire to talk about that, but what I do want to talk

 8   about is whether he's admitted that the Defendants don't

 9   directly infringe, which he has.

10                    MR. NELSON:  It's the same thing.  This

11   goes to the exact same issue, Your Honor, about -- about

12   whether there's a make, use, or offer for sale, and

13   that's what he's trying to say, and I think he said it

14   four times now that they do, because they offered for

15   sale, and he's trying to go around it.

16                    MR. NIEDERLUECKE:  Can I bring his

17   report -- in his report, he opines as to the law and

18   designs that there is direct infringement, there's

19   inducement, and there's contributory infringement.

20   How do I cross-examine the witness, the expert, who

21   stands up and says that to the jury, if I don't have the

22   ability to say you're wrong and you said -- you didn't

23   say that in your deposition?

24                    MR. NELSON:  But, Kurt, the problem is,

25   you're going to the problem --
```

1          MR. NIEDERLUECKE:  I'm not.

2          MR. NELSON:  But you are completely

3    forgetting about offers for sale, and that is, again, an

4    ultimate conclusion of law.

5          Go ahead and cross-examine him on any

6    point related to his opinions about what he's actually

7    said, but to bring in something about whether there's a

8    make, use, or offer for sale.  That goes, again, to an

9    ultimate conclusion.

10          MR. NIEDERLUECKE:  I will not, Your

11   Honor.  I won't bring up offer for sale.  He may bring

12   it up, but I won't.  I'm not going to question him on

13   offer for sale.

14                    THE COURT:  Okay.

15                    (Bench conference concluded.)

16   Q.    (By Mr. Niederluecke) Dr. Akin --

17   A.    Yes, sir.

18   Q.    -- none of the Defendants in this case sell a

19   stand with monitors mounted to it, do they?

20   A.    I think I have shown in my testimony this

21   morning, sir, that there are several advertisements

22   where they are offering to sell the stands.

23          So is your question, do they offer to sell

24   them or to mount them?

25   Q.    To actually sell them is my question.

1            Isn't it true that none of the Defendants in

2   this case, including the distributor, Tech Data, the

3   resellers, or for that matter, Ergotron, actually sell

4   stands that are mounted to displays?

5        A.    Well, I certainly demonstrated that you offer

6   them to be sold, and the only logical conclusion would

7   appear to me would be that their sole intent is to be

8   attached to the stand, because otherwise it has no

9   commercial value.  The stand doesn't have commercial

10  value.

11       Q.    So you're saying there is, you believe in

12  your mind, intent, right?

13       A.    Yes, sir.

14       Q.    Okay.  And that's one of the elements of

15  inducement and contributory infringement, correct?

16       A.    Yes, sir.

17       Q.    Now, you mentioned knowledge of the patent is

18  one of the requirements for indirect infringement,

19  right?

20       A.    Yes, sir.

21       Q.    Are you familiar with a number of Defendants

22  in this case?

23       A.    Of course, sir.

24       Q.    Let's talk about Tech Data Corporation.

25  Mr. Kevin Tiesmann is over there representing Tech Data

1  Corporation.

2       A.    Yes, sir.

3       Q.    Tech Data Corporation didn't have any

4  knowledge of the '978 patent until the Plaintiffs sued

5  them; isn't that correct?

6       A.    I believe that's correct, sir.

7       Q.    Okay.  So before July of 2006, Tech Data, in

8  your opinion, doesn't infringe; isn't that right?

9       A.    Unless I'm mistaken and they were included in

10  some of the e-mails in 2001 and 2003, but I don't think

11  they were, sir.

12       Q.    And similarly July of '06, they can't be

13  contributorially infringing prior to that date?

14       A.    Well, that would be a question of law.  If

15  you're correct in your dates, that would be my

16  impression.

17       Q.    You don't have any evidence that either --

18  that Tech Data had knowledge?

19       A.    Of the patent before they were filed with

20  notice of this suit?

21       Q.    Yes.

22       A.    Not that I recall, sir.

23       Q.    And the same was true with CDW,

24  unfortunately, Tommy Hines isn't here; he had to go to

25  the hospital.

1    A.    Sorry to hear that.

2    Q.    Hopefully, he will be back.

3          But CDW -- isn't it also true that you didn't

4  have any evidence that they knew of the patent before

5  July of 2006, when they got sued; isn't that correct?

6    A.    I don't recall them being aware of it before

7  that date, sir.

8    Q.    So if -- if they're -- if there was any

9  reason to say any of these products infringed

10  indirectly, those two companies couldn't be infringing

11  until July of 2006 and later, right?

12    A.    If you're correct about the dates, I would

13  agree, sir.

14    Q.    Now, Dr. Akin, as we heard your testimony,

15  you conducted an infringement analysis of the DS 100

16  dual, correct?

17    A.    Correct, sir.

18    Q.    The DS 100 quad, correct?

19    A.    Yes.

20    Q.    And the LX dual, correct?

21    A.    That's correct.

22    Q.    And you would agree that the discussion we

23  just went through applies to all three of those equally,

24  right?

25    A.    The discussion of direct and indirect

1  infringement, yes.

2      Q.    Now, with regard to the DS 100 --

3      A.    All right, sir.

4      Q.    I'm trying to find more common ground for us.

5  We -- in fact, I'm going to step back, and I'm going to

6  point you to your report and make sure we understand

7  what tests you applied -- what legal tests you were

8  applying when you came to your opinions.

9            If you turn to Page 9.

10     A.    Of the DS 100 report, sir?

11     Q.    Yes.

12     A.    I'm there.

13     Q.    Okay.  And I'm talking about literal

14  infringement, right?

15     A.    All right.

16     Q.    Do you see that?

17     A.    Yes, I see that section.

18     Q.    And that's what you -- that's what your

19  opinion was based on, was literal infringement today,

20  correct?

21     A.    It was based on literal infringement, direct

22  and indirect, yes.

23     Q.    Okay.  Okay.  And would you read the first

24  sentence of -- of the understanding -- the legal

25  understanding you had and what you applied to determine

1    direct infringement?

2        A.    I understand that literal infringement exists

3    if the accused device exactly meets all of the

4    limitations of at least one claim of the patent at

5    issue, period.

6              A claim limitation written in

7    means-plus-function form, reciting a function to be

8    performed rather than definite structure, subject to the

9    requirements of the U.S. -- or U.S.C. is a legal

10   paragraph -- pardon me -- subject to the sub --

11   requirements of Section 35 U.S.C., Paragraph 112,

12   Subsection 6 of 1994.

13       Q.    And, Dr. Akin, that's -- unless you -- if you

14   want to read more, you can, but that's all I think --

15   just my question was in that first one.

16       A.    All right, sir.

17       Q.    So in that first sentence, so the accused

18   device exactly meets all of the limitations of at least

19   just one claim, right?

20       A.    Yes, sir.

21       Q.    Now, we're going to talk about -- I hope I

22   don't trip over all this stuff, but we're going -- I'd

23   like to talk with you a little bit about the tests you

24   applied and this somewhat confusing language, this

25   means-plus-function stuff --

1      A.     Yes, sir.

2      Q.     -- okay?

3             And what you applied was a test

4  means-plus-function, right?

5      A.     Yes.

6      Q.     And it's called the function-way-result test,

7  right?

8      A.     That is correct.

9      Q.     Okay.  And that has -- and that's how you

10  compared the structure of what was in the patent with

11  the structure of the accused device to determine -- your

12  words were the device -- accused device meets all of the

13  limitations.

14     A.     If it has an equivalent structure, yes.

15     Q.     Yes.  So we're looking at structure to

16  structure.

17     A.     Structure to equivalent structure.

18     Q.     And we apply a three-part test?

19     A.     Correct.

20     Q.     Function?

21     A.     Yes.

22     Q.     Way?

23     A.     That's correct.

24     Q.     And result; is that correct?

25     A.     Yes, sir.

```
 1        Q.      Now, is it your understanding that in order

 2   for a corresponding structure in the accused product,

 3   the DS 100 stand -- you have to meet all three of these

 4   tests, at least that they are substantially the same,

 5   right?

 6        A.      Substantially similar, yes, sir.

 7        Q.      And even if one's missing, it doesn't

 8   infringe, does it?

 9        A.      You're correct, sir.

10        Q.      Now, I think we -- from your testimony, I

11   think we agree that -- what I want to talk about first

12   is the mounting means.

13        A.      All right, sir.

14        Q.      And we agree that none of Ergotron's products

15   that you're accusing have the identical structure,

16   right?

17        A.      That is correct, sir.

18        Q.      Okay.  So we're down to this test?

19        A.      We're at this function-way-result test.

20        Q.      In your function-way-result test -- let me

21   get my notes up here -- you talked about variable

22   pressure and friction.

23        A.      Correct.

24        Q.      And I think that was the general basis for

25   your finding of -- that it was -- worked in the same
```

1  way, right?

2      A.    That the variable pressure and friction

3  developed in such a way that they transmit both the

4  weight of the arm and display through the rotational

5  joint, along with the overturning torque of that weight.

6      Q.    Okay.  And -- are you done?

7      A.    Yes.

8      Q.    Okay.  Similarly, with the -- for supporting

9  the arm assembly, you relied on variable pressure and

10 friction, right?

11     A.    That's correct.

12     Q.    When I walk across the floor, am I applying

13 variable pressure and friction to be able to walk?

14     A.    You are, sir.

15     Q.    I am?

16           So am I equivalent to the structure in the

17 patent if I walk across the floor holding these two

18 things in my arm?

19     A.    No, sir.

20     Q.    Okay.  But I had variable pressure, and I had

21 variable friction, didn't I?

22     A.    Yes.

23     Q.    Thank you.

24           Dr. Akin, what is -- let's -- let's talk

25 about the mounting means.

1       A.    All right, sir.

2       Q.    Okay.  What is the result -- let's talk about

3   the DS 100.

4             What is the result of the mounting means of

5   the DS 100?

6       A.    It securely and safely mounts the displays to

7   the arm assembly.

8       Q.    And you believe that's the identical function

9   the patent does, correct?

10      A.    I thought you asked me about results, sir.

11      Q.    I'm sorry.  Thank you.

12            The -- the -- it's the identical result that

13  you believe the patent has -- the patent structure has;

14  is that correct?

15      A.    I'd have to go back and review that claim

16  element.  I don't have the claim in front of me, sir.

17      Q.    Well, didn't you just testify to this whole

18  test of --

19      A.    Yes, sir.

20      Q.    -- function-way-result?

21      A.    Yes.

22      Q.    And -- and -- and you got -- you've given me

23  the results here, and I thought, in your direct

24  testimony, you said that's the same result --

25      A.    Yes, sir.

1      Q.     -- that the structure in the patent has.

2      A.     Yes, sir, if I recall.

3      Q.     Okay.  So let's -- what I want to do here --

4 and I apologize.  This is -- I didn't have a fancy slide

5 presentation, so I'm a little slower than Mr. Nelson.

6 But what I want to do here and I want to put up the

7 function here.  I want to make sure we can see this,

8 okay?

9             Here's the function of Claim 16.

10     A.     I see that, sir.

11     Q.     And -- and can you read us the function?

12     A.     Mounting the displays to the arm assembly.

13     Q.     Mounting displays to the arm assembly.

14 I apologize for my writing.  Hopefully, you can kind of

15 tell what that says.

16     A.     Yes.

17     Q.     Dr. Akin, haven't you just gotten rid of one

18 of these tests?  Didn't you just say the result was the

19 same thing as the function?

20     A.     I can't see what the result is, sir.  I

21 thought I said that --

22     Q.     You said safely and securely -- it safely and

23 securely mounts displays to the arm assembly, right?

24     A.     I think that's what I said, sir.

25     Q.     And the function is mounting displays to the

1  arm assembly.

2      A.    Yes, sir.

3      Q.    So what you're really saying is, the bulk of

4  them really have the function, and then you know what?

5  At the end, they still have the function.

6      A.    No.  The result has to be different from the

7  function.

8      Q.    So that's -- the result has to be different

9  than the function.

10     A.    Yes, sir.

11     Q.    Okay.  And if it's not, then this

12 infringement analysis wouldn't be correct, would it?

13     A.    You're correct, sir.

14     Q.    Now, let's -- let's look at actually --

15 figure out what -- what to grab here, but let's take DS

16 100.  That actually has some screens on it, right,

17 Dr. Akin.  Is that what this is?

18     A.    Yes, sir.

19     Q.    Okay.  And then I'm going to put up here,

20 along with this, the Mass unit that you opine -- scoot

21 it over a little bit -- that you opine infringes -- or

22 I'm sorry -- that you opine is covered by the patent.

23     A.    That was my conclusion, sir, in regards to

24 the Mass device.

25     Q.    So we'll come back to mounting means.  I want

1  to go to support means.

2      A.    All right, sir.

3      Q.    We apply the function-way-result test, right?

4      A.    Yes, sir.

5      Q.    Now, I'm going to put up on the screen to

6  help out -- I have trouble following those little

7  numbers, so I've taken the liberty of giving us a little

8  more color to understand what it is that the Court's

9  claim construction included for structure.

10          Do you see that?

11     A.    Yes, I do, sir.

12     Q.    And does that appear, on your review, to be

13  an accurate indication of what the Court said was the

14  structure that has to be either in the accused device or

15  at least an equivalent to that?

16     A.    That's correct, sir.

17     Q.    Okay.  So what we really have here is a bolt

18  through a hole, right?

19     A.    That's not the only thing, sir.

20     Q.    Okay.  But part of the structure is a bolt

21  through a hole, isn't it?

22     A.    A bolt through a washer connecting to a

23  central plug, yes, sir.

24     Q.    Okay.  And then it's got some body that goes

25  down, the support body, right?

1    A.    The upright support body, yes.

2    Q.    So you believe that this structure, with an

3 arm and a clamp, is substantially the same, it's

4 equivalent, to a bolt through a hole?

5    A.    I don't believe that was my testimony, sir.

6    Q.    So you don't -- you agree with me, then, that

7 a clamp on an arm that's hooked to a post is not

8 equivalent to a bolt going through a hole to hold up an

9 arm.

10    A.    No, sir.  I said that the DS 100 has an

11 equivalent structure.  It -- for example, when that

12 joint is assembled together, the bolt, amongst other

13 things, squeezes that joint together, it forces the

14 washer against the upright.

15         That connection develops a variable pressure

16 that, in part, resists the overturning torque of the

17 weight, and in part, develops a friction force that

18 would be parallel to the upright, that is, vertical,

19 that, in part, would resist the supporting of the weight

20 itself.

21         And there are other support surfaces that I

22 could go on to identify, sir.

23    Q.    I apologize, but I don't know if I understood

24 a thing you said.

25    A.    I'm sorry.

```
 1        Q.    And that's my fault because you're the
 2   doctor.  But what I want to do is I want to look at the
 3   function-way-result here.
 4            Now, let's step back and let's talk about --
 5   we're analyzing this as one of ordinary skill in the
 6   art, correct?
 7        A.    Yes.
 8        Q.    And you define that as a college graduate,
 9   right?
10        A.    With a degree in either industrial design or
11   mechanical engineering at the BS level.
12        Q.    Yes.  And then zero to three years
13   experience.
14        A.    Yes, sir.
15        Q.    Okay.  So we're talking a 22- to 25-year-old
16   kid.
17        A.    I don't remember that far back, sir.
18        Q.    And you are not one of ordinary skill in the
19   art, are you?
20        A.    No, sir.
21        Q.    You have a Ph.D.
22        A.    Yes, sir.
23        Q.    And we already went through your credentials.
24        A.    Yes, sir.
25        Q.    Now, to a 25-year-old kid -- 22- to 25-year
```

1   old kid, who's got, you know, all this mechanical

2   engineering done, let's talk about the way -- in his

3   eyes or her eyes, how this functions.

4           Now, you would agree with me that the

5   structure shown in the support means creates a fixed

6   arm.

7       A.    You -- fixed in regards to vertical

8   elevation, sir?

9       Q.    Yes.

10      A.    Yes, sir, I will agree.

11      Q.    Okay.  So that's one of the ways it supports

12  it.  It supports it in a fixed fashion.

13      A.    I would agree.

14      Q.    And this DS 100 doesn't support it in a fixed

15  fashion, does it?

16      A.    In the viewing mode, it is, yes, sir.

17      Q.    Is that fixed?

18      A.    You just illustrated, sir, that it can slide

19  up and down, which is an additional ability not covered

20  by the claim of the patent, but it's also, in my

21  opinion, not the mode in which you would try to read

22  text off the screen.

23      Q.    But the point is, in the way it's supporting

24  it, that's important.  Because if I lean too hard and it

25  slides down, that's -- that's supporting this in a

1  different way.

2      A.     No, sir, it's not.  As I illustrated -- or I

3  think I mentioned before, that when you squeeze together

4  the vertical clamp on the DS 100, somewhat very

5  analogous to the spring here, you'll see that you have a

6  pressure around the post.  That pressure asserts a

7  horizontal pressure.  Friction develops.

8          And so, again, here we have friction acting

9  around the post in a vertical way that would contribute

10  to supporting the weight and resisting the overturning

11  torque to some extent.

12     Q.     I can push down on this as hard as I want,

13  can't I, and it won't move.

14     A.     The Mass device, sir?

15     Q.     Yes, the Mass device.  Thank you, for the

16  record, for pointing that out.

17     A.     I guess that would be a correct statement.

18     Q.     This is going to break before it moves.

19     A.     Well, you're correct, sir, but I don't see

20  the point.  It's irrelevant.  Because I'm not allowed to

21  compare to an existing device.  I'm supposed to compare

22  it to the patent.

23     Q.     Didn't you opine that this has exactly the

24  structure that's in the patent?

25     A.     One of the structures, yes, sir.

1      Q.    Okay.  Okay.  So it's fair to look at this,

2  because it has exactly the structure, exactly

3  function-way -- I mean, exactly the structure in the

4  patent.

5      A.    I think that's a question of law, but it

6  sounds like a reasonable point.

7      Q.    Okay.  So the only way these are going to

8  move is if these arms shear right off; isn't that right?

9      A.    Well, I could -- wouldn't say necessarily

10  that that's the only failure mode.  You're addressing a

11  failure mode, instead of a functioning mode?

12     Q.    That's one of the failure modes, is shearing.

13     A.    I think I'm -- yes, I would agree that's one

14  of the failure modes.

15     Q.    Okay.  So we have -- so if I push down on

16  this, it slides up and down, because it's height

17  adjustable, correct?

18     A.    It slides down.  Then you have to loosen the

19  bolt and then slide it back up again.  But it -- yes,

20  sir, it is height adjustable.

21     Q.    One of the results is that this (indicating),

22  whether you want to or you accidentally do it, has the

23  ability to slide up and down on this post.

24     A.    The DS 100 does have that vertical adjustment

25  capability, sir, that's not addressed in the claim

1  element.

2      Q.    And it does not -- doesn't have that

3  capability.  This device does not support in a movable

4  fashion.

5      A.    Would you clarify which device is this

6  device?

7      Q.    I'm sorry.  Thank you.

8           The patented structure that we're looking at

9  on the screen for the support means, we said it was

10  fixed.

11     A.    That is fixed, yes, sir.

12     Q.    And the support means here (indicating) is

13  slidable.

14     A.    It is.

15     Q.    Okay.

16          MR. FINDLAY:  Your Honor, I'm not sure

17  all the jury can see the back of that.

18          MR. NIEDERLUECKE:  I'm sorry.

19     Q.    (By Mr. Niederluecke) So this mounting

20  means -- I'm sorry -- this support means on the DS 100

21  provides height adjustability, doesn't it?

22     A.    That is correct.

23     Q.    That's a freedom to the user, correct?

24     A.    That's an additional freedom to the user

25  that's not covered in either claim element.

```
1        Q.    This is fixed, the DV -- the --

2        A.    I think you're --

3        Q.    Let me -- let me refer to the patent.

4        A.    Yes, sir.

5        Q.    The patent's -- the patent's support means is

6   a fixed means.

7        A.    Yes, sir.  And both of them are -- or the

8   structures identified by the Court are fixed with

9   respect to height of the arm center.

10       Q.    So your testimony is that this is equivalent,

11  along with the pole -- don't forget the pole -- to a

12  bolt going through a hole with a washer into a plug.

13       A.    Yes, sir.  For the ways that they transmit

14  the weight and its overturning torque to accomplish the

15  result of supporting the arm assemblies and displays

16  from the base, that is my opinion, sir.

17       Q.    And give me, if you would, an example of

18  something that supports an arm that doesn't do it by

19  variable pressure and friction.

20       A.    Well, sir, one thing that comes to mind would

21  be if one had an integral casting, for example, where

22  the arm and the column were an integral casting.  That

23  would be one example, sir.

24       Q.    So something a little closer to what we see

25  right here (indicating), in fact, right?
```

1      A.     I'm sorry, sir.  I can't see that.

2             No, sir, that's not exactly what I was

3  saying.  That can be disassembled.  I was talking about

4  an integral casting where the horizontal portion and the

5  vertical part going down to the base are a single piece

6  of material.

7      Q.     So you're saying if this axis didn't have

8  this little piece right here (indicating), this wouldn't

9  be what you would consider to be equivalent to that

10 structure?

11     A.     If it were a continuous integral piece, then

12 instead of using bearing pressures and friction, it

13 would use internal stress distributions to accomplish

14 the support means, sir.

15     Q.     The result of the DS 100 says height

16 adjustable and slidable on a pole, isn't it?

17     A.     That is correct.

18     Q.     And the structure in the support means that

19 you claim is equivalent supports in a fixed function,

20 not slidable, correct?

21     A.     You're correct.

22     Q.     By the way, the DS 100 has another feature

23 with this support.  It allows the screens to rotate,

24 doesn't it?

25     A.     You are correct, sir.

1    Q.    That structure does not that's in the patent,

2 correct?

3    A.    You're correct.   That feature is not in the

4 patent.

5    Q.    Let's stay on this since we are talking about

6 this structure.

7          The LX product, you believe that has an

8 equivalent structure to the patented structure as well,

9 right?

10    A.    Yes, sir.

11    Q.    This one's not disassembled, so it may be a

12 little more difficult to understand what's on here, but

13 you disassembled this, right?

14    A.    No, sir, I did not.   I did a partial

15 disassembly.   I was instructed not to damage the unit,

16 so I could not completely disassemble it.

17    Q.    Do you -- do you know what's inside of this

18 box right here (indicating)?

19    A.    Yes, sir, I do.

20    Q.    And this is -- by the way, we're looking at

21 Exhibit -- Defense Exhibit 1004, the LX.

22          And there are -- there are springs in that

23 box, aren't there?

24    A.    Yes, sir.

25    Q.    And have you ever heard of something called

1  constant force technology?

2      A.    Yes, sir.

3      Q.    And constant force technology is technology

4  where you can just kind of press it one place or

5  another, and it's going to stay.

6            Is that kind of how it works?

7      A.    Yes, sir.  It uses -- constant force

8  technology, as you described it, uses springs that are

9  basically adjusted to support the majority of the weight

10  of an object, in this case, the displays, and in

11  addition to that, it has a frictional brake associated

12  with it so that it will, by friction, stop at a position

13  and support the weight.

14            But it's a -- the user can apply a relatively

15  small amount of additional force up or down to overcome

16  that friction and move it to a new position, and then it

17  will, again, stop, and the friction will brake it there.

18      Q.    Right.  So this support means actually has

19  the ability to go down --

20      A.    Correct.

21      Q.    -- right?

22            And that's a spring in there, right?

23      A.    There's a spring and other components in

24  there and a frictional brake to hold it there.

25      Q.    So we've got spring forces acting in this

1  device, right?

2       A.    Yes, we do.

3       Q.    Okay.  We don't have any spring forces acting

4  in that device, right?

5       A.    You are correct.

6       Q.    There's my marker.

7             And, in fact, this one, even better than the

8  DS 100, allows you to, just with fingerprints, adjust

9  the height, correct?

10      A.    Yes.  That's the advantage of the constant

11 force technology and its braking system.

12      Q.    Yeah.  That's a result of the manner in

13 which this structure supports the arm, isn't it?

14      A.    It's a result of the way that arm is designed

15 to allow height adjustment, and then, of course, once

16 you stop it, it becomes a static support as covered by

17 the claim.

18      Q.    So what you want to do is you want to fix it

19 right now, right?

20      A.    Yes, sir.  I would say, in that position, you

21 would find that it is being held -- the arm is being

22 held above a surface, which is supposed to be the

23 result, above the base, as are the displays, through an

24 internal combination of springs creating forces and

25 friction squeezing together.  It has a brake element in

1  it, and it has other elements in it.

2      Q.    So, again, if I lean on this, it's going

3  down, isn't it?

4      A.    You're exactly right, sir.

5      Q.    Kind of back to -- that gets us really right

6  back to this kind of test.

7            What's -- what's the result we end up with

8  for the mounting means, Dr. -- or the support means, Dr.

9  Akin?

10     A.    The mounting means result is supporting the

11  arm assemblies and the displays from the base.

12     Q.    Okay.  That's the result.  That's the result,

13  right?  That's what you just said to me.

14     A.    Yes, sir -- oh, no.  I think I said that, but

15  I believe that's wrong.  Oh, no.

16           Are we talking about mounting means or

17  support means?

18     Q.    We're talking about support means here.

19  And what is -- what is the way -- or the result -- we're

20  looking at the result prong.  What's the result for the

21  support means?

22     A.    It supports the arm above the base.

23     Q.    Okay.  So, again, we have -- you just said

24  supports the arm above the base.  If we look at what the

25  Court has indicated that we should apply for a function,

1    supports the arm from the base.

2            So your testimony is, well, we're right back

3    to function again, and if I can find any structure that

4    gets me back to function, it's equivalent; isn't that

5    right?

6        A.    No.   I've, obviously, misquoted, because the

7    result cannot be the same as the function, sir.

8        Q.    Well, we'll let -- we'll see if -- what

9    the -- what your testimony was and what we heard, but

10   that's what I heard.

11           Now, let's -- if we can, let's get away from

12   the support means and let's talk about the mounting

13   means.

14           Now, the mounting means in the accused

15   structure is a ball and socket, among other things,

16   correct?

17       A.    That is correct, sir.

18       Q.    And I've got a nice color drawing for people

19   like me that aren't as quick as you are, Doctor.

20   Is this, in your view, an accurate representation of

21   what the Court has identified as a structure that's

22   required in the patent?

23       A.    It is, sir.

24       Q.    And that's a ball-and-socket joint, correct?

25       A.    Yes, sir.

1      Q.    And that ball-and-socket joint, as part of

2  the structure, is fixed in one part of the arm; is that

3  correct?

4      A.    Is it fixed at one point in the arm, sir?

5      Q.    Yeah.  I mean, it hooks into an arm at a

6  given spot, right?

7      A.    Yes, sir.

8      Q.    Okay.  And then it's fixed to the back of the

9  display, correct?

10     A.    It is, sir.

11     Q.    Okay.  And you mentioned -- the back of the

12  display, you mentioned some industry standard display

13  mount.

14           Do you remember that?

15     A.    Yes.  And I think I mentioned that there are

16  some standards for the dimensions between where screws

17  are supposed to be located.

18     Q.    Do you know what that standard's called?

19     A.    I believe it's the -- called the VSA

20  standard.

21     Q.    The VSA standards?

22     A.    I believe that's it, sir.

23     Q.    Do you know who came up with the VSA

24  standards --

25     A.    I do not.

1     Q.     -- to mount a -- stands to the arm -- or to

2  the display?

3     A.     I do not, sir.  I thought it was a committee

4  of industrial people, sir.

5     Q.     Would it surprise you to know that Harry

6  Sweere, the founder of Ergotron, actually developed and

7  contributed that VSA mount configuration to the

8  Standards Committee?

9     A.     That would make sense to me that he would be

10  one -- that his company would be represented on such a

11  committee.

12     Q.     Now, if we look at -- so what we have here is

13  a ball and socket hooked into a fixed location on an

14  arm, correct?

15     A.     Correct.

16     Q.     And we go back to the DS 100 system.  This is

17  a hinge (indicating), right?

18     A.     Yes, sir.

19     Q.     It's not a ball and socket, correct?

20     A.     It is not literally a ball and socket, no,

21  sir.

22     Q.     Correct.  Now, this hinge is slidably

23  connected to the arm, isn't it?

24     A.     You're correct.

25     Q.     It allows the user the freedom to put

1  whatever size stand or whatever size display they want;

2  isn't that correct?

3      A.    Within reason, yes, I would say that's

4  correct.

5      Q.    So one of the results we get is

6  flexibility -- make sure I spell that right -- in

7  monitors; is that correct?  That's a result of this

8  sliding ability?

9      A.    Monitor size is, yes, sir.

10     Q.    Okay.  And this structure doesn't have that

11  benefit, does it?

12     A.    No, sir, it does not.

13     Q.    Now, this also moves in just one degree of

14  freedom, right?

15     A.    That is correct.

16     Q.    It is a hinge, just like a hard door, right?

17     A.    Yes, sir.

18     Q.    So you can't have that full 360 degree of

19  freedom that Mr. Segar talked about with the ball and

20  socket where you said you can kind of do everything.

21         Do you remember that testimony?

22     A.    I -- I think I would disagree with you, sir.

23  I think maybe the question is not quite -- let me -- let

24  me state what I think you said to me, sir.

25         Are you asking me whether a single axis can

1 rotate a full 360 degrees around the axis?  Is that your

2 question?

3     Q.    No.  I'm talking about -- I'm asking you

4 whether -- whether this hinge can rotate about any axis.

5     A.    No, sir.  The hinge can only rotate about a

6 single axis, whereas a ball joint can rotate about three

7 mutually perpendicular axes.

8          So it, as I said earlier, includes the hinge

9 as a subset of its rotational abilities, that is, the

10 rotational abilities of a ball and joint.

11     Q.    I'm going to ask you this question that I

12 asked you at your deposition since you've come up

13 with -- you've come up with a structure for me.

14          This whole subset idea, can you tell me what

15 structure allows rotation in one device that is not

16 going to be a subset of your ball and socket?

17     A.    I'm not sure I understand the question.

18 Are you asking me, is there another structure that I

19 could suggest to you that would allow you to accomplish

20 that rotation without being the hinge or a ball and

21 socket?

22     Q.    Or without being a subset of a ball and

23 socket, because that's what you -- that's how you found

24 this to be equivalent, right?  It's a subset of a ball

25 and socket.

1    A.    Yes.  A hinge is a subset for rotational
2  abilities of a ball and socket, but I'm not sure I
3  understand what you're saying in your question, sir.
4    Q.    Well, let me step back.
5          Mounting means also includes the means for
6  adjusting the angular orientation of the screens, right?
7    A.    No, sir.  That's the adjusting means.
8    Q.    Okay.  The adjusting means has the angular
9  orientation, right?
10   A.    It does.
11   Q.    And it's the same structure as the mounting
12 means.
13   A.    It is the same physical structure, yes, sir.
14 I'm not sure what question we've got pending.
15   Q.    And my question is, can you tell me a device,
16 a structure, any structure, that has the function of
17 adjusting the angular position of the displays side to
18 side, like we talked about, that wouldn't be a subset of
19 this three-axis system?
20   A.    Yes, sir.
21   Q.    And what device would that be?
22   A.    Well, for example, I believe that a four-bar
23 kinematic linkage would accomplish that rotational
24 ability in a substantially different way.
25   Q.    What did you call it?

1      A.    A four-bar kinematic linkage.

2      Q.    Oh, okay.

3            Now, with the hinge, I just rotated the back

4  part (demonstrating).  Did you see that?

5      A.    No, sir, I did not see that.

6      Q.    Here, I'll do it again (demonstrating).

7  There's the hinge.

8      A.    Yes, sir.

9      Q.    I loosen it a little bit, and I rotate it.

10 Do you see that?

11     A.    Yes, sir.

12     Q.    Now it just goes up and down, correct?

13     A.    Correct.

14     Q.    And, in fact, when it just goes up and down

15 on the DS 100, it now allows the screens to tilt, right?

16     A.    That is correct.

17     Q.    Now, you would agree with me that in this

18 configuration, even if you mount screens on this, you

19 mount displays on this --

20     A.    All right, sir.

21     Q.    -- it doesn't have the ability to angle -- it

22 doesn't -- in this configuration right here, the screens

23 are going to be up and down, right, tilt?

24     A.    Correct.

25     Q.    They can't pan, right, in this configuration?

1    A.    Correct.

2    Q.    Now, did you notice that one degree of

3  freedom on the DS 100 and how, when you move the

4  displays, one of the other results you have is you're

5  guaranteed that it's gong to stay in that same

6  orientation?

7          So it doesn't matter whether I grab it down

8  here or grab it up here or how I move these, I can reach

9  across, and I can move them like that (demonstrating),

10 can't I?

11   A.    Correct, sir.

12   Q.    And no matter where I grab them and apply

13 force, they're just going to move in one line, one

14 angular motion, right?

15   A.    I would agree with that in general, yes.

16   Q.    Now, with the ball and socket, this is going

17 to move differently, depending on where I touch it,

18 right?

19   A.    You are correct.

20   Q.    So if I go like that or I go like this

21 (demonstrating), you're not in the line anymore, are

22 you?

23   A.    Well, as you're pointing out, you can move it

24 in two different axes, but it still includes the

25 side-to-side capability.

1    Q.    Somewhere in there, right?

2    A.    Yes, it's present.

3    Q.    But -- but -- but to get it to move exactly

4    side to side, I'd have to grab this with two hands or

5    I'd have to be really right on that exact spot -- and I

6    didn't hit it there; we'll try it again and see --

7    really on that -- almost that exact spot to get it to

8    turn side to side like a hinge does (demonstrating).

9    A.    I would agree that there would be a tendency

10   for the ball joint to rotate about more than one axis

11   simultaneously, depending on how you grabbed it, how you

12   moved it.

13   Q.    So here's another result:  Controlled motion

14   versus uncontrolled motion (demonstrating).  Wouldn't

15   you agree with me?

16   A.    I wouldn't go so far as to call it

17   uncontrolled.  I would -- I would simply observe that it

18   is an additional rotational ability beyond the claim

19   element that's not relevant to the claims at discussion.

20   Q.    Now, let's talk about the way it's supported,

21   the way the hinge supports the display, okay?

22   A.    Yes.

23   Q.    This hinge --

24   A.    The way the hinge mounts the display?

25   Q.    The way it mounts the display to support the

1  weight, I think you said.

2       A.    Yes.  All right.

3       Q.    This hinge on the DS 100 --

4       A.    All right.

5       Q.    -- supports the weight by a -- by a shear

6  force essentially, right?

7       A.    No, sir.

8       Q.    It's not friction, is it?

9       A.    Oh, yes, it is, sir.

10      Q.    Okay.  Because I remember -- I remember what

11 the --

12      A.    In part it's -- I said, in part, it's

13 friction.

14      Q.    Friction and variable force.

15      A.    Variable pressure and variable friction that

16 results in supporting the weight and the overturning

17 torque of the displays being in front of the arm.

18      Q.    So it's mounted the same way that a support

19 structure is, right?  They both rely on variable

20 bearing, pressure, and friction.

21      A.    They're not mounted in the same way, sir.

22 They have different structures, so they are both

23 accomplishing that in substantially the same way,

24 however, for the mounting means.

25      Q.    And so if I -- if I press down on this

1  (demonstrating) --

2      A.    Yes.

3      Q.    -- the DS 100 hinge, because it's relying on

4  friction to support the mount, is this going to slide at

5  some point?  Is it going to slip?

6      A.    It's not going to slip, no, sir.

7      Q.    Okay.  If I happen to lean on this one,

8  what's going on happen?  And I'm talking about the Mass

9  product with the ball and socket.

10     A.    Well, in that case, you have -- because you

11  were pushing down, you have caused the display to go

12  forward in sort of a tilting mode.

13     Q.    It's -- it's supporting it by friction.  The

14  ball and socket relies on friction, right?

15     A.    The ball and socket is relying on friction on

16  the bearing surfaces to support the -- to mount the

17  displays, as is the DS 100.

18     Q.    You're sure about that.  You're sure that --

19  you're sure that this is a friction that I can overcome.

20  You explained it with the box.  I remember the box on

21  the floor.  I can overcome this friction before this

22  device breaks, right?

23     A.    I did not say that, sir, because you are

24  pushing down.  I said that the friction that is present

25  is that there's a horizontal surface at the top of the

1  hinge, and there's a horizontal surface at the bottom of

2  the hinge, and you're trying to rotate it forward, tilt

3  it over.

4           And so the force on the top, horizontally,

5  friction will pushing one direction.  The friction force

6  on the bottom will be in the other direction.  They're

7  separated by a distance, a lever arm, and that

8  accomplishes, in part, resisting the overturning torque.

9  Now, in addition, you're primarily pushing down on the

10  joint, which is putting more weight on it.  So friction

11  has to be present in the hinge joint as well.

12      Q.    Is that the primary reason this display is

13  not going town right now, is friction?  Is that what

14  your testimony is, Doctor?

15      A.    Neither I or Dr. Stoll, when asked to do

16  calculations on that -- so I can't give you, you know, a

17  calculated answer, but I would agree with you that in

18  this device, I would think that the majority is being

19  carried by the bearing pressure but not all.

20      Q.    I can scoot these displays with the accused

21  hinge like that (demonstrating), if I wanted to,

22  couldn't I?

23      A.    Yes, sir.

24      Q.    Can't do it with the -- with the '798

25  structure, can I?

1     A.    No, sir.

2     Q.    We've got more sliding.

3           All right.  Let's try to get through this.

4  It's been a long day.

5           The LX also has hinges, does it not?

6     A.    It does indeed.

7     Q.    And they go side to side like the DS 100?

8     A.    Correct.

9     Q.    Again, the LX slides, doesn't it?

10    A.    You're correct, sir.

11    Q.    It doesn't have a mount that goes into a

12 hole, does it?

13    A.    It does not.

14    Q.    This provides a slidable support to the

15 display, doesn't it?

16    A.    Yes, sir.

17    Q.    And that '978 structure does not, correct?

18    A.    You are correct, sir.

19    Q.    Dr. Akin, in each of your analyses of the

20 structure for the means-plus-function, you rely on these

21 terms of variable pressure -- or I'm sorry -- variable

22 bearing pressure and friction, correct?

23    A.    Yes, sir.

24    Q.    And you rely on those regardless of whether

25 you're talking about the mounting means or whether

1   you're talking about the support means, correct?

2       A.    I found those ways in both the supporting

3   means and the mounting means, yes.

4       Q.    So you found two types of forces that are

5   present in basically all the mounting stuff we've looked

6   at and the support stuff we've looked at?

7       A.    Forces and torques, yes.

8       Q.    And so your conclusion is that based on

9   somebody of ordinary skill in the art who's either just

10  graduated from college or has been out for three years,

11  that somebody in college with a degree, if I asked them,

12  is a hinge equivalent to a ball and socket, your

13  testimony is that that college graduate is going to say

14  yes?

15      A.    No, sir, that's not my testimony.  Whether or

16  not they might be equivalent -- equivalent would depend

17  on the application, because there are other aspects

18  other than just rotation.

19          What I have said is that the single degree of

20  freedom axis rotation, the visible part of a hinge

21  action is a subset of the more general 3 degrees of

22  rotation of a ball joint.

23              MR. NIEDERLUECKE:  I'm getting close,

24  Your Honor.  If you want to keep going for just a slight

25  while longer, I'll be done.

```
 1                    THE COURT:  All right.

 2        Q.    (By Mr. Niederluecke) Dr. Akin --

 3        A.    Yes, sir.

 4        Q.    -- you explained to us in your direct that

 5  the DS 100 device is a term of art, but it's not a

 6  staple article of goods or staple goods; is that right?

 7        A.    That's my opinion, yes.

 8        Q.    And so we all understand what you -- what you

 9  mean, is that there's only one particular way to use

10  this device, and it's an infringing way; is that right?

11        A.    As it exists there, it is intended, in my

12  opinion, to be combined with a pair of displays which

13  would always form an infringing system.

14        Q.    So you're just looking at a device that

15  allows -- as it's here, that allows two displays to

16  tilt?

17        A.    Yes, sir.  Because, as you clearly

18  illustrated for us, it is easy to reconfigure those

19  joints into a mode that would be an infringing mode --

20        Q.    Dr. Akin, I'm going to stop you there.  You

21  don't have that in your report, do you?

22  In fact, let me ask you --

23                    MR. NELSON:  Your Honor, may we approach,

24  please?

25                    THE COURT:  Yes, you may.
```

```
 1                    (Bench conference.)

 2               MR. NELSON:  I believe what's happened

 3    is, he was trying to give a truthful answer, and

 4    Mr. Niederluecke cut him off.

 5               And Mr. Niederluecke is going to open the

 6    door and ask a question, and Dr. Akin has to give a

 7    response, and Dr. Akin should be able to give his entire

 8    response to the question.

 9               MR. NIEDERLUECKE:  And he's brought this

10    up sideways through the substantially non-infringing

11    uses.

12               What I'd like to -- Your Honor, what I'd

13    like to tell him is, I want him to focus on the

14    structure as it's shown here.

15               MR. NELSON:  He just cut Dr. Akin off.

16               MR. NIEDERLUECKE:  I did, because he was

17    about to testify to something that's not in his report.

18    And in fact, as I said --

19               THE COURT:  What was the question that

20    you asked?

21               MR. NIEDERLUECKE:  The question was

22    whether or not -- I was asking him about the tilting,

23    and so this configuration, as it sits here, doesn't

24    infringe.

25               And he was about to go into the
```

1   explanation that he hasn't brought any expert opinion

2   on, which is -- as we talked about earlier, which is you

3   could -- well, that you could just turn them around, and

4   then it wouldn't be capable of infringement.  And that's

5   not the basis of his infringement analysis.

6            MR. NELSON:  He's got to give a truthful

7   answer to that.  He can't cut him off.  He has -- he has

8   asked the question.  He has just opened the door to the

9   question.

10           MR. NIEDERLUECKE:  I can rephrase the

11  question and say, I want you to focus on just as it is

12  setting here.

13           MR. NELSON:  It doesn't really matter --

14           THE COURT:  Well, I'll allow him to ask

15  the question.  I think you've opened the door with it.

16           (Bench conference concluded.)

17      Q.   (By Mr. Niederluecke) Dr. Akin, I want to

18  analyze this product just as it's configured here, okay?

19  And my question is, just as it's configured here --

20      A.   Yes, sir.

21      Q.   -- it provides tilting, correct?

22      A.   Correct.

23      Q.   And it doesn't provide the angling towards

24  each other to a desired degree as the patent requires,

25  correct?

1      A.      You are correct.

2      Q.      Dr. Akin, you saw some fixtures put up on the

3  board that were some instruction manuals, correct?

4      A.      Yes, sir.

5      Q.      You've also seen that Ergotron advertises the

6  use of its product as being able to either tilt or pan,

7  correct?

8      A.      You are correct.  I did not find that in the

9  installation manual, but there was at least one document

10  presented by Ergotron that showed that, sir.

11      Q.      This is a mounting solution product

12  selection.  Do you see that?

13      A.      I'm looking at it, sir.  It's a little bit

14  out of focus for me, sir.

15      Q.      It may just be a bad picture.

16      A.      Are you referring to the side view up at the

17  upper left portion?

18      Q.      Well, I just want to identify the document,

19  so we're clear.

20              MR. NELSON:  Your Honor, could we

21  approach?

22              THE COURT:  Yes.

23              (Bench conference.)

24              MR. NELSON:  It's now seven minutes past

25  the hour, and we would request -- there doesn't appear

1  to be a stopping point in sight.  We're going to have at

2  least a couple of minutes of redirect.  We would ask

3  that perhaps we take a break for the evening at this

4  point.

5              MR. NIEDERLUECKE:  I -- literally, I've

6  got like five minutes left, and I'm done.

7              THE COURT:  All right.

8              (Bench conference concluded.)

9      Q.    (By Mr. Niederluecke) Dr. Akin, do you see in

10  the upper left-hand corner, it says DS 100?

11     A.    I see a vertical monitors pair, sir, I've not

12  considered before.

13     Q.    Well, we'll fix that, and we'll give you this

14  DS 100 series.

15     A.    Thank you, sir.

16     Q.    You recognize those series on the bottom,

17  right, those configuration options?

18     A.    Again, it's so out of focus for me, sir --

19  oh, that?

20     Q.    How about that?

21     A.    Sir, it's out of focus.  Could you give me

22  the hard copy or -- I mean, that's getting better, sir.

23     Q.    Okay.  Let me roll it here, and I'll freeze

24  it.

25     A.    Okay.  You are -- I think it says

1 freestanding base, cross bar.

2     Q.    That's the DS 100 dual, isn't it?

3     A.    Two sliding pivots.  It appears to be, yes,

4 sir.

5     Q.    Okay.  And if you look down by my fingers --

6 you can see my pen on my finger.  I apologize.

7     A.    All right, sir.

8     Q.    You have a side view right next to my left

9 finger there that shows that the LCD can be put in a

10 configuration that tilts up to 180 degrees forward and

11 back, correct?

12     A.    That's -- well, I'm not sure that it

13 illustrates a 180-degree aspect, but it does illustrate

14 that it can tilt as you have identified, sir.

15     Q.    So in Ergotron's advertisement --

16     A.    You're correct.  It does say up to 180

17 degrees.  I couldn't quite read that.

18     Q.    Okay.  So in their advertisements, they

19 actually advertise that this system can be used to put

20 it in that tilt fashion as well, correct?

21     A.    You are probably correct, sir.  I do not

22 recall seeing an advertisement of that, but I will

23 assume you can produce one for me.  I don't see that

24 it's unreasonable to expect that.

25     Q.    And isn't it true, Dr. Akin, that you don't

1  know how end users set up the DS 100 system, do you?

2      A.    Well, other than the fact that the

3  installation manual instructs them to mount the

4  monitors, I suggest -- I guess that's -- would be what I

5  would know.

6      Q.    Okay.

7      A.    They would mount the monitors to the hinge.

8      Q.    Okay.  So you saw the installation manual?

9      A.    Yes, sir.

10      Q.    But you don't know -- you didn't go talk to

11  any customers and say, how do you mount this, correct?

12      A.    I did not, sir.

13      Q.    Whether they prefer to have it in a tilting

14  function or a panning function?

15      A.    You're correct.

16      Q.    Okay.  And so one non-infringing way to set

17  this up is to set it up so it doesn't move, have it all

18  finally bolted down in a tilting fashion; isn't that

19  correct?

20      A.    If the hinges, for example, were permanently

21  in that position, welded to the arms --

22      Q.    Well, let's say slide -- slidably moving,

23  but --

24           MR. NELSON:  Again, Your Honor --

25      Q.    (By Mr. Niederluecke) -- in this -- in

```
 1  this --

 2                  THE COURT:  Excuse me.

 3      Q.    (By Mr. Niederluecke) -- in this tilting

 4  fashion or --

 5                  THE COURT:  Counsel, just a moment.  We

 6  have an objection.

 7                  (Bench conference.)

 8                  MR. NELSON:  He has, again, cut off

 9  Dr. Akin in mid sentence so that he cannot say -- to

10  finish the answer.  We appreciate it to give Dr. Akin

11  the ability to ask the -- to answer the question.

12                  He has opened the door here, and he can't

13  ask the question and get an answer he doesn't like and

14  then cut him off in mid sentence.

15                  THE COURT:  Let him finish his answer.

16                  (Bench conference concluded.)

17                  THE COURT:  All right, Dr. Akin.  You may

18  finish your answer.

19      A.    I was saying, sir, that if the hinge were

20  welded or somehow permanently affixed, even if it were

21  slidable, but permanently affixed and could only tilt,

22  then I would agree with you, in my opinion, that that

23  would be a non-infringing product, sir.

24      Q.    (By Mr. Niederluecke) Dr. Akin, how long have

25  you been working as a paid technical consultant?
```

1          A.      Since 1968, sir.

2          Q.      Forty years?

3          A.      Forty years, yeah.  Time flies when you're

4  having fun.

5          Q.      And you've been acting as a paid expert

6  witness in about 35 cases?

7          A.      Oh, no, sir, not -- not that I recall.  I

8  would think, over the 40 years, I would sort of remember

9  approximately 20 cases.  I really don't remember the

10 number.  Some of them product liability cases and some

11 of them patent cases.

12         Q.      And you're paid to be here, right?

13         A.      I am paid for my time required to develop my

14 opinions, yes, sir.

15         Q.      And that's at $350 an hour?

16         A.      Yes, sir.

17         Q.      And you have provided the opinions you

18 provided on the stand today, correct?

19         A.      Yes, sir.

20         Q.      And you provide -- you anticipate providing

21 an opinion regarding whether or not the '978 patent is

22 invalid, correct?

23         A.      You are correct.

24         Q.      Okay.  And you provided an opinion about

25 whether or not the Mass product infringes, correct,

1  whether the Mass -- well, first, whether or not the Mass

2  product is covered by the '978 patent, correct?

3       A.    I have rendered that opinion, yes, sir.

4       Q.    Yes.  And you've also rendered an opinion

5  whether or not the Mass product infringes, right?

6       A.    I don't understand, sir.

7       Q.    Isn't it true, Dr. Akin, that you provided an

8  opinion in this case, on behalf of Plaintiffs, that that

9  Mass product you see right there did not infringe Dell's

10 '170 patent?

11      A.    I would have to go back and review my report

12 on the '170 patent, sir.

13      Q.    You don't know, as you sit on the stand right

14 now, if you opined that the '170 patent was not

15 infringed by that product?

16      A.    I developed over 450 pages of report, sir, so

17 I have to admit, at the moment, I cannot remember.

18      Q.    So you didn't know if you were going to come

19 in here and say, you know, whether it infringes or you

20 were going to come in here and say it doesn't infringe,

21 correct?

22      A.    I believe my instructions were -- was that I

23 would not be testifying about the '170 patent, so I did

24 not review my -- that portion of my report, sir.

25            MR. NIEDERLUECKE:  Your Honor, may I

1    approach?  And I just have one more question.

2                    THE COURT:  All right.

3                    MR. NIEDERLUECKE:  Or two more, actually.

4        Q.   (By Mr. Niederluecke) If I can give you your

5    report, and if you could just read the title of it.

6        A.   Yes.  The title of this report is Rebuttal

7    Report to Expert Report of Dr. Ariz K. Silzars dated

8    July the 2nd, 2008, and I am the author of this report

9    for Mass Engineered.

10       Q.   And in that report, is it not correct that

11   you opined that the Mass device did not infringe the

12   claims of Dell's '170 patent?

13       A.   I assume that will be on the page that you

14   marked, sir?

15       Q.   Could be.

16       A.   You are correct.  That is a summary of my

17   opinion on Page 7 of this report.

18       Q.   And you heard the testimony here of

19   Mr. Moscovitch that he admits they infringe.

20       A.   Yes, I heard that testimony.

21       Q.   Thank you, Doctor.

22       A.   You're welcome, sir.

23                    THE COURT:  Redirect?

24                    MR. NELSON:  I have one question.

25                    REDIRECT EXAMINATION

1  BY MR. NELSON:

2     Q.    Dr. Akin, do height adjustability or leaning

3  on monitors or any of these other functions that

4  Mr. Niederluecke demonstrated have anything to do with

5  the functions claimed in Claim 16 and Claim 17 of the

6  patent?

7     A.    No.

8              MR. NELSON:  Thank you.

9              THE COURT:  All right.  Very well.

10 May this witness be excused -- well, no further

11 questions?

12             MR. NIEDERLUECKE:  No further questions,

13 Your Honor.

14             THE COURT:  Thank you.  You may stand

15 down.

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  All right.  Ladies and

18 Gentlemen of the Jury, let me visit with you just a

19 minute about where we are.

20             I have allowed each side in this case up

21 to 15 hours of testimony.  As it currently stands, the

22 Plaintiff has used 7 hours, and the Defendant has used 8

23 hours.  Well, that adds up to 15, which means we've

24 still got another 15 hours to go of testimony, if they

25 use it all.

1            Now, they may be kind and gracious and

2  give you some time back, and I will be encouraging them

3  to do that.

4            I had told you that we were going to try

5  to finish the evidence on Monday, and that is still my

6  hope, but in order to do so, we're going to have to work

7  very hard tomorrow, Friday, and on Monday to get through

8  with the evidence.

9            My hope would be that we could finish the

10  evidence on Monday, come back on Tuesday morning; I

11  would deliver my charge to you; you would hear closing

12  arguments; and then by late morning or certainly lunch,

13  at that time you could begin your deliberations on

14  Tuesday.

15            If we're not able to complete the

16  evidence on Monday, then there's a very good chance it

17  will bleed over long enough into Tuesday that we won't

18  have enough time to get everything done on Tuesday, and

19  we'll come back on Wednesday.

20            So my question to you is -- and I want

21  you -- we want to work at your convenience, because

22  y'all are being, I know, greatly inconvenienced to do

23  your public duty and service to be here as jurors, and I

24  know both sides and the Court greatly appreciate that.

25  Would it inconvenience anyone to start at 8:30 in the

1  morning and perhaps go until 5:30 tomorrow afternoon?

2              If it would, raise your hand.  Nobody is

3  going to be mad at you.  We'll understand.

4              All right.  Would you rather start at

5  8:30 and maybe go till 5:30 tomorrow and maybe do that

6  again on Monday to, hopefully, get through with the

7  evidence on Monday without the necessity of going over

8  into Wednesday?  All of -- who would be in favor of

9  that, please raise your hands.

10             I thought that might be the case.  I'm

11 pretty good at predicting juries, so...

12             All right.  Well, we'll do that then.  If

13 y'all will -- wouldn't mind getting up a little bit

14 earlier in the morning, I'm driving back and forth from

15 Tyler.  I don't like getting up earlier either, but I

16 think that's what we really need to do to try to get

17 through.  I know that nobody wants to work on Saturday

18 or Sunday.

19             So we'll see you back here in the

20 morning.  Please plan to be here ready to go at 8:30,

21 and attorneys be ready to go, and we're going to start

22 the evidence promptly at 8:30.

23             The jury is excused.

24             COURT SECURITY OFFICER:  All rise.

25             THE COURT:  Be adjourned.

1          (Recess.)

2              *       *       *       *

3

4

5                      CERTIFICATION

6

7          I HEREBY CERTIFY that the foregoing is a

8   true and correct transcript from the stenographic notes

9   of the proceedings in the above-entitled matter to the

10  best of my ability.

11

12

13

14  /s/_____                _____

    SUSAN SIMMONS, CSR                        Date
15  Official Court Reporter
    State of Texas No.:  267
16  Expiration Date:  12/31/08

17

18

19  /s/_____                     _____

    JUDITH WERLINGER, CSR                      Date
20  Deputy Official Court Reporter
    State of Texas No.:   731
21  Expiration Date  12/31/08

22

23

24

25