1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
2                         MARSHALL DIVISION

3   MASS ENGINEERED DESIGN, INC. *   Civil Docket No.
                                 *   2:06-CV-272
4   VS.                          *   Marshall, Texas
                                 *
5                                *   November 19, 2008
    ERGOTRON INC., ET AL         *   8:30 A.M.
6
                        TRANSCRIPT OF TRIAL
7            BEFORE THE HONORABLE LEONARD DAVIS
                 UNITED STATES DISTRICT JUDGE
8                       AND A JURY

9   APPEARANCES:

10  FOR THE PLAINTIFF:      MR. MAX TRIBBLE
                            Susman Godfrey
11                          1000 Louisiana St., Suite 5100
                            Houston, TX   77002
12                          MR. JUSTIN NELSON
                            MR. JAY NEUKOM
13                          Susman Godfrey
                            1201 Third Avenue, Suite 3800
14                          Seattle, WA   98101
                            MR. OTIS CARROLL
15                          Ireland Carroll & Kelley
                            6101 South Broadway, Suite 500
16                          Tyler, TX   75703
                            MR. FRANKLIN JONES
17                          Jones & Jones
                            201 East Houston Street
18                          Marshall, TX   75670
                            MR. GREG MAAG
19                          MR. JONATHAN PIERCE
                            Conley Rose
20                          600 Travis Street, Suite 7100
                            Houston, TX   77002
21
    APPEARANCES CONTINUED ON NEXT PAGE:
22  COURT REPORTERS:        MS. SUSAN SIMMONS, CSR
                            MS. JUDY WERELINGER, CSR
23                          Official Court Reporters
                            100 East Houston, Suite 125
24                          Marshall, TX   75670
                            903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)

1

2 APPEARANCES CONTINUED:

3 FOR THE DEFENDANTS:      MR. KURT NIEDERLUECKE
  (Ergotron, Inc.)         MS. LORA FRIEDEMANN
4                          MR. GRANT FAIRBAIRN
                           MS. LAURA MYERS
5                          Fredrikson & Byron
                           200 South Sixth St., Suite 4000
6                          Minneapolis, MN   55042
                           MR. ERIC FINDLAY
7                          Ramey & Flock
                           100 East Ferguson, Suite 500
8                          Tyler, TX   75702

9
  (Dell, Inc.)             MR. CRAIG TYLER
10                         Wilson Sonsini Goodrich & Rosati
                           8911 Capital of Texas Highway
11                         Westech 360, Suite 3350
                           Austin, TX   78759-7247
12                         MR. BLAKE ERSKINE
                           Erskine & McMahon
13                         P.O. Box 3485
                           Longview, TX   75606
14                         MR. MATT REED
                           MS. NATALIE MORGAN
15                         Wilson Sonsini Goodrich & Rosati
                           12235 El Camino Real, Suite 200
16                         San Diego, CA   92130

17
                    *      *      *      *      *
18

19                      P R O C E E D I N G S

20            (Jury out.)

21            COURT SECURITY OFFICER:  All rise.

22            THE COURT:  Please be seated.

23            All right.  Counsel, if you would, sort

24 of inform me where we are and what we still have left to

25 cover.

1           MR. NIEDERLUECKE:  Your Honor, from

2   Ergotron's presentation, we're on Jerry Moscovitch.

3   We'll hopefully, finish very shortly with his testimony.

4           Then it's down to our list of deposition

5   testimony.  We have it in written form for Mirek Waraksa

6   and Mark Elchuk.  We don't have videos for those.

7           And then we have two very, very short --

8   literally a few lines from Sean Roarty and Ed Duffy just

9   relating to evidentiary laches issues, and then one

10  video of Alan Tameshtit.

11          THE COURT:  And what kind of total time

12  are we looking at there; do you know?

13          MR. NIEDERLUECKE:  If you -- it depends

14  on if you want us to read in Waraksa or Elchuk or just

15  submit those to the Court.

16          THE COURT:  How long are those?

17          MR. NIEDERLUECKE:  If they're read in,

18  they're probably, I would guess, 15 to 20 minutes each,

19  if they're read in.  But we also have highlighted

20  copies, if you would rather just take the excerpt.

21          THE COURT:  We'll see -- we'll see where

22  we are.  I might have you just summarize them for them

23  and then submit a written copy.

24          MR. NIEDERLUECKE:  Okay.  And Waraksa is

25  1 minute -- about 14 minutes total for Tameshtit.

```
 1                    THE COURT:  Let me interrupt you for just
 2   a second.  I have a note from the jury that they said
 3   that they need a calculator.  Any objection to me
 4   sending a calculator in?
 5                    MR. TRIBBLE:  None from Plaintiff, Your
 6   Honor.
 7                    MR. TYLER:  No objection, Your Honor.
 8                    THE COURT:  All right.  Do we have a
 9   calculator we can --
10                    MR. TRIBBLE:  We have one.
11                    THE COURT:  Yeah, we've got one here.
12                    All right.  I'm just going to send that
13   in without a note, without a note response.
14                    Ms. Ferguson, here's their note.
15                    COURTROOM DEPUTY:  Thank you, Judge.
16                    THE COURT:  How long do you think total?
17                    MR. NIEDERLUECKE:  If I add it up here,
18   Your Honor, without the Waraksa and Elchuk, it's about
19   35 minutes worth of time, and we put them for 20 minutes
20   each.  It would be a little over -- I would guess we're
21   going to be a little over an hour, hour and ten minutes
22   at most.
23                    THE COURT:  Okay.  And what about
24   cross-examination of any of those?
25                    MR. TRIBBLE:  We have -- for Waraksa,
```

1  it's about 8 minutes, 30, because we do have a video of

2  our part that we would like the Court to view.  And we

3  have two and a half minutes on Elchuk, and I think -- so

4  far I think the cross on Jerry is about 30 minutes.

5  And then are you calling other videos?

6            MR. REED:  We do have additional videos,

7  Your Honor.  They all total a little less than 20

8  minutes.

9            MR. TRIBBLE:  Okay.  And so our counter

10  for one of those is 40 seconds.

11            THE COURT:  Okay.  All right.  So we're

12  looking at probably a little over an hour to deal with

13  Ergotron's direct and cross probably?

14            MR. NIEDERLUECKE:  Yes.  And then Dell

15  has about 20 minutes.

16            THE COURT:  All right.  Is that all Dell

17  has, is just 20 minutes?

18            MR. TYLER:  Yes, Your Honor.

19            THE COURT:  Do you have anything in

20  response to that?

21            MR. TRIBBLE:  Our cross -- or redirect, I

22  guess, of Mr. Moscovitch is about 30 minutes.

23            THE COURT:  Okay.  All right.  Well, one

24  of the reasons I asked -- of course, we don't know what

25  the jury will do or how long they will be, but I have

1  some other matters scheduled at 1:00 in Tyler this

2  afternoon.

3           So it looks like we'll be able to finish

4  with this testimony, and I can hear that.  And then I

5  wanted to ask, if the jury's not back, if either side

6  objects to Magistrate Judge Everingham receiving the

7  verdict if it comes in after 1:00 o'clock or after noon.

8           MR. TYLER:  No objection.

9           MR. NIEDERLUECKE:  No objection.

10           MR. TRIBBLE:  No objection.

11           THE COURT:  All right.  Very good.

12           All right.  You may proceed with your

13  testimony.

14  <u>JERRY MOSCOVITCH, DEFENDANT'S WITNESS, PREVIOUSLY SWORN</u>

15         CROSS EXAMINATION (CONTINUED)

16  <u>BY MR. NIEDERLUECKE:</u>

17    Q.   Good morning, Mr. Moscovitch.

18    A.   Good morning.

19          MR. NIEDERLUECKE:  Oh, before we start,

20  Your Honor, may I provide the list of exhibits that will

21  be -- I'd like to have admitted?  Your Honor, can I list

22  off my exhibits?

23          THE COURT:  Yes.  Uh-huh.

24          MR. NIEDERLUECKE:  Thank you.

25  Defendants offer Defendant's Exhibits 1375, 120, 145,

1  1072, 1074, 1076, 162 --

2                    THE COURT:  Little bit slower.  Okay.

3                    MR. NIEDERLUECKE:   -- 1125, 1126, 1127,

4  1128, 1056, 1251, 1132, 1133, 1225, 1378, 87, 1033,

5  1038, 1060, and then Plaintiff's Exhibit 1188.

6                    THE COURT:  Okay.  Any objection?

7                    MR. NELSON:  No, Your Honor.

8                    THE COURT:  Be admitted.

9                    MR. NELSON:  We just have a couple more

10  that have already been admitted.

11                    THE COURT:  All right.

12                    MR. NELSON:  And that's Plaintiff's

13  Exhibit 393, Plaintiff's Exhibit 405, PX1180, PX398,

14  PX395, DX1225, and DX1172.

15                    THE COURT:  Any objection?

16                    MR. NIEDERLUECKE:  No objection, Your

17  Honor.

18                    THE COURT:  Be admitted.

19                    All right.  You may proceed.

20                    MR. NIEDERLUECKE:  Thank you.

21      Q.    (By Mr. Niederluecke) Mr. Moscovitch, it is

22  your belief that you should rely on the experts to

23  determine what is prior art; isn't that correct?

24      A.    Well, I use my lawyers to communicate with

25  the Patent Office, yeah.

1        Q.    And you rely on those lawyers to determine

2   what is prior art; isn't that correct?

3        A.    Yes.  Right.

4        Q.    But you didn't consult with either of your

5   patent attorneys, Mr. Waraksa or Mr. Elchuk, to

6   determine whether the E-Book should be disclosed to the

7   Patent Office, did you?

8        A.    Well --

9        Q.    It's a yes-or-no question.

10        A.    No, I did not.

11        Q.    Thank you.

12             So you made the decision on your own -- you

13   made the decision on your own not to disclose the E-Book

14   to the Patent Office; isn't that correct?

15        A.    No.  I never even thought about the E-Book at

16   all.

17        Q.    So you're saying -- so you're saying you

18   never made any decision whatsoever?

19        A.    It never even occurred to me to consider the

20   E-Book.  It was an R&D project.  It was not a product,

21   wasn't a patent.  And at the time, I was working on

22   probably six designs, and I was supplying product to

23   Bloomberg.  So I had a 55-person company that I was

24   running.

25                    MR. NIEDERLUECKE:  Can you pull up

1    Defendant's Exhibit 1375, please?

2        Q.    (By Mr. Niederluecke) We talked a little bit

3    about this yesterday, Mr. Moscovitch.  This is your

4    declaration to the Patent Office regarding the '978

5    Reissue Patent; is that correct?

6        A.    Yes, that's correct.

7                MR. NIEDERLUECKE:  And if we go -- go a

8    couple of pages in, please.  Two more pages in.  Let's

9    keep going.  I want to go to Paragraph 12, if I can.

10               Thank you.  Can you bring up Paragraph

11   12?

12       Q.    (By Mr. Niederluecke) Now, in Paragraph 12,

13   you told the Patent Office that you and Mr. Waraksa had

14   reviewed patents, didn't you?

15       A.    Yes, that's correct.

16       Q.    But you and Mr. Waraksa didn't review any

17   patents, did you?

18       A.    We did.  During the prosecution of the '939

19   patent, the Patent Office sent him three patents.

20       Q.    Mr. Waraksa -- Mr. Moscovitch -- excuse me --

21   you were deposed on May 23rd of this year, weren't you?

22       A.    Yes, that's correct.

23       Q.    And on May 23rd, you were asked --

24               MR. NIEDERLUECKE:  As soon as I can get

25   it up here.  Sorry.  Page 352.

1    Q.    (By Mr. Niederluecke) Is it correct that on

2  May 23rd, in your deposition, I asked you:  In fact, you

3  and Mr. Waraksa didn't review any patents, did you?

4  Is that what I asked you?

5    A.    That's what you asked me here.

6    Q.    And your response was:  Not to my

7  recollection; isn't that correct?

8    A.    Well, I'm not sure --

9    Q.    Is that your response?

10    A.    Well, I'm not sure what you're asking here.

11    Q.    I'm asking --

12    A.    During the application, we didn't review any

13  patents.

14    Q.    Mr. Moscovitch, would you -- I asked you:  In

15  fact, you and Mr. Waraksa didn't review any patents, did

16  you; is that correct?

17           Is that what I asked?

18    A.    That's what you asked, yes.

19    Q.    And please read your answer.

20    A.    Not to my recollection.

21    Q.    And then I asked you:  So that statement is

22  wrong?

23           And what did you answer?

24    A.    Oh, I recollect what this is now.  You're

25  referring --

1      Q.     I'm sorry, Mr. Moscovitch.  I'm asking the

2    questions right now, and I'd like you to answer my

3    question.

4      A.     Well --

5      Q.     Okay.  I'm just simply asking you to read

6    from the deposition.  Your attorneys -- your attorneys

7    will have a chance to elicit your explanation.

8      A.     It possibly could be.

9      Q.     Okay.  So let me do it again so we're clear.

10   I asked you:  So that statement is wrong?

11           And what did you respond?

12     A.     It possibly could be.

13     Q.     Thank you.

14              MR. NELSON:  Your Honor?

15              THE COURT:  Yes.

16              MR. NELSON:  There was -- there's six

17   days of Mr. Moscovitch's deposition here.  Can I read an

18   excerpt that goes directly to this issue that speaks to

19   this?

20              THE COURT:  Yes, you may.

21              MR. NIEDERLUECKE:  What day?  What day?

22              MR. NELSON:  October 19th, the very first

23   deposition of Mr. Moscovitch, Page 242, Line 3.

24              QUESTION:  When you referred in your

25   reissue declaration to the prior art and the patents

1   that you reviewed, what was the scope of that prior art

2   and patents that you were referring to when you asked --

3   when we asked you that question?

4                   ANSWER:  That I reviewed?

5                   QUESTION:  Yeah.

6                   ANSWER:  It would be the three patents

7   that we discussed that were cited in the '939 patent.

8                   QUESTION:  And also the CRT?

9                   ANSWER:  CRTs, those prior art.

10                  THE COURT:  All right.  You may proceed.

11       Q.   (By Mr. Niederluecke) Mr. Moscovitch, your

12  statement to the Patent Office that you and Mr. Waraksa

13  reviewed patents was wrong, wasn't it?

14       A.    During the reissue patent?

15       Q.    Your statement in your declaration, yes, to

16  the -- in the reissue patent prosecution that you and

17  Mr. Waraksa had reviewed patents was wrong, wasn't it?

18       A.    No, it wasn't.

19       Q.    In fact, Mr. Waraksa (sic), you have no

20  explanation for that statement you made to the Patent

21  Office, do you?

22       A.    Excuse me.  My name is Mr. Moscovitch.

23       Q.    I'm sorry.  I am horrible with names.

24  Mr. Moscovitch --

25       A.    Yes.

1     Q.     -- you have no explanation for that statement

2  you made to the Patent Office; isn't that correct?

3     A.     Which statement are you referring to?

4     Q.     The statement -- the statement where you

5  stated that you and Mr. Waraksa had reviewed patents.

6     A.     We had reviewed patents.  We reviewed the

7  three patents that the Patent Office cited in the

8  prosecution of the '939 patent.

9     Q.     Mr. Moscovitch, on May 23rd, in your

10  deposition --

11               MR. TRIBBLE:  Page?

12               MR. NIEDERLUECKE:  I apologize.  Page

13  353.

14     Q.     (By Mr. Niederluecke) I asked you:  Why did

15  you tell the Patent Office that you and Mr. Waraksa had

16  reviewed prior art patents when, in fact, you hadn't?

17  And what did you respond?

18     A.     What it says here is:  I suppose this may be

19  an error.

20     Q.     And so then I followed up and asked you:  So

21  as we stand here today, you have no explanation for your

22  statement to the Patent Office in that regard?

23  And what did you respond?

24     A.     On this page here, I said, I do not.

25     Q.     Mr. Moscovitch, isn't it true that you didn't

```
 1  see the '170 patent until 2007?

 2       A.    Yes, that's correct.

 3       Q.    So you certainly hadn't reviewed the '170

 4  patent with Mr. Waraksa, correct?

 5       A.    Not the '170 patent, that's correct.

 6       Q.    And just to make sure I'm straight here from

 7  yesterday, the '170 patent shows booking of only one

 8  screen, not two, correct?

 9       A.    Actually, in Figure 3 of the '170 patent, it

10  shows booking of two screens.

11            MR. NIEDERLUECKE:  If we can, Counsel,

12  I'm going to the 10/19/07 deposition, Page 243.

13            MR. TRIBBLE:  Page?

14            MR. NIEDERLUECKE:  Page 243.

15       Q.    (By Mr. Niederluecke) Mr. Moscovitch, do you

16  remember, October of 2007, being deposed in this case?

17       A.    I do.

18       Q.    And you were deposed in this case as a

19  corporate representative of Mass; is that correct?

20       A.    Yes.

21       Q.    And is it correct that you were asked by your

22  own attorney, Mr. Nelson:  Do you think that this patent

23  shows booking as you just defined it?

24            And what was your answer?

25       A.    It says here, No, I don't, but I was
```

1  referring to Figure 1.

2      Q.    Where does it -- show me in the questioning

3  here where -- where it says you were referring to

4  Exhibit 1 (sic)?

5      A.    Well, right here in No. 19, it says:  This

6  patent shows booking of one screen which moves, and the

7  other screen remains stationary.

8          So for that particular figure, you're moving

9  the one screen with respect to a CRT.  In Figure 3,

10 there's a double hinge there which you can attach to a

11 notebook, and that allows both screens to book.

12     Q.    In fact, you said, this patent shows booking

13 of only one screen which moves, and the other screen

14 remains stationary, didn't you?

15     A.    That's what I said here, yeah.

16     Q.    Now, Mr. Moscovitch, you became aware of

17 Ergotron in 1999; isn't that correct?

18     A.    I don't recall when I became aware of them.

19 Possibly at the ComDex show in 1999.

20     Q.    And by -- by June of 2000, you were aware

21 that most of the competing products that were on the

22 market were going to infringe on the '978 patent; isn't

23 that correct?

24     A.    I'm not sure which products you're referring

25 to.

1    Q.    Well, I'm referring to most of the competing

2  products, Mr. Moscovitch.   Is that a correct statement?

3    A.    I don't know which products were out there.

4  Certainly, Ergotron was out there.

5    Q.    And you were aware, by June of 2000, of

6  Ergotron's DS 100 product, right?

7    A.    Yes, correct.

8    Q.    And, in fact, by June of 2000, you claimed to

9  have a legal opinion that most competitive products

10  would infringe on the '978 patent; isn't that correct?

11    A.    If you could -- if you could show me a

12  document.

13         MR. NIEDERLUECKE:   Can you pull up DX120?

14    Q.    (By Mr. Niederluecke) You did a proposal to

15  Richardson Electronics, correct?

16    A.    Yes, I did.

17    Q.    And is that that proposal?

18    A.    Yes, correct.

19    Q.    Defendant's Exhibit 120?

20         MR. NIEDERLUECKE:   And let's go to Page

21  10 of that proposal.

22    Q.    (By Mr. Niederluecke) Now, Mr. Moscovitch, by

23  June of 2000, you had gotten your notice of allowance on

24  the '978 patent, hadn't you?

25    A.    By June of 2000?   I believe so.

1    Q.    Okay.  So you knew you were -- you knew what

2  claims you were going to get, correct?

3    A.    Yes.

4           MR. NIEDERLUECKE:  Can you just pull up

5  generally that whole page, make it bigger for us?

6           There.

7    Q.    (By Mr. Niederluecke) And as you see, in that

8  first full paragraph, this was a proposal to a potential

9  client, correct?

10    A.    Partner.  Potential partner.

11    Q.    A potential business partner of yours.

12    A.    Yes.

13    Q.    And you told that business partner that you

14  had legal opinions that indicated that most of the

15  competitive products infringed on your patents; is that

16  right?

17    A.    That's what it says here, yes.

18    Q.    And one of those patents you're -- you're

19  referring to was the soon-to-be-issued '978 patent;

20  isn't that correct?

21    A.    Yes.

22    Q.    And did you, in fact, have a legal opinion in

23  June of 2000 to that -- to that effect?

24    A.    Well, I had talked with Mark Elchuk, my

25  patent attorney --

1    Q.    Okay.  And --

2    A.    -- and his opinion was that --

3              MR. NELSON:  Hold on.

4    Your Honor --

5              MR. NIEDERLUECKE:  He doesn't have to

6    disclose this.  Just the fact that he had it, and that's

7    what I was going to -- waiting for you to stop the

8    witness if you wanted to.

9    Q.    (By Mr. Niederluecke) Now, you didn't sue

10   Ergotron in 2001 because you wanted to build a

11   relationship with Dell; isn't that right?

12   A.    That's correct.  That was my goal.

13   Q.    You wanted to try to build a business; isn't

14   that right?

15   A.    Yes.

16   Q.    In fact, your strategy was to not sue

17   Ergotron in 2001; isn't that correct?

18   A.    Well, my strategy was not to get involved in

19   lawsuits.  That was -- that wasn't something that I

20   wanted to do.

21   Q.    But you could appreciate that since you

22   didn't sue Ergotron in 2001, Ergotron was going to

23   concentrate on growing its multidisplay business; isn't

24   that right?

25   A.    Well, I don't know that, but I know -- excuse

1  me -- in the case of other companies that have been

2  involved, they have approached me, and we've talked

3  about working together.  So we never heard from

4  Ergotron.

5      Q.    What other companies are you referring to,

6  Mr. Moscovitch?

7      A.    Well, Peerless for one.

8      Q.    And Peerless came to you because you -- you

9  alleged that their products infringed in this case,

10  didn't you -- didn't they?

11     A.    That's correct.

12     Q.    And, in fact, the deal you did with

13  Peerless -- is that right -- the 60,000-unit order?

14     A.    Correct.

15     Q.    Okay.  That came about as a result of you

16  alleging their products infringed, correct?

17     A.    No.  That came about as a result of a

18  business meeting.

19     Q.    A business meeting that occurred after they

20  were -- settled out in this case?

21     A.    Yes.  But they came to see me in Toronto.

22     Q.    Were they required to do that under their

23  settlement?

24     A.    I asked for a business meeting, but they --

25  they were very interested in doing that, and they

 1    were -- they pushed for that.

 2        Q.    Now, Mr. Moscovitch, I want to go back to

 3    your earlier statement about Ergotron growing its

 4    business, and I want to compare that to what you said in

 5    your deposition.

 6              Do you see at the bottom --

 7              MR. NIEDERLUECKE:  Page 517 of the May

 8    23rd deposition, Counsel.  Page -- so 517, starting at

 9    Line 22.

10        Q.    (By Mr. Niederluecke) Do you see I asked you:

11    Do you understand that just like you were doing

12    throughout the -- 2000 in trying to grow your business,

13    certainly, Ergotron was going to concentrate on trying

14    to grow its multidisplay business?

15              Do you see that?

16              MR. NELSON:  I'm sorry, Kurt.  Which day?

17              MR. NIEDERLUECKE:  Oh, May 23rd.

18        Q.    (By Mr. Niederluecke) Do you see that

19    question, Mr. Moscovitch?

20        A.    Yes, I see that, but I also --

21        Q.    And what was your answer?

22        A.    I understand that they would want to do that.

23        Q.    I'm sorry.  Just -- if you could read your

24    answer to my question on Line 2.

25        A.    I can appreciate what?

1      Q.    Do you think you actually probably said, I

2 can appreciate that?

3      A.    Probably.

4           MR. NELSON:  Can we read the very next

5 question and answer?

6           THE COURT:  Yes, you may.

7           MR. NELSON:  Question from

8 Mr. Niederluecke:  So in 2000 -- 2001, you understood

9 that every year you waited to see Ergotron was another

10 year that they would be investing to expand their own

11 business, right?

12           ANSWER:  Well, if we informed Ergotron

13 that they were infringing, I would think the right thing

14 to do would be to come and see us, talk to us.  Let's

15 talk about it.  Let's see what's possible.  We never

16 heard from them.

17      Q.    (By Mr. Niederluecke) And, in fact, as you

18 said in front of the jury, you never even picked up the

19 phone and called Ergotron, did you?

20      A.    I -- I didn't think it was my position to

21 call them.  I thought it was their position to call me.

22      Q.    But even though you didn't call them, you

23 continued to keep an eye on them, didn't you?

24      A.    I'm not sure what you mean by keep an eye on

25 them.

 1      Q.    Well, you certainly kept track of their

 2 products, right?

 3      A.    Not in great detail.  I mean, I knew

 4 something about what they were doing.

 5                MR. NIEDERLUECKE:  Can we pull up

 6 Plaintiff's Exhibit 1188, please?  1188.

 7      Q.    (By Mr. Niederluecke) In fact, you sent

 8 your -- your salespeople to -- to shows to take pictures

 9 of Ergotron's products, didn't you?

10      A.    I don't know that, but if you have a

11 document, then...

12      Q.    In fact, when it comes up here, we'll see it,

13 but in July of 2001 --

14                MR. NIEDERLUECKE:  Let's focus on the

15 bottom half of that, if we can.

16      Q.    (By Mr. Niederluecke) This is a -- the bottom

17 half is an e-mail from Eric Stageman to you, correct?

18      A.    Yes.

19      Q.    And what position did Eric have at Mass?

20      A.    Director of sales.

21      Q.    And the subject line is Ergotron, isn't it?

22      A.    Yes.

23      Q.    So this is -- this is July 27th of 2001.  Do

24 you see that date?

25      A.    Yes.

1        Q.     So that's about -- that's over a month after

2   you received Ergotron's letter back to you, correct?

3        A.     Yes.

4        Q.     Okay.  And -- and Mr. Stageman is sending you

5   photos from a trade show; is that correct?

6        A.     Yes, I believe so.

7        Q.     Okay.

8               MR. NIEDERLUECKE:  Let's go to the next

9   page, if we can.

10              And the next page.  Sorry.

11       Q.     (By Mr. Niederluecke) And they're not very

12  clear here, but these are photos of Ergotron's products

13  that Mr. Stageman took, aren't they?

14       A.     Yes, in a booth.  That's a photograph of

15  their booth.

16              MR. NIEDERLUECKE:  And let's go back to

17  the first page, if we can.

18              And if we can highlight the top half of

19  this e-mail now -- or bring it -- actually, blow it up,

20  if you would, the top half of the e-mail, so we can read

21  it.

22       Q.     (By Mr. Niederluecke) And in March of 2003,

23  you forwarded these to someone, didn't you?

24       A.     Yes.

25       Q.     You forwarded the e-mail, along with the

1   photos, correct?

2       A.    Yes.  I forwarded that to Artemia because

3   they were working with a patent lawyer in San Francisco,

4   and they were going to see if they could do something

5   for me.

6       Q.    And who is Artemia?

7       A.    It's a marketing group based in San

8   Francisco.

9       Q.    And they were working with a patent lawyer?

10      A.    They worked with a lawyer, and we were

11  talking about raising money and the issues we had in the

12  patent infringement.

13      Q.    And -- and that wasn't your lawyer, right?

14      A.    No, that wasn't my lawyer at the time, but

15  that's the lawyer that I was part of their team.

16      Q.    Do you know who that lawyer was?

17      A.    I can't remember his name.

18      Q.    Was it -- what -- do you know what firm it

19  is?

20      A.    I don't recall.

21      Q.    Was it Conley Rose?

22      A.    No, no, no.  It was in San Francisco.

23      Q.    So what discussion did you have with Farah at

24  Artemia in March of 2003 about possibly suing using your

25  patent?

1      A.     Well, the discussion we had was that, you

2  know, our business was not doing well, and here were

3  some of the products that were taking business from us,

4  and we were trying -- we were discussing trying to raise

5  some capital so we could get into the market properly.

6  So she was trying to help me raise capital.

7      Q.     And she was doing that by suggesting that you

8  could sue Ergotron to raise capital; is that correct?

9      A.     No, she didn't suggest that at all.  I said,

10  here -- here are some folks that we feel are infringing

11  our patent, and, you know, our business is not growing.

12  We're having difficulties.

13      Q.     But you didn't sue Ergotron in 2003, did you?

14      A.     I didn't sue anyone in 2003.

15      Q.     Isn't it true that by 2003, you had already

16  engaged Conley Rose regarding this matter?

17      A.     No, that's not true.

18      Q.     When did you engage Conley Rose?

19          MR. NELSON:  May we approach -- or I

20  could just say, I think we're treading on close

21  privilege grounds here, and we would appreciate -- I

22  think you can answer yes or no to that or give a date,

23  but --

24          MR. NIEDERLUECKE:  That's all I'm looking

25  for, Your Honor, is a date.  I don't --

```
 1        Q.      (By Mr. Niederluecke) And then I'll tell you,
 2   I don't want you to disclose any communications you had
 3   with your attorneys.  I'm just looking for the facts of
 4   when you met with people and when you engaged people,
 5   okay?
 6        A.      But what --
 7        Q.      So my question is --
 8        A.      Yes.
 9        Q.      -- just solely, when did you engage Conley
10   Rose regarding this matter?
11        A.      In 2006.
12        Q.      2006?
13        A.      Yes.
14        Q.      What --
15                MR. NIEDERLUECKE:  Withdraw that.
16        Q.      (By Mr. Niederluecke) Now, you're familiar
17   with Electrohome, and we spoke about them, right?
18        A.      Yes.
19        Q.      And are you aware -- they're not in business
20   anymore, correct?
21        A.      That's correct.
22        Q.      And do you know when they went out of
23   business?
24        A.      Quite a while ago.
25        Q.      Was it in the 2000s?
```

1       A.      I can't recall.

2       Q.      Certainly, they would have had many

3   documents, wouldn't they, relating to their work with

4   you in the mid 1990s on the dual LCD displays?

5       A.      I'm not sure what they have.

6       Q.      Well, you certainly were working with them in

7   the mid 1990s to develop the dual LCD product, right?

8       A.      I worked on that project and the two-pack as

9   well.

10      Q.      And -- and we've -- we've seen the

11  information on the screen.  It was Electrohome who was

12  receiving purchase orders from Bloomberg; isn't that

13  right?

14      A.      I've seen purchase orders in this lawsuit.

15      Q.      But since you waited till 2006 to sue

16  Ergotron and the other Defendants in this case, we

17  weren't able to obtain those kind of documents, were we?

18      A.      I don't know.  I mean, I don't control what

19  happened to Electrohome.

20      Q.      Well, but you controlled when you filed this

21  lawsuit, right?

22      A.      Actually, I didn't.  I mean, I -- of course,

23  the date when the lawsuit was filed, but there were

24  circumstances affecting -- well, that's all I can say.

25      Q.      Now, Mr. Moscovitch, the December 2000 --

1    you -- I'm on my last topic here, you'll be happy to

2    know.

3              You have a December 2003 license agreement

4    between you and Mass; is that correct?

5        A.    Yes.

6        Q.    And that's the one that you signed on behalf

7    of yourself and on behalf of Mass, correct?

8        A.    Yes.

9        Q.    And isn't it correct that the December 2003

10   license agreement was the only exclusive license

11   agreement that you had ever given on '978 patent?

12       A.    That's correct.

13       Q.    Mass had not -- now, even though you had

14   given Mass that exclusive license agreement in December

15   of 2003, you had not -- Mass has not paid you one penny

16   of royalties under the '978 patent; isn't that correct?

17       A.    They haven't paid me royalties because they

18   haven't been in the position to pay me.

19       Q.    But you believe that they owe you, as a

20   matter of that license agreement, for those royalties,

21   correct?

22       A.    Yes, I do.

23       Q.    How much do they owe you?

24       A.    I'm not sure.  I'd have to calculate it up.

25       Q.    Is it in the millions?

1        A.    I would -- I would think so.

2        Q.    Now, even though Mass owes you money in the

3    millions, isn't it correct that Mass hasn't listed that

4    liability to you on any of its financial statements?

5        A.    Well, they can't pay it, and so -- you know,

6    there's no way that they can pay it, so...

7        Q.    So my question is whether or not Mass, the

8    company --

9        A.    Yeah.

10       Q.    -- has indicated anywhere in its financial

11   statements that it owes you a royalty for sales under

12   the '978 patent?

13       A.    No, we haven't indicated it because they

14   can't pay the money, so...

15       Q.    And so when Mass went out to seek funds from

16   all these investors, Mass wasn't telling the investors

17   about the liability that it had to you; is that correct?

18       A.    The only time we actually went out to

19   investors was in 2002.

20       Q.    So after 2002, you stopped attempting to

21   raise funds; is that correct?

22       A.    I wrote a lot of business plans, but I didn't

23   raise any funds.

24       Q.    And business plans, you didn't include

25   those -- those -- that obligation; is that correct?

1      A.      We never went out with the business plans.

2      Q.      And my question was just, in those business

3  plans, you did not include that liability; is that

4  correct?

5      A.      That's correct.

6              MR. NIEDERLUECKE:  Pass the witness, Your

7  Honor.

8              THE COURT:  Cross-exam -- or direct

9  examination by Mr. Nelson.

10                        DIRECT EXAMINATION

11  BY MR. NELSON:

12     Q.      Good morning.

13             Let me just start --

14     A.      Excuse me.  Good morning.

15     Q.      Let me just start at the very end and some of

16  these last questions.

17             Some of the last questioning was about the --

18  this exclusive license agreement.  And I think, in front

19  of the jury, there was testimony and we saw documents

20  that although the written agreement was in 2003, it

21  extended back from the time it issued.

22             That was your testimony?

23     A.      That's correct.

24     Q.      Okay.

25             MR. NELSON:  Matt, could we bring up

1   Mr. Moscovitch's deposition on May 23rd, 2008, Page 536?

2   It may just be easier for me to do this.

3       Q.   (By Mr. Nelson) Okay.  And, Mr. Moscovitch,

4   you recall the testimony from Mr. -- the questioning

5   from Mr. Niederluecke about the truth and veracity of

6   Paragraph 12 of your reissue declaration?

7       A.   Yes.

8       Q.   And we completed the questioning on the

9   October 19th deposition where you -- where you said that

10  you had cited those three patents.

11           This is your October -- sorry -- the May

12  23rd, that was redirect on that very same day, and could

13  you just read for -- for the Judge starting on Page 13

14  through Line 22?

15           MR. NELSON:  Is that --

16           MR. NIEDERLUECKE:  Your Honor, I would

17  object to this.  The witness is here to testify, and I

18  think it's improper.  It wasn't for completeness, and I

19  think it's improper to have him just read from

20  deposition testimony that he previously provided.

21           THE COURT:  Overruled.  Overruled.

22      A.   Where did you want me to start?

23      Q.   (By Mr. Nelson) Start -- yes.  Go ahead and

24  start actually on Line 7.

25      A.   Seven?

1    Q.    Yeah, which is a question right there.

2    A.    Could you straighten it?

3    Q.    I'll try.  There we go.

4    A.    Okay.

5              QUESTION:  Now, by the time you had met

6    with Mr. Miller and Mr. Elchuk about your reissue

7    application, what patents had you and Mr. Waraksa

8    reviewed?

9              ANSWER:  We had reviewed three patents

10   that had been cited by the Patent Office during the

11   prosecution of the '939 patent.

12             QUESTION:  How had they come to Mass'

13   attention in that file history, the '939 patent file

14   history?

15             ANSWER:  The Patent Office had cited --

16             MR. NELSON:  Sorry.  I apologize.

17             ANSWER:  -- cited those patents during

18   the prosecution.

19             QUESTION:  So then looking at Paragraph

20   12 of your reissue declaration, and particularly that

21   last sentence, how do you characterize the accuracy of

22   the statements you made in that declaration?

23             ANSWER:  I would characterize it as being

24   true and accurate.

25             MR. NELSON:  Thank you.

1          And could we also, please, go back --

2    let's go to Plaintiff's Exhibit 1188, what we just saw.

3        Q.    (By Mr. Nelson) And, Mr. Moscovitch, there is

4    some testimony about this.

5              MR. NELSON:  Very briefly, let's blow up

6    the header, please.

7        Q.    (By Mr. Nelson) And I think you testified to

8    this in part of your answer, but let me just clarify.

9    This was an effort for you to raise money for your

10   business in 2003; is that right?

11       A.    Well, we were talking about trying to go out

12   and raise some money.

13       Q.    Okay.  Thank you.

14             And --

15       A.    Can I answer one more thing?

16       Q.    Yes, of course.

17       A.    Yeah.  I believe that the -- that this is the

18   information that Eric used --

19       Q.    You mean the bottom e-mail then?

20       A.    Yes.  I believe -- I'm not sure of the

21   dates -- the exact dates, but I believe it's the

22   information he used when he contacted Dell and wrote

23   that e-mail about Ergotron.

24       Q.    This was -- this e-mail of July 27th, 2001,

25   this was in between the time that you sent the notice

 1  letter to Ergotron, and that was what -- remind the

 2  Judge -- that was May of 2001 when you sent the -- a

 3  letter to Ergotron; is that right?

 4       A.    I believe so.

 5       Q.    And you got a response back in June of 2001;

 6  is that right?

 7       A.    Correct.

 8       Q.    And then in August of 2001, less than a month

 9  after this, is when you notified Dell; is that right?

10       A.    I believe so.

11       Q.    And since that time, were you trying to work

12  with Dell to -- and try to make your company work as a

13  viable business during that time?

14       A.    Absolutely.

15            MR. NELSON:  And let's go to Plaintiff's

16  Exhibit 357.

17       Q.    (By Mr. Nelson) This is the June 18th, 2001,

18  letter, their response to you; is that right?

19       A.    To my lawyers, yes.

20       Q.    Yeah.

21            MR. NELSON:  And let's blow up, again,

22  that last paragraph, please.

23       Q.    (By Mr. Nelson) And, Mr. Moscovitch, were you

24  expecting, based upon this last sentence, a response

25  back from Ergotron?

1      A.     Yes, we were.

2      Q.     And did you ever get a response back?

3      A.     No, we never did.

4      Q.     Okay.  And, Mr. Moscovitch, in your reissue

5  declaration, when you said that Mr. Waraksa failed to

6  appreciate the scope of the claims during the original

7  prosecution, was that testimony accurate?

8      A.     Yes.

9      Q.     And you did attend Mr. Waraksa's deposition

10 in this case; is that right?

11     A.     Yes, I did.

12     Q.     And didn't he confirm during the deposition

13 that he failed to appreciate the scope of the claims?

14     A.     Yes, he did.

15     Q.     Mr. Moscovitch, in your opinion, was -- did

16 the E-Book ever work?

17     A.     No, never worked.  And it was canceled.  In

18 the end, the whole project was canceled.

19     Q.     Are you aware of anyone who's ever tried to

20 submit a patent on this E-Book?

21     A.     No.

22            THE COURT:  Let me ask a question of

23 Mr. Nelson.  When was the E-Book canceled?  And I'll ask

24 the witness.

25            MR. NELSON:  The record is unclear, but

1  go ahead.

2       Q.    (By Mr. Nelson) When was the E-Book canceled?

3       A.    The E-Book was canceled sometime in 1995.  In

4  April of 1995, we were trying to pass the CISPR B, and

5  we were in the laboratory.  At the same time, I was

6  working on the two-pack, and then I began the LCD II.

7  And sometime in 1995, I convinced Susan to cancel the

8  project, and she agreed that it didn't make sense to put

9  any more money into it at all.

10               MR. NELSON:  Let's bring up Plaintiff's

11 Exhibit 190.

12               THE COURT:  And let me ask, what were the

13 dates of the invoices to Bloomberg?

14               MR. NELSON:  Well, the invoices to

15 Bloomberg were in 1994, but, actually, let me just show

16 you --

17               MR. NIEDERLUECKE:  Yeah.  I was just

18 going to say, they were April and October -- April and

19 September of 1994 were the two invoices.

20               MR. NELSON:  Can we bring up Plaintiff's

21 Exhibit 10, I believe?

22               Let's go to the next page.  What's -- can

23 we blow up the date?  And let's then blow up the last

24 paragraph as well.

25      Q.    (By Mr. Nelson) Is this a subsequent revision

1  and discussion about that purchase order in January,

2  1995?

3      A.    Well, they're talking about suppliers and

4  supplier orders.

5      Q.    Okay.  And could you please read for the

6  Judge, Mr. Moscovitch, just -- actually, you can read

7  that entire -- entirety of what's blown up.

8      A.    Okay.  Supplier orders commenced in the

9  summer of '94.  Planning to build in October '94.

10  Production was told to be ready to build in October and

11  subsequently in November and December.

12          Suppliers were told to put on the brakes

13  depending on commitments and dollar value in

14  mid-December '94 and wait to commence shipping on our

15  instructions.

16      Q.    And this was after these purchase orders that

17  you discussed with Mr. Niederluecke, right?

18      A.    I believe so.

19      Q.    Yeah.

20          MR. NELSON:  And let's bring up, I

21  think -- I think it's Defendant's Exhibit 1118.

22          No.  Try 1116.  Excuse me.

23          THE COURT:  Let me --

24          MR. NELSON:  I'm sorry.

25          THE COURT:  Let me just ask counsel for

1   Defendant to refresh my memory as to what the testimony

2   was of the Bloomberg witnesses regarding whether those

3   were shipped, and if so, when.

4                   MR. NIEDERLUECKE:  The testimony was that

5   they were shipped.

6                   If you'll recall, Your Honor, there was a

7   selection of 20 units that Mr. Roarty had prepared a

8   spreadsheet for that showed when they were received by

9   Bloomberg.  It wasn't an exhaustive list.

10                  MR. NELSON:  And, Your Honor, this is

11  actually what I put up on the screen right here.

12                  MR. NIEDERLUECKE:  Defendant's Exhibit

13  1116 was a -- as I said, it's not an exhaustive list,

14  but it provides some of these model numbers that were

15  received at Bloomberg, the date they were received, and

16  then the dates they went to the customers.

17                  And I believe -- well, that's that

18  information.  The rest of the exhibit actually shows --

19  for each one of those line items shows the detail

20  about -- more detail about that shipment.

21                  THE COURT:  And that shows the date

22  received by the customer, one in December of '94 and the

23  rest in '95?

24                  MR. NELSON:  Well, the December 1994 one,

25  Your Honor, was -- that was the testing laboratories,

```
 1  Sertelecom, so that was undergoing some testing.
 2                    THE COURT:  Okay.
 3                    MR. NELSON:  And then --
 4                    MR. NIEDERLUECKE:  Then you can see
 5  there's --
 6                    MR. NELSON:  -- there's five -- there's
 7  probably about seven or eight that were there during
 8  that time period.
 9                    MR. NIEDERLUECKE:  If you'll blow up the
10  top half.  All of that before the -- was it -- April
11  26th is the -- is the critical date, Your Honor.  April
12  26th of 1995.
13                    THE COURT:  Okay.
14      Q.    (By Mr. Nelson) And you were aware, Mr.
15  Moscovitch --
16                    THE COURT:  And --
17                    MR. NELSON:  I'm sorry, Your Honor.
18                    THE COURT:  -- ask him to -- of those
19  five or six that were prior to the -- April 26th, 1995,
20  does anyone know who these people are that were
21  receiving them or what they were received for?
22                    MR. NELSON:  Well, yes, Your Honor.  Can
23  I ask a preliminary question, and then we'll get to
24  that?
25                    THE COURT:  All right.
```

```
 1        Q.    (By Mr. Nelson) Mr. Moscovitch, did you

 2   know -- any of these shipments prior to April 1995, did

 3   you know that they had gone to these customers, besides

 4   this Sertelecom one that went to the laboratory?

 5        A.    I don't.  I do not.

 6        Q.    Okay.  And could you answer the Judge's

 7   question?  Do you know how and whether -- the

 8   circumstances in which they went to the customers?

 9        A.    My -- my conclusion could only be that they

10   would be engineering samples, because they were not --

11   they did not have any agency approvals, and they could

12   not be sold.

13             So they could be engineering samples, but

14   they couldn't be -- they really couldn't be sold.

15                  THE COURT:  And what agency approvals

16   were needed?

17                  THE WITNESS:  CISPR B was the policy of

18   Bloomberg.

19                  THE COURT:  And what is CISPR B?

20                  THE WITNESS:  CISPR B is a European

21   standard for radiation emissions.  And if you cannot

22   shield out the emissions, then you can't sell the

23   product because it's -- it doesn't pass safety for use

24   by people.

25        Q.    (By Mr. Nelson) Let me show you two documents
```

1    on this.

2                    MR. NELSON:  First, let's go to

3    Plaintiff's Exhibit 500.

4                    THE COURT:  Let me just -- kind of

5    hopscotching here, but while we're on this point, let me

6    ask Defendants what their response to that point is.

7                    MR. NIEDERLUECKE:  Well --

8                    THE COURT:  And you're welcome to ask the

9    witness any questions you'd like.

10                   MR. NIEDERLUECKE:  Certainly.  And some

11   of this is based on the Bloomberg testimony that came

12   in, Your Honor.

13                   THE COURT:  All right.

14                   MR. NIEDERLUECKE:  The Bloomberg

15   testimony --

16                   THE COURT:  Remind me of what that is.

17                   MR. NIEDERLUECKE:  -- is that these were

18   production units.  They were not engineering samples.

19   The Bloomberg testimony is that these were shipped out

20   to the customers.  They were used.  And that's what the

21   detail information provides.

22                   I'll note for the Court, obviously,

23   Bloomberg is in New York, and the testimony that

24   Bloomberg is in New York is the first sale actually is

25   to Bloomberg in New York.  And that's why the receipt at

1   Bloomberg on the left-hand side would show evidence of

2   the first sale that went on.

3           And Bloomberg didn't sell these to the

4   customers.  They -- they would send them to their

5   customers.  They lease them as part of their services.

6   So it's really not -- the second one is -- that's why it

7   says received by customer.  So that's the testimony

8   there.

9           CISPR B, of course, is a European

10  standard.  It's not a United States standard.  And there

11  was testimony in the exhibit that stated that they --

12  that it could meet the lower U.S. standards.

13          THE COURT:  Now --

14          MR. NIEDERLUECKE:  There's conflicting

15  testimony on the whole CISPR B --

16          THE COURT:  Are there any sales beyond

17  that -- or distribution beyond that last one there in

18  November of '95?

19          MR. NELSON:  Can I answer that one first?

20          MR. NIEDERLUECKE:  Yes.

21          MR. NELSON:  Go ahead.

22          MR. NIEDERLUECKE:  I was going to say,

23  it's my understanding, Your Honor, we did not get that

24  information from Bloomberg.  They were a third party.

25  They didn't -- we tried to get it, but trying to get

1   Bloomberg to help us out was a little tough.  They

2   didn't want to -- their lawyer, at least, wasn't real

3   interested in giving us that.

4            So this was the best we could do and

5   didn't want to inconvenience them for the rest of the

6   sales, so he had just prepared like a -- here's 20

7   examples.

8            MR. NELSON:  Your Honor, the subpoena

9   called for all records of this device, and there was

10  actually questioning at Mr. Roarty's deposition from

11  Bloomberg, who was the corporate witness, and this was

12  what they produced in response to that.

13           THE COURT:  Okay.  Thank you.  Go ahead.

14           MR. NELSON:  And to be clear, Your Honor,

15  he did say in that deposition that there probably were

16  others, and there was a request to follow up, and there

17  was nothing -- anything ever produced because of that,

18  so...

19      Q.   (By Mr. Nelson) Let's go to -- let's talk

20  about CISPR B a little bit and the standard, and,

21  Mr. Moscovitch, why you felt that the failure to pass

22  CISPR B, why you didn't think that it was a working

23  device because of it.

24           MR. NELSON:  Let's go to Plaintiff's

25  Exhibit 500.

1    A.    Well, before we get to CISPR B, I believe

2    it's also correct that the unit -- I don't believe that

3    the unit passed that FCC-B, so...

4                    THE COURT:  If what?

5    A.    FCC is the standard in the United States,

6    which is an agency approval standard in the U.S.

7    There's FCC-A and FCC-B and CISPR B.

8                    But CISPR B was the standard that Bloomberg

9    had to have for their product because they sold their

10   product worldwide.

11                   MR. NELSON:  And let's blow up the

12   paragraph beginning, it is therefore.

13   A.    This is a letter from --

14                   MR. NELSON:  And let's blow up the date,

15   please, at the top.

16   A.    Okay.  So just for clarification, Sertelecom

17   was based in Ottawa, Ontario, and was the testing

18   laboratory for all of Bloomberg's product worldwide, and

19   Bloomberg had to have all their product approved before

20   they could sell it.

21                   What it says here, It is therefore our

22   opinion that all devices designed for use by Bloomberg

23   meet the most stringent global requirements unless

24   specific written exception from Bloomberg LP be

25   received.

1    Q.    (By Mr. Nelson) And to your knowledge,

2  Mr. Moscovitch, was there any exception granted by

3  Bloomberg or Sertelecom or you with respect to the

4  E-Book?

5    A.    No.

6    Q.    And to your knowledge, Mr. Moscovitch, would

7  any E-Book have to go out that did not meet the

8  certification, have to go out with some kind of

9  engineering sample or sticker that would label it as not

10  for use or as an engineering sample?

11    A.    Yes.  It would have to have engineering

12  sample on it, not for sale.

13    Q.    And -- and, Mr. Moscovitch, there is some

14  testimony that in some of these Sertelecom tests, there

15  might have been one unit in testing that passed FCC.

16           Could you clarify -- or explain to the Judge

17  why -- if something passes in the lab for FCC, for

18  example, why it is still not necessarily ready to go out

19  into the market and pass the FCC Class B certification?

20    A.    Sure.  What happens in the -- when you're

21  testing the product, if the -- normally, what happens is

22  there are certain frequencies that the -- cannot be

23  shielded out.

24           And what you do is you take -- you -- first

25  of all, you sit down and you try to hypothesize how to

1 shield those frequencies.  And then you take the product

2 apart and you build breadboards, mockups, and then you

3 test each change that you make, and you have to go in a

4 serial fashion.

5          So you have to test one, see if it has any

6 impact.  Then you have to go back and test the others.

7 It's a very long process.

8      Q.    And let's --

9          MR. NELSON:  Let's first go to

10 Plaintiff's Exhibit 319.

11          And let's blow up that, please.

12          And, Your Honor, if you recall, there

13 were some dates in the February/March area.

14      Q.    (By Mr. Nelson) And if you can see it -- and,

15 Mr. Moscovitch, please read for the Judge what's going

16 on here and the date and whether at this point, in March

17 1995, that it had passed CISPR B testing.

18      A.    No, it hadn't passed CISPR B.  This --

19          MR. NELSON:  Let's blow up that last

20 sentence, please.

21      A.    Sure.

22          Well, what we're doing here is -- just to

23 clarify, the plastic parts that we had used for -- for

24 developing the product, we decided that we would try to

25 encase the product completely in metal.  Metal has

1    shielding capabilities.

2              So we actually went and made some prototype

3    parts of aluminum, and then we were shipping them to

4    Electrohome, and they were going to ship them on to the

5    laboratory, and we were going to do some testing in the

6    laboratory to see if that would have any effect on

7    trying to shield out some of these frequencies.

8              MR. NELSON:  And let's then go -- I

9    believe it's Plaintiff's Exhibit 126.

10              No, that's not it.  Bear with me.

11   Plaintiff's Exhibit 190.

12              Let's go to the last page of Plaintiff's

13   190, and let's blow up the second to last line -- third

14   to last line.

15              There we go.

16     Q.    (By Mr. Nelson) Okay.  And, Mr. Moscovitch --

17              MR. NELSON:  Let's blow up the date,

18   please.

19     Q.    (By Mr. Nelson) And what is this document,

20   Mr. Moscovitch?

21     A.    This is just a note talking about CISPR B.

22     Q.    Well, do you recall -- let's go to the first

23   page, so you can be reminded of what this meeting is and

24   what these notes are from.

25              MR. NELSON:  And then let's go back to

 1   the --

 2        Q.    (By Mr. Nelson) What is this -- where is this

 3   meeting?

 4        A.    This meeting is at Bloomberg in New York.

 5        Q.    And were you discussing CISPR B at this

 6   meeting?

 7        A.    Yes.

 8        Q.    Okay.

 9             MR. NELSON:  Let's go to the last page,

10   back where we were.

11             And can we highlight that, too, Matt?

12        Q.    (By Mr. Nelson) What does that say?

13        A.    It says that there's a CISPR B report coming,

14   but stop the process.

15        Q.    Well, what does that mean, Mr. Moscovitch?

16        A.    Stop -- stop the testing.

17        Q.    And at this point, was it possible for any

18   production units to have achieved CISPR B of the E-Book?

19        A.    No.  The E-Book never achieved CISPR B.

20   There was one head only that, basically, was a mockup,

21   and it was surrounded by a special conductive foam all

22   the way around it on the outside, and they were able to

23   achieve CISPR B on that one mockup.

24        Q.    And, Mr. Moscovitch, in addition to this

25   radiation problem and this testing problem, you were

1    aware that there was also significant problems with the

2    hinge and that it wouldn't stay in place, right?

3        A.    Yes, there were problems with the hinge;

4    there were problems with the grounding of the hinge; and

5    there were problems with heating, power supply problems;

6    and there were problems with the electronic boards,

7    which were developed by another company.

8        Q.    And, Mr. Moscovitch, were you aware of the

9    relationship between the radiation problems --

10              MR. NELSON:  And I think actually it's in

11   the record, Your Honor, in Dr. Akin's testimony

12   yesterday.

13       Q.    (By Mr. Nelson) But were you aware,

14   Mr. Moscovitch, of the relationship between the problems

15   with the hinge and then the problems of achieving CISPR

16   B testing -- CISPR B radiation testing?

17       A.    Yes.  You have to -- the hinge has to act as

18   a help in the grounding of the complete product, and

19   there were problems with that that we didn't have a

20   solution to at the time.

21       Q.    And, Mr. Moscovitch, it was also your

22   testimony -- we spent a fair amount of time during your

23   direct examination, but could you just remind the Judge,

24   in your opinion, did the hinge design ever work for the

25   E-Book?

1      A.      No, it never worked the way I intended it to,

2   and no one -- none of us could ever get it to work.

3   And we -- we went through about six different designs,

4   and there were at least three engineering reports

5   proposing other theoretical solutions to the problem.

6      Q.      And even as late as 1995 --

7              MR. NELSON:  Actually, let's go back to

8   Plaintiff's Exhibit 10 -- excuse me -- Plaintiff's

9   Exhibit -- yeah.  Next page.

10             And actually, if you'll blow up the

11  handwriting here on the side.  That's all right.  On the

12  side.  And let's highlight this tweaking the design.

13     Q.     (By Mr. Nelson) And even as late as 1990 --

14  this was -- who was this handwriting from,

15  Mr. Moscovitch?

16     A.      This is Susan Friedlander at Bloomberg.

17     Q.      And this is still talking about how, in 1995,

18  you're -- you're tweaking the designs, is what it says,

19  and trying to make the design work for the hinge?

20     A.      Yes.  And she's also -- if you look at the

21  top statement, she's saying, should we demand anything

22  here for returned -- because they're returning --

23  they're returning things that are not working, and

24  they're trying to figure out if they should get money

25  back for those.

1      Q.    And again, this is well after these purchase

2 orders, right?

3      A.    That's correct.

4            MR. NELSON:  And actually, let's just go

5 to Plaintiff's Exhibit 300 really quickly.

6      Q.    (By Mr. Nelson) You are aware,

7 Mr. Moscovitch, that some of these early purchase orders

8 were actually canceled, right?  Are you -- you are now

9 aware, right?

10     A.    I am now aware, yes.

11     Q.    Yeah.

12           MR. NELSON:  Let's go to the second line

13 under quantity.

14     Q.    (By Mr. Nelson) And this is -- this is what,

15 Mr. Moscovitch?

16     A.    Flat panel cancellation.

17     Q.    And just to be --

18           MR. NELSON:  And let's go to the date so

19 that there's -- there's -- the record's clear.  It's on

20 the top right side.

21     Q.    (By Mr. Nelson) This is -- this is in 1994,

22 so it's before some of this later discussion, right?

23     A.    Yes, correct.

24     Q.    But I think it's your testimony that the

25 design and the changes were still ongoing, and in fact,

1  there was a cancellation from some of these first

2  purchase orders, and then later ones were -- were being

3  revised and tweaked, et cetera, right?

4      A.    Well, yes.  My job was to try to make the

5  product work and to try to get a product that could work

6  and could be produced in volume, but we were --

7  unfortunately, we were never able to achieve that.

8      Q.    And just to be clear, Mr. Moscovitch, you

9  only know about these purchase orders and these delivery

10  dates because -- because of this case, because you

11  attended these depositions, and you've seen these

12  purchase orders in the past, what, six to eight months

13  or so; is that right?

14     A.    Yes.

15     Q.    And before that time, did you know about

16  these purchase orders?

17     A.    No.  They would not have shared that

18  information with me.

19     Q.    And Mr. Niederluecke was questioning you

20  about that you were a supplier for bases.  Why would

21  that still not indicate to you that there was a purchase

22  order -- or a confirmed purchase order where the

23  products were being delivered?

24     A.    Well, we were -- we have a purchase order for

25  bases, but I think there were four or five different

```
 1  types of bases that we were developing and testing out.

 2  And they were ordering bases from us, but I'm not sure

 3  why, frankly, they were ordering bases.

 4          MR. NELSON:  Well, let's go to -- back to

 5  Plaintiff's Exhibit 10, please, and go back to the

 6  second page.

 7      Q.   (By Mr. Nelson) You were one of these

 8  suppliers --

 9          MR. NELSON:  Let's blow up that last

10  paragraph.

11      Q.   (By Mr. Nelson) You were one of these

12  suppliers that was told to, quote, put on the brakes at

13  this time in January 1995?

14      A.   Yes, correct.

15      Q.   Okay.

16          MR. NELSON:  Let's -- where is put on the

17  brakes?

18          And let's just highlight that, please, on

19  the third -- second to last line.  Yeah.

20      Q.   (By Mr. Nelson) And, Mr. Moscovitch, again,

21  in your opinion, did the hinge design ever work for its

22  intended purpose?

23      A.   No.

24      Q.   And why -- why didn't it even occur to you to

25  submit this E-Book as -- as a piece of prior art to the
```

1  Patent Office?

2      A.    It never worked.  It was a canceled project.

3  I mean, I never even thought about it.  But it never

4  went into production, and it was not something that --

5  that I would do anything with as a product.  I mean, it

6  wasn't a product.  It was just, in the end, it was a

7  very long and expensive development project.

8      Q.    Thank you.

9            MR. NELSON:  And I think it's Defendants'

10  Exhibit 2.  Is that the registered patent?

11            Let's go to Defendants' Exhibit 1.

12            There we go.

13      Q.    (By Mr. Nelson) And, Mr. Moscovitch,

14  Mr. Niederluecke was questioning you about this --

15            MR. NELSON:  I'm sorry.  Your Honor, did

16  you have any more questions?  Is there anything that we

17  can --

18            THE COURT:  No.

19            MR. NELSON:  Okay.  Because we're

20  changing subjects.

21      Q.    (By Mr. Nelson) On the --

22            MR. NELSON:  Slightly.

23      Q.    (By Mr. Nelson) On the registered patent,

24  this is the '170 patent, Mr. Moscovitch?

25      A.    Yes, correct.

1     Q.    And again, I think -- I want to make clear

2   your testimony, what you told to the jury.  You knew the

3   patent number on this, right?

4     A.    I knew the patent -- well --

5     Q.    Well, let me ask a different -- this -- this

6   is of record in the '978 file history and was cited on

7   the patent, correct?

8     A.    Yes, correct.

9     Q.    And you disclosed this to your patent

10  attorneys as soon as you found out about it, right?

11    A.    Yes.  I sent him the letter from Mirek.

12    Q.    Okay.  All -- any prior art that you knew

13  about you told your lawyers about, right?

14    A.    Yes.

15    Q.    Okay.  And could you just walk us through how

16  this particular -- and I think there were three or four

17  patents around this time that -- that you and your

18  lawyers disclosed to the Patent Office.

19            Can you just tell the Judge how that came to

20  pass?

21    A.    Well, actually, I had sent a letter of

22  complaint to the Law Society about the way in which

23  Mirek had handled my whole filing of patents.

24                  THE COURT:  Wait.  Who?

25                  THE WITNESS:  The Law Society of upper

1  Canada.

2          MR. NELSON:  Mr. Waraksa.

3          THE COURT:  All right.

4          THE WITNESS:  Mr. Waraksa, the lawyer who

5  had handled the prosecution of the '939 patent.

6          I felt that he hadn't listened to me, and

7  he wouldn't listen to me and that I had suffered for

8  that.  And I felt that -- you know, I knew that he

9  had -- he was having psychological problems -- serious,

10  very serious psychological problems, and he was under a

11  doctor's care, and I felt that -- he was still writing

12  patents.

13          And, first of all, I felt that I had

14  suffered damages, but also I felt that other potential

15  inventors might suffer the same problems that I had

16  incurred.

17          So I sent a letter of complaint, and they

18  asked for a response from him.  And in that response

19  that he -- he answered them six months later, and he did

20  a patent search to say that I've uncovered these five

21  patents, and here's another reason why he would have

22  never got this -- his broad claim that he wanted, and --

23      Q.   (By Mr. Nelson) And you immediately disclosed

24  that to your lawyers, right?

25      A.   Yes.  As soon as I got it, I called Mark on

1  the phone, and I told him, Mirek has sent me this

2  letter, and here's what he said.  And he told me to send

3  it on to him, and he sent it on to the Patent Office.

4                    MR. NELSON:  And let's just -- let's go,

5  actually, to Defendants' Exhibit 1225 so we can actually

6  see this letter.

7                    Let's first go to the second page, and

8  let's blow up the last part that lists the patents.

9        Q.    (By Mr. Nelson) This -- this is what you

10  knew.  So you knew -- you got this letter, correct?

11       A.    Yes, that's correct.

12       Q.    And you saw the patent number on it, right?

13       A.    I saw five patents listed here, yes.

14       Q.    And then you didn't hide the letter; you

15  immediately turned it over to your lawyers, right?

16       A.    Yes, absolutely.

17       Q.    Okay.  And all these got cited to the -- to

18  the Patent Office?

19       A.    No.  Actually, only four of the five because

20  the fifth one was not prior art.  He was wrong about

21  that.

22       Q.    Oh, I see.  Okay.

23             Because the filing date was afterwards?

24       A.    I'm not sure.

25       Q.    Okay.

1    MR. NELSON:  And then let's just go back

2  to the first page and blow up the second paragraph,

3  please.

4    Q.    (By Mr. Nelson) And this is Mr. Waraksa

5  discussing his health problems?

6    A.    Yes.

7    Q.    And I don't want to get into it too much, but

8  this is what he's telling you?

9    A.    Yes.

10    Q.    Okay.  And were you -- during this timeframe

11  of '98, Mr. Moscovitch, were you trying to contact

12  Mr. Waraksa and trying to get his attention?

13    A.    Yes, I was.

14    MR. NELSON:  Let's go, please, to

15  Plaintiff's Exhibit 1180.

16    And let's blow up that through the first

17  line of the second paragraph.  Actually, let's -- you

18  can blow up the entire letter.  That's fine.

19    There we go.

20    Q.    (By Mr. Nelson) Can you please read,

21  Mr. Moscovitch, your attempts to contact Mr. Waraksa and

22  whether he actually ever got back to you?

23    A.    Yes.

24    I have tried to contact you without success

25  since January 9th, 1998.  As indicated in my phone mail,

1   it is urgent that I talk to you immediately.  I am most

2   concerned about preservation of certain patent

3   matters -- patent matters you are dealing with.

4         If I have not heard from you by February the

5   5th, 1998, I will have no choice but to take all

6   necessary steps, including contacting the Law Society,

7   to protect Mass.

8      Q.    Okay.  And you still were having difficulty

9   contacting him, right?

10      A.    Yes.

11      Q.    And you were not able to contact him before

12   your patent -- he didn't tell you when your patent

13   issued, right?

14      A.    No.  I met with him in the fall of 1997 when

15   he told me about all the issues he was having.  He was

16   living in an apartment, and we met outside downstairs.

17   And he was not going to work any longer, and he was on

18   medication, and he was living on his own, away from his

19   family.  He had a lot of issues.

20         And there was some matter that he was

21   supposed to take care of for me, and he asked me to

22   bring a check, which I did, and I gave him.  And I

23   believe he had told me before that the patent had been

24   allowed -- or was -- he thought it was going to be

25   allowed, something to that effect.

1          And I was -- wanted to know when the patent

2   would issue.  I wanted to know that it was a patent.

3   And I couldn't reach him after that.  And I finally was

4   able to reach him, but the patent actually issued in

5   November of 1997, and when I reached --

6          Q.    The original patent now, not the reissue.

7          A.    The '939 patent.  And he didn't know, and I

8   didn't know.  And the way he found out was he went to

9   his office sometime in January, I think it was, about

10  three months later.  It had been sitting on the floor of

11  his office for three months.

12         Q.    It had been sitting on the floor of his

13  office for three months?

14         A.    Yes.

15         Q.    And during that time, did you know that it

16  had been issued?

17         A.    No, I did not know.

18         Q.    And after that is when you began the reissue

19  process, is that right, or sometime after that?

20         A.    Well, I couldn't reach him, and I told my --

21  my corporate attorneys that I was very concerned, and I

22  didn't know what to do.  And they -- they had their own

23  patent department, and they -- they introduced me to a

24  very senior patent lawyer there.

25         Q.    And actually, let's clear up something

1   that -- on a slightly related point.

2           Mr. Niederluecke was questioning you about

3   this June 2000 Richardson Electronics proposal when he

4   was -- when you were saying that there was a patent that

5   was about to -- this patent was about to issue.

6           In June of 2000, had the patent issued yet?

7       A.   No.

8       Q.   And just to be clear, what is your knowledge

9   of when the patent actually issued?

10      A.   The -- well, the patent issued on December

11  5th of 2000.

12      Q.   And when was this lawsuit filed

13  approximately?  July 2006?

14      A.   July 7th, 2006.

15      Q.   And that's well within the -- well within six

16  years; is that right?

17      A.   Yes.

18      Q.   Okay.

19           MR. NELSON:  And, Your Honor, we're at

20  your pleasure.  Do you want to go into any more detail

21  about Mr. Waraksa or what happened at this --

22           THE COURT:  That's up to you.

23           MR. NELSON:  Okay.

24           THE COURT:  I think I will take about a

25  10-minute break.

1          MR. NELSON:  Okay.

2          THE COURT:  And you can decide whether

3   you want to put on any more.

4          COURT SECURITY OFFICER:  All rise.

5          (Recess.)

6          COURT SECURITY OFFICER:  All rise.

7          (Jury out.)

8          THE COURT:  Please be seated.

9          All right.  You may proceed.

10          MR. NELSON:  Your Honor, we have one more

11   line of questioning, and then we're going to be done,

12   and we're going to pass the witness and potentially

13   rest.

14          Can we bring up the Waraksa deposition on

15   the transcript 166, 1 through 12?  This prevents me from

16   using the document cam.

17          You got it, Matt?  166.  I'm sorry.

18          Okay.  And let's --

19      Q.   (By Mr. Nelson) Mr. Moscovitch, you were

20   present at this deposition?

21      A.   Yes.

22      Q.   And you testified before that the reason why

23   you filed for a reissue was because Mr. Waraksa failed

24   to appreciate the scope of the claims, correct?

25      A.   Yes.

1        Q.    Okay.  And Mr. Waraksa, for all that -- the

2   problems you had between him (sic), he actually

3   confirmed this point, didn't he?

4        A.    Yes, I believe he did.

5        Q.    Okay.  Well, let's just -- could you please

6   read for the Judge what Mr. Waraksa -- the question and

7   answer here?

8        A.    Sure.

9              Whether you overlooked it or whether you

10  didn't consider it or for whatever reason, you failed to

11  appreciate that --

12             ANSWER:  It could have had claims of

13  different scope, yes.

14              MR. NIEDERLUECKE:  And, Your Honor, if I

15  could, I think we may need to read in the preface to

16  that, try to see if we can add some context to that,

17  Your Honor.

18              Before the question was:  Sir, will you

19  listen to my question?

20              Assuming that he got broader coverage

21  than the original patent --

22              ANSWER:  Yes.

23              QUESTION:  -- that would suggest that the

24  Brooks patent was unnecessarily limited, correct?

25              The deponent said:  It had a different

1    scope.

2                    So that's what was the preface into that

3    question.

4                    THE COURT:  All right.  Thank you.

5        Q.   (By Mr. Nelson) And finally, briefly,

6    Mr. Moscovitch, you testified about the -- your dealings

7    with Dell.

8                    Did you rely on any actions by Dell in

9    building product and making tooling and -- and -- and

10   conforming to what they wanted?

11       A.   Yes, I did.

12       Q.   Did that cost you money?

13       A.   Yes.

14       Q.   And did -- okay.  I'll stop right there.

15   Thank you.

16                    MR. NELSON:  Pass the witness.

17                    THE COURT:  All right.  Redirect -- or

18   recross?

19                    RECROSS EXAMINATION

20   BY MR. NIEDERLUECKE:

21       Q.   Mr. Moscovitch, your patent doesn't speak

22   about EMI requirements, does it?

23       A.   No.  It's a mechanical patent.

24       Q.   And whether or not it passes CISPR B doesn't

25   have any effect on whether or not -- on any of the

1   limitations in your claim of the '978 patent, correct?

2       A.    That's correct.

3       Q.    Now, you mentioned that this -- the E-Book

4   product couldn't pass FCC-B, right?

5       A.    There was -- as a production product, no.

6       Q.    Right.

7       A.    As a product, no.

8       Q.    But you remember back then that in 1994, the

9   United States hadn't implemented FCC-B for this, had

10  they?

11      A.    I don't recall.

12      Q.    It was, in fact, relying on the looser

13  standard of FCC-A, wasn't it, for this product?

14      A.    Could be.  I'm not sure.

15              MR. NIEDERLUECKE:  And if we can pull up

16  Plaintiff's Exhibit -- Plaintiff's Exhibit 500.

17      Q.    (By Mr. Niederluecke) You were talking about

18  Bloomberg's requirements for CISPR B with Mr. Nelson.

19  Do you remember that?

20      A.    Yes.

21      Q.    And he pulled up a document, which will come

22  up in a minute, Plaintiff's Exhibit 500.  This is that

23  Sertelecom letter, right?

24      A.    Yes, correct.

25      Q.    And in fact, what was pulled up --

1          MR. NIEDERLUECKE:  And let's go to the

2   second page.  I'm not sure exactly --

3       Q.   (By Mr. Niederluecke) What was pulled up

4   about the requirements of CISPR B was actually the

5   recommendations from Sertelecom; isn't that right?

6       A.   Well, they're the testing agent for

7   Bloomberg.

8       Q.   In fact, if you go in the middle --

9          MR. NIEDERLUECKE:  Kind of blow up the

10  middle part there.  Just -- yeah.  Blow up the -- there.

11  That's good.

12      Q.   (By Mr. Niederluecke) And all this is, is a

13  letter suggesting -- starts with in this regards.  This

14  is a recommendation, isn't it, from Sertelecom to

15  Bloomberg that they should insist on using European

16  Class B requirements; isn't that right?

17      A.   Yes, because if they meet CISPR B, then they

18  meet all standards.

19      Q.   And if you -- and it talks even above about

20  the current Class A FCC, doesn't it?

21      A.   Correct, yes.

22      Q.   Okay.  Now, Mr. Moscovitch, whether or not it

23  meets any of these CISPR standards or FCC standards

24  didn't affect any sale or offer for sale from

25  Electrohome to Bloomberg, did it?

1      A.    I'm not sure.

2      Q.    I mean, that only -- those only apply when

3  you put them out in use; isn't that correct?

4      A.    Yes.  You cannot use them -- well, you can't

5  use them unless they have a sticker on them that says

6  they're engineering samples.

7      Q.    So CISPR B doesn't say you can't sell them,

8  does it?

9      A.    Well, you can't sell a product -- no, you

10  cannot sell a product -- if I sell my product without

11  agency approval, I'm subject to a serious fine, and I

12  have to withdraw the product.

13      Q.    What agency approval?

14      A.    We do CISPR B.

15      Q.    In Canada.

16      A.    Well, we sell our products, so we have to

17  pass CISPR B.

18      Q.    Oh, you're talking about Mass as a --

19      A.    Mass as a company.

20      Q.    -- seller.

21      A.    Yes.  We cannot sell our products or else

22  we're subject to very large fines and our product is

23  withdrawn.  We lose our ability to sell it.

24      Q.    Well -- so just to summarize this, at the

25  time, the requirements in the United States were FCC,

 1  Class A; isn't that correct?

 2       A.    I believe so.

 3       Q.    Okay.  And that -- this product could meet

 4  FCC, Class A, couldn't it?

 5       A.    I'm not sure if it could, actually.

 6       Q.    And you're not sure if it couldn't, right?

 7       A.    I don't -- well, it wasn't a production

 8  product, so -- but I'm not sure if it met Class A.  In

 9  the laboratory, it may have but not as a production

10  unit.

11       Q.    You were involved in all of the CISPR B

12  testing, right?

13       A.    Not all of it.  I was brought in at the end

14  because Susan put a SWAT team together, what she called

15  a SWAT team.

16       Q.    So you had some significant involvement.

17       A.    At the beginning, I wasn't involved.  It was

18  only in -- I'm thinking late '94, sometime in '95 that

19  she brought me into the project.

20       Q.    And you also, in 1994, produced 800 or more

21  bases for these E-Books, didn't you?

22       A.    I don't think I produced that number, no.

23       Q.    You didn't supply bases to Bloomberg --

24       A.    I did --

25       Q.    -- like you testified to the jury?

1       A.      I did supply bases, but I don't think I

2   supplied that volume of bases.

3       Q.      And even though you were supplying bases and

4   you were involved in this testing, it's your testimony

5   to the Court that you really didn't know what was going

6   on and what Electrohome was even doing with these units?

7   Is that your testimony?

8       A.      Well, all I'm saying is that the goal of the

9   exercise was to produce production units.  That was the

10  goal.  That's why we did everything.  But it never

11  worked.  So in the end, we had to cancel the whole

12  program.

13      Q.      In fact, that's a good point.

14              MR. NIEDERLUECKE:  Let's bring up

15  Plaintiff's Exhibit 10, if we could.

16              THE COURT:  Let me interrupt you a

17  second, Mr. Niederluecke, and ask you -- refresh my

18  memory as to what evidence, if any, you have with --

19  from Electrohome with regard to this issue of whether

20  any were produced or not.

21              MR. NIEDERLUECKE:  Your Honor, that's --

22  that's the problem I was eliciting in the earlier

23  testimony.  Electrohome is debunk now.  We couldn't get

24  any evidence -- well, I mean, from the company

25  Electrohome.  They don't exist.

1           THE COURT:  Did you run down any of the

2  people that worked on this with Electrohome?

3           MR. NIEDERLUECKE:  We weren't able to,

4  Your Honor.  Apparently, whatever assets got sold is

5  somebody in California, and we were never able to get

6  from Electrohome themselves -- we do have -- I mean,

7  Mr. Moscovitch produced documents that related somewhat,

8  and then we have the Bloomberg documents that show the

9  purchase orders and show the actual units and sales, and

10  then we have the testimony of Bloomberg employees who

11  said that these were shipped out to customers during

12  that timeframe.

13           THE COURT:  Okay.  Thank you.

14           MR. NIEDERLUECKE:  But what I'm trying to

15  focus on, Your Honor, is that regardless of the sales,

16  the purchase orders, offers for sale...

17           Let's go to the next page.

18           Justin, is this the one you had up

19  earlier?  I apologize.

20           MR. NELSON:  No.  I had Plaintiff's 10.

21           MR. NIEDERLUECKE:  Oh, thank you.  That

22  was it.

23           Plaintiff's Exhibit 10, please.

24     Q.   (By Mr. Niederluecke) While she's pulling

25  that up, let me ask --

1           MR. NIEDERLUECKE:  There we go.  Let's go

2  to the next page.

3      Q.    (By Mr. Niederluecke) This is a document sent

4  from Susan Friedlander to you; is that correct?

5      A.    Can you go back to the first page?

6      Q.    Sure.

7      A.    Yes.  But if you go to the second page --

8           MR. NIEDERLUECKE:  Let's go to the second

9  page.

10     A.    I'm not sure who authored the document

11 because the document is sent to Susan Friedlander.

12     Q.    (By Mr. Niederluecke) And so -- so it's your

13 understanding that she then put some notes on here and

14 sent it to you?

15     A.    That's right.

16     Q.    Okay.

17          MR. NIEDERLUECKE:  Let's pull up that

18 bottom in summary part again.

19     Q.    (By Mr. Niederluecke) Now, let's start with

20 the first part of this.

21          This is the document you had, right?

22     A.    She sent me a copy.  It was in my file.

23     Q.    Okay.  So you knew, as of the time she sent

24 this to you, that the suppliers were -- were ordered --

25 were commencing orders in the summer of '94 and were

1    planning to build in October of '94, weren't they?

2        A.    That's what it says here, yes.

3        Q.    Okay.  And you'd be -- you'd be building

4    those orders according to a purchase order, wouldn't

5    you?

6        A.    I would assume there would be some order.

7        Q.    And, in fact, it says production was told to

8    be ready to build in October and then subsequently in

9    November and December, correct?

10       A.    That's what it says, yes.

11       Q.    So at that time, you were being told, because

12   of these supplier orders, because of the purchase

13   orders, that you had to be ready to produce; isn't that

14   right?

15       A.    Well, it says -- it does say that they were

16   told to be ready to build, yes.

17       Q.    Now, how do you build if you don't have a

18   purchase order?

19       A.    Well, how do you build if you don't have a

20   product that works?

21       Q.    Well, you built the product, right?

22       A.    Yes, but it still didn't -- didn't work.

23       Q.    You built the product.  In fact, you had

24   detailed design drawings, didn't you?

25       A.    Well, yes -- well, those were checking

1    drawings, but yes.

2               MR. NIEDERLUECKE:   Could you bring up

3    Defendants' Exhibit 145?

4        Q.    (By Mr. Niederluecke) You had created these

5    drawings well before this -- the date of this letter,

6    January 25th, 1995, didn't you?

7        A.    Oh, yes.   These were checking drawings, and

8    we needed -- we actually -- as you saw in the earlier

9    documents, there's tooling.

10       Q.    And in fact, you could use these drawings or

11   the underlying data to manufacture the E-Book design

12   disclosed here, right?

13       A.    Yes.   And -- you could, and we did, but it

14   didn't work.

15               MR. NIEDERLUECKE:   Let's go to the last

16   page of that exhibit, if we can.

17       Q.    (By Mr. Niederluecke) And that's the E-Book

18   design there in that drawing package; is that correct?

19       A.    That's an exploded view with a -- one of the

20   bases, yes.

21               MR. NIEDERLUECKE:   And can you pull up

22   the date to that document?

23       Q.    (By Mr. Niederluecke) This shows that even as

24   far back as August of 1993, there were -- there was a

25   design that could be manufactured; isn't that correct?

1      A.    These are taken off the CAD data, yes.

2            MR. NIEDERLUECKE:  Can we pull up

3  Plaintiff's Exhibit 300?

4            Almost done, Your Honor.

5      Q.    (By Mr. Niederluecke) And Plaintiff's Exhibit

6  300, hopefully, will be the purchase order Mr. Nelson

7  had asked you about that was a cancellation.

8            MR. NIEDERLUECKE:  And can we just blow

9  up the whole main text?

10      Q.    (By Mr. Niederluecke) Do you recall that

11  testimony?

12      A.    Yes.

13      Q.    And it showed that in -- in -- at least on

14  April 5th, 1994, which is that date in the middle upper

15  part --

16      A.    Yes.

17      Q.    -- that there was a cancellation fee that was

18  being paid; is that right?

19      A.    Yes, that's correct.

20      Q.    And --

21      A.    But it's not clear what it's for, because

22  above it, it says flat panel development.

23      Q.    Right.  They're paying on four -- on April

24  30th, on the right there, they paid Electrohome $87,500

25  for a flat panel development; is that correct?

1    A.    Yes.  We still -- we were still working on

2  development.

3    Q.    Yes.  And this is going to Electrohome,

4  correct?

5    A.    I believe so.

6    Q.    Okay.  And then they -- they canceled and

7  paid for something in the amount of $284,600, right?

8    A.    Yes.

9    Q.    And that -- and that would -- in your

10  experience, that would be a fee that would be paid

11  because there was a design change, and there were some

12  parts that would have been ordered that wouldn't have

13  been needed anymore, so they were paying up for those?

14    A.    I don't know what it's for.

15    Q.    So this is -- April 5th is the purchase

16  order -- purchase order original date.  Let's -- and if

17  you see, there's -- you see how it's purchase order

18  7267?  Do you see that on the left there?

19    A.    Yes.

20    Q.    Okay.

21                MR. NIEDERLUECKE:  Then let's go to

22  Plaintiff's Exhibit 1107.

23    A.    As you can see, in Line -- it says Line 2 is

24  for reducing quantity after parts have been received.

25  Electrohome got most suppliers to keep these as low as

1  possible.

2        The reason they kept them as low as possible

3  is because the product wasn't working.

4        Q.    (By Mr. Niederluecke) This is in April of

5  '94, correct?

6        A.    That's right.

7        Q.    Okay.

8        A.    And this is -- this is the -- part of the

9  ongoing research and development.

10        MR. NIEDERLUECKE:  And then if you can

11  blow up the middle again.

12              That's not the one I want.

13              (Discussion off the record.)

14              MR. TYLER:  Your Honor, while they're

15  looking for that, I just want to advise the Court that

16  on direct, there were a few questions about Dell, so I'd

17  like to ask the witness a few questions --

18              THE COURT:  All right.

19              MR. TYLER:   -- after Mr. Niederluecke's

20  finished.

21              MR. TRIBBLE:  Your Honor, we have no

22  objection to Dell going ahead --

23              MR. NIEDERLUECKE:  I'm sorry.  Pull up

24  Defendants' -- did I say Plaintiff's?

25              MS. FRIEDEMANN:  Defendant's 1107.

1         MR. NIEDERLUECKE:  Defendant's 1107.  I

2 apologize.

3     Q.    (By Mr. Niederluecke) So, Mr. Moscovitch, we

4 looked at this next purchase order update.

5         MR. NIEDERLUECKE:  And if you could blow

6 it up again, Melissa.  Thank you.

7         Oh, let's move on.  That's the same one

8 we just looked at.

9     Q.    (By Mr. Niederluecke) In fact, at that same

10 time, we saw, and the evidence will show, that there was

11 a purchase order 7270, which was the one for $3.6

12 million for the new flat panels.

13         Do you recall that?

14     A.    I've seen it during this trial.

15     Q.    So, in fact, what -- what Bloomberg was doing

16 in April of '94 was saying, okay, we've got some extra

17 parts; let's reduce those down, because we don't need

18 them, and here's a new purchase order for $3.67 million

19 worth of product; isn't that right?

20     A.    I've only seen that here.

21     Q.    Right.  But that's what -- you understand

22 that's what that was, right?

23     A.    I don't know what that was for.  If you could

24 put it up, then I could see.

25     Q.    I wasn't finding the exact purchase order, so

1    I wasn't able to put it up.  We had it in the trial.

2    You looked at it, but...

3            Now, Mr. Moscovitch, if -- if the law says

4    that having drawings capable of making a product and

5    then offering that product for sale was sufficient to

6    make the device prior art, would you agree that you had

7    at least met those standards?

8        A.    Well, my position is the product didn't work.

9    It was an R&D project.  And again, we certainly tried to

10   make it work, and the goal was to make it work, and

11   that's why we started the project.  But in the end, the

12   project didn't work, so...

13       Q.    Okay.  My question was:  If -- if the law is

14   that you only need to have drawings sufficient to make

15   the device and an offer for sale of that device, would

16   you agree with me that you at least had those two

17   situations in place before April 25th, 1995?

18       A.    I'm not an expert in that, so I --

19       Q.    That's why I'm -- that's why I'm telling you.

20   I'm not saying what the -- I'm not asking you to say

21   what the law is; I'm telling you that if the law would

22   just require the making of drawings sufficient to make

23   the product and an offer for sale, would you agree with

24   me that those two events occurred prior to April 25th,

25   1995?

1       A.     I didn't make an offer to sell the product.

2       Q.     I didn't ask if you did, Mr. Moscovitch; I

3   asked if -- if everything you've seen now --

4       A.     Uh-huh.

5       Q.     -- if you're -- if you would agree with me

6   that at least those two points -- I mean, you agree --

7   let's start with the first one.  You agree that there

8   were manufacturing drawings and data that was sufficient

9   to make the product, correct?

10      A.     We could make parts for the product.  Some of

11  the components, yes.

12      Q.     In fact, Electrohome could make the entire

13  product, couldn't they?

14      A.     They could order parts off the tools; they

15  could build prototypes, yes.

16      Q.     So they could make the product, correct?

17      A.     Well, prototypes, what I call prototypes.

18      Q.     The product, correct?

19      A.     I don't call it a product.  I call it a

20  prototype.

21      Q.     Okay.  And what significance do you think it

22  matters to call it a prototype rather than a product,

23  Mr. Moscovitch?

24      A.     A product is something that works the way we

25  intended it to work and could be sold and could be

1  produced in very large volume.  That's a product.

2  Prototype is something that you build.  And you can

3  build it exactly the way you want it to work and with

4  all the details, but if you're testing it and it doesn't

5  work, then it's a prototype, and you're trying to

6  resolve things.  And if you have iterations as you go,

7  then that's a prototype.

8      Q.    Mr. -- Mr. Moscovitch, you got paid for all

9  the development work you did on this project, didn't

10 you?

11     A.    Not everything that I did, but I did get

12 paid.

13     Q.    Yes.  And you got paid for all of the bases

14 that you made and sold to Electrohome for the E-Book,

15 didn't you?

16     A.    Not all of them because I kept changing them.

17 So there were a lot of bases that I made that didn't

18 work, and I didn't get paid for those.

19     Q.    Okay.  But I'm talking about the ones you

20 supplied to Electrohome.

21     A.    There were some that I supplied that I got

22 paid, yes.

23     Q.    Okay.  And this was a -- you were in this to

24 make money, weren't you?

25     A.    Absolutely.

1      Q.     Okay.  And when you supplied those parts, you

2  didn't put any restrictions on what could be done with

3  those parts, right?

4      A.     Electrohome ordered them from me, and I

5  delivered them to Electrohome.

6              MR. NIEDERLUECKE:  I have no further

7  questions.  Thank you, Your Honor.

8              THE COURT:  Anything further?

9              MR. NELSON:  Just a few, three or four.

10                    REDIRECT-EXAMINATION

11  BY MR. NELSON:

12      Q.     I want to focus here on your intent.

13              MR. NELSON:  Let's go back to Plaintiff's

14  500, which is that Sertelecom document.

15      Q.     (By Mr. Nelson) Mr. Moscovitch, as that comes

16  up on the screen --

17              MR. NELSON:  There you go.  Yeah, we got

18  it.

19              And let's, again, blow up that fourth

20  paragraph.  It is therefore.

21      Q.     (By Mr. Nelson) Mr. Moscovitch, it was your

22  knowledge, right, that Bloomberg implemented this

23  recommendation from Sertelecom, right?

24      A.     Yes.  That's why I was part of that SWAT

25  team.

1    Q.    And -- right.  You actually participated in

2  efforts for it to get to -- to pass CISPR B.  That's why

3  they were trying to do it, right?

4    A.    Yes.  There were even e-mails from Susan

5  saying that the whole thing was very depressing.

6    Q.    Right.  And to your knowledge, if the product

7  did not pass CISPR B, what did that mean to you?

8    A.    It meant to me that the product could not be

9  sold.

10    Q.    And so -- so not only did -- was it your

11  knowledge that Bloomberg intended to implement this

12  standard -- to your knowledge, Bloomberg actually

13  implemented the standard, right?

14    A.    Yes, to my knowledge.

15    Q.    Okay.  And so --

16          MR. NELSON:  Let's just actually briefly

17  go back to -- let's first go to Plaintiff's --

18  Defendant's Exhibit 145.

19          And go to the last page where it had that

20  date.  I believe it was on the last page.

21          Yeah, last page date.  There we go.

22    Q.    (By Mr. Nelson) And, Mr. Moscovitch, this was

23  1993; is that right?

24    A.    That's correct.

25    Q.    And we've just seen documents here this

1  morning that there was constant changes and iterations,

2  including a development cancellation fee in 1994 and

3  changes after that.

4            In this -- these drawings, did the product

5  work at all or certainly for its intended purpose?

6       A.    No.   That's why we were constantly revising

7  it.

8       Q.    And let's -- I think it's Plaintiff's Exhibit

9  181, which is our version of that purchase order.

10            MR. NELSON:  And let's just blow up the

11  date, please -- or you can blow up the entire purchase

12  order, and let's focus in on that -- the date 7/6/1995.

13       Q.    (By Mr. Nelson) Mr. Moscovitch, does --

14  doesn't this purchase order show that it was undergoing

15  revision as of July 1995?

16       A.    Yes, that's correct.

17            MR. NELSON:  And let's actually blow up

18  the entire purchase order and go down.

19       Q.    (By Mr. Nelson) We talked about prototypes.

20            MR. NELSON:  Let's zoom in on that

21  last -- the last part of the first line where it says

22  early prototypes.

23       A.    It says, Revised purchase order.  Details to

24  be discussed, especially early prototypes.

25       Q.    (By Mr. Nelson) Yeah.  And let's -- what

1   does -- what does it say on the top left?  Warning:

2   Obsolete item?

3        A.     Obsolete item.

4        Q.     Yeah.  And -- okay.  And so just to be

5   clear --

6                    MR. NELSON:  Thanks.

7        Q.     (By Mr. Nelson) Just to be clear,

8   Mr. Moscovitch -- and this will be my final question --

9   did you intend to deceive the PTO in any way by not

10  disclosing this failed prototype?

11       A.     No, not at all.

12       Q.     Thank you.

13                    THE COURT:  All right.  Mr. Tyler?

14                    MR. NIEDERLUECKE:  May I ask a few

15  questions before you go?

16                    MR. TYLER:  Sure.

17                    RECROSS EXAMINATION

18  BY MR. NIEDERLUECKE:

19       Q.     Mr. Moscovitch, just one quick question --

20  one or two.  Depends on how you answer it.

21             The obsolete part that you just read in

22  that -- in that, do you know whether Bloomberg pulled

23  these out of their current financial systems?

24       A.     I have no idea where that came from.

25       Q.     Do you know if that obsolete was placed on

 1 | there well after 1995?

 2 |     A.    I have no idea.

 3 |     Q.    Okay.  Thank you.

 4 |                    CROSS-EXAMINATION

 5 | BY MR. TYLER:

 6 |     Q.    Good morning, Mr. Moscovitch.

 7 |     A.    Good morning.

 8 |     Q.    Very briefly, I believe your counsel elicited

 9 | some testimony regarding your making changes based on

10 | requirements from Dell.

11 |           Do you recall that?

12 |     A.    Yes.

13 |     Q.    And I guess an example we saw at trial was a

14 | letter about paint chips; is that right?

15 |     A.    That's one of the things that we did.

16 |     Q.    Okay.  The paint chips -- isn't it true that

17 | the paint chips were sent to you -- and it was an option

18 | that you had to change to Dell gray, correct?  It was

19 | not a requirement.

20 |     A.    No.  Actually, Dell told me that -- at the

21 | time I was making the product in black and that they

22 | wanted it to be in Dell gray, because their workstations

23 | were in Dell gray, and they didn't want it in black.

24 |     Q.    Isn't it true that at that time, they -- Dell

25 | actually changed all of its workstations to Dell gray at

1  that time, right?

2       A.    I'm not sure when they changed.

3       Q.    And that those paint samples were sent to all

4  of their vendors, given the option to change to Dell

5  gray if you wanted to try to attach to some of the Dell

6  sets?  Isn't that what happened?

7       A.    Oh, I don't know -- I don't know that they

8  changed at that time and that they sent it to all their

9  vendors.

10      Q.    So it's your testimony that it was a

11 requirement that you change to Dell gray?

12      A.    Yeah.  They wanted us to be able to match

13 their workstation.

14      Q.    Well, let me ask -- let me ask it a different

15 way --

16      A.    Yeah.

17      Q.    -- because I said the word requirement.

18 Did they require you to change to Dell gray to sell on

19 the website?

20      A.    My understanding is that they wanted me --

21 that they wanted my product to match their color.

22      Q.    The question is, did they require you to do

23 it?  Did you have a choice to not change?

24      A.    If I wanted to sell with Dell's product, I

25 didn't feel that I had a choice.

1    Q.    And you realize that there are many, many

2 other products sold on Dell's website that are not Dell

3 gray, right?

4    A.    I realize, but this is going with their

5 workstations, so -- directly with their workstations,

6 same as their own Dell branded product.

7    Q.    Okay.  Thanks.

8         MR. TYLER:  Thank you, Your Honor.

9         THE COURT:  All right.  Anything further?

10         MR. NELSON:  Just on this one point, just

11 a couple of questions, and we'll be done probably with

12 our case after that.

13                REDIRECT-EXAMINATION

14 BY MR. NELSON:

15    Q.    You did, Mr. Moscovitch -- and this is just

16 from the jury testimony -- raise your prices to third

17 parties at Dell's request?

18    A.    Yes.

19    Q.    And you did build tooling at Dell's request?

20    A.    I ramped up at their request, and I changed

21 the configuration of the product for shipping at their

22 request.

23    Q.    And you -- and you made significant

24 investments in personnel and manufacturing and redesign

25 all at their request?

1      A.    Yes.

2      Q.    And you traveled to Dell to meet with them

3  all at their request?

4      A.    Yes.

5      Q.    And you absorbed significant expenses in

6  packaging and shipping at their request?

7      A.    Yes.

8      Q.    Okay.  Thanks.

9            THE COURT:  Anything further of this

10  witness?

11            MR. NIEDERLUECKE:  No, Your Honor.

12            MR. TYLER:  No, Your Honor.

13            THE COURT:  You may step down.

14            Who will be next?

15            MR. NIEDERLUECKE:  Your Honor, actually,

16  we would -- we would like to call Jane Payfer to the

17  stand just to talk about this one --

18            THE COURT:  All right.

19            MR. NIEDERLUECKE:  -- website document.

20  We have the metadata for it, so I just want, as far as

21  the equitable issues here --

22            THE COURT:  All right.

23            MR. NIEDERLUECKE:  -- to address with her

24  that document.

25            And, Your Honor, this is -- I don't know

```
 1  if you want to give him the original or I can give him a
 2  copy.
 3                   May I approach the witness, Your Honor?
 4                   THE COURT:  Yes.
 5                   MR. NIEDERLUECKE:  And I'd ask that 1471
 6  be admitted.
 7                   THE COURT:  Any objection?
 8                   MR. NELSON:  No, no objection.
 9                   MR. TRIBBLE:  No objection.
10       JANE PAYFER, DEFENDANTS' WITNESS, PREVIOUSLY SWORN
11                        DIRECT EXAMINATION
12  BY MR. NIEDERLUECKE:
13       Q.    Ms. Payfer, you have Exhibit 1471 before you;
14  is that correct?
15       A.    Yes, I do.
16       Q.    And is this -- the second page of this
17  document, is that the Bloomberg document that we have
18  been addressing?
19       A.    Yes, it is.
20       Q.    Let's see.  Let me back up here.
21             And this is -- is this the document that you
22  provided testimony on regarding when you had actually
23  found this file from the Internet?
24       A.    Yes, it is.
25       Q.    And did you testify that -- in the -- in the
```

1   jury part of the case, that you downloaded this in 2007?

2       A.    Yes, I did.

3       Q.    Okay.  And the real question from Plaintiffs

4   was how that -- the date and time got on the bottom from

5   1997; is that correct?

6       A.    That was the concern.

7       Q.    After reviewing this document, is it still

8   your testimony that you downloaded this in 2007?

9       A.    Yes, absolutely.

10       Q.    Let's go back to the first page, if we can.

11              MR. NIEDERLUECKE:  And for the record,

12   this is the metadata similar to what Defendants were

13   pulling up on the screen in the trial.

14       Q.    (By Mr. Niederluecke) And do you see where it

15   lists in properties and, in fact, all over the document

16   the date of March 27th, 2007?

17       A.    Yes, I do.

18       Q.    Is that -- is that approximately when you

19   recall having downloaded that information?

20       A.    Yes.  I think I said it was the end of March

21   in 2007 in my testimony.

22       Q.    Thank you.

23              MR. NIEDERLUECKE:  I have no further

24   questions.

25              THE COURT:  Cross?

1         MR. NIEDERLUECKE:  Pass the witness.

2                   CROSS-EXAMINATION

3  BY MR. TRIBBLE:

4      Q.    Good morning.

5      A.    Good morning.

6      Q.    We just got this exhibit, so I guess I'll use

7  the document camera.

8      A.    You've had the file since it was given to you

9  and the other documents.

10     Q.    I just mean that --

11              MR. NIEDERLUECKE:  He just means --

12     Q.    (By Mr. Tribble) -- we had no notice of this

13  exhibit.  We didn't even know you were going to be

14  called as a witness.

15              You'll agree -- you have the original

16  exhibit?

17     A.    I do.

18     Q.    You'll agree that Defendants' Exhibit 1471,

19  the -- the pictures we were talking about in trial, they

20  start on the second page, correct, the images of the

21  page?

22     A.    Yes.

23     Q.    You'll agree there's no Bates number at the

24  bottom of that page, is there?

25     A.    The printout I have right now is the printout

1   attached to the metadata file, not the actual exhibit.

2   So the one I have doesn't have a Bates number.

3        Q.    You'll agree that the document we were using

4   at trial has a Bates No. E001288, correct?

5        A.    Yes.

6        Q.    Do you have the metadata for this file, for

7   this document?

8        A.    I don't have that metadata right now, no.

9        Q.    The -- the -- this document -- copies of this

10  document were in several places.  There were multiple

11  copies of this in the production of Ergotron.

12            Are you aware of that?

13       A.    No, I'm not.

14       Q.    Did you print out multiple copies of this

15  document and produce it multiple times?

16       A.    I print -- I downloaded it from the Internet,

17  converted that file to a PDF, and included that in my

18  testimony.

19       Q.    Was this metadata produced to us during the

20  litigation?

21       A.    It's part of the digital file that was

22  produced to you during the litigation, yes, sir.

23       Q.    Can you tell us what website -- we looked.

24  We couldn't find an archive site that has this page on

25  it.  Can you tell us where you found it?

1      A.      I cannot tell you that, and I also looked.

2  So I would confer that I -- the various sites that I

3  found, the link was not alive when I looked over the

4  weekend.

5      Q.      So you've looked for this document to find

6  the archive again, and you can't find it?

7      A.      That's true.

8      Q.      Okay.  Did you look at the metadata for the

9  other documents that were produced?

10      A.      I did not.

11      Q.      Did y'all go back and look at the original

12  production?  Was this an -- in paper in Ergotron's

13  files?

14      A.      I never saw it in paper in Ergotron's files.

15      Q.      Well, that -- you printed it out in 2007.

16  That's what you say, correct?

17      A.      Prior to 2007, I never saw it in paper in

18  Ergotron's files.  I found this document on the Internet

19  and then went back to the Bloomberg site to confirm that

20  it actually happened in 1997.

21      Q.      But my question is, the documents that we

22  got -- first of all, we only received TIFF images in the

23  document production.

24              Are you aware of that?

25      A.      I'm not aware of all of that, no, sir.

1    Q.    So the TIFF images didn't have any metadata

2  that would show us where the document came from; would

3  you agree with that?

4    A.    I don't know how TIFF images metadata stacks

5  up, sir.  I don't know that.

6    Q.    Do you know what original files, file

7  folders, and file drawers, the multiple versions of

8  Plaintiff's Exhibit 358, came out of at Ergotron's

9  files?

10   A.    I know that the file I submitted that was in

11  a marketing folder was the one I downloaded from the

12  Internet.  That's what I know.

13   Q.    And just so it's clear, you see the date and

14  the time at the bottom of the page.

15   A.    I actually wanted the date and time on the

16  page, sir, yes.

17   Q.    Why?

18   A.    Because I was building a timeline to put the

19  whole progression of flat panel technology into a whole

20  market evolution story.

21        So I was building this timeline and having

22  quite a bit of confusion on which flat panel monitors

23  were available at different points in time, and this

24  document, sir, dated that for me.

25             MR. NIEDERLUECKE:  I've got -- just

1  caution my witness, if it's trial preparation

2  information --

3                THE WITNESS:  Trial preparation

4  information.

5                MR. NIEDERLUECKE:  Yeah, and that's

6  privileged, so, Ms. Payfer, please don't disclose the

7  trial preparation information.

8      Q.    (By Mr. Tribble) And so how -- so how -- how

9  did you get the date and time to print out because you

10 wanted it there?

11     A.    The link that I found, I printed -- I believe

12 first -- I won't testify that I know every last step I

13 took.  I believe I reviewed it.  I believe I went back

14 to the Wayback machine and did find that same

15 information on the Bloomberg site.

16                And then I believe I converted it to a PDF

17 and saved it on our server where the document still

18 resides today.  It's not missing.

19     Q.    Did you produce that PDF in this litigation?

20     A.    Absolutely, we did.

21     Q.    We have a hard drive.  Can you show us where?

22     A.    Yes.  I think I can.

23     Q.    Well, are you saying you put terms into the

24 Wayback machine to do a search?

25     A.    No.  Once I found the document as a link on a

1  different site from Googling, then I went back to the

2  Bloomberg file to put Bloomberg's website in to confirm

3  that this was actually that website.

4      Q.    Are you aware that you -- when you print

5  out -- I believe when you print out to paper or to a

6  file in the Wayback machine -- you're saying you got

7  this from the Wayback machine, correct?

8      A.    No, I'm not.  I'm saying I found it through

9  Googling.

10          Sir, at that point in time, respectfully, I

11  did not know there was a link between Mr. Moscovitch and

12  Bloomberg.  I was just putting together a timeline.

13      Q.    Do you recall the exhibits showing the same

14  web page printed out at different times and dates that

15  had the dates and times in the exact same position as

16  the --

17      A.    Yes.

18      Q.    -- the April 21 date --

19      A.    All these pages have --

20      Q.    Excuse me -- and time on Plaintiff's Exhibit

21  358?

22          You recall walking through those, correct, or

23  did you see me walk through those with the witness in

24  trial?

25      A.    All the different pages of the document are

1  date stamped a different time.  I understand that.

2  That's what happens when we take a printout, yes, I

3  understand that.

4          But I have a PDF of this moment in time from

5  a documentation perspective.

6          MR. TRIBBLE:  Matt, do you have the PDFs

7  that we had for those exhibits?  Do you have those?

8      Q.    (By Mr. Tribble) You're aware that -- I mean,

9  the PDF -- you print to a PDF, and so that's when it

10 puts the time and date stamp on it.  You're aware of

11 that, aren't you?

12     A.    No, sir.  What I found on the website already

13 had the time and date stamp and the pages numbered on

14 it.  I then saved that file as another PDF on our

15 server.

16          MR. TRIBBLE:  Your Honor, I don't have

17 any more questions, but we may have some further

18 argument about this.

19          THE COURT:  All right.  Thank you.

20 Anything further?

21          MR. NIEDERLUECKE:  Nothing further, Your

22 Honor.

23          THE COURT:  All right.  You may step

24 down.

25          All right.  Who's next?

1          MR. NIEDERLUECKE:  Your Honor, next, if

2    we could, I'd like to read in just two very short

3    statements from Mr. Roarty and Mr. Duffy from their

4    depositions, and this just goes to the preservation of

5    that -- the evidence, and it just relates to the file.

6    So, Your Honor, first, I will -- I will read the

7    designations from Edward Duffy in his deposition.

8               QUESTION:  Could you state your name?

9               THE COURT:  What page -- what page and

10   line?

11              MR. NIEDERLUECKE:  Oh, I'm sorry.

12   Page 9, Line 6.

13              QUESTION:  Could you state your full --

14   your name -- full name for the record.

15              ANSWER:  Edward Duffy.

16              MR. NIEDERLUECKE:  Page 10, Line 4.

17              QUESTION:  And you used to work for

18   Bloomberg?

19              ANSWER:  Yes.

20              MR. NIEDERLUECKE:  Page 16, Line 14.

21              QUESTION:  Were you ever involved in the

22   manufacture process for display systems for Bloomberg?

23              ANSWER:  Yes.

24              QUESTION:  When did you first become

25   involved in that?

1          ANSWER:  Well, at some point after

2  joining the company, and I don't remember specific

3  dates, but Susan invited me to become active in a

4  display project that they had underway.

5          And that project was a twin-headed

6  15-inch CRT product developed in one contiguous plastic

7  skin.  And at that point, that's when I became involved

8  in the displays.

9          MR. NIEDERLUECKE:  And then Page 127,

10  Line 24.

11          QUESTION:  You were asked if you have any

12  documents relating to the subject of your testimony

13  today, and you said you didn't; is that right?

14          ANSWER:  Yes.

15          QUESTION:  And why don't you personally

16  have any documents?

17          ANSWER:  I'm no longer with the firm.  I

18  wouldn't have any reason to have any.

19          QUESTION:  Would you have had documents

20  when you were with the firm?

21          ANSWER:  Certainly.

22          QUESTION:  And when did you leave the

23  firm?

24          ANSWER:  June of '01.

25          QUESTION:  So had this issue arisen prior

1  to you leaving the firm, do you -- do you believe you

2  may have additional evidence -- or may have had

3  additional evidence that you could have brought to the

4  table today?

5          ANSWER:  Absolutely.

6          MR. NIEDERLUECKE:  And then Mr. Roarty's

7  deposition testimony next.  And his testimony begins on

8  Page 11, Line 25.

9          QUESTION:  And, Mr. Roarty, where do you

10  work?

11          ANSWER:  I work for Bloomberg.

12          QUESTION:  And how long have you worked

13  at Bloomberg?

14          ANSWER:  Twenty years.

15          MR. NIEDERLUECKE:  On Page 136.

16          QUESTION:  Mr. Roarty, before we get into

17  this next exhibit, did you make any documentation of

18  your ball and socket or telescoping arm ideas?

19          ANSWER:  I believe I had sketched it in a

20  notebook.

21          QUESTION:  The notebook you kept as part

22  of your work at Bloomberg?

23          ANSWER:  Yes.

24          QUESTION:  And were you able to locate

25  that notebook?

1              ANSWER:  No.

2              QUESTION:  Do you know what happened with

3    that notebook?

4              ANSWER:  I moved to England in 2001 for a

5    work assignment, and I lost a number of notebooks and

6    desk items.  I'm not sure what happened to them.

7              QUESTION:  When in 2001 did you move?

8              ANSWER:  It was August 24th, 2001.

9              MR. NIEDERLUECKE:  And that's the end of

10   Mr. Roarty's testimony.

11             THE COURT:  All right.

12             MR. NIEDERLUECKE:  Next we have the

13   testimony of Allen Tameshtit, who is the -- if you

14   recall, the Mass -- I believe his title was the current

15   director of intellectual property or a similar title.

16   We've got a clip -- I think two clips from each of the

17   depositions.  I think it goes about 14 minutes, Your

18   Honor.

19             THE COURT:  All right.

20             (Video playing.)

21             QUESTION:  Now, is it correct that Mass

22   had a prior art search completed in preparation for

23   filing an application for the '939 patent?

24             ANSWER:  We're unsure if there was a

25   patent search done or not.

1        QUESTION:  What systems was Mass aware of

2   that allowed for horizontal registration prior to filing

3   of the application for the '939 patent?

4            ANSWER:  Two CRTs sitting on a desk.

5            QUESTION:  And other than the statement

6   in the background of the invention, Mr. -- or Mass did

7   not disclose to the Patent Office, during the

8   prosecution of the '939 patent, any system where two

9   CRTs were sitting on a desk, correct?

10           ANSWER:  Again, we briefly spoke about

11  whether or not statements like that appear anywhere else

12  in the patent.  I'm not certain that they don't appear

13  anywhere else.  I'd have to look over it very carefully

14  to determine that.

15           QUESTION:  But you're not aware, as you

16  sit here today, other than reading the patent for what

17  it states, that there's any further disclosure?

18           ANSWER:  I'm not aware right now, no.

19           QUESTION:  Mr. Tameshtit, I'm going to

20  hand you what's been marked -- previously marked as

21  Exhibit 13.  Can you tell me what Exhibit 13 is?

22           ANSWER:  Well, from what appears on the

23  face, it appears to be a fax transmission from Bloomberg

24  Financial Markets Commodities News to Jerry Moscovitch

25  from Mr. Sean Roarty from Bloomberg, LP.

1          QUESTION:  And this attaches a page

2  identified as Bloomberg Financial Markets Commodities

3  News, Shapes and Sizes, correct?  If you look at the

4  second page.

5          ANSWER:  That's what it says at the top,

6  yes.

7          QUESTION:  You see at the bottom right,

8  that's dated July 1994, U.S.

9          ANSWER:  At the bottom, it says 7/94 U.S.

10          QUESTION:  Do you know whether this

11  document was in Mass' files?

12          ANSWER:  I believe it was provided by

13  Mass to you.

14          QUESTION:  And the date of this fax from

15  Bloomberg to Jerry Moscovitch was October 12, 1994,

16  correct?

17          ANSWER:  10/12/94.

18          QUESTION:  Was that monitor, the

19  Bloomberg flat panel, disclosed to the United States

20  Patent & Trademark Office as part of the '978 reissue

21  application?

22          MR. SCHLATHER:  Object to form.

23          ANSWER:  No.

24          QUESTION:  Why not?

25          MR. SCHLATHER:  Object to form.

1          ANSWER:  There was no need to.

2          QUESTION:  So looking at this document,

3    it wouldn't be your understanding that this is a

4    document that was a public document produced in July of

5    '94 in the United States from Bloomberg, L.P.?

6          ANSWER:  I can't say one way or another.

7    I don't know.

8          QUESTION:  With your experience as a

9    patent agent --

10         ANSWER:  Uh-huh.

11         QUESTION:  -- should this document have

12   been provided to the United States Patent & Trademark

13   Office as part of the '939 application?

14         ANSWER:  Mass' position is that this is

15   nonmaterial to patentability.

16         QUESTION:  Let's turn to Exhibit 5, if we

17   could, which is the '978 reissue application.

18         In the '978 reissue application, Mass

19   provided the Patent Office with an IDS, correct?

20         ANSWER:  In the '978, yes.

21         QUESTION:  Isn't it correct that the only

22   three prior art patents that were disclosed were the

23   same three that the Patent Office previously disclosed

24   to Mass in the '939 application?

25         ANSWER:  At what point?

1              QUESTION:  Oh.  Thank you.

2              At the time of January -- at the time of

3  this filing, January 13th, 1999, of the IDS, the only

4  three patents listed on this IDS were the three patents

5  that the prior -- that the Patent Office itself had

6  disclosed to Mass.

7              ANSWER:  I believe that's correct.

8              QUESTION:  And, in fact, Mass filed a

9  supplemental IDS, correct?

10              ANSWER:  Do you know the Bates number for

11  that?

12              QUESTION:  M3083, I believe.

13              ANSWER:  Yes.

14              QUESTION:  How did Mass learn of the

15  patents that are identified in the supplemental IDS

16  disclosure?

17              ANSWER:  Mass received a copy of a letter

18  that Mr. Waraksa had sent to the Law Society of Upper

19  Canada, which included those patents.

20              QUESTION:  Mr. Waraksa believed that you

21  could not obtain claims as broad as what were ultimately

22  claimed in the reissue, correct?

23              ANSWER:  I think the record shows that

24  Mr. Waraksa believed that a concept as simple as turning

25  two displays towards each other was not patentable.

1          QUESTION:  But my question is the first

2    opinion.  He decided -- he decided that Mass couldn't

3    get broader claims at the time he filed this

4    application, the '939 application.

5          ANSWER:  Yeah.  So if this helps, in the

6    declaration at Point 6, the last line, it says, I relied

7    on Mr. Waraksa's professional judgment that a claim of

8    the scope as claim -- I think that's 16, not 6 -- above

9    was not patentable in view of the prior art that

10   Mr. Waraksa and I reviewed prior to preparing and filing

11   the '158 application.

12         QUESTION:  And just for the record, we're

13   in Exhibit 5.

14         The Patent Office rejected initially the

15   reissue claims on the basis of -- at least Claim 16, I

16   should say, on the basis of the Robak patent, correct?

17         ANSWER:  Correct.

18         QUESTION:  And that Robak patent was one

19   of those three patents that were identified by the

20   Patent Office in the '939 application, correct?

21         ANSWER:  Correct.

22         QUESTION:  Do you know if that was the

23   patent that Mr. Waraksa showed to Jerry to make his

24   point about the scope of the patent claims?

25         ANSWER:  No.

```
 1                    QUESTION:  You don't know, or it wasn't?

 2                    ANSWER:  I'm not certain if that was the

 3   one.

 4                    QUESTION:  Based on this rejection on

 5   June 2nd, 1999, relying on the Robak design patent --

 6                    ANSWER:  Yes.

 7                    QUESTION:  -- did Mass do any further

 8   investigation beyond examining the patent itself?

 9                    MR. SCHLATHER:  Object to form.

10                    ANSWER:  By investigation, you mean what?

11                    QUESTION:  Did they -- did they search

12   for any other related art to the Robak design patent?

13                    ANSWER:  I believe it's Mass' position

14   that Jerry Moscovitch, Mass, did not do a patent search

15   during the time of that prosecution.

16                    QUESTION:  And did he do any other

17   informal investigation relating to art that may have

18   existed prior to the filing of the '939 application?

19                    MR. SCHLATHER:  Objection to form.

20                    ANSWER:  I don't know.

21                    QUESTION:  So to your knowledge, as the

22   representative of Mass, you're not aware of any other

23   investigations that were done?

24                    ANSWER:  I'm unaware of any

25   investigations that were done, yes.
```

```
 1                    (End of video clip.)

 2                    MR. NIEDERLUECKE:  Your Honor, then we

 3   have one shorter clip here.

 4                    MR. NELSON:  Can we just -- oh, I'm

 5   sorry.  We have a couple of counters.

 6                    And then, Your Honor, can we just state

 7   for the record, for what it's worth, there --

 8   Mr. Tameshtit was the 30(b)(6) designee on the file

 9   history.

10                    There were a few questions that went

11   beyond that.  We don't particularly object, obviously,

12   to Mr. Tameshtit's testimony, but we just point that out

13   for the record, that some of it is not actually

14   corporate testimony.

15                    We also have a very short, like

16   30-second, counterdesignation.

17                    MR. NIEDERLUECKE:  Do you want to play

18   that one, and then we'll play our second volume?

19                    MR. NELSON:  Oh.

20                    MR. NIEDERLUECKE:  We have a second

21   volume.  Either way.

22                    MR. NELSON:  We'll do it all at the end.

23                    MR. NIEDERLUECKE:  Okay.  In the second

24   one, this is him in his individual capacity.

25                    THE COURT:  All right.
```

```
 1                      (Video playing.)

 2                      QUESTION:  Mr. Tameshtit, I'm going to

 3    hand you what's been marked as Tameshtit Exhibit 4.  Can

 4    you tell me what this document is?

 5                      ANSWER:  It's a Letter of Acknowledgments

 6    and Agreement.

 7                      QUESTION:  And who is it between?

 8                      ANSWER:  Mass Engineer Design and Jerry

 9    Moscovitch on the one hand, and myself, Alan Tameshtit.

10                      QUESTION:  Is it your understanding that

11    this agreement obligates Mr. Moscovitch to certain

12    payment of compensation based on the results of the

13    lawsuit to you?

14                      ANSWER:  Yes.

15                      QUESTION:  And, in fact, this lawsuit

16    that we're currently in and the results of that lawsuit,

17    under your agreement, has a significant contribution to

18    your potential overall compensation, doesn't it?

19                      ANSWER:  Potentially.

20                      QUESTION:  You have a financial

21    incentive?

22                      ANSWER:  Yes.

23                      QUESTION:  And this was -- this agreement

24    was designed to give you that financial incentive with

25    regard to the litigation, correct?
```

1              ANSWER:  I imagine so.  I can't get into

2    Jerry's head, but that's what I would assume.

3              QUESTION:  When you were brought on as a

4    consultant in June of 2005, was Mass contemplating --

5    contemplating this lawsuit?

6              ANSWER:  I don't recall if, at the time

7    that I started in June 2005, Mass was contemplating the

8    lawsuit.

9              QUESTION:  So you didn't have any

10   discussions, as the potential director of intellectual

11   property for Mass, as to whether or not it was going to

12   enforce the '978 patent against Ergotron or others?

13             ANSWER:  I don't remember any specific

14   conversations about that when I started in June 2005.

15             QUESTION:  Did Mr. Moscovitch discuss

16   with you about how long he had contemplated potentially

17   suing to enforce the '978 patent?

18             ANSWER:  In a verbal conversation, you

19   mean, or --

20             QUESTION:  Either verbally or in written

21   communications.

22             ANSWER:  Well, I came to know that there

23   had been a letter sent to Ergotron, for example, in the

24   early 2000s, 2001, I believe it was.  I think that's a

25   record that's been produced.

1              QUESTION:  Did you learn that as a result

2    of this -- of the actual litigation, or did you know

3    that prior to filing the litigation?

4              ANSWER:  I believe I knew that prior to

5    filing the litigation.

6              QUESTION:  But in terms of actions taken

7    by Mass to prepare for litigation prior to engaging

8    counsel, are you aware from Mr. Moscovitch whether he or

9    his -- or Mass had done other work to prepare for the

10   litigation?

11             ANSWER:  Not much.  Again, I knew that he

12   sent out that letter, which indicates there was some

13   preparation in preparing that letter, obviously, but not

14   much else.  That was before my time.

15             QUESTION:  Do you have any understanding

16   why Mass waited until July of 2006 to actually file this

17   lawsuit?

18             ANSWER:  I don't know all the details

19   about what went into Jerry's decision-making process.

20             QUESTION:  Well, do you have -- do you

21   have any knowledge about why Mass waited until July of

22   2006?

23             ANSWER:  I believe one reason was that

24   Dell was a customer of Mass, and Mass was interested in

25   doing well with Dell, and obviously, a litigation would

1    not have furthered that cause.

2                    QUESTION:  You were working full time

3    from October 1, 2005, correct?

4                    ANSWER:  Correct.

5                    QUESTION:  And that was prior to your

6    knowledge that there may be a lawsuit to enforce the

7    '978 patent, correct?

8                    ANSWER:  In any level of seriousness,

9    yeah.  Again, I was aware of some letters that had been

10   exchanged in 2001, but as I mentioned earlier, there was

11   no serious discussion of a lawsuit until a few months --

12   until we engaged our lawyers.

13                   (End of video clip.)

14                   MR. NELSON:  Your Honor, we don't --

15   we're not actually going to play any of the Tameshtit

16   counters.  That's fine.

17                   Can I read one thing in the record for

18   Roarty really quickly?

19                   MR. NIEDERLUECKE:  Sure.

20                   MR. NELSON:  This is -- this was in the

21   jury, but just so Your Honor has it, this is the Roarty

22   deposition.  It's Page 24, Line 17, the questioning by

23   Mr. Niederluecke.

24                   QUESTION:  Since there's only

25   100-something pages, if we would have asked you for

1  documents in 2001, would Bloomberg have had documents

2  that since then, it has discarded?

3            MR. NELSON:  And this says Page 24, Line

4  22 and 23.

5            ANSWER:  Again, I don't know of any.  I

6  don't know.

7            THE COURT:  Thank you.

8            MR. NIEDERLUECKE:  Your Honor, next --

9            THE COURT:  Yes.

10           MR. NIEDERLUECKE:  The two that Ergotron

11  has left are Mirek Waraksa and Mark Elchuk.  We were

12  just talking with counsel.  I know we're running a

13  little late.  There's a number of objections that have

14  been placed regarding the testimony.

15           If the Court is willing to do this, we

16  respectfully request that we can provide you at least

17  with a book that has it designated and highlighted, and

18  you can have the objections, and then I think they were

19  going to provide you -- there is a little -- there is a

20  video for a portion of it.  They will provide you a

21  video.

22           THE COURT:  I would prefer to finish all

23  the evidence today.

24           MR. TRIBBLE:  That's fine, Your Honor.

25           What he's saying, though, is that the --

1   for the Elchuk deposition, you've already excluded that,

2   and Mr. Nelson can speak to that.

3              But for -- as to Waraksa, if you want to

4   see our video, they don't have a video of the first part

5   of theirs, and so it would be a matter of reading it

6   into the record.

7              We're happy to proceed however the --

8              THE COURT:  How long is it?

9              MR. NIEDERLUECKE:  Each one is probably

10  going to be about 20 minutes of reading, Your Honor.

11             THE COURT:  All right.  Is it something

12  that you think is germane to my decision, that I need to

13  hear?

14             MR. NIEDERLUECKE:  You mean in terms of

15  summarizing it or --

16             THE COURT:  Well, in terms of making the

17  decision that -- decisions that you're asking me to

18  make.

19             MR. NIEDERLUECKE:  Oh.  Well, we

20  designated what we think was germane.  It had to do with

21  the -- these are, obviously, the two patent attorneys

22  that were involved --

23             THE COURT:  Okay.  Well, let's read it

24  in, because I want to hear all this and -- how much more

25  do we have?  Are we going to be able to be through by

1  12:00?

2            I mean, I don't mind hearing it, but --

3  okay.  You're going to have 20 minutes of depositions,

4  right?

5            MR. NIEDERLUECKE:  No.  I think it's 20

6  for each one, Your Honor.

7            THE COURT:  So you're talking about 40

8  minutes.

9            MR. NIEDERLUECKE:  Yeah.

10            THE COURT:  All right.  And --

11            MR. NIEDERLUECKE:  And then Dell has

12  some.

13            THE COURT:  And then how much --

14            MR. REED:  We have just under 20 minutes

15  total of depositions as well, Your Honor.

16            THE COURT:  Okay.  So that's an hour.

17  And how much do y'all have?

18            MR. NELSON:  I think, to the extent it's

19  necessary, and we don't think it's relevant at all, we

20  have eight minutes video of Waraksa and maybe a minute

21  or two from -- to counter on Dell's and others.

22            But would you like -- can we discuss the

23  Elchuk testimony?

24            THE COURT:  Yeah, let's deal with that.

25            MR. NELSON:  And, Your Honor, at the

1  bench conference during trial, you had ruled that

2  Mr. Elchuk's testimony would be excluded, because

3  what -- they are using his deposition testimony, again,

4  as an expert to try to establish the fact that -- you

5  know, what the claims do and do not have on -- I'm

6  sorry -- the prior art does and does not have where he

7  wasn't involved in the prior art.

8             And, yeah, he's certainly not a person of

9  ordinary skill.  So -- and we would just ask to continue

10 that ruling from the floor and to exclude the testimony,

11 because it relates to the fact that they're using it for

12 expert opinion, and he's not an expert.

13             MR. NIEDERLUECKE:  Well, first of all,

14 we're not using it for expert opinion.

15             Secondly, this is the patent attorney

16 that prosecuted this.  One of the questions, obviously,

17 is what was disclosed to him; what did he do with it;

18 what did he understand; if it had been disclosed to him,

19 would he have disclosed it to the Patent Office and

20 whether or not he would have felt it was material and

21 had disclosed it had Jerry Moscovitch disclosed it to

22 him.

23             THE COURT:  All right.  Your objection is

24 noted.  I will -- you don't need to put that one on

25 today.  I will read it, and in all of my wisdom and

1  ability siphon out the part that's expert and only

2  consider the other part.

3              MR. NIEDERLUECKE:  And, Your Honor, if

4  you'd like, we could even include their specific

5  objections.  We have a list of those in a booklet.

6              THE COURT:  That will be fine.  Okay.

7  All right.

8              MR. NIEDERLUECKE:  You know, similarly,

9  Mirek Waraksa is the same thing, talking about the

10 prosecution.

11             And would you like to hear that, or would

12 you like to take that evidence in the same manner?

13             THE COURT:  Well, why don't you summarize

14 it for me, and then I'll -- I'll read it.  But you just

15 summarize the top four or five points that you think the

16 testimony makes.

17             MR. NIEDERLUECKE:  Well, I think with

18 Mr. Waraksa, Your Honor, the main points are that

19 Mr. Waraksa's testimony is that he did not make a

20 mistake in the -- seeking the prosecution of this

21 original patent; that the idea of booking was never

22 disclosed to him by Mr. Moscovitch when he started; and

23 that the booking issue came up only after Mr. Moscovitch

24 had -- after they had gotten to the notice of allowance

25 that Mr. Moscovitch had seen commercial products in the

1  market, and that's when that issue came up.

2             And then they proceeded to file the

3  patent rather than do anything else with it.  I mean --

4  I'm sorry -- the procedure allowed it to issue rather

5  than doing anything with it.

6             And then there's testimony regarding

7  these documents that you've heard of in this case, Your

8  Honor, that goes to the letters that were sent back and

9  forth and Mr. Moscovitch's knowledge of what

10 Mr. Waraksa's position was as to whether or not there

11 was a mistake that was made.

12            And then those would then relate to

13 Mr. Moscovitch's statement to the -- to the Patent

14 Office regarding that both he and Mr. Waraksa understood

15 that an error had occurred.

16            Then, finally, there's testimony

17 regarding the art and what was or was not disclosed to

18 him, and the testimony would be that the only thing --

19 Mr. Waraksa's testimony is that -- in fact, I think it

20 is that he actually was the one who thought I've seen

21 these two CRTs by each other, and that actually was

22 something he had told Mr. Moscovitch.

23            And then we go through addressing with

24 him what was or wasn't disclosed essentially during this

25 period of the original prosecution of the '939.  You

1    know, no disclosures were made of prior art.

2              And so there's testimony on that, and

3    then there's testimony about the actual Bloomberg

4    information and whether or not, if he had received that,

5    he would have disclosed that to the Patent Office.

6              So that's, in a nutshell, what --

7              THE COURT:  Do you have that testimony --

8              MR. NIEDERLUECKE:  Yes, I do.

9              THE COURT:  -- that I can put in my hand

10   where I can be sure I can find it?

11             And let me see other testimony that Dell

12   was wanting to offer.  Do you have that where I can take

13   that with me today, too?

14             MR. NIEDERLUECKE:  I do not have Dell.  I

15   don't know if Dell has it.

16             MR. REED:  What we have, Your Honor, is

17   we have not the entire transcript highlighted, but

18   rather just those portions that we were going to play.

19   We call them clips, and we've been exchanging these back

20   and forth with everybody, so it's --

21             THE COURT:  Okay.  How am I going to read

22   that or see that?

23             MR. REED:  We had intended to play it by

24   video, Your Honor.

25             MR. TYLER:  You can also take it on a

1   DVD, if you want to take it that way.

2             THE COURT:  Okay.  Let me have it on DVD,

3   if you would.

4             MR. NIEDERLUECKE:  And, Your Honor, I'll

5   give you -- and then, Your Honor, with regard to

6   Mr. Elchuk, that testimony, obviously, doesn't deal with

7   the Waraksa issues, but it deals with the same type of

8   information about what he knew, what was disclosed to

9   him, and then the art and what he would have done with

10  it if he had disclosed it.

11            THE COURT:  Do you have that in that

12  notebook?

13            MR. NIEDERLUECKE:  Yes.  This is all in

14  the notebook.

15            THE COURT:  Okay.  All right.  Thank you.

16            MR. NIEDERLUECKE:  And I have -- the

17  objections are in the front there for you.

18            THE COURT:  All right.  Very well.

19            MR. NELSON:  Can I have a brief response

20  on Mr. Waraksa?

21            THE COURT:  Yes, certainly.  And you can

22  play your clip, if you wish to.

23            MR. NELSON:  Okay.  We'll go ahead and

24  play the clip, but I -- I don't know if it's in the clip

25  or not, Your Honor, but one thing that's not in the clip

1  is that -- what came out through the notes is that there

2  was -- we would ask to actually -- before we play it, we

3  would ask that Mr. Waraksa be excluded in its entirety

4  due to the conversations that defense counsel had with

5  Mr. Waraksa beforehand.

6            And as Your Honor is aware, there are

7  assurances from two defense counsel that they didn't

8  discuss these divisional patents, and in fact, the notes

9  clearly reveal that they did talk about divisional

10 patents.

11            In addition, Mr. Waraksa said -- I asked

12 him at the deposition that -- whether he -- they spoke

13 about this conversation at the zoo, which was related to

14 the divisional patents, and Mr. Waraksa said no, he did

15 not talk about the zoo.

16            All over their notes, when talking

17 about -- in the defense notes are conversations about

18 talking at the zoo.  They're actually -- it says the zoo

19 on their notes, and it's -- all over the face of it, it

20 says divisional patents.

21            And this is despite both -- two lawyers

22 from the defense saying specifically, I didn't talk

23 about these divisional patents.

24            So we would ask that it be excluded

25 before we play -- we're happy to play the tape.

 1                    Briefly, Your Honor, it basically

 2   establishes that Mr. Waraksa lied about his name and the

 3   fact that he had been disbarred by the Canadian Bar

 4   Association, that he didn't tell Jerry about that and

 5   that despite all this -- and this is the key point for

 6   this defective reissue, Your Honor.

 7                    The legal standard for whether a reissue

 8   is proper is whether the lawyer failed to appreciate the

 9   scope of the claims, and that's what we show with

10   Mr. Moscovitch.  Despite all that, even Mr. Waraksa said

11   that he, quote, failed to appreciate the scope of the

12   claims.

13                    THE COURT:  Okay.  You may play your

14   clip.

15                    MR. NELSON:  Okay.

16                    THE COURT:  How long is it?

17                    MR. NELSON:  How long is it?  Five

18   minutes.

19                    MR. TRIBBLE:  Your Honor, we can give you

20   a DVD.  It's 15 minutes.  We'll be happy to play it for

21   you.

22                    THE COURT:  Well, what else do we have

23   after this?

24                    MR. TYLER:  I think that's it.  And

25   actually, we do have a problem with one of our DVDs.

1  Actually, our AV person, his mom did pass away last

2  night, so we had to get somebody else in, and we don't

3  know -- we know we have some of the DVDs, but we're not

4  sure if we have them all.

5              So I don't know if maybe we can get them

6  to you later today and have them taken over to your

7  office perhaps.

8              MR. TRIBBLE:  We've agreed to cut those

9  clips for them, Your Honor, and put them on a DVD.

10              THE COURT:  Okay.

11              MR. TYLER:  We can just get them over to

12  his office later on today or --

13              MR. TRIBBLE:  Maybe I can get Charlie

14  Ainsworth or somebody to bring that by.

15              THE COURT:  Okay.  That will be fine.

16  Just get them back to me today.

17              All right.  You may proceed with your

18  clip.

19              MR. TYLER:  And then we have a trial

20  brief to go along with those DVD clips.  Those are

21  referencing testimony that we already heard on the

22  stand --

23              THE COURT:  All right.

24              MR. TYLER:  -- if that's acceptable to

25  the Court.

```
1                    THE COURT:  All right.

2                    MR. NELSON:  We would object to that or

3  at least put a -- we haven't seen these briefs, and to

4  the -- we don't want to be able to paper on this.

5                    THE COURT:  Well, I think we're going to

6  need a briefing schedule on this.

7                    MR. NELSON:  Okay.

8                    THE COURT:  So why don't y'all get

9  together.  You need to confer, submit me an agreed-upon

10 order to get me briefs within, say, the next week to 10

11 days.

12                   MR. TYLER:  That's great, Your Honor.

13                   MR. NIEDERLUECKE:  Thank you, Your Honor.

14                   THE COURT:  First brief response,

15 replies, et cetera, okay?

16                   All right.  You may proceed.

17                   (Video playing.)

18                   QUESTION:  The other side, the

19 Defendants, are paying you for your time today?

20                   ANSWER:  Yes.

21                   QUESTION:  $300 an hour; is that right?

22                   ANSWER:  Yes.

23                   QUESTION:  Let me repeat this question,

24 sir:  You are currently suspended from the practice of

25 law in Canada; is that right?
```

1                  ANSWER:  Yes, I am.

2                  QUESTION:  You have been suspended from

3 the practice of law since when?

4                  ANSWER:  '99.  I'm not very certain, but

5 around 1999 or 2000.

6                  QUESTION:  You cannot practice law today

7 in Canada; is that right?

8                  ANSWER:  That's correct.

9                  QUESTION:  Do you recall Defendants'

10 lawyer, Mr. Niederluecke, questioning you about whether

11 you were a United States patent agent?

12                 ANSWER:  Yes.

13                 QUESTION:  You said that you were?

14                 ANSWER:  Yes.

15                 QUESTION:  You said that you have been a

16 United States patent agent for approximately 28 years;

17 is that right?

18                 ANSWER:  Roughly, yes.

19                 QUESTION:  You have been suspended from

20 practice from the United States Patent & Trademark

21 Office, haven't you, sir, at one point during that

22 period?

23                 ATTORNEY:  Objection, form.

24                 ANSWER:  Yes.

25                 QUESTION:  You were suspended from

1 practice in 2003; isn't that right?

2 　　　　　ANSWER:  That may be correct.

3 　　　　　QUESTION:  You were suspended from

4 practice for two years; isn't that right?

5 　　　　　ANSWER:  I'm not certain.

6 　　　　　QUESTION:  When Jerry hired you, you

7 understood that it was based on the solicitor/client

8 relationship in Canada; isn't that right?

9 　　　　　ANSWER:  Yes, I guess, and as a U.S.

10 patent agent.

11 　　　　　QUESTION:  Mr. Waraksa, you testified

12 earlier that your full name is Mirek E. Waraksa; is that

13 right?

14 　　　　　ANSWER:  A.

15 　　　　　QUESTION:  Mirek A. Waraksa is your full

16 name?

17 　　　　　ANSWER:  That's the name I go by, yes.

18 　　　　　QUESTION:  I'm sorry.  You stated under

19 oath that was your full name, didn't you?

20 　　　　　ANSWER:  Yes.

21 　　　　　ATTORNEY:  Objection to form.

22 　　　　　QUESTION:  Is that really your full name?

23 　　　　　ANSWER:  Well, it's the same as Jim is to

24 James.

25 　　　　　QUESTION:  I'm sorry.  Is Mirek Waraksa

1 your full name?

2                    ANSWER:  Legal name is Miroslaw, which is

3 M-I-R-O-S-L-A-W.

4                    QUESTION:  When you were asked what your

5 full name was before, you did not tell your full name;

6 isn't that right?

7                    ANSWER:  No.  I told you the name I go

8 under.

9                    QUESTION:  Sir, you were asked what your

10 full name was, correct?

11                    ANSWER:  Yes.

12                    QUESTION:  You did not tell counsel your

13 full name, did you?

14                    ANSWER:  I did not.

15                    QUESTION:  Mirek Waraksa is not your

16 legal name, is it?

17                    ANSWER:  Technically, in Canada, it is.

18                    QUESTION:  You go by Mirek Waraksa as

19 your -- I'm sorry.  You go by Mirek Waraksa as your

20 legal name in Canada?

21                    ANSWER:  Yes.

22                    QUESTION:  Did you go by Mirek Waraksa

23 when you were registered as a solicitor in Canada?

24                    ANSWER:  Yes.  That's actually the only

25 name I've ever used.

1            QUESTION:  Mr. Waraksa, this is a

2   complaint against you from the Law Society of Upper

3   Canada, is it not?

4            ANSWER:  Well, that was -- I haven't seen

5   this before.

6            QUESTION:  Mr. Waraksa, could you please

7   turn to Page 4 of this document?

8            ANSWER:  Yes.

9            QUESTION:  Do you see it says:  To

10  Miroslaw Antoni Waraksa, barrister and solicitor?

11           ANSWER:  Yes.

12           QUESTION:  That is you, isn't it?

13           ANSWER:  That's me.

14           QUESTION:  This is a complaint about you

15  from the Law Society, is it not?

16           ANSWER:  It's a complaint about me.  I'm

17  not certain what the complaint is.

18           QUESTION:  Mr. Waraksa, what name do they

19  use on this document?

20           ANSWER:  Miroslaw.

21           QUESTION:  Mr. Waraksa, the conduct for

22  which you are accused of professional misconduct

23  occurred in 1996; isn't that right?

24           ANSWER:  I believe so.

25           QUESTION:  1996 was the same time that

1  you were preparing and filing Mr. Moscovitch's patent

2  application, correct?

3                   ANSWER:  That's correct.

4                   QUESTION:  You never told Mr. Moscovitch

5  that, did you?

6                   ANSWER:  No.

7                   QUESTION:  Mr. Waraksa, during the time

8  that you were preparing and filing Mr. Moscovitch's

9  applications, you were on antipsychotic medication;

10  isn't that right?

11                   ANSWER:  No, that's not true.

12                   QUESTION:  Were you on any medication?

13                   ANSWER:  Yes, I was.

14                   QUESTION:  Please read for me the first

15  three sentences of the second paragraph.

16                   ANSWER:  Mr. Moscovitch is correct

17  regarding my health problems.  I, apparently, suffer

18  from a chemical imbalance that causes mood swings, and

19  I've experienced bouts of depression during which my

20  ability to work has been impaired.

21                   QUESTION:  Next sentence, please.

22                   ANSWER:  My doctor is still searching for

23  a combination of drugs that will control my mood swings.

24                   QUESTION:  Thank you.

25                   Did your doctor ever find a correct

1  combination of drugs to control your mood disorder?

2                ANSWER:  Yes, he did.

3                QUESTION:  When did he do that?

4                ANSWER:  Two years ago.

5                QUESTION:  From 1990 -- excuse me.  Let

6  me back up.

7                When did your mood problems and mental

8  health start to deteriorate?

9                ANSWER:  Sometime in the early '90s.

10                QUESTION:  Did you tell Mr. Moscovitch

11  that you were having mental health problems?

12                ANSWER:  Yes, I did, yes.

13                QUESTION:  What specifically did you talk

14  about to the Defendants two months ago in Toronto at

15  your house?

16                ANSWER:  What it was that I was trying to

17  protect with the '939 patent application.

18                QUESTION:  Mr. Waraksa, as you sit here

19  today, what is your recollection of what happened at

20  that meeting?

21                ANSWER:  We discussed the scope of the

22  protection available for the invention.

23                QUESTION:  What else did you talk about?

24                ANSWER:  That's about it.

25                QUESTION:  You talked about that for an

1  hour?

2          ANSWER:  Yes.

3          QUESTION:  Did you talk about the zoo?

4          ANSWER:  I don't think I mentioned the

5  zoo.

6          QUESTION:  You didn't mention the zoo at

7  all?

8          ANSWER:  No.

9          QUESTION:  Mr. Waraksa, this is a patent

10  disclosure about the dual LCD unit, correct?

11          ANSWER:  I'm not familiar with this

12  document.

13          QUESTION:  Sir, do you see on the upper

14  right, it says August 25th, 1995?

15          ANSWER:  Yes.  August 25, 1995.

16          QUESTION:  Your testimony, sir, is that

17  you don't -- despite being in a patent disclosure, you

18  don't recall any testimony about there being a

19  ball-and-socket joint for --

20          ANSWER:  No.

21          QUESTION:  -- independent tilt and

22  swivel?

23          ANSWER:  No, sir.  That's not what I'm

24  saying.  I'm saying that wasn't a particular feature

25  that should be patented.

1                    QUESTION:  You did talk about it?

2                    ANSWER:  I can scarcely remember, but,

3    yes, we did talk about a ball-and-socket joint being

4    there, yes.

5                    QUESTION:  And the independent tilt and

6    swivel of the LCD?

7                    ANSWER:  Yes.

8                    QUESTION:  Sir, can you please turn to

9    Exhibit 11?

10                   ANSWER:  Yes.

11                   QUESTION:  Sir, I'm going to turn your

12   attention to Paragraph 6, the first sentence.

13                   Sir, do you recall your testimony earlier

14   that you were not sure whether this testimony was or was

15   not true -- or this statement was or was not true?

16                   ANSWER:  At the time, we believed that

17   the claims were proper scope.

18                   QUESTION:  Yes, sir.

19                   ANSWER:  Yes.

20                   QUESTION:  And assuming that the reissue

21   patent issued, which it did, that would mean that

22   reissue coverage was available broader than that in

23   scope, correct?

24                   ANSWER:  Different scope, yes.

25                   QUESTION:  Yes, sir.

1          So assuming that it was unnecessarily

2    limited, you would agree that you failed to appreciate

3    that you could get broader coverage in 1995 and 1996,

4    correct?

5               ANSWER:  I -- I didn't see the

6    possibility of getting broader coverage, no.

7               QUESTION:  You didn't see the

8    possibility.  That's correct.  You didn't see the

9    possibility of that.

10              ANSWER:  I never considered it.

11              QUESTION:  You failed to appreciate it,

12   right?

13              ANSWER:  No, I never considered it.

14   There's a difference.  Mr. Moscovitch asked me to patent

15   a horizontal and vertical positioning apparatus, and

16   that's what I went for.

17              QUESTION:  Sir, will you listen to my

18   question?

19              Assuming that he got broader coverage

20   than the original patent --

21              ANSWER:  Yes.

22              QUESTION:  -- that would suggest that the

23   first patent was unnecessarily limited, correct?

24              ANSWER:  It had a different scope.

25              QUESTION:  Whether you overlooked it or

1  whether you didn't consider it or for whatever reason,

2  you failed to appreciate that --

3                   ANSWER:  It could have had claims of

4  different scope, yes.

5                   QUESTION:  Could you please turn to the

6  last paragraph -- sorry -- last sentence of that same

7  paragraph?

8                   Do you see where it says that

9  Mr. Moscovitch relied on your professional judgment?

10                   ANSWER:  Uh-huh.

11                   QUESTION:  Is that a yes?

12                   ANSWER:  Yes.

13                   QUESTION:  Mr. Moscovitch did rely on

14  your professional judgment, correct?

15                   ANSWER:  That's correct.

16                   QUESTION:  Could you please turn to

17  Paragraph 10?

18                   You see, sir, that it says that

19  Mr. Moscovitch explained to Mr. Rolston, as he did to

20  you, that he wanted both horizontal, vertical, and --

21  angling towards each other?

22                   ANSWER:  I see that, yes.  What about it?

23                   QUESTION:  You and Mr. Moscovitch did

24  have that discussion about angling towards each other,

25  correct?

1            ANSWER:  It came up incidentally.

2            QUESTION:  Have you been diagnosed as a

3   manic depressive?

4            ANSWER:  Yes.

5            QUESTION:  What are the symptoms of manic

6   depressive?

7            ANSWER:  Mood swings up every now and

8   then.

9            QUESTION:  One of them is poor judgment?

10           ANSWER:  Manic, there's a possibility of

11  poor judgment, yes.

12           QUESTION:  Were you diagnosed with having

13  poor judgment as a result of your manic depressiveness?

14           ANSWER:  No.

15           QUESTION:  There are also periods of

16  aggression and anger; is that right?

17           ANSWER:  Yes.

18           QUESTION:  Did you have that?

19           ANSWER:  Yes.

20           QUESTION:  But you didn't have any

21  episodes of poor judgment?

22           ANSWER:  I have lots of episodes of poor

23  judgment.

24           (End of video clip.)

25           MR. NELSON:  And, Your Honor, may we pull

1    up, just for one issue that came up later, the

2    divisional notes that -- their notes that specifically

3    talk about the zoo?

4            Would you like to see those, or do you

5    have them in your possession?

6            THE COURT:  Go ahead.

7            MR. NELSON:  All right.  Do we have

8    those, Matt?

9            The first one -- okay.  The first one

10   you'll see, Your Honor, is from Dell's lawyer, Brian

11   Dietzel.

12           THE COURT:  What exhibit number is this?

13           MR. NELSON:  This is not an exhibit.  We

14   can admit it, Your Honor.

15           THE COURT:  All right.  Mark it and make

16   it part of the record.

17           MR. NELSON:  Let's go to the second page

18   of the interview notes, please.

19           Actually, let's see -- yeah.  It's the

20   second page.  It would be the next page.

21           Yeah.  Right there.

22           And let's see, if he recalls meeting at

23   the zoo.  A little bit above -- oh, let me clear that.

24           And it's about two-thirds of the way

25   down.

1          And, Your Honor, what I want you to --

2    actually, in that same thing, Your Honor, it says Claim

3    1 divisional -- Matt, can you highlight that?

4          Oh, you can't?

5          Okay.  So I'll try to underline it.

6          Whoops.  That's okay.

7          MR. TRIBBLE:  We're going to have to

8    print those.

9          MR. NELSON:  Claim 1 of divisional on the

10   booking, and then recalls running into J.M. at the zoo.

11         And then, Your Honor, let's see if we can

12   go down to the next interview notes, and those are notes

13   from Ergotron's counsel, Laura Friedemann, and you'll

14   see on -- I guess it's Page 6 of the PDF.

15         Try to -- I'm sorry.  We need to -- go

16   back one -- go to Page 6 instead of 13, Matt, please.

17   And if you see -- and let's see, at the bottom, it says

18   explored divisional.

19         And then the next page -- whoops.  It

20   says -- if we can clear that -- right there, Your Honor,

21   it says M.W. and talking about the zoo again.

22         And then the next page at the bottom, it

23   says with regard to the divisional being contemplated,

24   it talks about it right there.

25         And then the next page, please.  Right

1  here you can see that they actually -- it says

2  contemplating getting divisional at metro zoo.

3            And this is -- of course, it's the same

4  meeting, so, you know, we're getting different -- but

5  every single lawyer on their side wrote that down, too.

6            And we'll skip down to Mr. Niederluecke's

7  notes of that same meeting.  And we go down -- can we

8  zoom in on -- let's go -- a little more.  Continue going

9  down.  Right there.

10            And zoom in on J.M. instructed M.W. not

11  to file divisional application at zoo.  And it also

12  talks about the divisional as well.

13            But those are the three lawyers, Your

14  Honor, two from Ergotron and one from Dell.

15            THE COURT:  All right.

16            MR. NIEDERLUECKE:  Your Honor, obviously,

17  with regard to whatever Mr. Waraksa said about the zoo

18  and the impeachment of the testimony, I understand that,

19  but I do want to address the extent that you have any

20  questions about the notes again as they bring them up.

21            What you saw in every one of those notes,

22  when they talked about the zoo or talked about a

23  divisional, it was always a divisional on booking, Your

24  Honor.  And that's what was interesting.  He kept

25  stopping on his highlighting.  We have it up there right

1  now.

2             Every time, what you would see in there

3  is you would see it talked about booking divisional.

4  What Mr. Waraksa was telling us was that -- as I

5  explained to you earlier, that they got the notice of

6  allowance.  They met.

7             Mr. Moscovitch brought up the idea that

8  there were these other products out there, and he was

9  concerned that nobody wanted his technology, and instead

10  they wanted -- he wanted to find out how he could cover

11  people's technology.  And that's where the booking

12  expansion came to.

13             And in fact, what Mr. Waraksa was

14  explaining to us was that he met to discuss -- because

15  they hadn't decided what to do with this patent.  It was

16  going to issue if they didn't do anything to continue it

17  or to -- in Canada, to divide it.

18             And so what he was talking about was,

19  what we were going to do about the booking divisional.

20  Do we want to file another patent to keep it going, or

21  do we want to complete this and say, no, we're done.  We

22  know what we could get, and we're done.

23             And that's what that was about.  And

24  that's why we had the issue previously that came up due

25  to your order and our misunderstanding in terms of our

1  ability to talk about booking but our inability to talk

2  about some other divisional.

3          To the extent that we talked about

4  booking there, it was always through the context of --

5  purely through the context of talking about this booking

6  patent that was issuing and whether or not they could

7  get broader scope of that claim for that booking patent.

8  And that was consistent with all those notes.

9          If you have any questions, I'm happy to

10 answer them, Your Honor.

11         THE COURT:  Anything further?

12         MR. NELSON:  Yeah.

13         First of all, Your Honor, move to admit

14 Plaintiff's Exhibit 1690, which is the notes of Dell

15 Attorney Brian Dietzel, the notes of 1691, which is the

16 notes of Ergotron's attorney, Laura Friedemann, and the

17 notes -- 1692, which are the notes of Ergotron attorney

18 Kurt Niederluecke at that meeting.

19         I will also say, Your Honor, the record

20 is clear on two occasions --

21         THE COURT:  Just a moment.

22         Any objections?

23         MR. NIEDERLUECKE:  No objection, Your

24 Honor.

25         THE COURT:  Be admitted.

1          MR. NELSON:  On two occasions, one of the

2     September hearings and again at the pretrial conference,

3     both Ms. Friedemann and Mr. Niederluecke, without our

4     having seen the notes -- I think the quote will be

5     exactly -- they said, Let me be clear.  We did not talk

6     about divisionals.  That is, obviously, not true.

7          MR. NIEDERLUECKE:  Your Honor, I wasn't

8     even at that, so I'm not sure why he represents that I

9     made statements at that hearing.

10          MR. NELSON:  Well, I think the record

11     will reflect that on the October 23rd pretrial

12     conference, you said, Let me be clear.  We did not talk

13     about divisionals.

14          THE COURT:  All right.  What else?

15     All right.

16          MR. REED:  Your Honor, I would just like

17     to make it clear, with respect to the equitable issues

18     on behalf of Dell, the clips that we have provided to

19     the Plaintiff's graphics people and that will be

20     provided to you on DVD, I understand, include very short

21     snippets from the testimony of each of the following

22     witnesses:  Susan Friedlander Calzone, Ray Wilk, Shala

23     Stevenson, Volume 2 and Volume 6 of the deposition of

24     Jerry Moscovitch, Amit Mathradas, Edward Duffy, and Eric

25     Stageman.

1      And in addition, there is one clip that

2  we do have a CD for -- or DVD that is from the

3  deposition of Dr. Akin, the Plaintiff's technical

4  expert, that goes to the question, again, of

5  indefiniteness.

6          THE COURT:  Okay.  How long is the total

7  of all those clips?

8          MR. REED:  All those together are just

9  under 17 minutes.

10         THE COURT:  All right.  Okay.  All right.

11         MR. REED:  Would you prefer to hear them

12  here now or --

13         THE COURT:  I may.

14         Let me inquire, Mr. Niederluecke, this

15  book that you have handed me, now, other than what's

16  already been presented to me, what are you offering out

17  of this book?

18         MR. NIEDERLUECKE:  Out of that book, Your

19  Honor, that has all that you've seen today.  The only

20  two in that book that are necessary that you haven't

21  seen are the Waraksa and the Elchuk highlighted

22  deposition designations.

23         THE COURT:  All right.  And so I don't

24  need Duffy, right?

25         MR. NIEDERLUECKE:  Right.  You can take

1  everything out but those two, if you'd like, Your Honor.

2  That was just a book of all the testimony to date.

3                   THE COURT:  And with regard to Elchuk,

4  the parts you are offering is that highlighted in

5  yellow; is that correct?

6                   MR. NIEDERLUECKE:  That's correct, Your

7  Honor.  And that includes the completeness designations

8  that the Plaintiffs have made.

9                   THE COURT:  And you're not offering

10  anything with -- with respect to Roarty, right?

11                   MR. NIEDERLUECKE:  I've already read

12  Roarty into the record, Your Honor, yes.

13                   THE COURT:  And then you've got Waraksa,

14  which, again, it's the highlighted yellow part?

15                   MR. NIEDERLUECKE:  Yes, sir.

16                   THE COURT:  And then you've got Alan

17  Tameshtit?

18                   MR. NIEDERLUECKE:  Tameshtit, yes, and

19  you saw his video, so you can take those out as well.

20                   THE COURT:  And then I've just got a

21  bunch of exhibits here.

22                   MR. NIEDERLUECKE:  Yeah.  Those are the

23  exhibits to the depositions.

24                   THE COURT:  Are these already introduced

25  into evidence?

1          MR. NIEDERLUECKE:  They are, Your Honor.

2          THE COURT:  And then is that going to

3 complete all of your proof?

4          MR. NIEDERLUECKE:  Yes, Your Honor.

5          THE COURT:  All right.  And does --

6          MR. NIEDERLUECKE:  With the reservation

7 that we would like to put in a trial brief to supplement

8 your --

9          THE COURT:  All right.  And does Dell

10 have any additional proof they wish to offer?

11          MR. REED:  Those would be the seven or

12 eight clips that total just under 17 minutes, Your

13 Honor.

14          THE COURT:  All right.

15          MR. NELSON:  And, Your Honor, may we move

16 the admission that was played on Mr. Waraksa, the

17 complaint -- I think it was Plaintiff's Exhibit 400 and

18 401.  May those be admitted into evidence?  I'm not sure

19 if they had actually been admitted yet.

20          THE COURT:  All right.  Is there any

21 objection?

22          MR. NIEDERLUECKE:  No objection, Your

23 Honor.

24          THE COURT:  All right.  Be admitted.

25          It does not appear to me that there's a

1 whole lot here.  Why don't you go ahead and just read in

2 this part with regard to what Waraksa and -- the other

3 witness that you wanted to offer.

4           MR. NIEDERLUECKE:  Certainly, Your Honor.

5           THE COURT:  I'd rather just have a clean

6 record of exactly what's before me than a lot of

7 filings.

8           MR. NIEDERLUECKE:  Would you like --

9           THE COURT:  And if you can get Dell's, I

10 may want to just listen to it, too.  I don't know how

11 long that's going to be.

12           MR. REED:  It's ready to go.  We can

13 start it right now, Your Honor.

14           THE COURT:  Okay.  Well, let me hear this

15 one first.

16           MR. NIEDERLUECKE:  You just want me to

17 read it?  You don't want any role playing, I presume?

18           THE COURT:  That's fine.  You can just

19 read it.

20           MR. NIEDERLUECKE:  Okay.  And would you

21 like me to identify the pages as I read or --

22           THE COURT:  Yes, that would be good or

23 just where you start.

24           MR. NIEDERLUECKE:  Okay.  This is the

25 deposition of Mark Elchuk dated May 22nd, 2008.

1   Starting on Page 5, Line 15:

2                  QUESTION:  Can you please state and spell

3   your full name for the record?

4                  ANSWER:  Mark, M-A-R-K, Douglas Elchuk,

5   E-L-C-H-U-K.

6                  MR. NIEDERLUECKE:  Page 6, Line 9.

7                  QUESTION:  Mr. Elchuk, do you recall when

8   Mr. Moscovitch retained your firm?

9                  ANSWER:  Generally, yes, I do.

10                 QUESTION:  Can you estimate a date or a

11  year?

12                 ANSWER:  That would have been just prior

13  to us beginning work on the reissue application that we

14  obtained for him.

15                 QUESTION:  And that was the purpose of

16  his retaining your firm for the reissue application for

17  the '978 patent?

18                 ANSWER:  Yes.

19                 MR. NIEDERLUECKE:  Page 8, Line 20.

20                 QUESTION:  Do you recall whether you

21  performed a patent search to help determine the scope of

22  the claims available?

23                 ANSWER:  No, we did not.

24                 QUESTION:  When determining the scope --

25                 MR. NIEDERLUECKE:  I'm sorry.  I'm on

1  Page 9 now, Line 25.

2              QUESTION:  When determining the scope of

3  the claims available, what prior art did you review with

4  Mr. Moscovitch?

5              ANSWER:  To the best of my recollection,

6  the only art that we would have reviewed was whatever

7  art was presented to us from Mr. Moscovitch.

8              MR. NIEDERLUECKE:  Page 12, Line 6.

9              QUESTION:  Was this particular

10 declaration, the one that's signed and dated on October

11 1, 1998, was this submitted with Mr. Moscovitch's

12 reissue application?

13             ANSWER:  Yes, I believe it was.

14             QUESTION:  And was this declaration the

15 primary support for Mr. Moscovitch's reissue

16 application?

17             ANSWER:  Yes.

18             MR. NIEDERLUECKE:  And go to Page 29,

19 Line 14.

20             QUESTION:  Mr. Elchuk, you've just been

21 handed what's marked as Elchuk 10.  This is a copy of

22 the '235 patent, correct?

23             ANSWER:  Yes.

24             QUESTION:  We're going to turn back to

25 the file history, Exhibit 2.  If you turn to the page

1  marked DEL041924, this is the third page of an office

2  action summary beginning on Page DEL041922, correct?

3                    ANSWER:  I'm sorry?

4                    QUESTION:  If you turn to DEL014 --

5  041922 --

6                    ANSWER: Yes.  Okay.

7                    QUESTION:  -- if you look under where it

8  says claim rejections, examiner initially rejected Claim

9  16 of the reissue patent as being anticipated by the

10 '235 patent, correct?

11                   ANSWER:  Yes.

12                   QUESTION:  Still in Exhibit 2, if you

13 turn to the page marked DEL041933, is this the amendment

14 in response to the office action beginning on page

15 DEL041922?

16                   ANSWER:  Yes, it appears to be.

17                   QUESTION:  In the third sentence --

18 actually, the second sentence after these limitations

19 are shown states there is no disclosure or suggestion

20 that the two displays are capable of being angled about

21 a vertical axis or towards each other, correct?

22                   ANSWER:  Yes.

23                   QUESTION:  So you distinguish the

24 invention claimed in the '235 patent from the invention

25 claimed in Mr. Moscovitch's reissue application on the

1  basis that the two displays in Mr. Moscovitch's

2  invention are capable of being angled about a vertical

3  axis or towards each other, correct?

4                    ANSWER:  Yes.

5                    QUESTION:  In other words, you

6  distinguish the '235 patent because it did not show

7  booking, correct?

8                    ANSWER:  Yes.

9                    QUESTION:  Mr. Elchuk, you've been handed

10 what has been marked as Elchuk 11.  Have you seen this

11 document before?

12                   ANSWER:  I do not believe that I have.

13                   QUESTION:  This is United States Patent

14 No. 5,076,524, correct?

15                   ANSWER:  Yes.

16                   QUESTION:  It was filed on December 27,

17 1990, correct?

18                   ANSWER:  Yes.

19                   QUESTION:  The date of the patent is

20 December 31, 1991, correct?

21                   ANSWER:  Yes.

22                   QUESTION:  Turn back to Exhibit 10 for a

23 minute, which is the '235 patent.  If you compare the

24 '235 patent with the '524 patent, it has the same two

25 inventors, correct?

1          ANSWER:  Yes.

2          MR. NIEDERLUECKE:  On Page 34, Line 14.

3          QUESTION:  Mr. Elchuk, could you turn to

4    the page marked DEL041829?  If you look at Figure 3,

5    Figure 3 shows the monitors facing towards one another,

6    correct?

7          ANSWER:  I believe that's correct.

8          QUESTION:  If you look down at Figure 4,

9    Figure 4 shows them being rotated or on a wide axis,

10   correct?

11         ANSWER:  Yes.

12         QUESTION:  And I think you testified

13   earlier that you distinguish Mr. Moscovitch's reissue

14   application from the '235 patent on the basis that the

15   displays in Mr. Moscovitch's invention are capable of

16   being angled about a vertical axis or towards one

17   another, correct?

18         ANSWER:  Yes.

19         QUESTION:  And I believe that you just

20   testified that the figures in the '524 patent show the

21   monitors being angled towards one another and rotating

22   about a vertical axis, correct?

23         ANSWER:  They appear to rotate about

24   separate vertical axes.

25         QUESTION:  After your brief review of the

1  '524 patent, is it your opinion that it shows that the

2  monitors are capable of booking?

3              ANSWER:  I cannot say that they're

4  capable of showing booking, as I believe we've claimed

5  in the reissue patent.

6              My recollection was that we were reciting

7  a support arm that supported the two displays and that

8  the displays could be angled about the support arm.  But

9  this appears to show two separate support arms about

10 which each of the displays can be rotated.

11             QUESTION:  And you testified earlier that

12 you had never seen the '524 patent before today,

13 correct?

14             ANSWER:  Yes.

15             QUESTION:  And the '524 patent was not

16 disclosed to the patent examiner, correct?

17             ANSWER:  Correct.

18             QUESTION:  Do you agree that the '524

19 patent would have been material to the examination of

20 Mr. Moscovitch's reissue application?

21             ANSWER:  Yes.

22             QUESTION:  Would you have disclosed the

23 '524 patent to the Patent Office if you had been aware

24 of it?

25             ANSWER:  Yes.

1          MR. NIEDERLUECKE:  Now on Page 38.

2          QUESTION:  So at least as of your e-mail

3     dated April 21, 1999, you were aware that Mass had done

4     work for Bloomberg, correct?

5          ANSWER:  Yes.

6          QUESTION:  You are aware that work

7     involved in the construction --

8          MR. NIEDERLUECKE:  I'm sorry.  Let me

9     reread that question.

10          QUESTION:  You were aware that that work

11     involved the construction of dual display screens,

12     correct?

13          ANSWER:  Yes.

14          MR. NIEDERLUECKE:  On Page 43.

15          QUESTION:  Yes.  Mass had a sample of the

16     Bloomberg flat panel.  This is their sample, photos of

17     it, since we don't have it here to look at.  Have you

18     had a chance to review the photos?

19          ANSWER:  Yes, I have.

20          QUESTION:  If you turn to the sixth page,

21     do you agree that the photo shows the two monitors being

22     angled towards one another?

23          ANSWER:  Yes.

24          QUESTION:  If you turn to the next page,

25     you can see that the monitors are supported by a single

1   support arm, correct?

2               ANSWER:  Yes.  They do appear to be

3   supported by a single support arm.

4               QUESTION:  Would you agree that the

5   previous photo shows booking?

6               ANSWER:  Yes, I would have to agree.

7               QUESTION:  Based on those facts, would

8   you consider the Bloomberg flat panel to be material to

9   the examination of Mr. Moscovitch's reissue application?

10              ANSWER:  This was actually prior art.  By

11  that, I mean it was well-known before the filing of Mr.

12  Moscovitch's reissue application, and we would have

13  cited this to the Patent Office out of an abundance of

14  caution.

15              MR. NIEDERLUECKE:  On Page 45.

16              QUESTION:  If you had seen these photos,

17  would you have disclosed the Bloomberg flat panel to the

18  Patent Office?

19              ANSWER:  Yes, as I said, assuming that

20  this had been produced and was publicly known before the

21  filing date of the original patent, because

22  Mr. Moscovitch was trying to obtain a reissue patent

23  for...

24              MR. NIEDERLUECKE:  Page 46.

25              QUESTION:  Turn back to Exhibit 14.

1 These were the series of three Bloomberg magazines dated

2 May 1994, November 1994, and December 1994 respectively,

3 correct?

4                       ANSWER:  Yes.

5                       QUESTION:  We looked for -- we looked at,

6 for example, the last page of the entire document, which

7 is an advertisement for the Bloomberg flat panel,

8 correct?

9                       ANSWER:  It appears to be correct.

10                      QUESTION:  And then underneath, it says,

11 Contact your Bloomberg representative, correct?

12                      ANSWER:  Yes.

13                      QUESTION:  If you turn back a few pages,

14 three, this particular magazine is dated December 1994,

15 correct?

16                      ANSWER:  Yes.

17                      QUESTION:  So it appears that as of

18 December 1994, Bloomberg was selling the Bloomberg flat

19 panel, correct?

20                      ANSWER:  That appears correct.

21                      QUESTION:  And I believe you testified

22 earlier that the date of the filing of the reissue

23 application was October 13th, 1998, correct?  You can

24 refer back to Exhibit 2, if you'd like.

25                      ANSWER:  The filing date of the reissue

1  application appears to be October 13th, 1998.

2              QUESTION:  So Bloomberg was selling the

3  Bloomberg flat panel prior to the time of the reissue

4  application, correct?

5              ANSWER:  That appears to be the case.

6              QUESTION:  And I believe you testified

7  earlier that if the Bloomberg flat panel had been

8  available publicly, that you would have cited it to the

9  Patent Office in an abundance of caution; is that

10  correct?

11              ANSWER:  That is correct.

12              MR. NIEDERLUECKE:  Page 55, Line 6.

13              QUESTION:  In Exhibit 18, Mr. Waraksa

14  represents that he purposely omitted any claims to the

15  booking feature, correct?

16              ANSWER:  I believe that's correct.

17              QUESTION:  So according to Mr. Waraksa's

18  letter, Exhibit 18, he did not believe that the claims

19  of the '978 patent were unnecessarily limited, correct?

20              ANSWER:  I believe that is what

21  Mr. Waraksa is saying in this letter.

22              QUESTION:  And Mr. Waraksa also

23  represents that it was not inadvertent that he left out

24  the claims relating to booking, correct?

25              ANSWER:  Yes, I believe that's what he is

1   explaining here.

2                    QUESTION:  Turning back to Exhibit 2

3   again, the file history, and if you turn to the page

4   marked DEL041980 -- and this is actually Page 3 of

5   Mr. Moscovitch's declaration, correct?

6                    ANSWER:  Yes.

7                    QUESTION:  And in Paragraph 6, the

8   declaration states, at the time of the filing and during

9   the prosecution of the '158 patent, neither I nor my

10  patent attorney, Mirek A. Waraksa, appreciated that the

11  existing claims of the '158 patent were unnecessarily

12  literally limited as noted above, correct?

13                   ANSWER:  Yes.

14                   QUESTION:  I think you testified earlier

15  that Mr. Waraksa's letter, Exhibit 18, he represents

16  that he purposely left out any claims relating to

17  booking, correct?

18                   ANSWER:  I believe that -- that's his --

19                   MR. NIEDERLUECKE:  Excuse me.  Let me

20  reread that.

21                   ANSWER:  I believe that's his

22  representation, correct.

23                   QUESTION:  So at the time this

24  declaration was signed on February 10, 2000, the

25  statement that Mr. Waraksa did not appreciate that the

1  claims were unnecessarily literally limited is

2  incorrect, correct?

3                    ANSWER:  That appears to be correct.

4                    MR. NIEDERLUECKE:  On 57.

5                    QUESTION -- this is at Line 25.

6                    QUESTION:  Did you obtain Mr. Rolston's

7  file?

8                    ANSWER:  No, I did not.

9                    QUESTION:  Did you obtain Mr. Waraksa's

10  file?

11                    ANSWER:  No, I did not.

12                    QUESTION:  Did you receive Mr. Waraksa's

13  or Mr. Rolston's file from Mr. Moscovitch?

14                    ANSWER:  Did I receive Mr. Rolston's from

15  Mr. Moscovitch?

16                    QUESTION:  Yes.

17                    ANSWER:  I don't believe we did.

18                    QUESTION:  Did you receive Mr. Waraksa's

19  file from Mr. Moscovitch?

20                    ANSWER:  I do not believe we did.

21                    QUESTION:  If you can turn to Paragraph

22  13, it states, The errors and omissions arose

23  inadvertently and without fraudulent or deceptive intent

24  on my part, correct?

25                    ANSWER:  Yes.

1            QUESTION:  But according to Mr. Waraksa's

2  letter, Exhibit 18, the errors and omissions were not

3  inadvertent, correct?

4            ANSWER:  That's what Mr. Waraksa appears

5  to be saying.

6            QUESTION:  If you can turn to the page

7  marked DEL041985, do you recognize this document?

8            ANSWER:  Yes.  It is a supplemental oath

9  of Jerry Moscovitch that I submitted on March 16th of

10  2000.

11            QUESTION:  It is your practice to explain

12  to inventors what is required under this oath?

13            ANSWER:  Yes.

14            QUESTION:  In your opinion, what is

15  required under this oath?

16            ANSWER:  That the client be completely

17  truthful and understand that the statements being made

18  are accurate to the best of their knowledge.

19            QUESTION:  In your opinion, are

20  Mr. Moscovitch's statements in his declaration true to

21  the best of his knowledge?

22            ANSWER:  Well, based on what Mr. Waraksa

23  is saying, I'm not sure that I can say that that's true

24  to the best of Mr. -- Mr. Moscovitch's knowledge.

25            MR. NIEDERLUECKE:  Now we're on Page 68,

1    Line 17.

2                    QUESTION:  I believe you testified that

3    your firm did not receive the files from Mr. Rolston or

4    Mr. Waraksa, correct?

5                    ANSWER:  That is my recollection.

6                    MR. NIEDERLUECKE:  And that is the end.

7                    THE COURT:  All right.  Very well.

8    Any cross-designation or response?

9                    MR. TRIBBLE:  None, Your Honor.

10                   THE COURT:  Okay.  All right.  Does that

11   conclude all of Ergotron's --

12                   MR. NIEDERLUECKE:  We have Mirek

13   Waraksa's still left.

14                   THE COURT:  All right.

15                   MR. NIEDERLUECKE:  Do you want me to read

16   that in?

17                   THE COURT:  Yeah.  Yeah.  Go ahead.

18                   MR. NIEDERLUECKE:  Okay.  And I now have

19   great sympathy for you when you read the jury

20   instructions.

21                   THE COURT:  How long do you think this

22   one is?

23                   MR. NIEDERLUECKE:  You know, Your Honor,

24   it looks significantly shorter.

25                   THE COURT:  Okay.

```
 1              MR. NIEDERLUECKE:  I bet it's certainly
 2  not more than 10 minutes.
 3              THE COURT:  All right.  Go ahead.
 4              MR. NELSON:  And a couple of notes
 5  before -- you have our completeness designations with
 6  that?
 7              MR. NIEDERLUECKE:  I believe they're in
 8  here.  That's what my understanding is.  Why don't you
 9  give me those just to make sure, but I believe they've
10  all been put in.
11              MR. TRIBBLE:  I think there are some left
12  out of Elchuk.
13              MR. NELSON:  Your Honor, we, again, would
14  like to note our objections on both Elchuk and Waraksa,
15  just to preserve them.
16              THE COURT:  Where are your objections?
17              MR. NIEDERLUECKE:  They should be in the
18  front of that --
19              THE COURT:  I gave you the notebook back.
20              MR. NIEDERLUECKE:  Oh.  Do you actually
21  have the notebook?  You gave me the two pages.  You
22  might still have the notebook up there.
23              THE COURT:  I don't believe so.
24              MR. NIEDERLUECKE:  No?
25              THE COURT:  I think Ms. -- Ms. Ferguson
```

1    has it right there.

2              MR. TRIBBLE:  Your Honor, I have a copy

3    of our objections.

4              THE COURT:  Okay.  Why don't you just

5    file those.  You want to mark them as an exhibit number

6    or something where we can --

7              MR. TRIBBLE:  Yes.  I'll mark them as

8    Plaintiff's Exhibit 1693.

9              THE COURT:  All right.

10             MR. TRIBBLE:  And for completeness, Your

11   Honor, I have these demonstratives that we've used with

12   Ms. Payfer during trial.  Can I mark those as

13   Plaintiff's Exhibits 1694 and then submit smaller copies

14   for the Court later?

15             THE COURT:  Yes, you may.

16             MR. TRIBBLE:  Okay.

17             THE COURT:  All right.  Proceed.

18             MR. NIEDERLUECKE:  This is the deposition

19   of Mirek Waraksa taken -- if I can find the date here --

20   on the 9th of June, 2008.  Page 5, Line 5.

21             QUESTION:  Mr. Waraksa --

22             MR. NIEDERLUECKE:  It's actually Line 1.

23   I apologize.  It's written a little differently here,

24   but Page 5, Line 1.

25             QUESTION:  Mr. Waraksa, can you, for the

1  record, state your full name?

2              ANSWER:  Full name is M-I-R-E-K, middle

3  initial A; last name is W-A-R-A-K-S-A.

4              QUESTION:  Sure.  What was the scope of

5  invention that Mr. Moscovitch was asking you to obtain

6  patent protection for?

7              ANSWER:  Initially, he wanted to protect

8  the general concept of a dual display system.  He

9  then -- but he did emphasize the rotary arm assembly,

10  the vertical/horizontal alignment option.

11             QUESTION:  Mr. Waraksa, did

12  Mr. Moscovitch, in your initial meeting, ever identify a

13  booking feature as part of his invention?

14             ANSWER:  No, he did not.

15             QUESTION:  Mr. Waraksa, I'll have you

16  look on Exhibit 1 as well just for dates.

17             Is it correct that you filed a patent

18  application for Mr. Moscovitch on April 26th, 1996?

19             ANSWER:  I believe that date is correct.

20  That is the date I filed for Mr. Moscovitch.

21             QUESTION:  And at that time, you had not

22  conducted any patent or prior art searches relating to

23  this invention, correct?

24             ANSWER:  That is correct.

25             QUESTION:  And you had not had any

1   conversations with Mr. Moscovitch regarding prior art

2   other than your indication that dual display systems had

3   existed?

4                    ANSWER:  That is correct.

5                    MR. NIEDERLUECKE:  On Page 34, Line 3.

6                    QUESTION:  And so at the time you filed

7   this application, did Mr. Moscovitch provide any

8   indication of prior art dual display systems to you?

9                    ANSWER:  No, he did not.

10                   QUESTION:  Let me rephrase it.

11                   Did you ask Jerry at any time about what

12  he might have known on prior art systems?

13                   ANSWER:  I wouldn't remember today

14  whether I specifically asked him that or not.

15                   MR. NIEDERLUECKE:  Page 37, Line 6.

16                   QUESTION:  Did you identify for

17  Mr. Moscovitch his duty to disclose information material

18  to the examination of the application?

19                   ANSWER:  Yes, I did.

20                   QUESTION:  Did Mr. Moscovitch review the

21  application prior to you filing it?

22                   ANSWER:  Yes, he did.

23                   QUESTION:  Did he make any objection to

24  you regarding the scope of the claims?

25                   ANSWER:  No.

1    QUESTION:  Did he make any objection to

2  you regarding anything about the application that he

3  reviewed?

4    ANSWER:  No.

5    QUESTION:  At the time the application

6  for the '939 patent was filed, had Mr. Moscovitch

7  described for you any commercial activities that he was

8  involved in regarding the dual display systems?

9    ANSWER:  He advised me he was consulting

10  with a client in the U.S. regarding the product.

11    QUESTION:  Did he provide any further

12  information?

13    ANSWER:  Nothing beyond that.

14    MR. NIEDERLUECKE:  I'm on Page 39, Line

15  14.

16    QUESTION:  So at the time you filed this

17  application, you were confident that you had properly

18  identified the scope of the invention that was intended

19  to be claimed?

20    ANSWER:  I believe I had followed his --

21  Mr. Moscovitch's instructions, prepared the patent

22  application to cover exactly what he wanted.

23    QUESTION:  Do you believe that you had

24  committed any error up to the time you filed the patent

25  application?

1            ANSWER:  No.

2            MR. NIEDERLUECKE:  And that was Page 57,

3  Line 18.

4            QUESTION:  Had Mr. Moscovitch ever

5  directed you to obtain coverage specifically to a

6  booking feature?

7            ANSWER:  No.

8            QUESTION:  For the invention disclosed in

9  the '939?

10            ANSWER:  No, he did not.

11            MR. NIEDERLUECKE:  Page 62, Line 4.

12            QUESTION:  Do you recall what Mr. Rolston

13  was asking you to do?

14            ANSWER:  He wanted me to swear an

15  affidavit that I had made a mistake in drafting the

16  original patent application, that it misrepresented the

17  scope of the invention to be protected.

18            QUESTION:  Did you sign such an

19  affidavit?

20            ANSWER:  No, I did not, because that

21  wasn't true.

22            QUESTION:  Why wasn't that true?

23            ANSWER:  Because I had followed

24  instructions specifically.  I had never been told about

25  the booking concept until well after the notice of

1  allowance issued in the case.  And I understood the

2  affidavit, the reissue affidavit, was going to be based

3  on the fact that the error had occurred from day one.

4              MR. NIEDERLUECKE:  Page 75, Line 8.

5              QUESTION:  I will represent this is a

6  declaration of Jerry Moscovitch that has been provided

7  by Mass in this litigation, and I will represent to you

8  that this is the declaration that Mr. Moscovitch filed

9  with the United States Patent & Trademark Office as part

10  of the reissued application.

11              ANSWER:  Is there nothing missing here

12  between 14 and 15?

13              QUESTION:  In what was filed with the

14  Patent Office, you will note that -- well, I believe

15  there is a sentence that is not on the top or the bottom

16  of one of these pages.

17              But once you've had a chance to just look

18  at it, I would like to walk you through a few areas and

19  ask you your understanding based on some factual

20  statements.

21              ANSWER:  Yes.

22              MR. NIEDERLUECKE:  Page 81, Line 23.

23              QUESTION:  The first sentence of

24  Paragraph 6 states, quote, at the time of filing and

25  during the prosecution of the '158 application, neither

1 I nor my patent attorney, Mirek A. Waraksa, appreciated

2 that the existing claim of the '158 application were

3 unnecessarily literally limited as noted above.

4                  Do you see that statement?

5                  ANSWER:  Yes.

6                  QUESTION:  Is that a true statement?

7                  ANSWER:  It is difficult to characterize

8 that as true or false.  I felt that the claims I drafted

9 aptly covered the invention that Mr. Moscovitch wanted

10 to protect.

11                  So I don't think the statement is

12 technically true, but I was certainly unaware of

13 anything that would have limited the scope of

14 protection.

15                  QUESTION:  In the last sentence of

16 Paragraph 6, Mr. Moscovitch states, quote, I relied on

17 Mr. Waraksa's professional judgment that a claim of the

18 scope as claimed, parenthetical, that should be 16,

19 actually; it is a typo, end parenthetical, above was not

20 patentable in view of the prior art that Mr. Waraksa and

21 I reviewed prior to preparing and filing the '158

22 application, end quote.

23                  Do you see that sentence?

24                  ANSWER:  Yes, I do.

25                  QUESTION:  Is that a true sentence?

1        ANSWER:  No.  We didn't do any prior art

2    searches.

3        QUESTION:  Prior to filing and preparing

4    the '158 application, did you review with Mr. Moscovitch

5    any prior art?

6        ANSWER:  Nothing beyond what I knew about

7    Apple's product.

8        QUESTION:  So it is your understanding,

9    based on your involvement of the prosecution, that the

10   last sentence in Paragraph 6 is false?

11       ANSWER:  That is false.  We never did

12   that assessment.

13       QUESTION:  If you turn to Paragraph 10 --

14       ANSWER:  Yes.

15       QUESTION:  -- is Mr. Moscovitch's

16   statement to the Patent Office that he had initially

17   explained to you that he was seeking a patent covering

18   the two displays that could be adjusted themselves

19   relative to the support such that they were angled

20   towards each other?

21       ANSWER:  No.

22       QUESTION:  So this statement in Paragraph

23   10, to that extent, would be false?

24       ANSWER:  Yes.

25       QUESTION:  If you could turn to Paragraph

13, Mr. Moscovitch states that, quote, the errors and

omissions arose inadvertently without fraudulent or

deceptive intent on his part, end quote.

Do you see that?

ANSWER:  Yes.

QUESTION:  Is that a true or false

statement?

ANSWER:  It is not entirely true.

MR. NIEDERLUECKE:  Page 85, Line 20.

QUESTION:  I am going to show you a

document that has been previously marked as Moscovitch

Exhibit 14.

Mr. Moscovitch, have you ever seen this

document before?

ANSWER:  No, I have not.

QUESTION:  Do you know what Exhibit 14

shows?

ANSWER:  A dual display system.

QUESTION:  Did Mr. Moscovitch ever

disclose to you anything regarding the dual display

system illustrated in Moscovitch Exhibit 14?

ANSWER:  No, he did not.

QUESTION:  Had you been aware, at the

time you were prosecuting the '939 patent application,

that such a design was in existence more than a year

1  prior to the application, would you have disclosed this

2  to the Patent Office?

3                ANSWER:  Yes, I would have.

4                QUESTION:  Would you have considered this

5  to be material to the patentability of the '939

6  invention?

7                ANSWER:  Yes, I would have.

8                QUESTION:  For your benefit, I will

9  represent to you that these are photographs of a sample

10  that had been provided by Mass in this case.  These are

11  actual photographs that we took upon examination of the

12  sample.

13                First of all, you discussed seeing a

14  product when you initially were meeting with or during

15  the process of meeting with Mr. Moscovitch for applying

16  for his invention.  Was this the product that you were

17  shown?

18                ANSWER:  No.

19                QUESTION:  Have you ever seen this

20  product prior to today?

21                ANSWER:  No, I have not.

22                QUESTION:  Had Mr. Moscovitch shown you

23  this sample during the prosecution of the '939 patent,

24  would you have disclosed this to the Patent Office?

25                ANSWER:  Yes, I would have.

1          QUESTION:  Based upon these photographs,

2    do you believe that this product shown in Exhibit 12

3    would have been material to the prosecution of the '939

4    application?

5          ANSWER:  Yes, I do.

6          MR. NIEDERLUECKE:  Page 89, Line 20.

7          QUESTION:  And again, as you look through

8    here, I will represent to you that these are excerpts

9    from a Bloomberg magazine dated May 1994, November 1994,

10   and December 1994.

11         ANSWER:  December '94 was the last date?

12         QUESTION:  Yes.  And I'll represent that

13   in each of these, you will see in each article that

14   there is a page disclosing a display system.  Have you

15   ever seen these Bloomberg magazines, these particular

16   magazines?

17         ANSWER:  No, I have never seen these.

18         QUESTION:  So Mr. Moscovitch never

19   disclosed to you any of the advertisements shown in

20   these magazines?

21         ANSWER:  No, he did not.

22         QUESTION:  Based upon your review today,

23   had Mr. Moscovitch disclosed these advertisements to

24   you, would you have disclosed them to the United States

25   Patent Office?

1          ANSWER:  I very likely would have.

2          MR. NIEDERLUECKE:  Now Page 91 -- and I

3  think we're almost done.  Page 91, Line 22.

4          QUESTION:  So if you or Mr. Moscovitch

5  didn't provide this information to the Patent Office, is

6  there any way that the Patent Office would learn of the

7  commercial activity?

8          ANSWER:  No.

9          QUESTION:  Mr. Moscovitch (sic), I have

10  given you what has been marked as Exhibit 14.

11          Have you ever seen Exhibit 14 before?

12          ANSWER:  No, I never have.

13          QUESTION:  Mr. Moscovitch never showed

14  you any drawings similar to this?

15          ANSWER:  Nothing comparable to this.

16          QUESTION:  Had he provided you this type

17  of information, what would you have done?

18          ANSWER:  I would have considered

19  disclosing it to the U.S. Patent Office.

20          MR. NIEDERLUECKE:  Page 93, Line 11.

21          QUESTION:  So when you disclosed to

22  Mr. Moscovitch about two Apple computer CRTs sitting on

23  a table, he made no reference to you whatsoever about a

24  dual display system shown in Exhibit 14?

25          ANSWER:  No, he did not.

1          QUESTION:  Based upon your review of

2  these exhibits we have just been looking at, do you

3  think Mr. Moscovitch was being forthright with you

4  regarding his knowledge?

5          ANSWER:  No.  I think he withheld a fair

6  bit from me.

7          MR. NIEDERLUECKE:  Page 95, Line 3.

8          QUESTION:  Did Mr. Moscovitch disclose to

9  you any purchase orders for dual LCD systems?

10          ANSWER:  No, he did not.

11          QUESTION:  Had you been aware of purchase

12  orders of the system identified in the photographs as

13  Exhibit 12 --

14          ANSWER:  Yes.

15          QUESTION:  -- would you have disclosed

16  that to the Patent Office?

17          ANSWER:  Yes, I would have.

18          MR. NIEDERLUECKE:  Page 115.

19          QUESTION:  And finally, I know there have

20  been certain statements made in Mr. Moscovitch's letters

21  and declarations regarding your health problems.

22          Do you recall those?

23          ANSWER:  Yes, I do.

24          QUESTION:  Did any of your health

25  problems inhibit your ability to properly prosecute the

1   '939 application?

2        ANSWER:  No, nothing did.

3        QUESTION:  Did any of your -- did any of

4 your health problems affect your ability to fully comply

5 with the requests of Mr. Moscovitch?

6        ANSWER:  Nothing.

7        MR. NIEDERLUECKE:  And that is the end of

8 Mirek Waraksa's deposition.

9        THE COURT:  Thank you.

10        Anything other than what Plaintiffs have

11 already offered?

12        MR. TRIBBLE:  No.  We've played our

13 designations, but I do have this Plaintiff's Exhibit

14 1693, our objections to Elchuk and Waraksa and just --

15 I'm putting a sticker on them for these large boards

16 that were used with Ms. Payfer during the jury trial and

17 the first page, which was used today, to show the

18 printout of the different times and the other Bloomberg

19 articles.  I'm going to substitute out a small copy of

20 these.

21        THE COURT:  All right.  Very well.

22        Does Ergotron have any further evidence

23 it wishes to offer with regard to the equitable issues?

24        MR. NIEDERLUECKE:  No, Your Honor.  Thank

25 you.

```
 1                    THE COURT:  All right.  Dell?

 2                    MR. REED:  Would you prefer us to go

 3   ahead and play the clips that we have today?

 4                    THE COURT:  This is a 17-minute clip, you

 5   say?

 6                    MR. REED:  It's actually about seven or

 7   eight different clips, the longest of which is 5

 8   minutes, but the time for all of them together is just

 9   under 17 minutes.

10                    THE COURT:  Okay.

11                    MR. TRIBBLE:  And we have that burned to

12   a DVD, if you'd like it, Your Honor.

13                    THE COURT:  Okay.  Why don't you let me

14   have the DV -- can I play that in my CD player in my

15   car?

16                    MR. REED:  I don't believe so, Your

17   Honor.

18                    THE COURT:  Have to play it on the

19   computer?

20                    MR. REED:  A computer or a DVD player.

21                    THE COURT:  Okay.  All right.  Yeah.  Why

22   don't you let me just have that, and I'll listen to

23   that.

24                    It's about five minutes until 12:00 --

25   well, excuse me.  Does that complete your offer?
```

 1                  MR. REED:  We actually have one disk, one

 2  clip, and then I believe that the Plaintiffs prepared

 3  for us -- thank you -- a second disk with the other

 4  clips.

 5                  THE COURT:  All right.  If you'll hand

 6  those up to Ms. Ferguson and mark those as a Defendants'

 7  exhibit, if you would.

 8                  MR. TYLER:  And, Your Honor, may I

 9  suggest that we'll discuss a schedule for a trial brief?

10                  THE COURT:  Yes.  Okay.  I'll get to that

11  in a minute.  Let me get this evidence in.

12                  Mark those as Defendants' exhibits and

13  attach them.

14                  And do you have the designations for

15  those that you can give to the court reporter?

16                  MR. REED:  Yes, Your Honor.

17                  THE COURT:  All right.  And do you have a

18  hard copy you can give to the court reporter of that?

19                  MR. REED:  Yes.

20                  THE COURT:  Okay.  Why don't -- give that

21  to her, and she can attach that or substitute it in.

22  Does that complete all of -- is there any objection to

23  that offer by Dell?

24                  MR. TRIBBLE:  No objection, Your Honor.

25                  THE COURT:  Okay.  And those are exhibit

1   numbers what?

2                MR. REED:  These are the depo

3   testimony that's --

4                THE COURT:  Okay.  Do you have those

5   marked or --

6                MR. REED:  We can mark those if you want

7   them marked.  It's also what's on the disk.

8                THE COURT:  Okay.

9                MR. REED:  And the disk is marked --

10               THE COURT:  Why don't you mark that

11  composite as one exhibit and then the disk as two other

12  exhibits.

13               MR. REED:  Okay.  The composite paper

14  copy of the transcripts is marked as Defendant's Exhibit

15  1474.

16               THE COURT:  All right.

17               MR. REED:  One of the CDs that we're

18  submitting that has the deposition testimony of Dr. Akin

19  is Defendant's Exhibit 1472.

20               THE COURT:  Okay.

21               MR. REED:  And the other CD that has the

22  compilations of all of the other witnesses that I listed

23  before is Defendant's Exhibit 1473.

24               THE COURT:  Okay.  All right.  Those are

25  admitted.

1                    All right.  Any other evidence from Dell?

2  Any other evidence from Dell?

3                    MR. TYLER:  No, Your Honor.

4                    THE COURT:  All right.  Any other

5  evidence from Plaintiffs?

6                    MR. TRIBBLE:  None, Your Honor.

7                    THE COURT:  All right.  The record's

8  closed.  That's all the evidence, right?

9                    MR. TRIBBLE:  Correct.

10                   THE COURT:  Speak now or forever --

11  whatever.

12                   Okay.  It's about 12:00.  I'm going to

13  have to take off for Tyler for a hearing that I have

14  over there.  The -- if the jury doesn't come in before I

15  leave, as we had discussed, Magistrate Judge Everingham

16  will handle it from there on with the agreement of the

17  parties.

18                   And also do I have your agreement for him

19  to handle any jury notes that may come out?

20                   MR. TRIBBLE:  Yes, Your Honor.

21                   MR. NIEDERLUECKE:  Yes, Your Honor.

22                   THE COURT:  Mr. Tyler, do you agree?

23                   MR. TYLER:  I do, yes, sir.

24                   THE COURT:  All right.  Very well.

25                   Now, let me -- I don't know what the

1 verdict in this case is going to be.  Y'all are going to

2 meet and confer with regard to a briefing schedule for

3 your equitable issues.

4 　　　　　　I'd like for you to also include in that

5 meet and confer a briefing schedule for all of your post

6 verdict motions, however it comes out.

7 　　　　　　My desire is to move on toward entry of a

8 final judgment in this case, again, regardless of how it

9 comes out, very promptly.

10 　　　　　　I've had cases that I've tried that once

11 this gravy gets cold, it's real hard to swallow later

12 on, and I just want to get it dealt with.  It's hard

13 enough the first time when it's hot, but it really gets

14 hard if we start letting it slide and other things get

15 put in front of it, and then it goes to a month and two

16 months and six months and longer.

17 　　　　　　So try to give me a briefing schedule

18 that will get everything to me where we can have a

19 hearing within 30 days, 45 days at the most to where we

20 can have a hearing, I can hear it, and we can get to a

21 final judgment stage, okay?

22 　　　　　　All right.  Thank y'all.  I enjoyed

23 trying the case with you, and good luck to both of you.

24 　　　　　　We're adjourned.

25 　　　　　　MR. NIEDERLUECKE:  Thank you.

1      MR. TRIBBLE:  Thank you.

2      COURT SECURITY OFFICER:  All rise.

3      (Recess.)

4      *       *       *       *       *

5

6      <u>CERTIFICATION</u>

7

8          I HEREBY CERTIFY that the foregoing is a

9  true and correct transcript from the stenographic notes

10 of the proceedings in the above-entitled matter to the

11 best of my ability.

12

13

14

15 /s/_____        _____
   SUSAN SIMMONS, CSR                Date
16 Official Court Reporter
   State of Texas No.:  267
17 Expiration Date:  12/31/08

18

19

20 /s/_____        _____
   JUDITH WERLINGER, CSR            Date
21 Deputy Official Court Reporter
   State of Texas No.:   731
22 Expiration Date  12/31/08

23

24

25