**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **MASS ENGINEERED DESIGN, INC.,**<br>And **JERRY MOSCOVITCH,** | § | |
| | § | |
| | § | |
| **Plaintiffs, Counter - defendants,** | § | |
| **Cross-claimants,** | § | **CASE NO.  2:06 CV 272** |
| | § | **PATENT CASE** |
| **vs.** | § | |
| | § | |
| **ERGOTRON, INC.,** *et. al.*, | § | |
| | § | |
| **Defendants, Counterclaimants** | § | |
| | § | |
| **and** | § | |
| | § | |
| **DELL MARKETING L.P.,** | § | |
| | § | |
| **Intervenor - Defendant,** | § | |
| **Counterclaimant** | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Having considered the parties' written submissions along with the evidence, the Court

**DENIES** Dell's Motion for Permanent Injunction or Reasonable Royalty (Docket No. 670),

**DENIES** Defendants' Motion for Judgment as a Matter of Law ("JMOL") or New Trial (Docket No.

666), **GRANTS** in part Plaintiffs' Motion for Post-Trial Relief (Docket No. 682), and **DENIES**

Dell's Motion for Enhanced Damages and Attorneys' Fees (Docket No. 671).  This opinion also

includes the Court's findings of fact and conclusions of law regarding Defendants' affirmative

defenses of inequitable conduct, latches, and equitable estoppel and Plaintiffs' affirmative defense

of equitable estoppel.

1

## BACKGROUND

Jerry Moscovitch is the founder and CEO of Mass Engineered Designs, Inc. (Moscovitch and Mass are referred to collectively as "Mass").  On April 26, 1996, Moscovitch filed a patent application which ultimately resulted in U.S. Patent No. 5,687,939 (the "'939 patent") issued on November 18, 1997.  The patent described a single stand, dual display system that allowed the orienting of two flat-panel displays either horizontally or vertically.  Moscovitch licensed the patent to Mass.

Moscovitch subsequently filed a reissue application requesting an additional feature be added to the patent allowing the displays to rotate towards each other around a vertical axis.  The patent was reissued on December 5, 2000 as U.S. Patent No. RE 36,978 (the "'978 Patent").  Noted as prior art on the face of the '978 patent is U.S. Patent No. 5,673,170 (the "'170 patent").  The '170 patent is owned by Dell Marketing L.P. ("DMLP"), a wholly owned subsidiary of Dell.

During and after the time that the '939 and '978 patents were pending, Mass was involved in the design and manufacture of multi-monitor display stands. Ergotron is also a designer and manufacturer of multi-monitor display stands.  Though Ergotron and Mass were aware of each other, they had no direct contact or business dealings prior to 2001.  In early 2000, Mass began a six year relationship with Dell.  Throughout this relationship, Dell marketed and resold Mass and Ergotron products to its broad base of customers.  When Mass learned that Dell was offering Ergotron products to its customers, it notified Dell and Ergotron that Ergotron products infringed Mass's patent.  Regardless, Dell continued to sell both Ergotron and Mass products through 2006. Ultimately, Mass's relationship with Dell ended and shortly thereafter, on July 7, 2006, Mass filed this infringement suit against Ergotron, Dell, CDW Corporation ("CDW"), and Tech Data

2

Corporation ("Tech Data")[1] (collectively, "Defendants").   Mass alleged direct and indirect infringement against all Defendants.  In response, Defendants asserted a variety of defenses, and Dell counterclaimed for direct infringement of the '170 patent.  Before trial, Mass conceded validity and infringement of the '170 patent and proceeded only with its affirmative defense of implied license.

After a six day jury trial and a one day bench trial on equitable issues, the jury returned a verdict that the '978 patent was valid, infringed by all Defendants, and that Ergotron and Dell infringed willfully.  The jury awarded Mass $3,000,000 in damages.  Additionally, the jury found that Mass willfully infringed the '170 patent and that Dell's claim was not barred by an implied license.  The jury awarded Dell $120,000 on its counterclaim.  Following the verdict, Mass and Defendants move for a variety of relief as explained below.

## DEFENDANTS' MOTION FOR JMOL AND NEW TRIAL

### *JMOL standard*

JMOL "is appropriate only when a 'reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'"  *Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010, 1017 (Fed. Cir. 2009) (quoting *Cambridge Toxicology Group, Inc. v. Exnicios*, 495 F.3d 169, 179 (5th Cir. 2007), in turn quoting FED. R. CIV. P. 50(a)(1)).  In determining whether to grant JMOL, a court reviews all the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).  In recreating the facts as they may have been found by the jury, the record is assessed in the light most favorable to the verdict winner.

---

[1] CDW and Tech Data were both resellers of Ergotron products.

3

*Richardson-Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir.1997).

**Defendants' Motion for JMOL - Jury Instructions regarding Obviousness**

Initially, Defendants contend that the Court's jury instructions concerning obviousness and prior art were erroneous and led to an improper jury verdict.   The Court gave the following instructions regarding the "scope and content of the prior art" for the purposes of determining "obviousness:"

> In order to qualify as prior art, the Defendants must show two things by clear and convincing evidence:
>
> 1.    That the E-Book was either (a) publicly used in the United States more than one year before Mr. Moscovitch filed his patent application on April 26, 1996 or (b) the E-Book was on sale in the United States more than one year before Mr. Moscovitch filed his patent application on April 26, 1996; and
>
> 2.    That the E-Book was ready for patenting more than one year before Mr. Moscovitch filed his patent application on April 26, 1996. . . .
>
> With respect to (2), Defendants must show by clear and convincing evidence that the E-Book was ready for patenting more than one year before Mr. Moscovitch filed his patent application on April 26, 1996.  An invention is ready for patenting either when it is actually reduced to practice or when the inventor has prepared drawings or other descriptions of the invention sufficient to allow a person of ordinary skill in the art to make or use the invention.  The claimed invention is ready for patenting when the inventor believes it would work for its intended purpose.

Defendants first argue that the instructions incorrectly state that prior art must be "ready for patenting."   Defendants rely on *Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.* for the proposition that a reference constitutes prior art only if it is "within the field of the inventor's endeavor" or "reasonably pertinent to the particular problem with which the inventor was involved." 411 F.3d 1332, 1339 (Fed. Cir. 2005).  *Princeton Biochemicals* dealt with prior art in the form of printed publications describing different aspects of the patented invention.  *Id.* at 1335.  There, some of the invalidating publications were directed toward a different technology than the one described

in the patent.  *Id.* at 1339.  The Federal Circuit used Defendants' proposed language in explaining

that the publications were in a field analogous to the field covered in the patent.  *Id.* ("In this case,

all the references for obviousness constitute analogous art, even though some of the references fall

within the related field of liquid chromatography.")

The issues in *Princeton Biochemicals* bear little resemblance to the relevant prior art issues

in this case.  First, *Princeton Biochemicals* concerned "printed publication" prior art references.  The

contested prior art at trial was the alleged "prior use" or "sale" of the "Bloomberg E-Book."  In order

for prior art to be used in combination to determine obviousness under 35 U.S.C. § 103, the alleged

prior art must first qualify as prior art under § 102(a), (b), (e), (f), or (g).  *OddzOn Prods., Inc. v. Just

Toys, Inc.*, 122 F.3d 1396, 1401-01 (Fed. Cir. 1997).  The "prior art" definitions in *Princeton

Biochemicals* clarified whether publications already qualifying as prior art under § 102(b) were

considered "prior art" within the same field as the patent.  In this case, the primary issue submitted

to the jury concerning the "Bloomberg E-Book" was whether it qualified as prior art under the "prior

use" or "public sale" prongs of § 102(b).

For the purposes of the "on sale" or "public use" bar of § 102(b) an invention is "prior art"

when it is either used in the United States or the subject of a commercial offer for sale more than a

year prior to the patent application and is "ready for patenting."  *Pfaff v. Wells Elecs., Inc.*, 525 U.S.

55, 67 (1998).  An invention is "ready for patenting" when 1) it is reduced to practice before the

critical date or 2) "the inventor had prepared drawings or other descriptions of the inventions

sufficiently specific to enable a person skilled in the art to practice the invention."  *Id.* at 67-68.

Defendants concede that an invention must operate for its intended purpose in order to be "reduced

to practice" but argue that a drawing or sketch is sufficient to make an invention "ready for

5

patenting" even when the drawing or sketch does not teach an invention that operates for the purpose that the inventor conceived.  To the contrary, *Pfaff* instructs against Defendants' interpretation.

First, *Pfaff* holds that "ready for patenting" can be proven by drawings that enable one skilled in the art to practice "the invention."  *Id.*  "The invention" clearly references the inventor's conception of a finished invention.  *Id.* at 66 ("The word 'invention' must refer to a concept that is complete, rather than merely one that is 'substantially complete.'")  Additionally, *Pfaff* expressly rejected a test for application of § 102(b) because of the "possibility of additional development[s]" in the invention after an offer for sale.  *Id.* at 68 n.14.  Under Defendants' view, an offer for sale coupled with drawings sufficient for one skilled in the art to build anything (whether it was the conceptualized invention or not), would constitute prior art that could render a patent obvious.  That is clearly not the law.

Finally, Defendants argue that *Beckham Instruments v. LKB Produkter AB*, stands for the broad proposition that "[e]ven if a reference discloses an inoperative device, it is prior art for all that it teaches."  892 F.2d 1547, 1551 (Fed. Cir. 1989).  Defendants' proposition is correct, however the central dispute in this case was whether the "Bloomberg E-Book" was a "reference" under § 102 at all.  *See id.* at 1550 (explaining that a *prior patent* was prior art for all it disclosed even if the invention was inoperable).  *Pfaff* clearly requires that an invention be "ready for patenting" before it can become prior art under § 102.  525 U.S. at 66 (explaining that evidence of substantial completeness will not create an invalidating reference under § 102).

During trial, the parties sharply disputed whether the "Bloomberg E-Book" was offered for sale or even completed.  Furthermore, there was disputed testimony as to whether the E-Book was a cancelled prototype.  In cases like this, where the central issue is whether the alleged "prior art"

6

invention was completely conceptualized before an offer for sale, the jury instructions were correct.

***Defendants' Motion for JMOL - Obviousness***

Defendants also move for JMOL arguing that the '978 patent is obvious. In 1993, Bloomberg, L.P. ("Bloomberg") hired Electrohome, Inc. ("Electrohome") and Moscovitch to aid in designing and constructing a multi-screen computer terminal for use in analyzing investment and market data. The terminal was envisioned as a single unit, housing both the computer and two flat screen monitors. This product was ultimately referred to as the XGA, Bloomberg Terminal, or E-Book ("E-Book"). Evidence at trial revealed that the E-Book was continuously under development for two years. As the product progressed, it took the form of a computing unit that served as the base, a column extending vertically from that base, and two 10.4 inch LCD displays connected to the column using a pair of hinge joints.

The ultimate intention of the hinge joint was to enable the two displays to angle towards each other or "book." Moscovitch testified that the E-Book never operated as intended and had a series of mechanical and electrical failings. First, the hinges holding the displays would become loose causing the displays to angle sporadically. Additionally, according to Moscovitch, the E-Book was never able to meet Bloomberg's strict self-imposed radiation emissions standards.

Though these inherent problems were never completely addressed, the E-Book went through various iterations of design and redesign and a series of three dimensional blueprints and drawings were completed. During trial the parties sharply contested whether the E-Book was prior art and also whether it was used publicly, sold, or offered for sale prior to the critical date, April 26, 1995. The jury found that the '978 patent was valid.

The jury's ultimate determination on the question of obviousness is reviewed without

deference while underlying determinations of fact are reviewed for substantial evidence.  *Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1345 (Fed. Cir. 2008).  Here, Defendants' only argument is that the E-Book was prior art that renders the '978 patent obvious.

During trial, Defendants had the burden of proving that the E-Book was prior art by clear and convincing evidence.  *z4 Tech., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1354-55 (Fed. Cir. 2007).  Therefore, the jury finding will not be disturbed unless a reasonable jury could not have found that the E-Book was not both 1) in public use or the subject of a commercial offer for sale prior to the critical date, and 2) "ready for patenting."  *See Pfaff*, 525 U.S. at 67.

The trial record reveals conflicting evidence over whether the E-Book was publicly used, offered for sale, or sold prior to the critical date.  The most compelling evidence that Defendants presented took the form of "purchase orders" suggesting that the E-Book was offered for sale prior to the critical date.  Defendants' Exhibit 1114, 1065, 1116.  These purchase orders contain a variety of dates for when the orders were generated and when units were "received."  Bloomberg employee Sean Roarty testified by video deposition that some of the shipment dates reflected on these purchase orders were "requested" shipment dates by the customer rather than actual shipment dates.  Trial Transcript ("TT") 11/17/08 a.m. (Roarty) at 149:10-19.  He also testified that he did not know whether the "purchase orders" were the result of separate signed agreements.  *Id.* at 142:24-143:4.  Regardless, Roarty testified that some of these documents show that the E-Book was shipped and received by actual Bloomberg customers as early as December 7, 1994.  Defendants' Exhibit 1116 (Roarty Spreadsheet).  The purchase orders take the form of computer printouts generated from a computer program.  The face of one of the printouts reads "Warning! Obsolete Item," and "details to be discussed . . .esp. early prototypes. price to be discussed . . . and how to improve quantities/

8

delivery dates!"  Defendants' Exhibit 1065.  Further, the printouts that are clearly titled "purchase order update" are between Electrohome and Bloomberg, partners in the creation of the E-Book. Defendants' Exhibit 1065, 1114.  Rather than suggest that these printouts reflected actual offers for sale, the notations on the face of the "purchase orders" tend to bolster Moscovitch's claim that commercial sales could not and did not actually occur.

In addition, the final "purchase order" document was a series of computer printouts that clearly refer to the E-Book, but contain a list of coded actions that are not readily interpretable from the face of the documents.  Defendants' Exhibit 1116.  In connection with these documents, Roarty built a spreadsheet that purportedly interpreted the codes to show that the E-Book was delivered to various customers prior to the critical dates.  *Id.* (Roarty Spreadsheet).  The printouts themselves do not memorialize any agreement.  The printouts also have little meaning to anyone unfamiliar with the computer program that generated them.  A patent can not be invalidated based on one person's testimony without sufficient corroborating evidence.  *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1371 (Fed. Cir. 2007).  The jury was free to disbelieve Roarty's testimony that E-Books were complete products that were actually sold to third parties.  There was no documentary evidence, besides the "purchase orders," to indicate that any company besides Bloomberg or Electrohome used or received the E-Books.

Finally, during the time period covered by the "purchase orders" Moscovitch was manufacturing and delivering bases to Electrohome for installation on the E-Book. TT 11/12/08 a.m. at 138:1-139:10.  Despite this, Moscovitch vigorously asserted that no E-Books were sold or delivered because the project was still in the prototype phase.  TT 11/12/08 a.m. 139:11-19 (Moscovitch). Further, Moscovitch maintained that the E-Book could not have been sold because

it failed to meet Bloomberg internal radiation emission specifications. *Id.* at 43:14-25. The latter statement was bolstered by evidence that the E-Book had not even passed Federal standards until early in 2005. Plaintiffs' Exhibit 320. Evidence further suggested that the E-Book was still in the development phase though the end of February 2005. Plaintiffs' Exhibits 11, 772, 320. These dates directly conflict with the sale and delivery dates reflected in the "purchase orders."

Given the "purchase orders'" lack of clarity in conjunction with the testimony of Roarty and Moscovitch, reasonable minds could easily differ as to whether a sale or true offer for sale had occurred. *See Lacks Indus., Inc. v. McKechnie Vehicle Components USA*, Inc., 322 F.3d 1335, 1347-48 (Fed. Cir. 2003) (holding that an "offer for sale" requires evidence of an offer capable of creating a binding contract upon acceptance under the UCC); *see also Nordberg Inc. v. Telsmith, Inc.*, 881 F. Supp. 1252, 1291 (E.D. Wis. 1995), aff'd, 82 F.3d 394 (Fed. Cir. 1996) (holding "indefinite or nebulous discussion about a possible sale in the future" is insufficient to trigger the on-sale bar").

Furthermore, there is substantial evidence to support a jury verdict that E-Book was not ready for patenting before the critical date. Throughout the E-Book's development, Moscovitch created detailed drawings and schematics of the E-Book. Defendants' Exhibit 145. However, Moscovitch testified that the E-Book hinge joints, and thus the booking feature, never operated as planned or expected and that throughout this time period the E-Book was going through continuous modification in order to correct these problems. TT 11/10/08 p.m. (Moscovitch) 43:12-17.

Bloomberg employees also testified that the E-Book did not maintain the booking feature. TT 11/17/08 a.m. at 147:22-148:7, 157:22-158:12 (Roarty). The initial E-Books were described as "troublesome first children" and a "faulty product" because the screens were "flopping around." TT 11/17/08 a.m. at 157:22-158:12 (Roarty); TT 11/17/08 p.m. at 15:16-22 (Duffy). Roarty testified

10

that the E-book was marketed and sold regardless of whether it was complete.  TT 11/17/08 a.m. at 158:5-12.

In order to correct the problem with the hinge mechanism as well as other electrical problems, development continued on the E-Book through 2005.  Plaintiffs' Exhibits 11, 772, 320. Finally, Moscovitch testified that the project was ultimately terminated before a solution to the hinge problem was resolved because of the E-Book's failure to pass radiation emission testing.  TT 11/17/08 a.m. at 43:14-25.  Claims must be functional before the critical date for the "on sale" bar to apply.  *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 622-23 (Fed. Cir. 1985).  Functionality is determined by whether the invention "has been shown to be commercially useful for its intended purpose."  *Id.*  Though some prototypes of the E-Book were created (including the faulty hinge joint and the radiation issue), there was sufficient evidence for the jury to conclude that the drawings and prototypes did not work for their intended purpose and never constituted a completed invention.

Finally, with no guidance, analysis of the claims, or review of the evidence, Defendants proclaim that the E-Book itself renders claims 16 and 17 of the '978 patent obvious because "the content of the prior art, the scope of the patent claim, and the level of ordinary skill are not in material dispute."[2]  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).  To the contrary, as described above, the prior art was sharply in dispute at trial.  Additionally, even if the E-Book was clearly prior art, there is no indication that it rendered the claimed invention obvious.  Defendants' primary argument to the jury was that the E-Book disclosed the "booking" feature, not previously

---

[2] Defendants' motion originally alleged that the E-Book anticipated claims 16 and 17 of the '978 patent under § 102(b).  However, JMOL was granted that the E-Book did not anticipate the '978 patent based on the agreement of the parties.  *See* TT 11/18/08 a.m. at 132:12-133:44, 134:22-135:2.

known in the art, that rendered the '978 patent obvious.[3]  TT 11/18/08 p.m. 108:20-109:8.  First, the

E-Book did not have an "arm assembly" as required by claim 16 and 17.  *See* TT 11/10/08 p.m. at

44:1-17.  Defendants' briefing provides no indication of how an "arm assembly" with regard to dual

display systems is made obvious by the E-Book.

Additionally, while the E-Book was *intended* to have a design allowing two displays to adjust

towards each other, there was ample testimony by Defendants' own witnesses to suggest that the E-

Book could not hold an angle.  How an invention was intended to work cannot be included in the

prior art.  *See Pfaff*, 525 U.S. at 67.  At most, the jury was left to determine how the E-Book actually

operated and determine whether it invalidated claims 16 and 17.  As a result, the jury could have

easily concluded that the E-Book, as described in the drawings and prototypes that were made, did

not teach a "mounting means" that permitted the "displays to be angled towards each other to a

desired degree" as taught by claims 16 and 17 of the '978 patent.  As this is a reasonable conclusion

in light of the evidence, the jury finding of non-obviousness will not be disturbed.  Defendants'

Motion for JMOL on the issue of obviousness is denied.

### Defendants' Motion for JMOL - Written Description

Defendants next contend that JMOL should be granted because the patent is invalid for lack

of an adequate written description.  The "written description" requirement of 35 U.S.C. § 112 is met

when the description "clearly allow[s] persons of ordinary skill in the art to recognize that he or she

invented what is claimed . . . ."  *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 866 (Fed. Cir.

1993).  Whether the written description requirement has been met is a question of fact.  *Id.*  Thus,

---

[3] Though the obviousness issue is not clearly or completely briefed in Defendants' Motion for JMOL, Defendants urge in other motions before the Court that the E-Book is key prior art because of its "booking feature." *See* Defendants' Post Bench Trial Memoranda, 2:06-cv-272, Docket No. 667 at 3-4.

the jury verdict finding the patent valid is reviewed for substantial evidence.  *Id.*  Defendants argue that the elements of claim 16 teaching a "means for adjusting the angular orientation of each of the displays . . . to thereby permit said displays to be angled towards each other to a desired degree" and claim 17 teaching a means for "adjusting the angular orientation of each of the displays . . . about a generally vertical axis to thereby permit said displays to be angled relative to each other to a desired degree" are not discussed in the patent.  Defendants rely on their expert, Dr. Stoll's, testimony that one skilled in the art would not have understood from the description that Moscovitch was in possession of the claimed invention.

There is substantial evidence to support the jury verdict.  Figures 4 and 20 of the '978 patent describe a ball and socket joint that mounts flat-panel monitors to an arm assembly.  Dr. Stoll testified on cross examination that a review of Figure 4 in the patent would lead one skilled in the art to know that monitors attached to such a mechanism would have the ability to angle towards each other.  TT 11/17/08 p.m. at 121:4-13.  Mass's expert, Dr. Akin, also testified that review of Figures 4 and 20 would allow one skilled in the art to understand that the inventor had the functions described in claim 16 and 17.  TT 11/18/08 a.m. at 91:19-92:19.  Drawings alone may provide a "written description" of an invention as required by § 112.  *Wang*, 993 F.2d at 866.  Considering the testimony of both Drs. Stoll and Akin, there was substantial evidence to support the jury finding. Defendants' Motion for JMOL on the issue of "written description" is denied.

### *Defendants' Motion for JMOL - Indefiniteness*

Defendants next move for JMOL on grounds that the term "to a desired degree" in claims 16 and 17 are indefinite.  The Court previously rejected this argument in its claim construction opinion.  *See* 2:06-CV-272, Docket No. 266 at 13-15 ("Construction Opinion").  Defendants now

13

claim that Mass's expert testimony that "to a desired degree" is somewhat dependant on the "desire of the end user" conclusively evidences the indefiniteness of the term.  *See* TT 11/13/08 p.m. at 101:12-19.

The argument is flawed for two reasons.  First, the Court's Construction Opinion assumes and concedes that "'desired degree' requires foreknowledge on the part of the end user . . . ." Construction Opinion at 15.  The Court concluded that the intrinsic context of the claim language confirmed that the term was objectively verifiable.  *Id.*  Second, Mass's expert testimony was entirely consistent with the Court's opinion that "desired" only reflected an understanding that "viewers' preferences may change depending on certain facts such as glare and seat height."  *Id.*  The expert testimony only confirms the Court's prior opinion.  Finally, the expert testimony is extrinsic evidence that does not overcome the Court's analysis of the intrinsic context of the claim.  *See Praxair, Inc. v. ATMI, Inc.,* 543 F.3d 1306, 1321 (Fed. Cir. 2008) (explaining that expert testimony is extrinsic evidence that cannot prove a patent indefinite "since indefiniteness is a legal rather than a factual question").  Defendants' JMOL on grounds of indefiniteness is denied.

### Defendants' Motion for JMOL - Infringement

Defendants next move for JMOL on the issue of infringement.  Infringement is a question of fact that is reviewed for substantial evidence when tried to a jury.  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008).  Defendants first contend that there is insufficient evidence to support Plaintiffs' claims of direct infringement.  Claims 16 and 17 of the '978 patent contain an element requiring a "pair of electronic displays."  Defendants asserted during trial that they could not directly infringe because they did not attach flat-panel monitors to the dual display stands that they sold.

14

Ergotron's corporate representative testified that the sole purpose of the stands that Ergotron manufactured was to attach multiple monitors. TT 11/14/08 a.m. at 129:9-18. Dr. Akin also opined that the accused products were designed to be used with monitors. TT 11/13/08 p.m. at 56:19-57:11. Defendants did not contend that the accused Ergotron LX stands had a non-infringing purpose. Further, there was overwhelming evidence that all Defendants bundled the DX100 and LX stands with two flat-panel displays. *See, e.g.*, TT 11/14/ 08 a.m. at 131:10-12; Plaintiffs' Exhibits 14, 272, 273, 274, 277, 519, 606, 1523, 1527, 1531, 1533.

Defendants cite *MIT v. Abacus Software, Inc.*, 5:01-CV-344, 2004 WL 5268128 at *26 (E.D. Tex. August 24, 2004) (Craven, J.) for the proposition that liability for direct infringement can not exist unless an accused apparatus is actually assembled regardless of whether the component pieces of the apparatus are designed to be assembled in the infringing configuration. The holding in *MIT* does not stretch that far. Rather, *MIT* merely holds that products that, by themselves, do not necessarily infringe, nor suggest an infringing combination, cannot directly infringe until the products are actually combined in the infringing combination. Here, as reflected in the evidence at trial, display stands are made for the sole purpose of mounting displays.

"[I]f a device is designed to be altered or assembled before operation, the manufacturer may be held liable for infringement if the device, as altered or assembled, infringes a valid patent." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995); *see also Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 19 (Fed. Cir. 1984) (components of a machine held to infringe when components are ready for assembly and serve "no useful noninfringing purpose"). Here, there was ample evidence to lead the jury to conclude that the DX100 and the LX had no purpose other than to mount two displays. Indeed, the products were

15

bundled with two displays, shipped with two displays, and were packaged with directions on how to mount the displays.  There was sufficient evidence to support the jury verdict regarding direct infringement.

Defendants also contend that they are entitled to JMOL regarding indirect infringement because there was no evidence that the accused products necessarily infringed the '978 patent and there was no evidence of specific instances of direct infringement.  Indirect infringement, both contributory and by inducement, requires the presence of direct infringement.  *See ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007); *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1334 (Fed. Cir. 2003).  "In order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit."  *ACCO Brands*, 501 F.3d at 1313.

The Ergotron DS100 has the ability for displays to be oriented vertically or horizontally.  TT 11/17/08 p.m. at 76:4-13; Plaintiffs' Exhibit 1674.  When the displays are oriented vertically, they rotate about a horizontal axis and when they are oriented horizontally, they rotate about a vertical axis.  TT 11/17/08 p.m. at 76:6-13.  The DS100 directly infringes when the displays are oriented horizontally.  The display orientation is changed by loosening a bolt and rotating a hinge counter-clockwise.  *Id.*  During trial there was an abundance of evidence that the Defendants promoted, almost exclusively, the infringing configuration. Plaintiffs' Exhibits 14, 272, 273, 274, 277, 519, 606, 1523, 1527, 1531, 1533. Nevertheless, Defendants claims that some promotional materials only promote the non-infringing configuration.   However, Defendants do not point to a single advertisement, or any documentary evidence, that shows the DX100 in a non-infringing

16

configuration.[4]

Defendants rely on *Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1276 (Fed. Cir. 2004), and *ACCO Brands* to argue that any device with a non-infringing configuration can not necessarily infringe. To the contrary, neither *ACCO Brands* nor *Dynacore* were cases where the Defendants so vigorously promoted an infringing use. *See Lucent Tech., Inc. v. Gateway, Inc.*, 580 F. Supp. 2d 1016, 1037 (S.D. Cal. 2008) ("Unlike the present case and others cited above, however, the court in *ACCO Brands, Inc.* concluded that there was no evidence in the record that the alleged infringer distributed materials encouraging the infringing method of operation."); *Dynacore*, 363 F.3d at 1276, n.6. Furthermore, there was sufficient evidence for the jury to conclude that the "non-infringing" use was occasional rather than substantial. *See Hoffmann-La Roche, Inc. v. Promega Corp.*, 33 U.S.P.Q.2d 1641, 1648 (N.D. Cal.1994).

Finally, infringement of an apparatus claim occurs when the claimed combination is "used or is available for use." *Cyrix Corp. v. Intel Corp.*, 846 F. Supp. 522, 536 (E.D. Tex. 1994) (citing *Lemelson v. United States*, 752 F.2d 1538, 1548 (Fed.Cir.1985). As Defendants note, "[t]o infringe an apparatus claim, it is not necessary for an accused device actually to be performing the functions specified by the claim. All that is required is that the device have the claimed structure, and that this structure in the device have the capability of functioning as described by the claim." *Id.* Defendants argue that a DS100 in the vertical configuration does not "presently" have the capability of infringing. However, the evidence showed the DS100 is always capable of infringing. A mere

---

[4] The one advertisement that Defendants claim *only* promotes the non-infringing configuration contains a small bulleted point suggesting that the DX100 has an "up/down tilt." Prominently featured on that same advertisement, as with all others, is the DX100 in the infringing configuration along with large print, bolded lettering instructing to "[s]ell the DS100 Dual Monitor Desk Stand *Horizontal*." As explained, the infringing configuration occurs when the displays are aligned horizontally.

adjustment placed the stand in either the horizontal or vertical position.  The product was designed

so that both configurations could be used at any time (though only the infringing configuration was

overwhelmingly advertised).  Certainly the *capability* of infringement was available at any time, in

the manner prescribed by the Defendants, in accordance with the design of the product.

Defendants next assert that there was insufficient evidence of specific intent to induce

infringement for CDW and Tech Data.  A review of the record reveals an abundance of evidence

tending to show that CDW and Tech Data intended for their customers to use the DS100 as they

advertised and directed.  *See, e.g.*, PX 14, 351, 519, 593, 606; TT 11/14/08 a.m. at 137:10-23.  After

review of the record, there is sufficient evidence to support the jury verdict that Defendants induced

or contributed to direct infringement.  Defendants' JMOL on the issue of infringement is denied.[5]

### *Defendants' Motion for JMOL - Willfulness*

Defendants move for JMOL on the jury finding that Ergotron and Dell willfully infringed the

'978 patent.  To prevail on a charge of willful infringement, the patentee must show the accused

infringer acted with objective recklessness.  *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed.

Cir. 2007).  First, the patentee must show by clear and convincing evidence that the infringer acted

despite an objectively high likelihood that its actions infringed a valid patent.  *Id.*  The accused

infringer's state of mind is irrelevant to this objective inquiry.  *Id.*  If the patentee meets this threshold

objective standard, the patentee must further demonstrate that the accused infringer knew or should

---

[5] Defendants attempt to preserve various objections to jury instructions by footnote.  The footnotes are not
adequately briefed, nor is the law adequately discussed.  Importantly, nowhere in these various footnotes do
Defendants discuss the standard for reviewing jury instructions given during trial.  *See Travelers Cas. & Sur. Co. of
Am. v. Ernst & Young LLP*, 542 F.3d 475, 489 (5th Cir. 2008) (discussing three requirements before a failure to give
a requested instruction constitutes reversible error); *see also* Local Rule CV-7(c) ("Briefing is an especially helpful
aid to the judge in deciding . . . post trial motions.").  Because these deficiencies prejudiced both Plaintiffs and the
Court, these arguments are waived.

have known of this objectively high risk. *Id.* Whether infringement is willful is a question of fact and reviewed for substantial evidence. *Metabolite Labs., Inc. v. Labs. Corp. of Am. Holdings*, 370 F.3d 1354, 1359 (Fed. Cir. 2004).

Defendants argue that there is no evidence that either Dell or Ergotron had notice of the '978 patent before the filing of this suit. The evidence is to the contrary. Mass warned Ergotron of possible infringement of the '978 patent on May 25, 2001. Plaintiffs' Exhibit 61. The letter named a number of products, but not the accused products in this case. Regardless, Ergotron engineers conducted analysis of the accused products and decided that they did not infringe. TT 11/17/08 a.m. 48:3-13, 49:2-13. 50:5-18. The jury was free to disbelieve the occurrence, accuracy, and reasonableness of this investigation.[6] In fact, Defendants' corporate represented testified that an examination of the '978 patent "immediately reminds you of the [accused product] DS100." TT 11/14/08 a.m. 140:22-141:1, 144:22-24.

There was also evidence that Ergotron was aware of Mass's products when it started developing the DS100. TT 11/13/08 p.m. at 27:13-28:4. Furthermore, Mass's products were marked with the '978 patent number at the time that Ergotron conducted an engineering analysis of them in 2002. TT 125:23-126:7. There was circumstantial evidence that Ergotron was researching Mass's products at a time when the DS100 was still in development. Plaintiffs' Exhibit 361, 1321, TT 11/17/08 at 112:1-5.

There is also evidence that Dell had sufficient knowledge of the '978 patent. First, it is undisputed that Mass's products were marked while Dell was reselling them. 11/10/08 p.m. at

---

[6] Given the function, purpose, and structure of the accused products in light of the '978 patent, a side by side comparison of either Mass's products or the '978 patent with the accused products would yield sufficient evidence of the "objective" prong to withstand judgment as a matter of law.

125:23-126:7. Also, in August 2001 Mass informed Dell that its resale of Ergotron products was an infringement of Mass's patent. Plaintiffs' Exhibit 124. Dell suggested that Mass address accusations of infringement to Ergotron because "[w]e are just a reseller." *Id.* There was even some evidence that Dell was attempting to encourage customers to purchase Mass products because Dell believed Ergotron products were infringing the '978 patent. *See* Plaintiffs' Exhibit 385. Finally, there was evidence that Dell had no procedures to investigate patent infringement and did not investigate infringement of the '978 patent when it was notified. TT 11/13/08 p.m. at 26:2-10, TT 11/13/08 a.m. at 123:5-15.

Defendants also suggest that *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, entitles them to JMOL because of their persuasive invalidity and non-infringement arguments at trial. 260 Fed. Appx. 284 (Fed. Cir. 2008). The case is easily distinguishable. In *Black & Decker* the jury had found that several claims of the patent-in-suit were invalid in accordance with the Defendants' arguments. *Id.* at 291. In this case, Defendants' infringement and invalidity arguments were entirely rejected by the jury. This is not to suggest that the arguments were in any way frivolous. Willfulness requires an objectively high "likelihood" of infringement given the facts and circumstances at the time of infringement. The hindsight technical arguments of counsel and testimony by Defendants' expert were undoubtedly considered by the jury and given their appropriate weight. There is nothing in the record to suggest that these arguments, by themselves, warrant JMOL on willfulness. Thus, Defendants' motion for JMOL on the issue of wilfulness is denied.

### Defendants' Motion for JMOL - CDW Speculative Damages

Defendants' next contend that the damage award against CDW is unsupported by the evidence. Assuming that CDW is not liable for direct infringement, Defendants assert that CDW

20

can only be assessed damages for indirect infringement for the five days that it continued to sell infringing products after this lawsuit was filed.  There is no dispute that the first time that CDW had notice of the '978 patent was at filing.  Defendants assert that there is no evidence of the number of infringing products sold during those five days.

As recounted above, there is sufficient evidence that CDW is liable for direct infringement.  Therefore, damages could be assessed against CDW regardless of its notice of the '978 patent.  *See* 35 U.S.C. § 287(a) (requiring only that patented articles be marked in order to recover for direct infringement).  Furthermore, the evidence supported the $500,000 damages award against CDW for direct infringement.  *See* TT 11/14/08 p.m. at 78:3-25, 87:2-17, 88:44-89:2; *see also* TT 11/17/08 p.m. at 164:23-168:3; Defense Exhibit 1466.  Defendants' JMOL regarding CDW's damage award is denied.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING EQUITABLE DEFENSES[7]

### *Defendants' Affirmative Defense of Inequitable Conduct*

Defendants move the Court to find the '978 patent invalid for inequitable conduct on two grounds.  First, Defendants argue that the E-Book was highly material prior art that Moscovitch intentionally withheld from the Patent and Trademark Office ("PTO").  Second, Defendants allege the Moscovitch fraudulently asserted that he had performed a prior art search before he filed his patent application.  Mass responds that the E-Book was not material and Moscovitch never represented to the PTO that he had conducted a prior art search.  Mass also asserts that in no instance did Moscovitch have a specific intent to deceive the PTO.

---

[7] To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

The standard for showing inequitable conduct is stringent and well known. "Inequitable conduct resides in failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 872 (Fed. Cir.1988); *see also Praxair, Inc. v. ATMI, Inc.,* 543 F.3d 1306, 1313 (Fed. Cir. 2008) . Because an actual "intent to deceive" is required, "[m]istake or negligence, even gross negligence, does not support a ruling of inequitable conduct." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1353 (Fed. Cir. 2008). A court only has discretion to invalidate a patent for inequitable conduct after a showing of both materiality and intent to deceive. *Id.* When examining intent, the alleged conduct must be "viewed in light of all the evidence, including evidence indicative of good faith . . . ." *Kingsdown*, 863 F.2d at 876. However, when a "failure to disclose" is alleged intent to deceive may be inferred when 1) highly material information is withheld, 2) the applicant knew of the information and knew or should have known of the materiality of the information, and 3) the applicant has not provided a credible explanation for the withholding. *Praxair*, 543 F.3d at 1313-1314.

**Materiality**

The jury found that the '978 patent was valid. Thus, the jury found that the E-Book was either not prior art or immaterial to the validity of the '978 patent. Nevertheless, Defendants argue that the E-Book was material because it disclosed the "booking" feature absent in other prior art reviewed by the patent examiner. Specifically, the patent examiner rejected then-pending claims 16 and 17 (originally just claim 16) as anticipated by U.S. Patent No. Des. 340,235 (the "'235 Patent"). Defense Exhibit 1125 at M03078. In response, Moscovitch amended claim 16 to clarify that the

22

claimed invention was distinguished from the '235 Patent because the "mounting means" also "comprised means for adjusting the angular orientation of each of the displays relative to the arm assembly to thereby permit the displays to be angled 'toward' each other to a desired degree." *Id.* at M03094. Ergotron asserts that the "booking" feature of the E-Book became highly material during prosecution as a result of these inclusions.[8]

As discussed above, there was evidence to suggest that the E-Book was not "ready for patenting" because it never sufficiently embodied material portions of the invention that Moscovitch envisioned and was hired to design. Rather, the E-Book's "booking" feature, on which Defendants base their argument, was never fully reduced to practice. All witnesses testifying about the E-Book ultimately conceded that the limitation of the E-Book prototype was that the displays would not hold their angle. TT 11/10/08 p.m. (Moscovitch) 43:12-17; TT 11/17/08 a.m. at 157:22-158:12 (Roarty); TT 11/17/08 p.m. at 15:16-22 (Duffy). Thus, the feature of the E-Book that Defendants proclaim made the invention material, never operated as envisioned or expected because of a flaw in the design. Again, Defendants attempt to use the conception of how the E-Book should have operated, rather than what was actually designed in order to stress its materiality. Even if the E-Book was prior art, its materiality was very low in light of the '978 patent's amended claim language that booking "permit[s] the displays to be angled toward each other to a desired degree." The evidence reflected that the E-Book never achieved that result.

**Intent**

Regardless of the materiality of the E-Book, the evidence showed that Moscovitch never

---

[8] Defendants also argue that the E-Book was material because it anticipated the '978 patent. The argument is extremely disingenuous considering that Defendants conceded at trial that the E-Book did not anticipate the patent. *See* TT 11/18/08 a.m. at 132:12-133:44, 134:22-135:2.

formed the requisite intent to deceive the PTO.  A lesser showing of materiality requires a greater showing of intent.  *See Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006).  In order to create an inference of deceptive intent, Defendants must prove that Moscovitch knew or should have known of the E-Book's materiality.  *Praxair*, 543 F.3d at 1313-1314.

Moscovitch maintained that the E-Book was a failed prototype because the booking feature never worked, it never passed radiation testing required for sale, and it had various other mechanical and electrical problems.  TT 11/18/08 23:7-24:15.  All of these statements were corroborated by either documentary evidence or defense witness testimony.  The best evidence that Defendants presented to rebut Moscovitch's claim was his manufacture of E-Book bases for Electrohome.  However, it is undisputed that during this very same time period Moscovitch, Electrohome, and Bloomberg were attempting to solve the radiation problem and Moscovitch was providing parts for this purpose.  *See* Plaintiffs' Exhibit 319, 499, 1002.  Defendants' evidence of Moscovitch's intent also relies heavily on the Bloomberg "purchase orders" previously discussed.  As mentioned, the Defendants failed to present clear and convincing evidence that the "purchase orders" constituted a true sale or offer for sale or that Moscovitch had knowledge of any public use, sale, or offer for sale of the E-Book.

Further, Defendants contend that Moscovitch's knowledge of advertisements about the E-Book constituted knowledge that the E-Book had become prior art.  *See* TT 11/12/08 a.m. 131:24-133:7, Defense Exhibit 1072, 1074.  There was trial testimony that Bloomberg was active in advertising the up-and-coming E-Book.  Moscovitch was instrumental in designing computer graphic images of a finished E-Book in order to include in advertisements.  However, Mass does not dispute that Moscovitch wanted the E-Book to go to market.  Rather, in this context, the issue of

intent focuses on whether Moscovitch knew that the E-Book was a completed invention that was offered for sale, sold, or publicly used prior to the critical date.  Here, the advertisements and Moscovitch's involvement with them evidence only an inventor's excitement and intention to market an as-of-yet incomplete and unmarketable concept. *See* TT 11/18/08 p.m. at 33:8-34:14.  Defendants have not presented clear and convincing evidence that the Moscovitch participated in or had knowledge of the public use, sale, or bona fide offer for sale of the E-Book.

Finally, as general evidence of good faith, Mass urges that Moscovitch disclosed various items of prior art to the PTO as soon as they came to his attention.  *See* Defendants' Exhibit 221 (IDS dated 08/30/1999); Plaintiffs' Exhibit 928 (Background Section).  In response, Defendants argue that communications with the PTO ought to have reminded Moscovitch that the E-Book existed and that his failure to disclose the E-Book in these communications constituted bad faith.  Defendants' argument misses the central issue.  Moscovtich disclosure statements to the PTO revealed clearly relevant prior art patents.  Defendants' argument suggests that mere evidence of non-disclosure of the E-Book also constitutes evidence of bad faith.  It does not.  Rather, the disclosure statements reflect Moscovitch's awareness of his duty to disclose known prior art and his attempt to comply with that duty no matter the potential harm that the prior art may have had on his pending applications.  The entire record indicates that Moscovitch erred only in appreciating the potential materiality of the E-Book. Such evidence does not reflect a specific intent to deceive. *Abbott Labs.*, 544 F.3d at 1353.  Defendants have failed to present clear and convincing evidence of Moscovitch's deceptive intent.

Defendants also allege that Moscovitch made false statements in his reissue application.  After a review of the record, Defendants have failed to present clear and convincing evidence that

Moscovitch made any materially false statements to the PTO with the intent to deceive. Consequentially, the Court does not find that Mass's damages award is barred on the basis of inequitable conduct.

### Defendants' Affirmative Defense of Laches

Defendants next contend that Mass's damage award should be barred on the basis of equitable estoppel or that laches bars any damages prior to Mass's filing suit. The basis for these arguments is Mass's alleged delay in filing suit after accusing defendants Ergotron and Dell of infringement.

"Laches focuses on the dilatory conduct of the patentee and the prejudice which the patentee's delay has caused." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1031-32 (Fed. Cir. 1992). To prove a defense of laches, Defendants must establish that 1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant" and 2) "the delay operated to the prejudice or injury of the defendant." *Id.* at 1032. There is generally a six year presumption of delay and prejudice starting from the time a patent owner knew or should have known of the accused infringement. *Id.* at 1035-36. Here, both parties agree that the delay was shorter than six years. Therefore the Defendants have the burden of proving both factors.

As discussed, trial evidence revealed that Mass first informed Ergotron of potential infringement on May 25, 2001 and Dell in August 2001. Plaintiffs' Exhibits 61, 124. Ergotron responded to these allegations, but never directly requested further information. *See* Defendants' Exhibit 176. Rather, Ergotron noted that it had patents on its own products and it had been marketing its products for several years. *Id.* Dell was dismissive of the allegations and instructed

26

Mass to address any concerns of patent infringement to Ergotron because Dell was "just a reseller." Defendants' Exhibit 24.   During this time period Mass was establishing a business relationship with Dell.   TT 11/19/08 p.m. 18:9-20.   Also during this time, and regardless of Mass's warnings, Dell continued to sell Ergotron products. Mass's relationship with Dell lasted six years.   Shortly after that relationship ended, Mass filed suit on July 7, 2006 against Ergotron and Dell.

Mass certainly delayed in filing suit against Ergotron, however the evidence shows that any delay regarding Dell was the result of ongoing negotiations to sell Mass's products.   *See A.C. Aukerman*, 960 F.2d at 1033 (holding negotiations with the accused a sufficient justification for delay).   Ergotron points to the delay itself along with its lack of communication with Mass to suggest the delay was unreasonable and inexcusable.   Along with Mass's ongoing negotiations with Dell, there was evidence that other companies were in negotiations with Mass to settle any potential disputes concerning the '978 patent.   The response to Mass's May 25, 2001 letter and trial testimony suggest that Ergotron believed that it did not infringe the '978 patent in 2001.   *See* TT 11/18/08 p.m. at 6:7-8:2.   Finally, the jury finding of willful infringement balances the equities against a finding that Mass's delay was unreasonable and inexcusable.   This is not a case where the "patentee [] intentionally [lay] silently in wait watching damages escalate . . . ."   *A.C. Aukerman*, 960 F.2d at 1033.   Rather, here the infringer had notice and, after consideration of the accused product (and other products), decided that they would proceed with the sale of those products regardless.

Also for this reason, Ergotron's claims of economic prejudice are equally unpersuasive.   The evidence is overwhelming that Ergotron continued to infringe because of normal economic pressure and not an avoidance of potential liability.   *See* TT 11/18/08 p.m. at 6:7-8:2, 18:3-11, 14:21-16:9, Plaintiffs' Exhibit 1321.   Further, Ergotron claims evidentiary prejudice because of Ergotron's

27

founder's death in 2004 and the intervening loss of several notebooks and files evidencing the inception and prosecution of the patented invention.  However, besides the death, Ergotron presents no evidence of when any of these notebooks or files were lost.  Specifically, Ergotron does not claim that any of this evidence went missing during the period of delay, nor have they alleged any specific evidence from Ergotron's founder that was not presented by other witnesses at trial.  Given these deficiencies and Defendants' able and thorough presentation of evidence at trial, the Court does not find that Defendants were unable to present a "full and fair defense."  *A.C. Aukerman*, 960 F.2d at 1033.  Defendants' request for relief based on laches is denied.

### Equitable Estoppel - '978 Patent

Next, both Mass and Defendants contend that the other side should be equitably estopped from asserting its patent.  Defendants assert that Mass's unreasonable delay caused a reasonable belief that Mass had acquiesced to its infringement.  Mass asserts that its course of dealing with Dell created a reasonable belief that Dell would not assert its '170 patent against Mass.  Equitable estoppel is a complete defense to patent infringement.  *A.C. Aukerman*, 960 F.2d at 1041.  To prove equitable estoppel a party must show: (1) the inventor or owner of the patent communicated in a misleading way that it would not sue the defendant; (2) the defendant substantially relied on the misleading conduct to its detriment; and (3) the defendant would be materially prejudiced if the suit were allowed.  *Id.* at 1042-43.  Unlike laches, no presumption arises for a length of delay.  *Id.* at 1043.  Silence may be included within the definition of "misleading conduct" but the "inaction must be combined with other facts respecting the relationship or contacts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned."  *Id.* at 1042.

Ergotron and Dell assert that Mass's warnings of infringement in 2001, coupled with a five

28

year silence, constitutes grounds for equitable estoppel. However, Defendants do not present any further evidence of communications from Mass that indicate that they should reasonably believe Mass had decided not to pursue its patent infringement.[9] Defendants attempt to suggest that their requests for more information were ignored by Mass and that inaction constituted grounds for equitable estoppel. However, Ergotron failed to produce evidence that it requested more information from Mass and neither Dell or Ergotron's response to Mass's claims of infringement indicate that they took Mass's infringement claims seriously. Defense Exhibit 24, 175; TT 11/18/08 p.m. at 6:7-8:2. There is no evidence that Dell and Ergotron were "lull[ed] . . . into a sense of security" by Mass's silence. *See A.C. Aukerman*, 960 F.2d at 1041; *see also TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 583 (E.D. Tex. 2007) (Clark, J.) (holding that enforcement letter, then silence for 6 years was insufficient to raise claim for equitable estoppel). Rather, the evidence strongly suggests that Dell relied on its indemnity agreements with its manufacturers and Ergotron relied on its own opinion (that was never disclosed to Mass) of non-infringement in continuing to manufacture and sell the accused products. Thus, Mass's conduct was not particularly misleading, and Defendants did not substantially rely on Mass's silence in continuing their business activities. Defendants' claims of equitable estoppel are denied.

---

[9] This series of communications are readily distinguishable from the communications in *Scholle Corp. v. Blackhawk Molding Co., Inc.*, 133 F.3d 1469 (Fed. Cir. 1998). In *Scholle*, there were continuous communications between the parties for 3 1/2 years regarding the patent-in-suit. *Id.* at 1472. Though there was never an accusation of the particular accused products, the parties continuously discussed collateral litigation involving the same patent. *Id.* The silence regarding the accused product followed an affirmative, and by no means unclear, statement by the defendant to the plaintiff that they would consider the accused product non-infringing unless otherwise informed. *Id.* The court found that a direct statement to that effect created a duty to speak and that the continuous breach of that duty over a course of 3 1/2 years created a reasonable inference that the plaintiff would not assert its patent over the accused product. *Id.* The communications from the Defendants in this case were far more ambiguous than in *Scholle*. As a whole, the Court can find no collective conduct by Mass that created a duty to speak or that would reasonably have led Defendants to believe it would not enforce its patent.

*Equitable Estoppel* – '170 Patent

On the other hand, Mass's claim of equitable estoppel against Dell is based on affirmative, long term, and misleading conduct.[10]   The following facts are undisputed.   Dell and Mass had a six year relationship from 2000 to 2006.   The '170 patent was listed as prior art on the face of the '978 patent.   Dell was well aware of Mass's products as well as its own '170 patent.   TT 11/13/08 a.m. at 121:11-16, 123:25-124:2-6.   Dell never mentioned or asserted the '170 patent during its relationship with Mass.   TT 11/13/08 a.m. at 119:21-120:9 (Garrana), 88:1-5 (Moscovitch).   During this time, Dell sold Mass's infringing products.   *Id.* at 86:8-18.   At the least, Dell had knowledge that Mass was selling its products to third parties and never objected.   TT 11/14/08 a.m. at 62:25-63:11. In fact, rather than instructing Mass to stop selling to third parties, Dell asked Mass to raise its third party price in order to incentivize Mass's customers to purchase the products through Dell.   TT 11/14/08 a.m. at 69:22-71:17 (Mathradas).   In response to Dell's encouragement, Mass paid marketing fees to Dell, manufactured to Dell's specifications, hired employees to manage its account with Dell.   TT 11/19/08 a.m. at 64:8-13, TT 11/12/08 a.m. at 18:19-23, 15:16-23.   Additionally, there is no dispute that Dell's backing led to significant expense by Mass in an attempt to create tooling for its products and fill Dell's purchase orders.   TT 11/10/08 p.m. at 131:13-135:13; Defense

---

[10] Prior to trial, Mass emailed Defendants and the Court announcing that "Mass has elected to defend the counterclaim on the '170 patent solely on the basis of its implied license defense.  We give this information in anticipation of any preliminary remarks that the Court may choose to give to the panel."  Dell now argues that Mass has waived equitable estoppel as a defense because of this communication.  Dell also alleges that it did not object at trial because Mass produced the same evidence for implied license as equitable estoppel.  Therefore, Dell argues, it was without notice of Mass's "resurrection" of the defense of equitable estoppel.  However, Mass presented evidence relevant to equitable estoppel during the bench trial after the jury was deliberating on implied license.  Dell did not object to this evidence.  Additionally, Dell has not shown prejudice or explained what evidence it has been unable to present.  Finally, it was unreasonable for Dell to conclude that Mass had waived an equitable defense several days before trial by e-mail and only by implication.  This is especially true when the communication specifically refers to jury panel instructions.

Exhibit 69.  Testimony elicited by Dell confirms that Dell's involvement with Mass had an impact on Mass's sales and exposure to third parties.  TT 11/18/08 a.m. at 5:22-6:3, 42:17-19, 69:11-70:7. Finally, there is no dispute, as Mass conceded for trial, that Mass's products clearly infringe the '170 patent.  In fact, Dell has requested a $250,000 per year ongoing flat royalty for infringement and alternatively, a permanent injunction.  There is no question that either of these requested remedies would work a material prejudice upon Mass by crippling its business.

Dell responds to allegations of affirmative encouragement by arguing that its silence respecting the '170 patent, without more, could not constitute grounds for estoppel.  Dell's general proposition is correct, however as distinguished from Defendants' claims of equitable estoppel, there is evidence of affirmative conduct that led Mass to believe that Dell would not assert its patent rights.  Dell both encouraged sales through itself as well as to third parties.[11]  Certainly a six-year course of dealing concerning an infringing product between the patentee and the infringer is sufficient to prove non-assertion of a patent.  *See Scholle*, 133 F.3d at 1472 ("[W]hen the course of dealings between a patentee and an alleged infringer is such that the alleged infringer reasonably infers from the patentee's misleading conduct or inaction that the patentee has waived its patent rights, then the first element of equitable estoppel has been established absent a statement to the contrary by the patentee.")

On the issue of reliance, Dell cites several cases that hold that there is no reliance where a

---

[11] Dell asserts that it should not be barred by equitable estoppel from asserting its patent rights against Mass as to third parties while admitting, as it must, that it is barred from asserting its rights for infringing products that it resold.  Dell reasserts this argument as to every element of Mass's claims for equitable estoppel and implied license.  However, nowhere has Dell pointed to authority that allows it to encourage infringement as long as the patent holder is profiting while secretly reserving the right to assert a patent as to sales to third parties that it both knows about and encourages.  Rather, "[w]here equitable estoppel is established, all relief on a claim may be barred."  *A.C. Aukerman*, 960 F.2d at 1041.  Furthermore and as recounted above, Mass can establish the elements of equitable estoppel as they stem from the reasonable inference that Dell would not enforce the '170 patent *as to third parties*.

defendant continues infringing because of a belief of non-infringement rather than a misrepresentation by the patentee. *See, e.g.*, *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 879 (Fed. Cir. 1991). These cases are inapplicable to this situation, where Dell affirmatively encouraged Mass to sell its products through Dell and to third parties. The reliance, in this instance, stems from Dell's encouragement to infringe its patent. As Dell points out, Dell did not seek damages for sales made through Dell. Had Dell informed Mass that it would enforce the '170 patent, then Mass would have clearly understood, from the time of its relationship with Dell, that it would be unable to deal with other companies without consulting with Dell or incurring liability for infringement. Rather, trial testimony indicates that Mass relied on Dell's encouragement of third party sales by reaping the economic benefits of increased exposure, marketing, and increased economies of scale stemming from the Dell relationship.

Dell urges that Mass could not have relied on Dell's encouragement because infringement to third parties began before Mass's relationship with Dell. This argument misses the point. The critical "reliance" occurs as a response to the patentee's conduct. Therefore, the infringer's conduct prior to the representation is irrelevant. Here, the "misrepresentation" occurred when Mass began its relationship with Dell. During this time, the evidence reveals that a significant portion of Mass's sales were to third parties. Plaintiffs' Exhibit 1225; Defendants' Exhibit 693. Dell further argues that Mass's continued sales following the relationship with Dell and Dell's eventual counter-claim evidences Mass's non-reliance.[12] To the contrary, Mass has withheld delivery and manufacture on a 4 million dollar purchase order pending the resolution of this suit. TT 11/12/08 a.m. at 45:21-47:18. Additionally, the fact that Mass has continued engaging in business does not rebut the

---

[12] Dell has only accused Mass of infringement for sales of Mass's products in and after 2006.

32

reliance that occurred during the Dell-Mass relationship (and thus during the misrepresentation) that is relevant to the estoppel analysis.

Finally, Dell contends that Mass's lofty sales goals prior to its relationship with Dell preclude a finding of material prejudice.  However, as previously noted, the undisputed evidence reflects that Mass's involvement with Dell directly led to the marketing, manufacture, and sale of Mass's products through Dell and to third parties.  Plaintiffs' Exhibit 1225; Defendants' Exhibit 693.  This is not a case where mere "business judgment" led to the continued practice of the infringing product.[13]  Rather, Dell's conduct lulled Mass "into a sense of security in going ahead [with selling to third parties]."  *See A.C. Aukerman*, 960 F.2d at 1042.  Dell's encouragement, without any reservations, had a severe and lasting impact on Mass's business practices.  To allow Dell to collect damages now would be inequitable and result in material prejudice to Mass.  Thus, Dell is equitably estopped from asserting its '170 patent against Mass.

## MASS'S MOTIONS FOR POST-TRIAL RELIEF

### *Mass's JMOL - Implied License*

Mass also moves for JMOL on its affirmative defense of implied license.  The same undisputed facts leading to a finding of equitable estoppel strongly suggest the existence of an implied license.  However, the jury found that Mass did not have an implied license to practice the '170 patented invention.  Therefore, the verdict may not be disturbed unless a "reasonable jury would not have a legally sufficient evidentiary basis to find [an implied license].'"  *Kinetic Concepts*, 554

---

[13] *See Gasser Chair Co., v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 775 (holding that an expansion of business during a period of delay along with Defendants' dismissal of Plaintiffs' charges of infringement during the delay constituted reliance on business judgement by the defendant and thus defeated the reliance element of equitable estoppel).

F.3d at 1017.

In this context, equitable estoppel and implied license are related.  Generally, "courts and commentators relate that implied licenses arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel." *Wang*, 103 F.3d at 1581. "The primary difference between the estoppel analysis in implied license cases and the analysis in equitable estoppel cases is that implied license looks for an affirmative grant of consent or permission to make, use, or sell: i.e., a license." *Id.*  On the other hand, estoppel requires "misleading" conduct. *Id.*  However, in the typical estoppel case it is unreasonable delay by the patentee that "misleads" the infringer into believing that patent rights will not be asserted.  This case is atypical.  The "misleading" conduct here stemmed from affirmative conduct allowing and encouraging the infringer to continue infringing.  In both cases, the infringer is misled into believing that the patentee has forsaken his patent rights.  However, in contrast with an estoppel case on the basis of silence, the affirmative acts and "course of conduct" between the parties in this case suggest an implied license as well. *See id.*; *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241 (1927).

In *Wang*, the Federal Circuit approved a five part test for determining the existence of an implied license: 1) there was an existing relationship between the patentee and infringer; 2) within that relationship the patentee transferred a right to use the patented invention to the patentee; 3) the right was transferred for valuable consideration; 4) the patentee has now denied the existence of the right; and 5) the patentee's statements and conduct created the impression that it consented to the accused infringer making, using, or selling the patented invention.[14]  *Wang*, 103 F.3d 1576,1579.

---

[14] This is the same five-part test contained in Dell's proposed jury instructions and ultimately given to the jury.

34

As an initial matter, Dell argues that Mass had to prove that it granted Mass a license specifically to sell to third parties because Dell did not seek damages against Mass for infringement. In essence, Dell seeks to bifurcate its right to sue on the '170 patent between itself and third parties. The authority is directly contrary to Dell's position.  In *Wang*, the plaintiff initiated a relationship with the defendant in order to induce the defendant to make memory chips, but allow the plaintiff to assemble them into memory cards ("SIMMs") and sell them.  *Id.* at 1575.  Instead, the defendant assembled the SIMMs itself and sold them to the plaintiff *as well as third parties*.  *Id.*  The Federal Circuit made no distinction between an implied license granted to the patentee and one granted to third parties.  Regardless, in this case the "implied right" transferred by Dell's conduct included both itself and third parties.

In regard to the first element, the undisputed evidence is that Dell and Mass had an ongoing relationship between 2000 and 2006.  Dell argues that the infringement must have occurred during this time, or that there must have been a relationship especially regarding third party sales.  However, these requirements do not appear in *Wang*, Defendants' proposed jury instructions, the final jury instructions, nor does Dell point to any authority supporting its position.  All that is required to prove the first element is a relationship between the parties.  The undisputed evidence clearly indicates that there was.  The first element is met.

The second element requires that a right was transferred between the patentee and infringer. The undisputed evidence showed that Dell resold Mass's infringing products, showed Mass's products along with its products at trade shows, and asked Mass to increase its third-party price to conform with Dell's price.  Moscovitch expressly testified that he wanted an exclusive relationship, but that Dell insisted that he sell to third parties.  TT 11/10/08 p.m. at 146:20-147:2.  There is no

35

testimony from Dell witnesses rebutting Moscovitch's testimony.  The only rebuttal evidence that Dell points to is Moscovitch's own testimony that the infringement of Dell's patents began before Mass's relationship with Dell.  As previously discussed, that the infringement begin during the relationship is not a requirement of implied license.  Therefore, Dell's encouragement of Mass's sales through it and to third parties was supported by Dell's representatives as well as Moscovitch. Dell presented no conflicting evidence on this point.  For this reason, the second element is met.

The third element requires consideration.  Dell admits in its response, that it received a profit for Mass's sales through Dell, was paid by Mass to market to third parties through the Dell website, and received a discounted "reseller" price from Mass.  Dell's Response to Plaintiffs' Motion for Post-Trial Relief, 2:06-cv-272, Docket No. 685 at 5.  These admissions conform with the evidence. *See* TT 11/10/08 p.m. at 129:12-130:14; TT 11/18/08 a.m. at 62:5-24, 67:1-7, 66:4-67:23; TT 11/13/08 a.m. at 86:8-87:12; Plaintiffs' Exhibit 115.  Under *Wang*, this consideration alone is more than sufficient to constitute valuable consideration. *Wang*, 103 F.3d 1576,1579.  Dell characterizes Mass's advertising on Dell's website as strictly advertising to "Dell customers."  However, there is no dispute that Dell placed Mass products alongside Dell's both on the internet and at trade shows that catered to third parties.  There was no evidence that Dell required third parties to buy only through Dell or required Mass to sell only through Dell.  Dell marketed Mass's products to third parties and received consideration for doing so.  Since this evidence went unrebutted at trial, the third element of implied license is met.

Dell clearly contests that it granted a right to Mass.  The fourth element is met.  The fifth element requires that the patentee's statements and conduct create the impression of consent to making and using the patented product.  There is no dispute that Dell initiated the relationship with

Mass.  Dell marketed and sold Mass products.  Dell does not present or point to any contrary evidence.  Rather, Dell argues again that Mass's infringement prior to its relationship with Dell proves that Dell did not "cause" the infringement.  Again, Dell has pointed to no authority requiring the infringing conduct begin only after the relationship with the patentee begin.  There is no dispute that Dell led Mass to build infringing products, marketed Mass to third parties, sold Mass's infringing products, and despite Dell's knowledge, involvement, and power to restrict the practice, Mass sold products to third parties.  Dell presents no evidence to the contrary.  Given the undisputed facts, the fifth element is met.  JMOL is granted in favor of Mass on the issue of implied licence.

As a result of the Court's findings regarding equitable estoppel and implied license, Dell's motion for a permanent injunction or ongoing royalty, Mass's motion for JMOL regarding willfulness, Dell's motion for enhanced damages, and Dell's motion for attorneys' fees are denied as moot.

### Attorneys' Fees, Costs, and Enhancement Damages for Willfulness

Mass seeks attorneys' fees, costs, and an enhancement for willfulness.  Its arguments are based on the "egregiousness" of Defendants' conduct as well as various allegations of litigation misconduct.

Attorneys' fees and costs may be awarded in "exceptional cases" to the "prevailing party." 35 U.S.C. § 285.  Plaintiffs argue that an award of fees and costs are appropriate because of a finding of willfulness alone.  However, "exceptional cases" may, but are not required to, include the jury's finding of willfulness.  *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 518 F. Supp. 2d 876, 895 (S.D. Tex. 2007) (citing *Avia Group Int'l, Inc. v. L.A. Gear Ca., Inc.*, 853 F.2d 1557, 1567 (Fed. Cir. 1988)).  "The decision to increase damages is committed to the discretion of the trial judge . . . ."

*Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990).  However, in cases where there has been an express finding of willfulness, the trial court must, in denying attorney fees, "explain why the case is not 'exceptional' within the meaning of 35 U.S.C. Section 285."  *Id.*

In addition, a court may in its discretion enhance damages up to three times when there is a finding of willful infringement or bad-faith on the part of an infringing party.  35 U.S.C. § 284; *see SRI Int'l, Inc. v. Advanced Techs. Labs., Inc.*, 127 F.3d 1462, 1468-69 (Fed. Cir. 1997).  "Bad faith" in this context refers to an infringer's lack of due care with regard to avoiding infringement and is more properly called "bad faith infringement."  *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1571 (Fed. Cir. 1996).  Although "bad faith" acts such as litigation misconduct are not sufficient alone to support an enhancement of damages, assuming the requisite culpability is present, such acts can be considered in determining whether to award enhanced damages and how much to award.  *See id.* at 1570-71.  A finding of willful infringement provides sufficient culpability to justify the enhancement of damages under § 284.  *See id.* at 1571, 1573.

Enhanced damages are a punitive measure taken by a court to penalize a willful infringer for his or her increased culpability.  *See id.* at 1570.  However, a court can refrain from awarding enhanced damages in light of a finding of willfulness based on the weight of the evidence supporting willfulness and the closeness of the issues at trial.  *See Brooktree Corp. v. Advanced Micro-Devices, Inc.*, 977 F.2d 1555, 1582 (Fed.Cir.1992); *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997).  "The paramount determination in deciding enhancement and the amount thereof is the egregiousness of the Defendants' conduct based on all the facts and circumstances."  *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992), abrogated on other grounds by *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed. Cir. 1995) (en banc).  Factors courts consider in

deciding whether to enhance damages and the amount of enhancement include: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) Defendants' size and financial condition; (5) closeness of the case; (6) duration of Defendants' misconduct; (7) remedial action by the defendant; (8) Defendants' motivation for harm; (9) whether defendant attempted to conceal its misconduct.  *Id.* at 827.

This was an extremely close case.  Defendants presented compelling and credible evidence on nearly every issue.  The jury deliberated for seven and a half hours and, at one point, expressed their deadlock regarding the issue of infringement.  Jury Note No. 5, 2:06-CV-272, Docket No. 659. In light of the competing evidence, willfulness and many other issues were a product of the jury's credibility determinations.

Mass presented evidence that Ergotron had access to the Mass's design and wished to compete with Mass.  There was competing evidence that Ergotron independently designed its multi-monitor stands and even entered the market before Mass.  Ergotron clearly knew of Mass's patent, but communications between the parties were ambiguous and unclear.  Mass accused different products than the infringing products in May 2001.  Though there is evidence that Ergotron did an independent analysis of the accused products in 2001, Ergotron never communicated its position of non-infringement clearly to Mass.  Dell and Mass never had meaningful negotiation over the '978 patent.  Mass did not re-initiate contact with Ergotron until this suit was filed.

There is no dispute that Ergotron has redesigned its infringing product since the start of the litigation (but not definitively as a result of the litigation).  There was no evidence that Ergotron or

Dell ever attempted to conceal its infringement from Mass.   While the evidence that a true "infringement analysis" was done on Ergotron's products strains credibility, there is also fairly weak evidence that Dell or Ergotron were motivated by a specific intent to steal Mass's patented invention. *See* TT 11/14/08 a.m. 140:22-141:1; 144:22-24; TT 11/18 p.m. at 6:11-23; 7:8-8:2.   Rather, the evidence suggested that defendants used their business judgment to continue infringing despite the '978 patent.   Counterbalancing this fact was Mass's delay in bringing this lawsuit against Dell and Ergotron.   A delay that is insufficient to prove latches, may weigh against a finding of an "exceptional case."   *See Loral Corp. v. B.F. Goodrich Co.*, 1989 WL 206377 (S.D. Ohio 1989), judgment rev'd on other grounds, 899 F.2d 1228, 15 U.S.P.Q.2d (BNA) 1396 (Fed. Cir. 1990).   Thus, the factual circumstances do not warrant an enhancement of damages or a finding of an "exceptional case."

Additionally, Mass points to a laundry list of litigation misconduct that allegedly supports a finding of enhanced damages and an "exceptional case."   However, a review of these allegations reveals that the Court has considered, ruled on, and provided a remedy for the vast majority of these instances.   For instance, Mass requested and received an adverse inference instruction as a result of some evidence of Defendants' non-production of documents.   Mass was also allowed to question witnesses extensively on document production. *See, e.g.*, TT 11/14/08 a.m. at 151:9-152:18; 153:13-24.   The jury was able to consider Mass's evidence of spoliation and non-production and incorporate their inferences into their verdict.

Mass was also granted discovery sanctions on various occasions. *See, e.g.*, Memorandum Opinion and Order, 2:06-CV-272, Docket No. 617 (Oct. 31, 2008).   Basing an enhancement or award of attorneys' fees on misconduct that has previously been sanctioned would be unnecessarily

40

cumulative and inequitable.   Furthermore, Mass has engaged in similar misconduct.   *See* Memorandum Opinion and Order, 2:06-CV-272, Docket No. 195 (Jan. 8, 2008).   After review of the remainder of the allegations of misconduct, none of them are particularly egregious or overwhelmingly supported by the evidence.   Ultimately, Mass does not persuasively show that it has been prevented from fairly trying its case or that Defendants have been malicious or frivolous in defending it.   Mass's allegations of litigation misconduct do not warrant an enhancement or a finding of an "exceptional case."   Because the *Read* factors weigh in opposition to enhancement and Mass's allegations of litigation misconduct do not support enhancement, no enhancement is warranted based on the jury's willfulness finding.   *See Modine*, 917 F.2d at 543.   For the same reasons, this is not an "exceptional" case under § 285, and an award of attorneys' fees and costs are not warranted.   *See id.*

### Mass's Motion for New Trial on Damages

Mass next moves for a new trial strictly on the issue of damages.   Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which new trials have heretofore been granted in actions at law in courts of the United States."   "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir.1985).

The damages questions in the verdict form instructed the jury as follows:

> 4.      What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Plaintiffs for Defendants' infringement of the '978 patent?
>
> 5.      Of the total damages awarded in Question 4 please list the amount, if

41

any, attributable to each defendant listed below.

**Please note, the total of the sums listed below may exceed the total infringement damages found by you in Question 4, because the same infringement damages can be attributable to more than one defendant.  The amounts found by you in this Question may be used by the Court to apportion damages between the Defendants, but in no event will Plaintiffs recover damages in excess of the total damages found by you in answer to Question 4.**

The jury answered Question 4 in the amount of $3,000,000.  The jury answered Question 5 by apportioning 1.5 million to Ergotron and 500,000 to each of the other Defendants.

Mass and Mass's expert argued damages to the jury on the basis of a theory of joint and several liability.  According to Mass and its expert, since Ergotron produced all of the infringing products, it was responsible for 100% of the damages.  Each of the reseller defendants would be apportioned a pro rata amount of these damages depending on how many infringing products they resold. *See* TT 11/14/08 p.m. at 87:16-22, 88:4-15, 88:22-24.  Because the jury clearly did not follow this damages model, Mass now claims that the damage award is unsupported by the evidence, and a new trial on damages is warranted.

Juries are not constrained to award the amount of damages requested.  Rather "[a] jury's choice simply must be within the range encompassed by the record as a whole." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir.1995) Here, there was enough evidence to support the jury's damages award.  While Mass proposed a "lost profits" damages model, Defendants' damages model was based upon a reasonable royalty resulting from a hypothetical negotiation between the parties.  TT 11/17/08 p.m. at 143:8-11; 159:17-21.  Defendants' damages expert, Carol Ludington, suggested that there was a range of amounts between zero and 6 million that would constitute a reasonable royalty award.  Defense Exhibit 1466.  Importantly, she explained that "if the

42

jury wanted to pick one of those numbers [within the range] instead of the number I think is the best one, I think those would all be reasonable." *Id.*; TT 11/17/08 p.m. at 164:23-168:3.  The jury chose a number at the midpoint of the range provided by Ludington.

Finally, the verdict form was clear that the jury was not required to apportion damages based upon Mass's theory.  The jury was instructed that "sums listed below *may* exceed the total."  The jury was also entitled to apportion damages based on a hypothetical negotiation between Mass and each of the Defendants.  *See Unisplay*, 69 F.3d at 517; *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.1970).  Evidence relevant to a number of the *Georgia Pacific* factors was presented throughout the trial and summarized by Ludington's testimony.  The jury award is supported by the record as a whole.  Thus, Mass's motion for a new trial on damages is denied.

## PERMANENT INJUNCTION

Mass moves for a permanent injunction enjoining all Defendants from making, using, selling, or offering to sell any products infringing the '978 patent in the future, including but not limited to the accused products in this case, and equivalents thereto.  In determining whether to issue a permanent injunction in patent cases, courts apply the four factor test provided for in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).  A party is entitled to a permanent injunction only if: "1) [the party] has suffered an irreparable injury; 2) that remedies at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the [parties], a remedy in equity is warranted; and 4) that the public interest would not be disserved by a permanent injunction."  *Id.* at 391.  The Supreme Court held "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that

such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.* at 1841.

Mass has shown that it was irreparably injured and that monetary damages, such as royalties, would be insufficient to compensate the injury.  It is uncontested that Mass's primary business is practicing the '978 patent.  The trial testimony is overwhelming that Ergotron is a direct competitor to Mass.  TT 11/10/08 p.m. at 10:19-22; TT 11/1208 a.m. at 40:9-17; TT 11/13/08 a.m. 35:2-7, 40:14-41:1, 103:5-8.  The fact that there is direct competition in a markplace weighs heavily in favor of a finding of irreparable injury.  *See Brooktrout, Inc. v. Eicon Networks Corp.*, 2:03-CV-59, 2007 WL 1730112, at *1 (E.D. Tex. June 14, 2007) (Ward, J.).  Mass has previously lost significant market share based on the sale of infringing products.  TT 11/14/08 p.m. at 65:18-66:16.  This is partly because the evidence suggests that customers in the dual-display market make subsequent, high-volume purchases following any initial purchase.  Plaintiffs' Exhibits 321, 331, 466.  These marketplace conditions tend to lead to an ongoing and compounding loss of market share when direct competitors continue to sell infringing products.  Thus, money damages, or a royalty will be insufficient to compensate for the loss of ongoing customer goodwill.  *See Tivo v. EchoStar Comm. Corp.*, 446 F. Supp. 2d 664, 669 (E.D. Tex. 2006) (Folsom, J.), *rev'd on other grounds*, 516 F.3d 1290 (Fed. Cir. 2008) (explaining that so called "sticky customers" continually shaped the market to patentee's disadvantage).

The balance of hardships favors Mass.  Mass is engaged predominantly in the single stand, dual display market.  Over the years of infringement Mass's sales have steadily declined concluding in a sharp dip after the termination of its relationship with Dell.  TT 11/14/08 p.m. at 65:18-99:16. Ergotron has redesigned its products to non-infringing configurations and have benefitted from years

44

of exposure and market share.  *See* TT 11/10/08 a.m. at 101:5-6.  Allowing even the possibility of

continued infringement would undoubtedly further restrict the market for Mass's products.  The

hardship on Defendants would be negligible considering their established place in the market and

their purported intentions to discontinue all infringing products.

Finally, the public interest would be served by issuing an injunction.  Where products do not

relate to a significant compelling public interest, such as health or safety, this factor weighs in favor

of an injunction.  *See Tivo*, 446 F. Supp. 2d at 670 ("The public has an interest in maintaining a

strong patent system. . . .The infringing products are not related to any issue of public health or any

other equally key interest.").  Dual display stands relate to no key public interests or concerns.

Therefore, this factor weighs in favor of injunction.

Defendants do not contest the facts proving the necessity of an injunction.  Rather, they first

contend that there is no need for an injunction because Ergotron has stopped selling the infringing

products.  This argument is contrary to the law.  "The fact that the defendant has stopped infringing

is generally not a reason for denying an injunction against future infringement unless the evidence

is very persuasive that further infringement will not take place."  *W.L. Gore & Assoc., Inc. v.

Garlock, Inc.*, 942 F.2d 1275, 1281-82 (Fed. Cir. 1988).  Defendants have presented no evidence

besides their redesign of the infringing product that infringement may not occur in the future.  The

evidence is not so compelling as to defeat the necessity for an injunction.

Defendants also argue that it is impossible tell, by the verdict form, which products have been

found to infringe.  A general verdict form does not preclude the issuance of an injunction.  In the

case of a general verdict, the court may find facts necessary to determine the scope of the injunction.

*See United States v. An Article of Drug, etc.*, 661 F.2d 742, 746-47 (9th Cir.1981) (rejecting the

45

argument that it was "impossible to tell from the general verdict which use or uses the jury found impermissible" because "the evidence was also heard by the judge, and the judge, not the jury, determined the scope of the injunction based upon the judge's view of the facts established by the evidence"); *Burton v. Armontrout*, 975 F.2d 543, 544 (8th Cir. 1992) (accord).  Thus, in light of the evidence and in accordance with the verdict, all three classes of products represented by the DS100, DS100 Quad Horizontal and the LX should be enjoined.

Next, Defendants argue that the language of the injunction is impermissibly vague because it does not specify which particular products Defendants are enjoined from practicing.  Defendants are correct.  In order to comply with Rule 65(d) "the only acts the injunction may prohibit are infringement of the patent by the adjudicated devices and infringement by devices not more than colorably different from the adjudicated devices."  *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004).  Therefore, Mass's proposed language prohibiting "any products infringing the '978 patent . . . and equivalents thereto" is overly broad and restricts more than the devices adjudicated.  However, since the three product models at issue at trial were only representative of all the products included in the case, the Court has insufficient information before it to refashion the injunctive language.  Therefore the Court orders the parties to submit a proposed injunctive order in accordance with Rule 65(d) and these principals.  Plaintiffs' motion for an injunction is granted.

## CONCLUSION

For the aforementioned reasons Dell's Motion for Permanent Injunction or Reasonable Royalty (Docket No. 670) is **DENIED**, Defendants' Motion for Judgment as a Matter of Law ("JMOL") or New Trial (Docket No. 666) is **DENIED**, Dell's Motion for Enhanced Damages and

Attorneys' Fees (Docket No. 671) is **DENIED**, and Plaintiffs' Motion for Post-Trial Relief (Docket No. 682) is **GRANTED** in part.  Specifically, judgment as a matter of law is **GRANTED** with respect to the '170 patent on the grounds of implied license and equitable estoppel.  The Court further **GRANTS** Mass's request for an injunction and **ORDERS** that the parties submit proposed orders for a permanent injunction and final judgment consistent with this opinion by Friday, April 24, 2009.

        **So ORDERED and SIGNED this 17th day of April, 2009.**

_____
        **LEONARD DAVIS**
        **UNITED STATES DISTRICT JUDGE**